IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | **(EXPEDITED HEARING REQUESTED)** |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 4

    A.    Over the past year, under Musk's ownership, advertisements have frequently appeared on X alongside racist, antisemitic, and violent content. ..................... 4

    B.    Media Matters and Hananoki report on X's pattern of permitting the placement of advertisements alongside extremist content. ................................ 7

    C.    Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting. ............................................................................. 9

    D.    Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk. ................................................................................... 13

    E.    Plaintiffs sued Paxton to protect their First Amendment rights. ....................... 17

STANDARD OF REVIEW ........................................................................................... 20

ARGUMENT ............................................................................................................... 21

I.    This Court has personal jurisdiction over Paxton. ...................................................... 21

II.    Media Matters and Hananoki are likely to prevail on the merits of their claims. ........ 23

    A.    Plaintiffs are likely to establish that Paxton retaliated against their constitutionally protected activities in violation of the First Amendment. ...... 23

    B.    Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws. ................... 35

    C.    Plaintiffs are likely to establish that the legal process against them in Texas violates due process due to a lack of contact with that state. ........................... 39

III.    Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand. ........................................................... 40

IV.    The remaining equitable factors strongly favor granting preliminary relief. .............. 44

CONCLUSION ............................................................................................................ 45

CERTIFICATE OF SERVICE ..................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*,
  333 F.3d 168 (D.C. Cir. 2003) ...........................................................36

*Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*,
  592 F. Supp. 2d 883 (S.D. W. Va. 2009) .............................................42

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ...............................................................36, 42

*Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*,
  64 F.4th 1354 (2023) ..........................................................................24

*Anderson v. Reilly*,
  691 F. Supp. 2d 89 (D.D.C. 2010) .....................................................25

*\*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ..........................................24, 27, 28, 35

*Bice v. Bernstein*,
  No. 93-CA-22258, 1994 WL 555379 (Md. Cir. Ct. Apr. 20, 1994) ......38

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ...........................................................................39

*In re Brewer*,
  863 F.3d 861 (D.C. Cir. 2017) ............................................................20

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) ...........................................................................39

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ...............................................................................36

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ...........................................................................40

*\*Calder v. Jones*,
  465 U.S. 783 (1984) ...........................................................................22

*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) .............................................................45

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ............................................................26

*Constantine v. Rectors & Visitors of George Mason Univ*,
  411 F.3d 474 (4th Cir. 2005) ............................................................27

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ......................................................29, 31

*Coss v. Teters*,
  No. 2:23-CV-00180, 2023 WL 3470899 (S.D. W. Va. May 12, 2023)..................28

*\*Crawford-El v. Britton*,
  93 F.3d 813 (D.C. Cir. 1996) ............................................................24

*\*Def. Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ......................................................22, 23

*El Dia, Inc. v. Rossello*,
  165 F.3d 106 (1st Cir. 1999)............................................................24

*Equitable Trust Co. v. State Comm'n on Human Relations*,
  411 A.2d 86 (Md. 1979) ...............................................................38

*Experience Works, Inc. v. Chao*,
  267 F. Supp. 2d 93 (D.D.C. 2003) .....................................................21

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) .........................................................26

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
  264 U.S. 298 (1924).....................................................................37

*Flynt v. Rumsfeld*,
  180 F. Supp. 2d 174 (D.D.C. 2002) ...................................................26

*\*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)..................................................................39

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ..........................................................46

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)..................................................................39, 40

*Grunseth v. Marriott Corp.*,
  868 F. Supp. 333 (D.D.C. 1994) .......................................................38

*Hartley v. Wilfert*,
918 F. Supp. 2d 45 (D.D.C. 2013) ...................................................................27, 31

*\*Hartman v. Moore*,
547 U.S. 250 (2006)................................................................................................24

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*,
386 F.3d 1148 (D.C. Cir. 2004) .............................................................................25

*Heller v. Nicholas Appelgate Cap. Mgmt. LLC*,
498 F. Supp. 2d 100 (D.D.C. 2007) .......................................................................21

*IMAPizza, LLC v. At Pizza Ltd.*,
334 F. Supp. 3d 95 (D.D.C. 2018) ..........................................................................22

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982)................................................................................................39

*Johnson v. TheHuffingtonPost.com, Inc.*,
21 F.4th 314 (5th Cir. 2021) ..................................................................................30

*Jones v. District of Columbia*,
177 F. Supp. 3d 542 (D.D.C. 2016) .......................................................................42

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ...............................................................................45

*Klayman v. Obama*,
142 F. Supp. 3d 172 (D.D.C. 2015) ...................................................................42, 45

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) .................................................................................37

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ....................................................................................45

*Lewis v. Mutond*,
568 F. Supp. 3d 47 (D.D.C. 2021) ..........................................................................21

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
667 F.2d 267 (2d Cir. 1981)...................................................................................37

*Major League Baseball v. Crist*,
331 F.3d 1177 (11th Cir. 2003) .............................................................................37

*Marcus v. Search Warrants*,
367 U.S. 717 (1961)................................................................................................36

*Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*,
  2 F.3d 544 (4th Cir. 1993) ...................................................................20

*Menken v. Emm*,
  503 F.3d 1050 (9th Cir. 2007) ..............................................................22

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974)..............................................................................26

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)..............................................................................45

*Mouzavires v. Baxter*,
  434 A.2d 988, 993 (D.C. Cir. 1981) ......................................................23

*N.J.-Phila. Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of
  Higher Educ.*,
  654 F.2d 868 (3d Cir. 1981)...................................................................41

*NAACP v. Alabama*,
  357 U.S. 449 (1958)..............................................................................36

*Nat'l Org. For Women, N.Y.C. Chapter v. F.C.C.*,
  555 F.2d 1002 (D.C. Cir. 1977) ............................................................26

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..........................................................................1, 25

*New York Times Co. v. United States*,
  403 U.S. 713 (1971)..............................................................................41

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019)..........................................................................35

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................................................21

*Okla. Press Publ'g Co. v. Walling*,
  327 U.S. 186 (1946)..............................................................................35

*Pebble Ltd. P'ship v. EPA*,
  310 F.R.D. 575 (D. Alaska 2015) .....................................................35, 37

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2009) ..............................................................35

*Perry v. Sindermann*,
  408 U.S. 593 (1972)..............................................................................24

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
    391 U.S. 563 (1968)..............................................................................................32

*Playboy Enter. v. Meese*,
    639 F. Supp. 581 (D.D.C. 1986)........................................................................28

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
    573 F. Supp. 3d 1021 (D.S.C. 2021)..................................................................45

*\*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) .........................................................21, 41, 43, 45

*Roth v. United States*,
    354 U.S. 476 (1957)......................................................................................25, 45

*S.C. Freedom Caucus v. Jordan*,
    No. 3:23-CV-795-CMC, 2023 WL 4010391 (D.S.C. June 13, 2023) ..............29, 30

*Shoen v. Shoen*,
    48 F.3d 412 (9th Cir. 1995) ................................................................................28

*Snoeyenbos v. Curtis*,
    60 F.4th 723 (4th Cir. 2023) ...............................................................................27

*Snyder v. Phelps*,
    562 U.S. 443 (2011)............................................................................................26

*Stanford v. Texas*,
    379 U.S. 476 (1965)............................................................................................36

*Tech. Patents, LLC v. Deutsche Telekom AG*,
    573 F. Supp. 2d 903 (D. Md. 2008) ....................................................................30

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967)............................................................................................25

*\*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................26, 31, 32

*\*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) .......................................................................43, 44

*Unity08 v. FEC*,
    596 F.3d 861 (D.C. Cir. 2010) ...........................................................................44

*Urquhart-Bradley v. Mobley*,
    964 F.3d 36 (D.C. Cir. 2020)..............................................................................23

*W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) .................................................................................43

*\*Walden v. Fiore*,
    571 U.S. 277 (2014)...................................................................................22, 40

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ................................................................................26

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ..............................................................................29

*\*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................................21

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978)......................................................................................36, 37

**Statutes**

28 U.S.C. § 2201...........................................................................................................24

28 U.S.C. § 2202...........................................................................................................24

D.C. Code § 13-423(a)(1)..............................................................................................24

D.C. Code § 13-423(a)(3)..............................................................................................24

D.C. Code § 16-4702.....................................................................................................38

D.C. Code § 16-4703.....................................................................................................38

Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3)...........................................................38

Md. Cts. & Jud. Proc. Code Ann. § 9-112(c)(2)...........................................................38

Tex. Bus. & Com. Code Ann. § 17.45(6) ......................................................................17

Tex. Bus. & Com. Code Ann. § 17.46(a) ......................................................................17

Tex. Bus. & Com. Code Ann. § 17.47 .....................................................................28, 30

Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b)..............................................................17

Tex. Bus. & Com. Code Ann. § 17.62 .....................................................................28, 30

Tex. Bus. & Com. Code Ann. § 17.62(b) ......................................................................17

Tex. Bus. Orgs. Code Ann. § 9.002(a)..........................................................................17

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...............................................................................................17, 30

## INTRODUCTION

Media Matters for America ("Media Matters") and Eric Hananoki research and report on political extremism in the United States media, including on social media platforms. Their work is impactful, often at the center of a vigorous ongoing national conversation about political extremism in American public life. Plaintiffs are before this Court now because of Texas Attorney General Ken Paxton's attempts to silence Plaintiffs' speech about the world's allegedly richest man—by misusing the powers of the Texas Attorney General's Office to launch a retaliatory, unlawful investigation into Plaintiffs for their constitutionally protected research and reporting on Elon Musk and the social media platform he owns, X Corp. (formerly known as Twitter). This lawless investigation—which includes a demand that Paxton be permitted to rifle through Plaintiffs' most sensitive journalistic and organizational documents—is a frontal assault on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs seek immediate relief to safeguard their constitutionally protected speech and press rights, and their rights under the District of Columbia and Maryland reporters' shield laws, pending adjudication of their claims for permanent relief. Plaintiffs have been—and will continue to be—irreparably harmed without immediate relief.

Hananoki, a Senior Investigative Reporter at Media Matters, has investigated the dramatic rise in hateful rhetoric on X since it was acquired in late 2022 by Musk. Under Musk's ownership, content that promotes violence, white nationalism, antisemitism, and a host of baseless conspiracy theories has proliferated on the platform. With that rise in extremist content, advertisers who have seen their brands appear alongside vile hate speech on X have distanced themselves from the platform. Plaintiffs and many other media organizations have documented this trend in America's so-called digital town square for over a year.

This case arises out of Paxton's conduct following and in response to Hananoki's reporting—specifically, a November 16, 2023, article published on the Media Matters's website, titled: "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*." In that article, Hananoki reported on Musk's apparent support for a conspiracy theory that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." The article noted that at the same time Musk appeared to endorse this antisemitic conspiracy theory, X was continuing to allow advertisements to appear on the platform next to pro-Nazi content—despite X's repeated assurance to advertisers that the platform had taken measures to protect against such juxtapositions.

Under siege from a deluge of reports about both his own offensive speech and the offensive speech that continued to proliferate on his social media platform, Musk lashed out at Media Matters, threatening a "thermonuclear" lawsuit in response to Hananoki's article. Certain politicians and media figures rallied to Musk's cause, but none more enthusiastically than Paxton, who on November 20, 2023—within minutes of Musk's suing Plaintiffs—announced he was launching an "investigation" into Media Matters under Texas's deceptive trade practices act.

Paxton's short press release announcing the investigation offered no explanation as to how Media Matters—a D.C.-based non-profit—had allegedly violated Texas law, or even what possible jurisdiction he had over it (as none of its or Hananoki's work covering Musk occurred in or had anything to do with Texas). Nor did it identify any substantive grounds for the investigation, beyond that Paxton was purportedly "troubled" by Musk's "allegations." Instead, the bulk of the press release denigrated Media Matters as a "radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square."

The very next day, Paxton issued a civil investigative demand ("Demand"), commanding Media Matters to turn over confidential materials, including documents and communications about its research and reporting, communications with possible sources at X and its advertisers, and sensitive materials related to Media Matters's operations. *See* Declaration of Aria C. Branch ("Branch Decl."), Ex. A.[1] The Demand has a return date of December 12, 2023, meaning that Paxton is now entitled to enforce the demand in Texas state court *at any time*. The Demand is an extraordinary intrusion into Plaintiffs' newsgathering and reporting, and is plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have— or may create—related to their research and reporting on X or Musk. And as Paxton has emphasized in subsequent correspondence with Plaintiffs' counsel, he believes his powers to pursue Plaintiffs' documents are virtually unrestricted—in his view, he need not show that jurisdiction is proper in Texas and the ordinary rules of civil procedure do not apply.

Paxton's retaliatory investigation and Demand are transparent attempts to punish and deter Plaintiffs' speech and press activities. And they have had their intended effect: Plaintiffs have been chilled from publishing additional criticism or coverage of X or Musk since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. To stanch this ongoing irreparable harm, Plaintiffs move for a temporary restraining order excusing their compliance with the Demand, as well as a preliminary injunction to maintain such relief until Plaintiffs' constitutional and state law claims are resolved on the merits. This Court has jurisdiction because this lawsuit arises from unlawful retaliatory

---

[1] Media Matters first received the Demand on November 22, 2023 via FedEx at its Washington, D.C. office and Paxton later dispatched a process server to the District of Columbia. Paxton's agent formally served the Demand on Plaintiffs' outside counsel at their Washington, D.C. office, on December 1, 2023. Branch Decl. ¶ 4.

action that, by Paxton's own admission, was "directed" at Media Matters in the District of Columbia. *See* Compl. ¶¶ 76–77. Plaintiffs request a speedy hearing under Rule 57 on their claim for declaratory relief that the Demand and the investigation violate their rights under the U.S. Constitution and D.C. and Maryland law.

## BACKGROUND

A. **Over the past year, under Musk's ownership, advertisements have frequently appeared on X alongside racist, antisemitic, and violent content.**

Elon Musk completed his purchase of the social media platform now known as X on October 27, 2022. He purchased the platform, purportedly, because of his belief that "it is important to the future of civilization to have a common digital square."[2] After taking control, Musk laid off approximately 80 percent of the platform's staff and downsized or eliminated critical areas responsible for overseeing platform policy, trust and safety, communications, and ethical AI. Compl. ¶ 26. He likewise laid off many of the content moderators responsible for keeping the platform free of harassment. *Id*. Musk's changes raised public alarm and sparked concern amongst lawmakers over the platform's ability to combat misinformation and hate speech.[3]

Under the auspices of promoting "free speech," Musk also suspended products and policies that protected users from misinformation and violent content. Compl. ¶ 27. He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists reporting on his air travel. *Id*. In the wake of Musk's deep changes to the social media platform, extremist, racist, antisemitic, and violent content surged on X. *Id*. ¶ 28.

---

[2] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[3] Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*].

Within the first 12 hours of Musk's takeover, there was "a nearly 500% increase in the use of the N-word." *Id*. Within the first week, use of the word "Jew" increased fivefold with antisemitic content receiving the most engagement. *Id*. Within just two months, the *New York Times* reported the following about the rise in hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."
- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."
- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."

Compl. ¶ 29. The platform likewise saw a renewed explosion of baseless conspiracy theories concerning, among other things, COVID-19 vaccines and QAnon. This spike in violent and extremist content on X, as well as Musk's drastic management changes, were widely reported on by a broad array of media outlets at the time. *Id* ¶ 34 (collecting sources).

These developments quickly led to advertisers leaving the platform. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[4] The result was a precipitous drop in X's revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" and, in September, reported that advertising revenue was "still down 60%."[5] Still

---

[4] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3; Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership,* Reuters (Nov. 18, 2022), https://www.reuters.com /technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk.

[5] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3.

more advertisers began to flee X when the increasing hateful and violent rhetoric started appearing

alongside their advertising, creating a false association between their brands and vile hate speech.

X's inability to control the placement of extremist content alongside advertisements was

widely reported in the media, beginning soon after Musk's takeover. Some examples include:

1.  **Reuters**, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022) ("Advertisers are grappling with Twitter's new ownership under Tesla boss Elon Musk, who once tweeted 'I hate advertising.'").

2.  **The Washington Post**, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022) ("Ads from dozens of major brands were appearing on white nationalist and extremist accounts.").

3.  **ARS Technica**, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022) ("[T]he US Department of Health and Human Services realized its promoted tweet about updated COVID vaccines was appearing on Twitter pages of white nationalist accounts.").

4.  **The Verge**, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022).

5.  **Center for Countering Digital Hate**, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 2023) ("[J]ust ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter.").

6.  **The Washington Post**, "Extremist influencers are generating millions for Twitter, report says," Taylor Lorenz (Feb. 9, 2023).

7.  **The Kansas City Star**, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Mar. 15, 2023) ("CNN reported on Thursday that in the past 24 hours it had spotted ads on X, formerly called Twitter, for the University of Missouri and major brands, such as Amazon, Samsung, Cox Communications and others, on the profile page of VDARE, a racist outlet.").

8.  **Business Insider**, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023) ("Ads for Disney, ESPN, the NBA, Adobe, and Microsoft appeared . . . next to vitriolic white supremacist content.").

9.  **The N.Y. Post**, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023) ("Neo-Nazi propaganda continues to find a home on Twitter and is adjacent to ads from major companies").

Compl. ¶ 34. This coverage occurred independently of Plaintiffs' own reporting efforts, reflecting

the widespread interest and discussion around hate speech in America's "digital town square."

### B.      Media Matters and Hananoki report on X's pattern of permitting the placement of advertisements alongside extremist content.

Since 2004, Media Matters has reported on misinformation and bias in the media. As part of its mission to educate the public on violent extremism and political rhetoric, Media Matters began researching and reporting on the rise in extremist and fringe content on X after Musk's changes to the platform. Hananoki, a Senior Investigative Reporter at Media Matters whose beat covers political extremism, has for over a decade researched and written about extremist and violent rhetoric on social media platforms, often shining a spotlight on politicians and other public figures in the process. Hananoki Decl. ¶¶ 2, 4, 6–9. His reporting has been widely cited and discussed in America's largest news outlets. *Id.* ¶ 5. And it has been relied upon by government agencies and public officials in their work, including a Department of Justice indictment, the Mueller Report on Russian interference in the 2016 election, and a bipartisan U.S. Senate Select Committee on Intelligence report. *Id.* ¶ 6. Even Attorney General Paxton has previously relied on Hananoki's reporting. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats" and conspiracy theories from an Assistant Attorney General in Texas, prompting Paxton's office to fire the employee. *Id.* ¶ 8.

Hananoki has reported on X—and before that, Twitter—for nearly a decade. *Id.* ¶ 9. In the past year, he has written numerous articles about X given the marked increase in extremism on the platform since Musk's takeover. *Id.* ¶ 10–12. Hananoki's research and reporting has often focused on what advertisements X's users may encounter on the platform. *Id.* ¶ 12. Since February 10, 2023, Media Matters has published at least 14 articles about X's placement of advertisements alongside hateful content, most of which were researched and written by Hananoki. Dimiero Decl. ¶ 12. They include:

1.    "Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers," (Feb. 10, 2023).

7

2.   "Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers," (June 8, 2023).

3.   "Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group," (June 22, 2023).

4.   "Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account," (July 27, 2023).

5.   "Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool," (Aug. 8, 2023).

6.   "X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands," (Aug. 11, 2023).

7.   "Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account (Aug. 16, 2023).

8.   "X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11," (Sept. 11, 2023).

9.   "X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates," (Sept. 12, 2023).

10.  "X is placing ads for the NFL on prominent white nationalist accounts," (Sept. 27, 2023).

11.  "X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts," (Oct. 12, 2023).

12.  "Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing," (Nov. 13, 2023).

13.  "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," (Nov. 16, 2023).

14.  "X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags," (Nov. 17, 2023).

Media Matters's reporting was consistent with the findings of other news sources—in the wake of Musk's purchase (and regardless of his intent), the X platform continued to allow the juxtaposition of advertisements alongside extremist content. *Id.* ¶ 13; Hananoki Decl. ¶ 13. Hananoki employed ordinary and unremarkable investigative journalistic practices to investigate this issue, using an existing X research account controlled by Media Matters to follow white supremacist accounts and gauge how X's automated advertising algorithm would respond. Compl. ¶¶ 39–40.

Hananoki's November 16, 2023 article reported the results of his most recent investigatory work, providing public examples of X's advertisement placement and reporting on Musk's

apparent endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities." Hananoki Decl. ¶ 14. In researching, fact checking, and drafting the November 16 article, Hananoki complied with Media Matters's policies and used ordinary journalistic practices. Dimiero Decl. ¶¶ 7, 11–12. Hananoki typically works from home in Maryland, but sometimes visits Media Matters's District of Columbia office for work-related purposes. Hananoki Decl. ¶ 3.

### C.    Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting.

Despite a year's worth of reporting by Media Matters and other outlets on X's inability to protect advertisers from extremist content, Musk singled out Hananoki's November 16 article reporting on Musk's apparent endorsement of an antisemitic conspiracy theory, for which Musk also received widespread condemnation by other news outlets. Hananoki Decl. ¶¶ 14, 16–18. Two days after the article was published, with direct reference to Hananoki's article, Musk posted on X that he would file "a thermonuclear lawsuit against Media Matters." *Id.* ¶ 16.

Certain conservative media and political figures—nearly all themselves prior subjects of Media Matters's reporting on political extremism—quickly urged retaliation against Media Matters. As an example, on November 19, 2023, President Trump's former advisor Stephen Miller declared, "There are 2 dozen+ conservative state Attorneys General," implying states should investigate Plaintiffs for their journalism. Compl. ¶ 46. Missouri Attorney General Andrew Bailey responded by announcing that his "team [was] looking into" Plaintiffs' article. *Id.* ¶ 47. Paxton went even further, (i) announcing in a November 20, 2023 press release that he was launching an "investigation" into Media Matters under Texas's deceptive trade practices act, and (ii) issuing the wide-sweeping Demand for Media Matters's internal and journalistic documents one day later, under the auspices of the same "investigation." Branch Decl., Exs. A, B.

In Paxton's press release announcing the investigation, he failed to explain how Plaintiffs were believed to have allegedly violated Texas's consumer fraud laws or how Media Matters—a Washington, D.C.-based non-profit media organization—could even plausibly be subject to Texas's jurisdiction for reporting about X, a company organized under Nevada law with its principal place of business in California.[6] The four-sentence press release was, however, notable for its use of charged and nakedly partisan language, with the Attorney General repeatedly disparaging Media Matters as "a radical anti-free speech . . . [and] left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" Branch Decl., Ex. B.

In interviews about the investigation, Paxton confirmed that he was targeting Media Matters based entirely on Musk's unverified and self-serving allegations about Media Matters.[7] He also broadly encouraged other Republican attorneys general to use their state powers to "investigate" the District of Columbia-based media outlet, apparently without any regard to the proper reach of their state powers. This included an interview with activist Benny Johnson, who framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters," neither of which Paxton denied. Branch Decl., Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. 2:2–4. And when Johnson asked Paxton if he "encourage[d] other Republican attorney generals (sic) to do this[?] . . . Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" Paxton

---

[6] Paxton later admitted that he became aware of Media Matters's alleged conduct only through Musk's litigation, rather than any independent investigation or work by his office. *See* Newsmax, *Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity'* at 2:12, Rumble (Nov. 21, 2023) ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it."), *available at* https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html.

[7] *See, e.g.*, *Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,' supra* note 6.

responded by encouraging others in his position to investigate Media Matters. *Id.* at 2:4–20. Paxton confirmed on CNBC that he launched his investigation because of "the information that [Media Matters] provide[s]" the public regarding X. Branch Decl., Ex. D, Tr. 3:5–6.

Like the press release, the Demand that Paxton issued to Media Matters on November 21, 2023, provided no explanation as to how Media Matters or Hananoki might conceivably have violated Texas law, nor any basis for exercising the State's coercive power over them. Plaintiffs first received the Demand on November 22, 2023 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton later dispatched a process server, who attempted to serve the Demand on Media Matters at its office in the District of Columbia on November 30, 2023. Paxton's agent ultimately served the Demand on Media Matters's outside counsel in Washington, D.C. on December 1, 2023. Branch Decl. ¶ 4. The Demand has a return date of December 12, 2023. Ex. A at 1. Media Matters's letter response on December 12, 2023 provided a range of objections to the Demand, including but not limited to the arguments raised in this motion. *See* Branch Decl., Ex. E at 2–3. Media Matters's response also provided notice of Plaintiffs' efforts to obtain preliminary relief through a lawsuit filed in federal court in Maryland. *Id.* at 1; *see* Complaint, *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1; *see also infra* Section E (Background).

Paxton's office responded on December 29, 2023. Branch Decl., Ex. F. Its letter confirms that Paxton intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." *Id*. at 1–2. Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of

Civil Procedure." *Id*. at 1. Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. *Id*.[8] And yet, to date, Paxton has provided no explanation at all as to how Plaintiffs may have violated Texas law, or are plausibly subject to Texas's jurisdiction, and he has continued to point to Musk's allegations as the sole basis of his investigation. *See Media Matters for America*, ECF No. 33 at 1, 6.

On its face, the Demand is unreasonable, overbroad, and seeks materials that are protected from disclosure under the First Amendment and District of Columbia and Maryland shield laws. Ex. A at 7. The Demand requests that Media Matters produce on an ongoing basis all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X, as well as all internal and external communications regarding the November 16 article. *Id*. at 2, 7. In other words, it operates as an ongoing demand for virtually any materials related to Plaintiffs' coverage of X and Musk. It also demands all external communications with employees and representatives of X and ten other corporate entities from November 1, 2023 to November 21, 2023, *id*.; categories of documents related to Media Matters's internal operations, including documents related to its organizational structure, sources of income originating in Texas, operational expenditures in Texas, current and past X accounts including those used to obtain the screenshots contained in the November 16 article, and sources of funding for operations involving X research and publications, *id*. The Demand is plainly overbroad and intrusive on its face, but Paxton has failed even to venture an

---

[8] Defendant's December 29, 2023 letter requested an answer by January 4, 2024. Counsel for Media Matters responded to Paxton's letter to reassert all objections to the Demand, and to reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment. *See* Branch Decl., Ex. G.

explanation as to why he needs these documents. Readily available public information confirms Plaintiffs' lack of contacts with Texas, while a year's worth of articles from a bevy of publications confirms the accuracy of Hananoki's reporting.

> **D.    Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk.**

Paxton's investigation, public attacks, and far-reaching Demand have chilled Media Matters and Hananoki's speech and press activities. Hananoki's research and writing have been severely impaired. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Dimiero Decl. ¶ 20; *see also* Hananoki Decl. ¶¶ 29–31. Draft articles he intended to publish about violent extremism on X have been held back by his editors for fear of further retaliation from Paxton. Hananoki Decl. ¶¶ 30–31. Since Paxton launched his investigation, Hananoki has not published any articles about Musk's handling of political extremism on X. *Id.* ¶ 30; Dimiero Decl. ¶¶ 17–20. Compounding this chill, Hananoki and Media Matters have been subjected to a wave of threats since Paxton's public retaliation campaign. Hananoki Decl. ¶ 27; Padera Decl. ¶ 27; Dimiero Decl. ¶ 23. In response, Hananoki has increased security at his home, Hananoki Decl. ¶ 28, and Media Matters has hired an outside security firm, Padera Decl. ¶ 28.

Hananoki's diminished reporting output is not for want of content. Since Paxton's investigation began, Hananoki has continued generating story ideas regarding extremist content on X but has not pursued them for fear of legal retaliation. Hananoki Decl. ¶¶ 29, 32. This includes coverage of Musk's reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X

account of Stew Peters, a far-right and white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki Decl. ¶ 32. Hananoki fears that reporting on these topics will draw further retaliation against himself, his employer, and his colleagues. Hananoki Decl. ¶ 34. These story ideas are well within Hananoki's long-running beat, yet he is nonetheless chilled from reporting on these topics, Hananoki Decl. ¶ 32, at least one of which received extensive national coverage in other publications.[9] Even where Hananoki has been able to publish work, he has self-censored from writing about X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones' recent reinstatement on X—a plainly relevant aspect of the story. Hananoki Decl. ¶ 36.

Hananoki's chill is directly connected to the fear that any materials he generates in preparing such stories are subject to the Demand, which calls for the ongoing production of all internal communications even touching upon Musk's purchase of X or X CEO Linda Yaccarino. Hananoki Decl. ¶ 34. Yaccarino has frequently made claims (undermined by Plaintiffs' reporting) that X provides a safe platform for advertisers.[10] This same concern has even hampered Hananoki's ability to communicate internally with his editor, for fear that their communications

---

[9] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

[10] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

about story ideas will be turned over to Paxton, the attorney general of a state with absolutely no connection to Hananoki's work. *Id.*

Other researchers and writers at Media Matters have also been constrained in their journalistic work because they are fearful of becoming embroiled in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional retaliation. Dimiero Decl. ¶¶ 16–18, 21. As a direct result of Paxton's harassment, they have pared back reporting and publishing, particularly on any topics relating to the Paxton investigation. *Id.* Media Matters's editorial team's fear of retaliation has repeatedly caused them to not publish stories about X and Musk. *Id.* ¶¶ 18–19. This is not for want of material—Media Matters has received scores of unsolicited tips from readers and X users who continue to witness extremist and violent content placed next to advertisements on X. *Id.* ¶ 18. Media Matters has not pursued these tips due to Paxton's retaliation, in part because any work created by acting on these tips may have to be disclosed to Paxton. *Id.* ¶¶ 16–18, 22.

In a radical change of operation, Media Matters's executive and editorial team have also been forced to become closely involved in the organization's publishing decisions since Paxton launched his investigation. *Id.* ¶ 21. Now, Media Matters must carefully assess whether a new article impacts existing legal proceedings or could generate new ones. *Id.* This has significantly slowed down the publication process. *Id.* Media Matters's associations with external groups have also been impacted by the investigation. Padera Decl. ¶ 25. Several groups that previously collaborated closely with Media Matters are reevaluating doing so following the commencement of Paxton's investigation, worried that any related communications may be turned over to Paxton or lead to investigations into their own work. *Id.* And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement

15

with partner organizations out of concern over potential exposure to legal consequences. *Id.* For example, while the Demand remains pending, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on hate speech on X. *Id*.

Media Matters's external affairs staff have also self-censored communications with other groups, including pausing on sharing with longstanding Media Matters partners research regarding X and its content moderation policies. External affairs staff have even refrained from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners. *Id.* Paxton's investigation has also caused Media Matters's department directors to pause similar reporting on content moderation and advertisement placement issues for at least one other social media platform, out of fear such reporting will lead to further retribution. *Id.* ¶ 26.

Paxton's overbroad and unreasonable Demand further chills Plaintiffs' speech by threatening compelled disclosure of sensitive documents and communications, including materials concerning the organization's editorial processes that Hananoki relied on to prepare his November 16 article. Ex. A at 7; Dimiero Decl. ¶¶ 15–20, 22. It would further require Media Matters to turn over operational information, Padera Decl. ¶ 21, including information about its employees, donors, funding, and expenditures. Ex. A at 7. And it does all of this without affording Media Matters the protections that apply in civil litigation to guard against irrelevant, improper, overreaching, or burdensome document requests. *See generally* Fed. R. Civ. P. 26(b)(1).

The Demand is no empty letter—it is backed by the now imminent possibility that Paxton will seek to compel compliance from Plaintiffs in a Texas court, where Paxton argues Plaintiffs have scant few avenues to fight the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b); *see*

Ex. F. Media Matters and Hananoki have no relevant contacts with Texas, and thus had no reasonable expectation that they would be summoned to Texas to answer for their journalism and defend their speech and press rights (let alone be subjected to intrusive demands from the State Attorney General). Media Matters is not registered as a foreign corporation in Texas; it has no registered agent in Texas; nor does it "transact business," perform any "business practices," or conduct any "trade" or "commerce" in Texas. Tex. Bus. Orgs. Code Ann. § 9.002(a); Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). Paxton's investigation focuses on reporting by Hananoki that involved no contact—direct or indirect—with Texas. Hananoki Decl. ¶¶ 21–24. The prospect that Plaintiffs may be dragged into Texas court in retaliation for their D.C. and Maryland work has further chilled them and discouraged further coverage of X and Musk. *Id.* ¶ 39; Dimiero Decl. ¶¶ 16–20, 22.[11]

### E.    Plaintiffs sued Paxton to protect their First Amendment rights.

Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1. Plaintiffs initially filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles giving rise to Paxton's unlawful investigation. Plaintiffs moved for a preliminary injunction and temporary restraining order the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 2; *see also id.*, ECF No. 20 (motion refiled on Dec. 14, 2023, after service on Paxton was complete). In support of the motion, Plaintiffs submitted several declarations from individuals at Media Matters,

---

[11] The Deceptive Trade Practices Act also arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

including declarations that detailed Media Matters's utter lack of connection to Texas, eviscerating any possible basis for any colorable claim that Texas has any authority over the District of Columbia-based organization. *Id.*, ECF Nos. 2-2, 2-3, 2-4, 38-1.[12]

Plaintiffs' motion was fully briefed on January 2, 2024. In his response in opposition, Paxton offered little defense of his investigation on the merits, instead focusing largely on ripeness, personal jurisdiction, and venue objections. *See* Branch Decl., Ex. I, *Media Matters for America*, ECF No. 33. Paxton's response also ignored the extensive declarations that Media Matters had, by then, provided to the Maryland court, which laid out Media Matters's lack of contacts with Texas. Nor did it indicate that Paxton had made any effort to "investigate" Media Matters's contacts with the forum by using databases or information surely available to him as Texas's chief law enforcement officer. Instead, Paxton has persisted in claiming that he is entitled to Media Matters's internal documents, without ever making any threshold showing of either jurisdiction or credible claims of violation of law. Ex. F.

The court held a hearing on Plaintiffs' motion for a preliminary injunction on January 8, 2024 but postponed its ruling in light of its concerns about whether, on the facts alleged and presented, it had personal jurisdiction over Paxton in Maryland.[13] That question animated nearly the entirety of the hearing, at the conclusion of which the court directed the parties to further brief the jurisdictional issue (and any other issue that Paxton wished to raise for dismissal), setting a five-week briefing schedule. Branch Decl., Ex. H, Tr. 32:2–17; *see also Media Matters for*

---

[12] Consistent with Local Rule 5.1(d), new declarations that incorporate this information have been filed in support of this motion.

[13] The Court repeatedly indicated that if it were to find personal jurisdiction, Plaintiffs' allegations would survive a ripeness challenge. Ex. H, Tr. 4:13–17; *see also id.*, Tr. 30:13–17 (noting again, later in the hearing, a strong likelihood that if the court reached the question, it was likely to "find subject matter jurisdiction").

*America,* ECF No. 47. The court advised the parties, however, that if they wanted a resolution "that is fast and fair to both sides," they "would move [the case] to D.C.," either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. Ex. H, Tr. 23:6–12. And the court advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that." *Id.*, Tr. 25:20–23.[14]

Repeatedly, the court expressed little doubt that the District of Columbia had specific jurisdiction over Paxton. It stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." *Id.*, Tr. 11:20–23, 22:10–24; *see also id.*, Tr. 6:17–23. The court even understood Paxton's pleadings to have "referenced that there is personal jurisdiction in D.C." *Id.*, Tr. 24:6–17. The court's reading of Paxton's pleadings was well-founded. His opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." Ex. I at 16. Paxton's response went so far as to concede that Media Matters "*could have instead sued in its home—the District of Columbia.*" *Id.* at 24 (emphasis added). Counsel for Paxton reiterated the point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*" Ex. H, Tr. 6:17–23 (emphasis added).

While Plaintiffs maintain that personal jurisdiction over Paxton is proper in Maryland, they are suffering ongoing irreparable harm and need immediate relief. Plaintiffs accordingly have accepted the Maryland court's suggestion that the "fair and fast" way to resolve Plaintiffs' motion

---

[14] The court similarly advised Paxton that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Ex. H, Tr. 24:19–22. Despite the Court's offer, and Plaintiffs' willingness, to transfer the matter to this District with the agreement of the parties, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed." *Id.*, Tr. 24:6–8.

is to move it to D.C., where Paxton has all but admitted that jurisdiction is proper. *Id.* at Tr. 6:17–23; Ex. I at 15 ("Defendant announced his investigation in Texas . . . and issued the CID to Plaintiff Media Matters in the District of Columbia"); *id.* at 16 ("Defendant's conduct was not in any sense 'aimed' at Maryland—indeed, his CID was issued to, and served in, the District of Columbia, where Media Matters resides."); *id.* at 24 ("Media Matters . . . could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred."). Plaintiffs have therefore voluntarily dismissed their action in the District of Maryland and have promptly refiled their complaint in this District to secure urgent relief.[15]

## STANDARD OF REVIEW

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a temporary restraining order is sought against the government, the last two requirements merge, "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). The requirements for a preliminary injunction and for a TRO are the same. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

---

[15] Plaintiffs filed a Notice of Dismissal in the Maryland case prior to filing this Complaint. *See Media Matters*, ECF No. 49. Because that notice is self-executing under Rule 41, it effectuated dismissal. *See In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017); *Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2 F.3d 544, 546 (4th Cir. 1993). Plaintiffs have also provided defense counsel with a courtesy copy of the Complaint and all filings associated with this motion for a temporary restraining order and preliminary injunction. Plaintiffs' counsel have asked defense counsel whether they will accept service on behalf of their client, and defense counsel have agreed. Plaintiffs will effectuate service as soon as the summons is issued.

## ARGUMENT

**I.     This Court has personal jurisdiction over Paxton.**

This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475 (1984)).

This Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton has repeatedly entered the District of Columbia for purposes of his investigation, first by using a common carrier to physically deliver the Demand to Media Matters's headquarters, and then by procuring the service of an agent—a process server— and directing that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person *or through an agent*, goods, *mail*, or some other means—is certainly a relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphases added) (citation omitted); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). And the Demand "was served on Media Matters in the District of Columbia." Ex. H, Tr. 6:22–23; *see also id.*, Tr. 11:20–23, 17:5–7.

Second, Paxton's Demand seeks numerous categories of documents that he had reason to believe would be located primarily in the District, where Media Matters is headquartered. By

demanding reams of documents stored, and in many cases created, in the District, Paxton has unquestionably "directed" activity at the District. Indeed, Paxton admitted that the civil investigation demand[] was directed as [sic] Media Matters, which is a . . . a District of Columbia corporation." Ex. H, Tr. 6:17–23; *see id.*, Tr. 22:18–24. Plaintiffs' claims, in turn, "are based on" Paxton's Demand. *Def. Distributed v. Grewal*, 971 F.3d 485, 492 (5th Cir. 2020); *see also infra* Sections II.B–C.

Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Section II.A. In intentional-tort cases, specific jurisdiction exists where the defendant has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984). Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District, causing a substantial and predictable chill to Media Matters. *See infra* Section II.A. The Fifth Circuit's decision in *Defense Distributed v. Grewal* is directly on point; the court held there that the Attorney General of New Jersey had purposefully availed himself of Texas by issuing a cease-and-desist letter to a Texas company in Texas, thereby "project[ing] himself across state lines and assert[ing] a pseudo-national executive authority." 971 F.3d at 493. The plaintiffs in *Defense Distributed* plausibly alleged the "letter had a chilling effect on the exercise of their First Amendment rights," which, "in turn, caused them to cease publication." *Id.* at 495. As the Fifth Circuit explained, "*this alone constitutes purposeful availment*" because "[t]he defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* at 493–94 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)) (emphasis added). That is precisely the case here.

Paxton has little ground to complain now about now being haled into court in the District of Columbia. Paxton opposed the District of Maryland's exercise of personal jurisdiction over him on grounds that support this Court's authority. *See supra* Section E (Background); *see also* Ex. I at 16 (arguing that "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides"). Indeed, he specifically objected to jurisdiction in Maryland on the grounds that Media Matters "*could have instead sued in its home—the District of Columbia*." Ex. I at 24 (emphasis added). Paxton's reliance on this line of argument was so significant that the District of Maryland court read his response to "reference[] that there is personal jurisdiction in D.C." Ex. H, Tr. 24:12–14. Plaintiffs have now acceded to Paxton's preference for litigating in this forum, which the District of Maryland court suggested was the "fast and fair" venue for resolving Plaintiffs' motion. *Id.* at Tr. 23:6–12.

As for statutory personal jurisdiction, the District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). Thus, insofar as the Court may exercise personal jurisdiction over Defendant Paxton consistent with due process, it also has statutory personal jurisdiction under D.C. Code § 13-423(a)(1) and (3).

## II.   Media Matters and Hananoki are likely to prevail on the merits of their claims.

### A.   Plaintiffs are likely to establish that Paxton retaliated against their constitutionally protected activities in violation of the First Amendment.

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "Official reprisal for protected speech 'offends the Constitution [because] it

threatens to inhibit exercise of the protected right.'" *Id.* at 256 (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). It is "obvious" that efforts "to punish political speech by members of the press . . . run afoul of the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999). The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable" because "'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs are likely to prove each of these elements and prevail on the merits of their first claim. A declaratory judgment and injunctive relief are appropriate remedies for First Amendment injury. *See* 28 U.S.C. §§ 2201, 2202; *Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*, 64 F.4th 1354, 1366–67 (2023); *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

> 1.    **Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities.**

Media Matters is a non-profit media watchdog group that provides journalistic research and investigative reporting on political extremism. *See supra* at 7. Hananoki is a senior investigative reporter for Media Matters who covers political extremism, including extensive coverage of X's ongoing placement of advertisements on racist, antisemitic, and violent accounts

on the X platform. *See supra* Section B (Background). Plaintiffs routinely investigate, publish, report, and comment on political extremism in American media, including on platforms like X.

Plaintiffs' journalistic pursuits—on topics of clear public concern and discussion—are at the core of our First Amendment freedoms. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves not only the news media itself, but society at large: "A broadly defined freedom of the press assures the maintenance of our political system and an open society," *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). A free press is foundational to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 269–70 (explaining such "freedom of expression upon public questions is secured by the First Amendment").

Paxton is targeting Plaintiffs for retaliation because of their protected journalism and speech. As explained, since Musk purchased X in October 2022, the platform has permitted advertisements to appear next to accounts that promote racist, antisemitic, and violent content. *See supra* Section A (Background). This has been the subject of extensive public discussion and media coverage, and not only from Plaintiffs. *See supra* at 7–8. X and Musk have invited this scrutiny by repeatedly framing X as the "digital town square" for public debate. *See supra* at 6.

Plaintiffs' reporting on this issue of important national concern is unequivocally protected by the First Amendment. "Freedom of the press holds an . . . exalted place in the First Amendment firmament." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 375 (D.D.C. 2020); *see also Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters's own

editorial judgment in what to publish on its platform is likewise entitled to protection; "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values." *Nat'l Org. For Women, N.Y.C. Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977). This protection "unequivocally" extends to its "editorial judgment and . . . free expression of views on" matters of public concern, such as political extremism on X, "however controversial." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 391 (1973)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. at 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar). Simply put, "the First Amendment applies in full force to *all* 'news, comment, and advertising'" and "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Tornillo*, 418 U.S. at 258). Plaintiffs are therefore likely to show they "engaged in conduct protected under the First Amendment," *Aref*, 833 F.3d at 258, by investigating and reporting on political extremism on X.

### 2. Paxton's retaliatory conduct has already chilled, and continues to chill, Plaintiffs' First Amendment rights.

Paxton, through his investigation and Demand, has already taken "action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258. Though not dispositive, plaintiffs' "actual response" to the retaliatory conduct "'provides some evidence of the tendency of that conduct to chill First Amendment activity.'" *Hartley v. Wilfert*,

918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 500 (4th Cir. 2005)). The "cause of action targets conduct that tends to *chill* [First Amendment] activity, not just conduct that *freezes* it completely." *Constantine,* 411 F.3d at 500 (emphases in original). Plaintiffs are *not* required to "prove that the allegedly retaliatory conduct caused [them] to cease First Amendment activity altogether." *Id.* It is sufficient to show—as Plaintiffs do—that Paxton's retaliatory acts would chill the First Amendment activity of similarly situated plaintiffs of ordinary firmness.

The Court must "conduct this inquiry on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023). Here, as the result of their reporting about a company organized under Nevada law with its principal place of business in California, a non-profit news organization headquartered in Washington, D.C.—with most of its employees, including Hananoki, working within the Washington, D.C. metropolitan area—has been made subject to an investigation in Texas seeking highly sensitive material regarding its funding, expenditures, organizational structure, communications with sources, and internal discussion of news stories. Ex. A at 7. The investigation was initiated by a State Attorney General without any showing that Plaintiffs violated that state's law or are even subject to its jurisdiction, all while that Attorney General disparages Media Matters as a "radical anti-free speech organization" that wants to "limit freedom" and must be stopped. Ex. B; *see* Ex. A. Plaintiffs had *no* reasonable expectation of ever being subject to investigation by the Texas Attorney General, never mind under the state's Deceptive Trade Practices Act—Media Matters is a non-profit media organization, does not engage in trade or commerce with consumers, and neither it nor Hananoki has any relevant connection to the state. Padera Decl. ¶¶ 5, 7–14; Hananoki Decl. ¶¶ 3, 21–23. Despite no jurisdictional nexus, Paxton demands Plaintiffs turn over their most

sensitive journalistic and organizational documents. Ex. A at 7. Paxton may seek to have Plaintiffs

held in contempt or sue them in a foreign court under unspecified charges for their refusal to do

so. *See* Tex. Bus. & Com. Code Ann. §§ 17.62, 17.47. This form of retaliation is no idle threat or

mere inconvenience. It carries serious implications for Media Matters's ability to operate and

report on matters of public concern. To compound matters, Paxton has encouraged other attorneys

general to launch their own retaliatory campaigns against Plaintiffs under their state laws, again

regardless of any genuine basis to do so or any plausible basis for jurisdiction. *See supra* at 11.

Paxton's explicit retaliation against Plaintiffs for news coverage and reporting would

plainly "deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833

F.3d at 258. The mere "*threat* of invoking legal sanctions and other means of coercion, persuasion,

and intimidation" can be sufficient to tend to chill protected speech. *Playboy Enter. v. Meese*, 639

F. Supp. 581, 585 (D.D.C. 1986) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372

U.S. 58, 67 (1963)); *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing First

Amendment harm from the "threat of administrative and judicial intrusion into the newsgathering

and editorial process"); *Coss v. Teters*, No. 2:23-CV-00180, 2023 WL 3470899, at *4 (S.D. W.

Va. May 12, 2023) ("[T]hreats alone can constitute an adverse action if the threat is capable of

deterring a person of ordinary firmness from engaging in protected conduct." (quoting *Hill v.

Lappin*, 630 F.3d 468, 474 (6th Cir. 2010))). Here, moreover, Paxton's public threats to retaliate

have already moved from threat to deed—he has formally announced his investigation and issued

the Demand. Ex. B; Ex. A. And he followed up with a letter on December 29, 2023, expounding

an expansive view of his power and repeating his threat to enforce. Ex. F. Courts have, naturally,

found that the actual commencement of a threatened investigation—even before any conclusion is

reached or penalties imposed—constitutes actionable retaliation. Indeed, the Fourth Circuit found

a plaintiff's speech chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to modify what content he could put on his website—actions akin to Paxton's conduct here. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013). "A person of ordinary firmness would surely feel a chilling effect" under such circumstances. *Id.*; *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them"). The passage of the Demand's return date exacerbates this harm. Plaintiffs remain under investigation and must now conduct their journalistic work under the ongoing specter of being haled into Texas court at any moment to defend against Paxton's efforts to rummage through their files.

The predictable—and intended—chilling effect of Paxton's investigation and Demand is reinforced by the power Texas law vests in him to further punish Plaintiffs for noncompliance— "here the penalties include public reprimands, sanctions, civil penalties," *S.C. Freedom Caucus v. Jordan*, No. 3:23-CV-795-CMC, 2023 WL 4010391, at *8 (D.S.C. June 13, 2023), as well as restraining orders and the ability to hale Plaintiffs into courts in a jurisdiction with which they have no meaningful contacts, Tex. Bus. & Com. Code Ann. §§ 17.47, 17.62; *cf. Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 917 (D. Md. 2008) (recognizing the "chilling effect" of haling parties into jurisdiction with which they have limited contacts), *aff'd sub nom. Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012). These sanctions further establish an "asserted chill [that] would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *S.C. Freedom Caucus*, 2023 WL 4010391, at *8. And unlike in regular litigation, where Media Matters and Mr. Hananoki can resist burdensome discovery

through the rules of civil procedure, Paxton's Demand is not subject to such ordinary protections, including the requirements that his demands be relevant and proportional. Ex. F; *see generally* Fed. R. Civ. P. 26(b)(1).[16] Media Matters and Mr. Hananoki therefore have severely constrained grounds for resisting the Demand.

Notably, Paxton himself has recognized that retaliatory efforts like these are likely to chill speech. In 2016, after Massachusetts issued a similar CID to Exxon Mobil, Paxton's office authored an amicus brief on behalf of numerous other states, explaining that:

> The[] [First Amendment] protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone[.]

Branch Decl., Ex. J, Brief of Amici Curiae at 6, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K, ECF No. 63-2. Paxton's own words speak volumes about the purpose and intended effect of his own Demand here. His supposed concern that Massachusetts was using a civil investigative demand under its consumer protection laws—the same power Paxton uses here—"to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in . . . policy debates" rings even truer here. *Id.* at 1. Paxton was unequivocal that "the authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in" public debate. *Id.* at 3. Paxton was concerned such abuse of state law "chills speech" and "contravenes the First Amendment." *Id.* And he repeated

---

[16] The Demand—and Paxton's expansive view of his right to issue and enforce it, *see* Ex. F—also goes far beyond what would be permitted in ordinary civil litigation, because it dispenses of any threshold showing of jurisdiction. In civil litigation, a party is ordinarily not properly subject to discovery absent a showing of jurisdiction, and binding federal circuit precedent applicable in Texas precludes the exercise of that jurisdiction in a case where the targeted conduct consists of a story published online with no meaningful ties to Texas. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–20 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022).

these arguments in two similar amici briefs—again written by *his* office on behalf of numerous other states—in the Second Circuit and the Southern District of New York. In the former, Paxton argued that abusing civil demands to chill speech imperils "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it." Branch Decl., Ex. K, Brief of Amici Curiae at 10, *Exxon Mobil Corp. v. Healey*, No. 18-1170 (2d Cir.), ECF No. 77; *see also* Branch Decl., Ex. L, Brief of Amici Curiae at 10, *Exxon Mobil Corp. v. Schneiderman*, No. 1:17-cv-02301-VEC (S.D.N.Y.), ECF No. 196-1 (again arguing candid discussion was "threatened by the chill of 'investigations' hanging in the air"). Here, Paxton is employing the very same tactic he previously criticized to obtain the same unconstitutional ends.

Finally, although not dispositive, Plaintiffs' speech has already been chilled. *See Hartley*, 918 F. Supp. 2d at 53; *Cooksey*, 721 F.3d at 236 (finding plaintiff had "sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner*, 502 F. Supp. 3d at 381. This District's decision in *Turner* is particularly relevant. There, the court granted a preliminary injunction after a retaliatory investigation caused journalists to "remove[] content perceived to be objectionable to defendants" from the publication's website. *Turner*, 502 F. Supp. 3d at 381. Notably, the publication in question was Voice of America's Urdu service, whose journalists are federal government employees. *Id.* The court granted an injunction against ongoing and future investigations even though, in considering the First Amendment right of government journalists, it was bound to weigh those rights against the government's interest in regulating speech of its employees under the *Pickering* doctrine. *Id.*; *see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Although at least one investigation at issue in *Turner* had already concluded, that was not

pivotal to the court's analysis. Rather, *Turner* held the state's interest as employer to be outweighed because the investigations, in general, (i) had actually "penalize[d] and chill[ed] speech," and (ii) "appear[ed] to do so on the basis of perceived viewpoint." *Turner*, 502 F. Supp. 3d at 381.

Both conditions have *already* been met here. In launching his investigation, Paxton expressed his intent to punish Plaintiffs because of their "perceived viewpoint," *id.*, calling Media Matters "a radical . . . left-wing organization," Ex. B. And Plaintiffs' speech is chilled. Hananoki Decl. ¶¶ 26–36; *see also* Dimiero Decl. ¶¶ 15–23. For starters, Hananoki, after writing articles on X for the better part of a year, has been chilled from publishing new articles about the platform because of fear of further retaliation. Hananoki Decl. ¶¶ 29–32; *see id.* ¶¶ 11–12; *see also* Dimiero Decl. ¶¶ 11–12, 15–23. His editors have instructed him that Media Matters cannot publish work he has already prepared describing extremism on X. At the same time, Media Matters has been flooded with tips about extremist content on X appearing alongside advertisements, but it has not followed up on these tips due to chill imposed by Paxton's actions—including, in particular, the concern that it would have to turn over source information to Paxton per the terms of the Demand. Dimiero Decl. ¶¶ 15–20. Hananoki—over his sixteen-year career as a reporter—has never been subject to this kind of retaliation from a government official, which has severely disrupted his writing and research. Hananoki Decl. ¶¶ 29, 38. Indeed, he continues to generate story ideas, but is deterred from pursuing them for fear that he will exacerbate retaliation against himself, his colleagues, and his employer. Hananoki Decl. ¶¶ 30–32, 34.

The chill has also impacted Media Matters more broadly. Many other Media Matters reporters have shied away from covering topics that could be perceived as related to Paxton's investigation, for fear of being targeted in return. Padera Decl. ¶ 23–24; Dimiero Decl. ¶¶ 15–18, 21–23. Media Matters's ability to release work to the public has been harmed—its publication

process has been slowed due to leadership's need to scrutinize drafts in view of Paxton's investigative intrusion. Dimiero Decl. ¶¶ 16–18, 21. Media Matters's editorial team has had to make the difficult decision not to publish articles due to threats of investigation and legal action. *Id.* ¶¶ 15–21. Likewise, Plaintiffs' ability to work with other organizations has been chilled, as groups that once routinely worked with them are reevaluating the partnership for fear that their documents and communications could be turned over to a retaliatory attorney general. Padera Decl. ¶ 25. And Media Matters is now self-censoring itself when anything related to X comes up in communications with these groups. *Id.* ¶¶ 24–26.

### 3. Paxton's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities.

Plaintiffs' commentary and reporting on X, particularly Hananoki's November 16 article discussing Musk's apparent endorsement of an antisemitic conspiracy theory, is unambiguously what caught Paxton's attention. In his own words, Paxton initiated the Demand on Plaintiffs because of "the information they provide" the public regarding X. Ex. D, Tr. 3:5–6. Paxton's choice to investigate Plaintiffs—without *any* showing that they violated Texas law or are subject to its jurisdiction—immediately followed Musk's public complaints about the November 16 article. *See* Ex. A; Ex. B. Paxton announced his investigation on November 20. 2023—within minutes of Musk filing his meritless civil suit against Media Matters.[17] *See* Ex. B. Not long after launching his investigation, Paxton encouraged *other* state Attorneys General to take retaliatory actions against Plaintiffs. Ex. C, Tr. 2:12–20. And, on the next day, Paxton admitted that he

---

[17] Musk reposted the announcement, implying a connection between the investigation and Musk's and Miller's call for involvement of state attorneys general. *Compare* @elonmusk, X.com (Nov. 20, 2023 8:00 PM ET), https://twitter.com/elonmusk/status/1726767436618191177 ("Fraud has both civil & criminal penalties"), *with* @elonmusk, X.com (Nov. 19, 2023 2:19 PM ET), https://twitter.com/elonmusk/status/1726319293267407107 ("Interesting. Both civil and criminal …").

"learned about" Media Matters's alleged conduct "through the actual lawsuit that Elon Musk filed and then the reporting of it."[18] Despite citing no basis to conclude that Media Matters is subject to Texas jurisdiction, that X's "allegations about what happened" are in fact true, or that Media Matters has violated Texas law, Paxton chose to launch his investigation with an intrusive search into Media Matters's internal files rather than first survey other public documents and articles that corroborate Media Matters's reporting to determine if more intrusive demands could be justified.[19]

The Demand also confirms that Paxton's retaliatory conduct is motivated by Plaintiffs' coverage of X and Musk. It demands that Plaintiffs turn over "all documents related to internal and external communications" concerning Hananoki's November 16 article, as well as Plaintiffs' internal and external communications "regarding Elon Musk's purchase of X" and "regarding Linda Yaccarino;" "communications with employees and representatives of X;" and "all current and past X accounts" controlled by Plaintiffs. *See* Ex. A at 7. The materials sought by these demands reflect Paxton's desire to rifle through Plaintiffs' files concerning their news coverage and reporting. There is no serious dispute that—but for Plaintiffs' constitutionally protected reporting on X—Paxton would not have launched his retaliatory investigation or served his Demand. On that basis, Plaintiffs will show "a causal link between the exercise of a constitutional right and the adverse action." *Aref*, 833 F.3d at 258; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Plaintiffs are therefore likely to prevail on their claim for unlawful retaliation.

---

[18] *Supra* note 6.

[19] Repeatedly, in response to Plaintiffs' preliminary injunction motion in the Maryland case, Attorney General Paxton failed to identify any threshold basis for pursuing any of these questions, effectively admitting the Demand is a fishing expedition to determine if he can obtain evidence from Media Matters to justify the investigation in the first place. *See Media Matters for America*, ECF No. 33 at 1, 6, 8–9, 20 & n.6. This would be troubling under any circumstances, but is particularly so here, where a foreign Attorney General demands internal and confidential documents from a media organization based on reporting of which he disapproves.

**B.      Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws.**

Plaintiffs' First Amendment retaliation claim, on its own, is sufficient to warrant a temporary restraining order or preliminary injunction. But Plaintiffs also face other imminent harms, captured by their other claims, that separately warrant immediate relief.

1.      ***Constitutional Claims***. Attorney General Paxton has demanded that Plaintiffs turn over a trove of their most sensitive documents or else he may haul them into Texas court at any moment. *See supra* at 11–13, 16–17. Paxton's wide-ranging Demand touches upon nearly every part of Media Matters's operations, including its organizational and employee structure; its "sources of income;" its "operational expenditures;" its "internal [] communications" on articles and matters of public concern; its social media accounts on X; its communications with employees at X and X's advertisers (including potential sources); and "all direct and indirect sources of funding" for all "operations" relating to publications on X. Ex. A at 7. Plaintiffs are likely to show this intrusive Demand violates both the First and Fourth Amendments.

The Fourth Amendment limits the scope of administrative subpoenas. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment guards Plaintiffs from the compelled disclosure of materials that would chill their constitutional rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment"). These twin constitutional guarantees often overlap; thus, where "the materials sought to be seized" by an administrative subpoena even simply "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965))

(emphasis added). "No less a standard could be faithful to First Amendment freedoms." *Stanford,* 379 U.S. at 485. That is especially true where, as here, no cause has been shown before demanding documents—such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants,* 367 U.S. 717, 729 (1961).

Paxton's Demand seeks to pry into matters protected by the First Amendment and shows no trace of "scrupulous exactitude." *Stanford*, 379 U.S. at 485. Instead, it broadly seeks information about Plaintiffs' donors, sources of funding, and expenditures in a manner designed to chill Plaintiffs' speech and press activities. Ex. A at 7. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a . . . right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The First Amendment thus "prohibit[s] . . . compelled disclosure" of documents about an organization's associational activities—including the compelled disclosures about members and donors—absent compliance with "exacting scrutiny." *Id.* at 2382–83, 2386 (holding California violated First Amendment by requiring disclosure of "donors' names and the total contributions" to charitable organization); *see also NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (membership lists); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (campaign contributions); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (identities of employees and volunteers). Paxton has sorely failed to meet the "exacting scrutiny" and "scrupulous exactitude" required to obtain these types of materials. "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). This Court has the power to

enjoin enforcement of such a constitutionally infirm subpoena. *See Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 274 (2d Cir. 1981).

The Demand is further infirm because it seeks journalistic materials that are afforded significant constitutional protection. Paxton may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through his search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Paxton has not satisfied any such standard here, yet nonetheless seeks categories of notes and files on draft articles and communications with potential sources—clearly protected materials. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"). The Demand is not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship*, 310 F.R.D. at 582 (quashing subpoena). Fundamentally, Paxton's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187–88 (11th Cir. 2003) (concluding that CID violated Fourth Amendment and "that an investigation predicated solely upon legal activity does not pass muster under *any* standard").

Plaintiffs are therefore likely to prevail on their second claim that the Demand itself is an unlawful fishing expedition in violation of the First and Fourth Amendments.

**D.C. & Maryland Shield Laws.** The Demand also seeks information protected by the District of Columbia's shield law. D.C. Code §§ 16-4702, 4703. The D.C. shield law provides

absolute protection against compelled disclosure of sources, *id.* § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702. The Demand also seeks information protected by Maryland's analogous shield law. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2). The shield laws are grounds to quash or limit a subpoena. *Grunseth*, 868 F. Supp. 333, 336–37 (quashing subpoenas under the D.C. shield law); *see also Equitable Trust Co. v. State Comm'n on Human Relations*, 411 A.2d 86, 99 (Md. 1979) ("It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." (quoting *Fed. Trade Comm'n v. Texaco, Inc.*, 517 F.2d 137, 149–50 (D.C. Cir. 1975)); *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1 (Md. Cir. Ct. Apr. 20, 1994) (quashing subpoena even where qualified disclosure test met).

Permitting attorneys general, like Paxton, to skirt another state's shield laws by misusing their statutory authority to issue subpoenas violates basic principles of federalism and would make a mockery of state shield laws. The District of Columbia and Maryland both have a profound interest in protecting their residents from being made to answer outside their home jurisdictions— by states that obviously lack personal jurisdiction over such residents—and made to divulge documents protected by D.C. and Maryland law. Texas may not "enact [] a policy for the entire Nation" by issuing CIDs that trample over another state's shield laws and deprive foreign residents of the benefits of such laws. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

**C.**     **Plaintiffs are likely to establish that the legal process against them in Texas violates due process due to a lack of contact with that state.**

The Due Process Clause of the Fourteenth Amendment "recognizes and protects an individual liberty interest" against being unwillingly subjected to legal process in a jurisdiction with which a person lacks meaningful contact. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Simply put, due process guards against forcing parties like Plaintiffs to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers*, 582 U.S. at 263. Such arbitrary imposition of a "State's coercive power" is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Plaintiffs are likely to show that they are not within the personal jurisdiction of Texas, and thus not lawfully subject to Paxton's retaliatory investigation or any effort by him to enforce the Demand against Plaintiffs in Texas court.

Two flavors of personal jurisdiction exist: general and specific. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Goodyear*, 564 U.S. at 919). Plaintiffs are plainly not subject to general jurisdiction in Texas—neither is domiciled or "fairly regarded as at home" in Texas. *Goodyear*, 564 U.S. at 924; *see supra* at 10–11.

Specific jurisdiction is lacking as well. It requires "an affiliation[n] between the forum and the underlying controversy, principally, [an] activity . . . that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (first alteration in original). The controversy here arises out of Plaintiffs' reporting and publishing on political extremism on X—work that occurred exclusively in D.C. and Maryland. No element of this work occurred in Texas, required interaction with Texas, or was purposefully directed towards—or intended to have an effect—in Texas. Hananoki Decl. ¶¶ 3, 21–23; *see also supra* at 9. Paxton's actions alone are

39

what connects this case to Texas, but he "cannot be the only link between" his chosen forum and Plaintiffs—"[r]ather, it is [Media Matters and Hananoki's] conduct that must form the necessary connection with the forum State" for any jurisdictional basis to exist there. *Fiore*, 571 U.S. at 285.

No such connection exists here. For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a 'sufficient benchmark' for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297). As documented in sworn declarations filed in federal court on December 12, 2023, Media Matters does not maintain any meaningful contacts with Texas. *See* Declarations, *Media Matters*, ECF Nos. 2-2, 2-3, 2-4. Accordingly, Plaintiffs are likely to show that any imposition of Texas's coercive power by Paxton—which he continued to wield in his December 29, 2023 letter, *after* receiving Plaintiffs' declarations—violates due process.

## III.   Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand.

Hananoki and Media Matters have been suffering irreparable harm since Paxton first served his retaliatory and far-ranging Demand. The issuance of this Demand by a state Attorney General has reasonably chilled Plaintiffs from publishing news coverage and criticism of Musk and X. Dimiero Decl. ¶¶ 16–23; Hananoki Decl. ¶¶ 26, 29–36; *see also supra* Section D (Background). It is well established that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. Fed.*

*Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quotation marks omitted). This harm will continue while Plaintiffs' journalistic efforts are subject to the intrusive and retaliatory demand for documents and communications from Paxton. *See id.* "[E]very moment's continuance" of Paxton's investigation into Plaintiffs' newsgathering and Demand for materials "amounts to a flagrant, indefensible, and continuing violation of the First Amendment." *New York Times Co. v. United States*, 403 U.S. 713, 714–15 (1971) (Black, J., concurring).

Plaintiffs' irreparable harm is exacerbated by the far-ranging scope and burdens of Paxton's retaliatory Demand. Among other overbroad requests, the Demand seeks "all documents" relating to "internal and external communications" regarding "Elon Musk's purchase of X" and "Linda Yaccarino" generally. Ex. A at 7. Because it requires continued production of documents until Plaintiffs' "final" production, the Demand also reaches new documents Media Matters and Hananoki create in relation to further reporting they may wish to do on the impact of Musk's purchase of the X platform—to take just one example—further chilling their ability to report and speak on such topics. The Demand even seeks "all . . . external communications with employees and representatives of X" between certain dates, effectively a demand for communications with sources at X. *Cf. N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 884 (3d Cir. 1981) (observing likelihood of irreparable harm in "first amendment contexts" where state action "prevent[s] a source from communicating with a reporter"). Paxton's prying into Plaintiffs' notes, research materials, and communications with any sources—in a jurisdiction where none of Plaintiffs' activities occur—adds to the harm Plaintiffs are suffering. Dimiero Decl. ¶¶ 15–23; Hananoki Decl. ¶¶ 21–23, 26, 29–36. The passage of the return date only aggravates this harm—Plaintiffs may now be dragged to Texas at any time.

The Demand poses an additional imminent and irreparable injury to Plaintiffs' associational rights. *See Bonta*, 141 S. Ct. at 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). At nothing more than the whim of Paxton, Texas demands documents from Plaintiffs concerning their donors, employees, operational expenditures, and internal communications. Ex. A at 7. Defendant Paxton has offered *zero* explanation of Texas's need for these materials, never mind an explanation sufficient to meet exacting scrutiny. *Bonta*, 141 S. Ct. at 2382–83. Indeed, to date Paxton has offered no explanation at all as to how Plaintiffs have violated Texas law or are properly subject to investigation in Texas. *See generally* Ex. A. Subjecting Plaintiffs to such an "unreasonable search[]" is "sufficient to demonstrate irreparable harm." *Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F. Supp. 2d 883, 892 (S.D. W. Va. 2009) (violation of Fourth Amendment constituted irreparable harm); *see also, e.g.*, *Klayman v. Obama*, 142 F. Supp. 3d 172, 195 (D.D.C. 2015).[20]

Plaintiffs' already strong showing of irreparable harm here is bolstered by the strength of their First Amendment claims. "In First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing Am.'s Greatness*, 831 F.3d at 511. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009); *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

[20] The compelled disclosure of Plaintiffs' donors constitutes irreparable harm both to Plaintiffs and their donors, who lack the opportunity to protect their identities from disclosure. The irreparable harm to third parties further pushes this factor, as well as the balance of the equities, in Plaintiffs' favor. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016).

constitutes irreparable injury." (cleaned up)). Paxton's violation of core First Amendment rights reinforces the need for swift relief to remedy Plaintiffs' ongoing harms.

That Paxton has not yet enforced the Demand in Texas court is immaterial—Plaintiffs are harmed now by the chill imposed by Paxton's retaliatory course of conduct. This case "involves the First Amendment, under which a chilling effect on speech can itself be the harm," regardless of whether the Demand is ever enforced in court. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175, 1178 (9th Cir. 2022) (correctly recognizing that "retaliatory framework" is "appropriate" for reviewing whether punitive issuance of administrative subpoena chills speech in violation of the First Amendment). Unlike in *Twitter*—which concerned a similar civil investigative demand served by Paxton under the same Texas law here—Plaintiffs here have adequately "allege[d] [a] chilling effect on [their] speech." *Id.* at 1175. Indeed, Plaintiffs have established a paradigmatic chill of First Amendment protected activity—they are declining to publish news articles they otherwise would have but for Paxton's retaliatory campaign. Dimiero Decl. ¶¶ 16–20; Hananoki Decl. ¶¶ 29–36. The Ninth Circuit in *Twitter* expressly recognized that "a chilling effect on speech can itself be the harm" when a plaintiff brings a First Amendment claim in response to such a demand. 56 F.4th at 1178. Once a plaintiff shows reasonable chill, "its constitutional injury has already occurred; there is no way for [a plaintiff] to avoid that alleged injury by challenging the document request later" when the CID is eventually enforced. *Id.* at 1178–79; *see also Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (expressing "reluctance to require parties to subject themselves to enforcement proceedings . . . where . . . First Amendment rights are implicated and arguably chilled by a credible threat of prosecution" (quotation marks omitted)).

And Paxton is well-aware that the law does not prohibit pre-enforcement challenges on First Amendment grounds. Not only was he a party to the *Twitter* case holding as much, he

previously acknowledged First Amendment activity is "chilled" by a CID "hanging in the air" and "stifling . . . those seeking information [] to evaluate various viewpoints in [a] public policy debate." Ex. J at 6; *see generally* Ex. K (reraising arguments in an amicus brief to the Second Circuit); *see also* Ex. L (reraising arguments in an amicus brief to the Southern District of New York). Paxton's prior briefing to *three* federal courts—authored by *his office* on behalf of Texas and other states—supported a pre-enforcement challenge on the basis that issuance of a CID alone can unlawfully chill speech. *See* Ex. J at 6; Ex. K at 2 (claiming that such conduct imperiled "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it").

Plaintiffs present clear evidence that their reporting was consistent with *a year's worth of other media coverage* about the rise of extremism on X, including the repeated placement of advertisements next to such content. Compl. ¶¶ 27–39. This includes many reports and posts by people unrelated to Media Matters who found examples of hate speech appearing adjacent to advertising on X. *Id*. Paxton's far-reaching and baseless requests have had real impacts on Plaintiffs' ability to exercise protected First Amendment speech—an irreparable harm that becomes more entrenched in the absence of judicial relief. *See, e.g.*, Hananoki Decl. ¶¶ 29–36. Paxton's willful retaliation against Plaintiffs for participating in an important national conversation about political extremism on a major social media platform injures them now.

## IV.    The remaining equitable factors strongly favor granting preliminary relief.

The remaining equitable factors favor Plaintiffs. Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest" (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))). "The public's interest in protecting First Amendment rights" is

beyond dispute: "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" state action. *Pursuing Am.'s Greatness*, 831 F.3d at 511–12. That interest is heightened where, as here, First Amendment protections serve both Plaintiffs and the general public; "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up). Granting temporary relief ensures that Plaintiffs may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and further serves the public interest against government fishing expeditions, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see also Klayman*, 142 F. Supp. 3d at 196 ("Given . . . that plaintiffs are likely to succeed on the merits of their Fourth Amendment claim, the public interest weighs heavily in their favor.").

In contrast, granting preliminary relief does not harm Paxton. Because his investigation lacks any legitimate basis or connection to Texas, he suffers no harm in having his efforts temporarily enjoined. Paxton "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a temporary restraining order and a preliminary injunction. A proposed order is attached.


Dated: January 18, 2024                              Respectfully submitted,
                                                     */s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*+
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
+Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch