IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>      Defendant. | Civil Action No. 24-cv-147 |

**DECLARATION OF ARIA C. BRANCH
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Aria C. Branch, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I am a Partner at Elias Law Group LLP in Washington, DC. I am a member of the bar in the District of Columbia and the Commonwealth of Virginia. I am counsel for Media Matters for America and Eric Hananoki ("Plaintiffs") in this matter, I have been admitted to practice before this Court.

3.     I submit this declaration in support of Plaintiffs' Motion for Temporary Restraining Order in the above-captioned matter.

4.     On December 1, 2023, Ezra Reese, a Partner at Elias Law Group, was physically served by Attorney General Paxton's office at the Elias Law Group office building, located in the District of Columbia.

5.      A true and correct copy of the Civil Investigative Demand issued on November 21, 2023 by Texas Attorney General Warren Kenneth Paxton Jr. is attached as **Exhibit A**.

6.      A true and correct copy of the November 20, 2023 press release from Attorney General Paxton's office describing the investigation is attached as **Exhibit B**.

7.      A true and correct copy of the certified transcript of Attorney General Paxton's November 28, 2023 interview with Benny Johnson is attached as **Exhibit C**.

8.      A true and correct copy of the certified transcript of Attorney General Paxton's November 21, 2023 interview with CNBC "Last Call" is attached as **Exhibit D**.

9.      Attached as **Exhibit E** is a true and correct copy of the December 12, 2023 letter response to Attorney General Paxton's Civil Investigative Demand.

10.      A true and correct copy of the December 29, 2023 response letter from OAG is attached as **Exhibit F**.

11.      Attached as **Exhibit G** is a true and correct copy of the January 4, 2024 letter response to Attorney General Paxton's December 29, 2023 letter.

12.      A true and correct copy of the transcript of the TRO hearing, held before U.S. District Court Judge Paula Xinis of the U.S. District Court for the District of Maryland at 12:30 PM on January 8, 2024, is attached as **Exhibit H**.

13.      A true and correct copy of Defendant's Opposition to Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction in *Media Matters v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, is attached as **Exhibit I**.

14.      A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and ten additional states in *Exxon Mobil Corp. v. Healey et al*., Case No. 16-CV-00469-K (N.D. Tex.), ECF. No. 63-2, is attached as **Exhibit J**.

15. A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and eleven additional states in *Exxon Mobil Corp. v. Healey et al.*, Case No. 18-1170 (2d Cir.), ECF No. 77, is attached as **Exhibit K**. This brief is also available on Westlaw at 2018 WL 5298251.

16. A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and ten additional states in *Exxon Mobil Corp. v. Schneiderman et al.*, Case No. 1:17-cv-02301-VEC (S.D.N.Y.), ECF No. 196-1, is attached as **Exhibit L**.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Aria C. Branch*
Aria C. Branch

# Exhibit A



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

To:   **Media Matters for America**            *via FedEx 7741 8756 3037*
                                               **Return Date: December 12, 2023**

c/o   **Angelo Carusone**
      **800 Maine Ave SW, Suite 500**
      **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                          **Authorized Agent**
Levi Fuller                             Ryan Hanlan
Assistant Attorney General              Investigator
(512) 936-1308                          (512) 936-3354

# Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents.** All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. ***Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.*** Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates.** Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents.** If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

    e.  the date of the document;

    f.  a description of the subject matter of the document sufficient to determine the applicability of the privilege;

    g.  the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

    h.  the specification(s) of the Demand to which the document is responsive;

    i.  the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

    j.  whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

   Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction.** All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

   If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.**  Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form.  Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.**  Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

   a.  Regarding an individual, to identify that individual's:

      i.  name;

     ii.  current or last known telephone numbers at business and home; and

    iii.  current or last known business and home addresses.

   b.  Regarding a person other than an individual, to identify:

      i.  its full name;

     ii.  the nature of its organization;

    iii.  the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

    iv.  its principal line of business or activity.

   c.  Regarding any other tangible thing, to identify:

      i.  what it is, giving a reasonably detailed description thereof;

     ii.  when, where, and how it was made, if applicable;

    iii.  who made it, if applicable; and

    iv.  its current custodian or the person that had last known possession, custody, or control thereof.

8.  **"Including"** means including, but not limited to.

9.  **"Person"** includes you and means any entity or natural person.

10.  **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11.  The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12.  Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit B

# KEN PAXTON
### ATTORNEY GENERAL of TEXAS

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

# Exhibit C



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

In re: MMFA Litigation


RECORDED CONVERSATION



Job No.:  518338

Pages:  1 - 3

Transcribed by: Lauren Bishop

1          BENNY JOHNSON: So, this is obviously

2    horrifying. Devastating and comes in concert with

3    Elon Musk dropping and I quote, thermonuclear

4    lawsuit. On Media Matters, though it seems like

5    you're standing with the Missouri Attorney General,

6    do you encourage other republican attorney generals

7    to do this? We're -- we're so thankful that somebody

8    is just standing up and doing something. Where are

9    the rest of the republican AGs? There's got to be 20,

10   30 republican AGs in the country. Why are they so

11   quiet on issues like this?

12          KEN PAXTON: You know, that's a good

13   question. I -- I would -- I would encourage them to

14   look at this. They may have just become aware of it.

15   I mean it's a relatively new issue so hopefully over

16   the next couple weeks, you'll see other attorney

17   generals look at this and -- and I -- I would

18   encourage even democratic attorney generals. I know

19   they probably wont but they should because they

20   should care about free speech as much as we do.

21          (The recording was concluded.)

22

1                    CERTIFICATE OF TRANSCRIBER

2              I, Lauren Bishop, do hereby certify that

3     the transcript was prepared from the digital audio

4     recording of the foregoing proceeding; that said

5     proceedings were reduced to typewriting under my

6     supervision; that said transcript is a true and

7     accurate record of the proceedings to the best of my

8     knowledge, skills, and ability; and that I am neither

9     counsel for, related to, nor employed by any of the

10    parties to the case and have no interest, financial

11    or otherwise, in its outcome.

12

13            *Lauren Bishop*

14    _____

15    LAUREN BISHOP

16    Planet Depos,

17    December 8, 2023

18

19

20

21

22

| **A** | | | |
|---|---|---|---|

**ability**
3:8
**about**
2:20
**accurate**
3:7
**ags**
2:9, 2:10
**any**
3:9
**attorney**
2:5, 2:6, 2:16, 2:18
**audio**
3:3
**aware**
2:14

**B**
**because**
2:19
**become**
2:14
**benny**
2:1
**best**
3:7
**bishop**
1:22, 3:2, 3:15

**C**
**care**
2:20
**case**
3:10
**certificate**
3:1
**certify**
3:2
**comes**
2:2
**concert**
2:2
**concluded**
2:21
**conversation**
1:9

**counsel**
3:9
**country**
2:10
**couple**
2:16

**D**
**december**
3:17
**democratic**
2:18
**depos**
3:16
**devastating**
2:2
**digital**
3:3
**doing**
2:8
**dropping**
2:3

**E**
**elon**
2:3
**employed**
3:9
**encourage**
2:6, 2:13, 2:18
**even**
2:18

**F**
**financial**
3:10
**foregoing**
3:4
**free**
2:20

**G**
**general**
2:5
**generals**
2:6, 2:17, 2:18
**good**
2:12

**H**
**hereby**
3:2
**hopefully**
2:15
**horrifying**
2:2

**I**
**interest**
3:10
**issue**
2:15
**issues**
2:11
**it's**
2:15

**J**
**job**
1:20
**johnson**
2:1

**K**
**ken**
2:12
**know**
2:12, 2:18
**knowledge**
3:8

**L**
**lauren**
1:22, 3:2, 3:15
**lawsuit**
2:4
**litigation**
1:7
**look**
2:14, 2:17

**M**
**matters**
2:4
**mean**
2:15

**media**
2:4
**missouri**
2:5
**mmfa**
1:7
**much**
2:20
**musk**
2:3

**N**
**neither**
3:8
**new**
2:15
**next**
2:16

**O**
**obviously**
2:1
**other**
2:6, 2:16
**otherwise**
3:11
**outcome**
3:11
**over**
2:15

**P**
**pages**
1:21
**parties**
3:10
**paxton**
2:12
**planet**
3:16
**prepared**
3:3
**probably**
2:19
**proceeding**
3:4
**proceedings**
3:5, 3:7

| Q | supervision<br>3:6 | 5 |
|---|---|---|
| question<br>2:13 | **T** | 518338<br>1:20 |
| quiet<br>2:11 | thankful<br>2:7 | |
| quote<br>2:3 | that's<br>2:12 | |
| **R** | there's<br>2:9 | |
| record<br>3:7 | thermonuclear<br>2:3 | |
| recorded<br>1:9 | transcribed<br>1:22 | |
| recording<br>2:21, 3:4 | transcriber<br>3:1 | |
| reduced<br>3:5 | transcript<br>3:3, 3:6 | |
| related<br>3:9 | true<br>3:6 | |
| relatively<br>2:15 | typewriting<br>3:5 | |
| republican<br>2:6, 2:9, 2:10 | **U** | |
| rest<br>2:9 | under<br>3:5 | |
| **S** | **W** | |
| said<br>3:4, 3:6 | weeks<br>2:16 | |
| see<br>2:16 | we're<br>2:7 | |
| seems<br>2:4 | wont<br>2:19 | |
| should<br>2:19, 2:20 | **Y** | |
| signature-p1kal<br>3:13 | you'll<br>2:16 | |
| skills<br>3:8 | you're<br>2:5 | |
| somebody<br>2:7 | **2** | |
| something<br>2:8 | 20<br>2:9 | |
| speech<br>2:20 | 2023<br>3:17 | |
| standing<br>2:5, 2:8 | **3** | |
| | 30<br>2:10 | |

# Exhibit D



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

1

2

3

4

5

6

7                    In re: MMFA Litigation

8

9                    RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.:  517865

21   Pages:  1 - 6

22   Transcribed by: Lauren Bishop

1          MALE SPEAKER 1: Let's speak with

2    Republican Attorney General of Texas, Ken Paxton.

3    Ken, Attorney General, thank you very much for

4    joining us. What specifically are you looking for in

5    this investigation?

6          KEN PAXTON: We have an obligation. I have

7    four different responsibilities into the Texas

8    Constitution. One of those is to look at any

9    fraudulent activity of a corporation and then we also

10   oversee charitable organizations. So in this case

11   with Media Matters being charitable organization,

12   nonprofit, we have the responsibility to make sure

13   that doing things that are inappropriate for

14   violating state law. We've started off with asking

15   them questions and we're going to ask them questions

16   and whether that leads to anything else will be

17   determined by their actual behavior and what

18   information they turn over.

19          MALE SPEAKER 1: There are already people

20   of course questioning the -- I won't say the

21   jurisdiction, but Texas' involvement given that X

22   formerly known as Twitter, is a California-based

1    corporation. What is the people and the state of

2    Texas' interest in this?

3              KEN PAXTON: Well, look, I mean X operates

4    in Texas. It operates all the world and Media

5    Matters, what they do to X, the information that they

6    -- they provide effects Texas. And so anything that

7    affects Texans, we have an obligation to look at and

8    that's -- that's what we're doing. So, yeah, it

9    doesn't matter whether they're incorporated, but

10   they're doing business and Texas becomes our

11   interest.

12             MALE SPEAKER 1: Well, what -- and it's

13   very complicated and of course, this is TV, so we

14   don't have a lot of time, but as I understand it

15   Attorney General Paxton, what X is alleging and --

16   and by the way Media Matters is denying -- want to

17   make that clear. Is that Media Matters created a lot

18   of fake accounts or a bunch of different accounts

19   followed a bunch of accounts that might be around or

20   involved in hateful content and sort of almost gained

21   the algorithm to force a specific result. They deny

22   it. Let's say they actually did that. Is that illegal

1    in any way?

2          KEN PAXTON: Yeah. I mean it can be.

3    Depends on exactly what they did. If it's viewed as

4    fraudulent activity under Texas law, then they can be

5    accountable to the state of Texas for that. I mean,

6    the reality is we're also -- we're in a lawsuit with

7    Twitter. We've been in a lawsuit with them for

8    several years involving kind of this similar

9    information that they might have created fake

10   accounts several years ago that were deceptively

11   providing information to advertisers and consumers

12   about how big their audience is. So we've looked at

13   actually both sides.

14          MALE SPEAKER 1: Yeah. Because there are

15   just regular users that probably have multiple

16   accounts for multiple different -- multiple different

17   reasons. Would this be more of a criminal situation

18   or a civil situation because I can -- I can go from A

19   to Z if -- if the allegations are accurate you're

20   damaging X's business by basically doing this and

21   then writing about it and then spooking advertisers

22   away.

1    KEN PAXTON: Yeah. So for us we don't have

2 any authority to investigate or do anything

3 criminally unless we're referred that by a local

4 district attorney in Texas. So district attorney in

5 Texas with to do the investigation, refer us to

6 either investigation or prosecution. Until then

7 everything that we're doing is completely civil

8 related to what -- exactly what you're talking about.

9    (The recording was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

1                CERTIFICATE OF TRANSCRIBER

2        I, Lauren Bishop, do hereby certify that

3   the transcript was prepared from the digital audio

4   recording of the foregoing proceeding; that said

5   proceedings were reduced to typewriting under my

6   supervision; that said transcript is a true and

7   accurate record of the proceedings to the best of my

8   knowledge, skills, and ability; and that I am neither

9   counsel for, related to, nor employed by any of the

10  parties to the case and have no interest, financial

11  or otherwise, in its outcome.

12      *Lauren Bishop*

13

14

15  _____

16  LAUREN BISHOP

17  Planet Depos,

18  December 6, 2023

19

20

21

22

## A

**ability**
6:8
**about**
4:12, 4:21, 5:8
**accountable**
4:5
**accounts**
3:18, 3:19,
4:10, 4:16
**accurate**
4:19, 6:7
**activity**
2:9, 4:4
**actual**
2:17
**actually**
3:22, 4:13
**advertisers**
4:11, 4:21
**affects**
3:7
**ago**
4:10
**algorithm**
3:21
**all**
3:4
**allegations**
4:19
**alleging**
3:15
**almost**
3:20
**already**
2:19
**also**
2:9, 4:6
**any**
2:8, 4:1, 5:2,
6:9
**anything**
2:16, 3:6, 5:2
**around**
3:19
**asking**
2:14

**attorney**
2:2, 2:3, 3:15,
5:4
**audience**
4:12
**audio**
6:3
**authority**
5:2
**away**
4:22

## B

**basically**
4:20
**because**
4:14, 4:18
**becomes**
3:10
**been**
4:7
**behavior**
2:17
**being**
2:11
**best**
6:7
**big**
4:12
**bishop**
1:22, 6:2, 6:16
**both**
4:13
**bunch**
3:18, 3:19
**business**
3:10, 4:20

## C

**california-based**
2:22
**case**
2:10, 6:10
**certificate**
6:1
**certify**
6:2
**charitable**
2:10, 2:11

**civil**
4:18, 5:7
**clear**
3:17
**completely**
5:7
**complicated**
3:13
**concluded**
5:9
**constitution**
2:8
**consumers**
4:11
**content**
3:20
**conversation**
1:9
**corporation**
2:9, 3:1
**counsel**
6:9
**course**
2:20, 3:13
**created**
3:17, 4:9
**criminal**
4:17
**criminally**
5:3

## D

**damaging**
4:20
**december**
6:18
**deceptively**
4:10
**deny**
3:21
**denying**
3:16
**depends**
4:3
**depos**
6:17
**determined**
2:17

**different**
2:7, 3:18, 4:16
**digital**
6:3
**district**
5:4
**doing**
2:13, 3:8,
3:10, 4:20, 5:7

## E

**effects**
3:6
**either**
5:6
**else**
2:16
**employed**
6:9
**everything**
5:7
**exactly**
4:3, 5:8

## F

**fake**
3:18, 4:9
**financial**
6:10
**followed**
3:19
**force**
3:21
**foregoing**
6:4
**formerly**
2:22
**four**
2:7
**fraudulent**
2:9, 4:4

## G

**gained**
3:20
**general**
2:2, 2:3, 3:15
**given**
2:21

go
4:18
going
2:15

**H**

hateful
3:20
hereby
6:2

**I**

illegal
3:22
inappropriate
2:13
incorporated
3:9
information
2:18, 3:5, 4:9,
4:11
interest
3:2, 3:11, 6:10
investigate
5:2
investigation
2:5, 5:5, 5:6
involved
3:20
involvement
2:21
involving
4:8

**J**

job
1:20
joining
2:4
jurisdiction
2:21

**K**

ken
2:2, 2:3, 2:6,
3:3, 4:2, 5:1
kind
4:8

knowledge
6:8
known
2:22

**L**

lauren
1:22, 6:2, 6:16
law
2:14, 4:4
lawsuit
4:6, 4:7
leads
2:16
let's
2:1, 3:22
litigation
1:7
local
5:3
look
2:8, 3:3, 3:7
looked
4:12
looking
2:4
lot
3:14, 3:17

**M**

make
2:12, 3:17
male
2:1, 2:19,
3:12, 4:14
matter
3:9
matters
2:11, 3:5,
3:16, 3:17
mean
3:3, 4:2, 4:5
media
2:11, 3:4,
3:16, 3:17
might
3:19, 4:9
mmfa
1:7

more
4:17
much
2:3
multiple
4:15, 4:16

**N**

neither
6:8
nonprofit
2:12

**O**

obligation
2:6, 3:7
one
2:8
operates
3:3, 3:4
organization
2:11
organizations
2:10
otherwise
6:11
outcome
6:11
over
2:18
oversee
2:10

**P**

pages
1:21
parties
6:10
paxton
2:2, 2:6, 3:3,
3:15, 4:2, 5:1
people
2:19, 3:1
planet
6:17
prepared
6:3
probably
4:15

proceeding
6:4
proceedings
6:5, 6:7
prosecution
5:6
provide
3:6
providing
4:11

**Q**

questioning
2:20
questions
2:15

**R**

reality
4:6
reasons
4:17
record
6:7
recorded
1:9
recording
5:9, 6:4
reduced
6:5
refer
5:5
referred
5:3
regular
4:15
related
5:8, 6:9
republican
2:2
responsibilities
2:7
responsibility
2:12
result
3:21

**S**

said
6:4, 6:6

| | | |
|---|---|---|
| **say** | **things** | **we're** |
| 2:20, 3:22 | 2:13 | 4:6 |
| **several** | **time** | **whether** |
| 4:8, 4:10 | 3:14 | 2:16, 3:9 |
| **sides** | **transcribed** | **world** |
| 4:13 | 1:22 | 3:4 |
| **signature-p1kal** | **transcriber** | **writing** |
| 6:12 | 6:1 | 4:21 |
| **similar** | **transcript** | **X** |
| 4:8 | 6:3, 6:6 | **x's** |
| **situation** | **true** | 4:20 |
| 4:17, 4:18 | 6:6 | **Y** |
| **skills** | **turn** | **yeah** |
| 6:8 | 2:18 | 3:8, 4:2, 4:14, |
| **sort** | **tv** | 5:1 |
| 3:20 | 3:13 | **years** |
| **speak** | **twitter** | 4:8, 4:10 |
| 2:1 | 2:22, 4:7 | **1** |
| **speaker** | **typewriting** | **1** |
| 2:1, 2:19, | 6:5 | 2:1, 2:19, |
| 3:12, 4:14 | **U** | 3:12, 4:14 |
| **specific** | **under** | **2** |
| 3:21 | 4:4, 6:5 | **2023** |
| **specifically** | **understand** | 6:18 |
| 2:4 | 3:14 | **5** |
| **spooking** | **unless** | **517865** |
| 4:21 | 5:3 | 1:20 |
| **started** | **until** | |
| 2:14 | 5:6 | |
| **state** | **users** | |
| 2:14, 3:1, 4:5 | 4:15 | |
| **supervision** | **V** | |
| 6:6 | **viewed** | |
| **sure** | 4:3 | |
| 2:12 | **violating** | |
| **T** | 2:14 | |
| **talking** | **W** | |
| 5:8 | **want** | |
| **texans** | 3:16 | |
| 3:7 | **way** | |
| **texas** | 3:16, 4:1 | |
| 2:2, 2:7, 3:4, | **we're** | |
| 3:6, 3:10, 4:4, | 2:15, 3:8, 5:3, | |
| 4:5, 5:4, 5:5 | 5:7 | |
| **texas'** | **we've** | |
| 2:21, 3:2 | 2:14, 4:7, 4:12 | |
| **thank** | | |
| 2:3 | | |

# Exhibit E



ELIAS
LAW
GROUP

250 Massachusetts Ave NW, Suite 400 | Washington, DC 20001

December 12, 2023

**VIA ELECTRONIC MAIL AND FEDEX**

Levi T. Fuller
Assistant Attorney General
Special Litigation and Non-Profit Enforcement
Consumer Protection Division
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711-2548
Levi.Fuller@oag.texas.gov

> Re:   **Office of the Attorney General of Texas Civil Investigative Demand: Media Matters for America**

Dear Mr. Fuller:

We write as counsel to Media Matters for America ("Media Matters") in response to the Civil Investigative Demand ("CID") served on Media Matters on December 1, 2023. For the reasons explained below and in the lawsuit filed by Media Matters against Attorney General Paxton yesterday,[1] Media Matters objects to the CID in its entirety.

Your Office's initiation of this investigation and issuance of the CID constitutes flagrant retaliation against Media Matters for engaging in constitutionally protected speech and press activities. *See* Exhibit A (Complaint). The CID itself—served without any explanation as to how Media Matters may have violated or is even subject to Texas law on deceptive trade practices—infringes upon Media Matters's free speech and press rights under the First and Fourth Amendments, its due process rights under the Fourteenth Amendment, and its rights under the Maryland and District of Columbia reporters' shield laws. The CID has chilled and will continue to chill Media Matters from publishing additional news reports on X Corp. ("X") and Mr. Musk out of fear of further retaliation and harassment. Plaintiffs are seeking immediate relief in the form

---

[1] *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.). As-filed copies of the operative complaint and a copy of Plaintiffs' motion for temporary restraining order, are appended to this letter as Exhibits A and B.

1

Office of the Attorney General of Texas
December 12, 2023
Page 2

of a temporary restraining order and/or preliminary injunction to protect them from the ongoing, imminent, and irreparable injury posed by the CID.

Background. In November 2023, Mr. Eric Hananoki, senior investigative reporter at Media Matters, published three pieces of investigatory reporting on Media Matters's website showing the placement of advertisements for major corporations next to extremist content on the social media platform formerly known as Twitter, now called X and owned by X.[2] Mr. Hananoki's reporting was consistent with a year's worth of additional reporting from an array of different media outlets showing pervasive white nationalist, antisemitic, and other extremist content available on X. *See* Ex. A at 11-21. On November 20, following the publication of these articles, X filed a lawsuit in the Northern District of Texas against Media Matters and Mr. Hananoki. *See X Corp. v. Media Matters for America, et al.*, Case No. 4:23-cv-01175 (N.D. Tex.). On the same day, the Texas Attorney General issued a press release announcing that he was opening an investigation into Media Matters "for potential fraudulent activity."[3] Rather than set out any basis for investigating Media Matters—or explaining how the Texas Office of the Attorney General could even plausibly have jurisdiction over Media Matters—the press release used charged and partisan language, characterizing Media Matters as a "a radical anti-free speech organization" and a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]"

Media Matters received a copy of the CID via Federal Express on November 22 and was served via counsel on December 1, 2023. The CID provided a return date of December 12, 2023, less than two weeks later, and demands production of 12 overbroad categories of documents ("Demands") that overwhelmingly have nothing to do with trade practices or consumer protection. This Office's investigation, Mr. Paxton's related public statements and threats, and the issuance and substance of the CID have chilled Media Matters' protected speech and press activities. *See* Ex. A at 21-29.

Objections to CID. *First*, this Office is plainly without jurisdiction to investigate Media Matters, which is a non-profit media watchdog group with a principal place of business in Washington, D.C., where it is registered to do business. Media Matters is not registered as a foreign corporation in Texas because it does not "transact business" in Texas. Tex. Bus. Org. Code § 9.0002(a). Nor does it have a registered agent in Texas. Media Matters does not perform any "business practices" in Texas, Bus. & Com. § 17.44(a), and does not conduct any "trade" or "commerce" in Texas, *id.* §§ 17.45(6), .46(a). Mr. Hananoki's research, drafting, preparation, and review of the news articles referenced in the CID were done at his home in Maryland, where he performs nearly all of his work for Media Matters. Mr. Hananoki has never traveled to Texas to

---

[2] Articles specifically published on MediaMatters.Org on Monday, November 13, Thursday, November 16, and Friday, November 17 (the "November Articles").

[3] Press Release, Ken Paxton, Attorney General of Texas, Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity (Nov. 20, 20223), https://www.oag.state.tx.us/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

Office of the Attorney General of Texas
December 12, 2023
Page 3

perform his duties for Media Matters, nor did his preparation of the referenced articles involve communication with any residents, consumers, or businesses located in Texas.

*Second*, the CID demands associational and journalistic materials protected from disclosure by the First Amendment. Demands 1, 2, 4, 5, and 6-12 expressly seek documents which are protected wholesale from disclosure by the First Amendment privilege guaranteed to Media Matters by the U.S. Constitution. Demand 12 in particular, seeks documents sufficient to identify Media Matters's sources of funding, in violation of Media Matters's and its donors' associational rights protected by the First Amendment. As detailed in the attached complaint and motion, Attorney General Paxton has singled out Media Matters in retaliation for its constitutionally protected speech, resulting in an infringement of its rights and work as part of the press. *See* Ex. A at 21-32. This Office's investigation and the CID constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution and U.S. Code Section 1983.

*Finally*, the CID seeks expansive, privileged, and objectionable categories of documents and communications, many of which dramatically exceed the scope of the purported underlying issues. Each demand is overly broad and unduly burdensome. Demands 4-5, 7, 10-11 seek the production of large amounts of documents, many of which are protected from disclosure by the attorney-client privilege. Demands 1-5 constitute far-reaching fishing expeditions into Media Matters' possible jurisdictional contacts within Texas, and as stated above, Media Matters does not conduct business activity in Texas. Demands 1-6 are wholly irrelevant to any allegedly "fraudulent activity" engaged in by Media Matters. Additionally, with few exceptions, the CID imposes an unreasonable, burdensome temporal obligation on Media Matters by seeking an ongoing production of documents from January 1, 2022 until an undefined "final date of your production of responsive documents[.]"[4] Demands 2-3, and 12, which seek financial information from Media Matters, are both vague and overbroad.

Because the production of any materials demanded by the CID would require Media Matters to comply with an unconstitutional retaliation and unreasonable request for documents, many of which are privileged, Media Matters objects to the CID in its entirety.

The objections delineated above are illustrative and are not meant to be exhaustive. Media Matters's objections to the CID are based on the information it currently has available. It reserves the right to alter, supplement, or otherwise modify these objections based on the discovery of new or additional circumstances. Nothing in this letter constitutes waiver of any additional objections Media Matters may raise in the future to the CID or to any other investigations or claims brought by this Office or any other Texas official.

---

[4] CID at 2; Demands 2-8, 12.

Office of the Attorney General of Texas
December 12, 2023
Page 4

Regards,

Abha Khanna
Aria C. Branch
Christopher D. Dodge
Jacob D. Shelly
Elena A. Rodriguez Armenta
Daniela Lorenzo
Omeed Alerasool
**Elias Law Group LLP**

Theodore J. Boutrous, Jr.
Jay P. Srinivasan
Amer S. Ahmed
Anne Champion
**Gibson, Dunn & Crutcher LLP**

*Counsel to Media Matters*

# Exhibit F



## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

Abha Khanna                                                   December 29, 2023
Elias Law Group LLP
250 Massachusetts Ave. NW
Suite 400
Washington, DC 20001
AKhanna@elias.law

RE: Civil Investigative Demand Issued to Media Matters and Due on December 12, 2023

Ms. Khanna:

I am in receipt of your letter dated December 12, 2023.

As an initial matter, and as your letter acknowledges, Media Matters' responsive materials were due on or before December 12, 2023. Your client had an avenue under the Texas DTPA to seek State judicial intervention within 20 days of receipt of our CID, Tex. Bus. & Com. Code 17.61(g), but did not take it. We are submitting this letter in an effort to reach an out-of-court resolution to CID production and to your objections. You should not, however, confuse our engagement on these issues as a waiver of the State's right to pursue appropriate legal action to enforce this CID, if necessary, in the future. *See e.g. id.* at 17.62.

Even if Media Matters had sought judicial intervention from the CID at issue in this case, such a request would have been unmeritorious. Unlike other pre-suit investigative procedures provided for under Texas law, a CID issued by the Attorney General's Consumer Protection Division is not limited by the Texas Rules of Civil Procedure. *Compare* Tex. Bus. & Com. Code § 17.61(c) *with* Tex. Bus. & Com. Code § 15.10(d)(1). What is more, longstanding precedent in both the State of Texas, and the United States generally, grants Attorneys General broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation. Indeed, to resist the Attorney General's investigation, Media Matters would have needed to establish that there were zero permissible justifications for the investigation. *See Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980); *see also F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001).

Furthermore, in spite of your displeasure with the supposed lack of insight that our Office has provided into its confidential investigation,[1] again – unlike other statutory investigative tools – the Consumer Protection Division's only obligation is to "state the general subject matter of the

---

[1] See Tex. Bus. & Com. Code § 17.61(f).

investigation," – which given your letter's detailed "background," you have not – and apparently cannot – contest that Media Matters was provided.

Even setting all of this aside for purposes of discussion, however, and even if the Texas Rules of Civil Procedure did apply (they do not), the Texas Rules of Civil Procedure – and the rules of courts throughout the country – uniformly require parties to put meat on the bones of their objections. It is not enough to baldly state that a request is "overly broad," "unduly burdensome," "vague," or "irrelevant." Rather, "a responding party who objects to a request for production because it is overbroad, unduly burdensome, vague, ambiguous, or unreasonably cumulative or duplicative should explain why the discovery request suffers from each asserted deficiency." *In re Park Cities Bank*, 409 S.W.3d 859, 876 (Tex. App. 2013); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex. 1999) ("[a] party resisting discovery… cannot simply make conclusory allegations that the requested discovery is unduly burdensome or unnecessarily harassing"). The conclusory nature of your objections, however, appears to be a stonewall that does not enable genuine opportunity for discourse. If we cannot understand the scope of your complaints, it is impossible for us to offer any redlines in satisfaction of those complaints.

Your letter also contends that the Attorney General's Consumer Protection Division is "plainly without jurisdiction to investigate Media Matters." While that may be your position based on your review of the records demanded, this complaint exemplifies the very purpose of a pre-suit investigation: the State of Texas is not bound to accept Media Matters' unvarnished representation that it has not availed itself of this State or otherwise engaged in deceptive and misleading actions relating to Texas businesses and consumers. Indeed, as revealed by you, there is a lawsuit pending in the United States District Court for the Northern District of Texas that alleges *inter alia* that Media Matters intentionally misled and deceived millions of Texans, and created false impressions, confusion, and misunderstandings with respect to the affiliations, associations, and advertising of several major companies, whom transact massive amounts of business in this State, including X Corp. and Austin-based Oracle.

Despite your failure to avail yourself of the DTPA's allowance for State court adjudication of our CID, and without prejudice to our ability to pursue the demanded materials in full, the objective of this letter is to respectfully request that you provide a more thorough explanation of each of your complaints as applied to each specific demand. Our Office has no desire to engage in protracted, unnecessary litigation over the demands in the CID, and is more than willing to engage with you to address any good faith arguments about the First Amendment, privilege, or anything else. For example, if you believe that one of our demands is overbroad, explain the extent and reasoning of your contention, and we will make our best efforts to accommodate your objection. With this information, we can attempt to move forward towards a more efficient resolution.

We request that you provide a response to this letter by January 4, 2024.

Sincerely,

Rob Farquharson

Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Texas

# Exhibit G



250 Massachusetts Ave NW, Suite 400 | Washington, DC 20001

January 4, 2024

**VIA ELECTRONIC MAIL AND FEDEX**

Rob Farquharson
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711-2548
Rob.Farquharson@oag.texas.gov

Re:     Office of the Attorney General of Texas Civil Investigative Demand: Media Matters for America

Dear Mr. Farquharson:

We are in receipt of your letter dated December 29, 2023 ("Letter"). While we appreciate your Office's invitation to "attempt to move forward towards a more efficient resolution," Letter at 2, we continue to believe that there is only one appropriate disposition to this matter—termination of your office's investigation in its entirety, including withdrawal of the civil investigative demand ("Demand") served on Media Matters on December 1, 2023. This is the case for at least two reasons.

First, as your letter acknowledges, it is our client's position that your office is plainly without jurisdiction to conduct this investigation of Media Matters, an organization with its principal place of business in Washington, D.C. that does not avail itself of Texas in any relevant respect and that has not availed itself of Texas at all, much less with respect to the facts that apparently gave rise to your investigation. This is not an "unvarnished representation" as your letter claims—your office is now in receipt of three sworn declarations filed in federal court averring to Media Matters's lack of contact with Texas. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.), ECF Nos. 20-2, 20-3, 20-4. A minimal investigation by your office would also reveal that Media Matters is not registered with the Texas Secretary of State to conduct any business in your jurisdiction. To date, your office has not identified a single relevant connection between Media Matters and Texas beyond the unproven (and incorrect) allegations in a lawsuit improperly filed by a private party in the Northern District of Texas that is as jurisdictionally deficient as your investigation. The notion that your office is entitled to *any*

1

Office of the Attorney General of Texas
January 4, 2023
Page 2

materials, let alone the extraordinarily broad and privileged swathe of materials requested, based on such a paltry showing offends basic principles of fairness and due process.

Second, as your office is also aware, it is our position that Attorney General Paxton's investigation constitutes unlawful retaliation in violation of the First Amendment and numerous other constitutional and statutory rights and privileges held by our clients. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.), ECF No. 1 (Complaint). Your December 29 Letter continues this pattern of imposing extra-jurisdictional threats that operate to chill Media Matters's protected First Amendment activity. For example, your letter contends that the only way to resist the Attorney General's freewheeling investigation would be for Media Matters to show that "there were zero permissible justifications for the investigation"—while conceding that your Office has not provided any explanation of jurisdiction or how Media Matters violated Texas law beyond identifying a "general subject matter" of the investigation. Letter at 1-2. Your Office also claims that Attorney General Paxton has "broad discretion in the overall breadth and relevance" of materials he may seek from Media Matters, apparently without cause or explanation. Letter at 1. We do not agree that the Attorney General may—upon no showing of cause or jurisdiction—engage in an unlawful fishing expedition into our client's privileged and constitutionally-protected materials, or misuse Texas law to retaliate against our clients with a legally baseless Demand that chills their constitutionally-protected speech and activities.

Accordingly, because your investigation and Demand are both lacking in jurisdiction and unlawful under the United States Constitution, your requests are void from the start. But the Demand is further overbroad and burdensome for the reasons set forth in our December 12 response. *See* December 12 Letter Response at 3-4 (providing non-exhaustive list of objections). Any further discussion of those objections, however, is premature. As you are aware, your Office's retaliatory actions form the basis of a lawsuit in the District of Maryland filed by Media Matters and Mr. Eric Hananoki. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.). A hearing in that case on Plaintiffs' motion for a temporary restraining order and preliminary injunction is scheduled for January 8, 2024. *See* ECF No. 24 (scheduling hearing); ECF No. 31 (granting in part Defendant's request for extension). Because Plaintiffs seek to enjoin your investigation, as well as any further enforcement of the Demand, that hearing will determine whether, or to what extent, your investigation may proceed. Given that the hearing is mere days away and the Court has indicated that it intends to rule expeditiously, we do not see any utility in having further substantive discussions about the Demand until all parties receive clarification from the Court about whether the investigation may proceed.

For the avoidance of doubt, Media Matters reasserts the objections in its December 12, 2023 letter to your Office, including the objections made to individual Demands Nos. 1-12 in the CID. *See* December 12 Letter Response at 3-4 (providing non-exhaustive list of objections). And as explained above, Media Matters also reiterates its objection to the Demand (and related investigation) in its entirety due to jurisdictional and legal infirmities described in Media Matters's and Mr. Hananoki's complaint.

Office of the Attorney General of Texas
January 4, 2023
Page 3


Regards,

Abha Khanna
Aria C. Branch
Christopher D. Dodge
Jacob D. Shelly
Elena A. Rodriguez Armenta
Daniela Lorenzo
Omeed Alerasool
**Elias Law Group LLP**

Theodore J. Boutrous, Jr.
Jay P. Srinivasan
Amer S. Ahmed
Anne Champion
**Gibson, Dunn & Crutcher LLP**

*Counsel to Media Matters*

# Exhibit H

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      GREENBELT DIVISION


 3  _____
                                        )
 4  MEDIA MATTERS FOR AMERICA, et al.,  )
                                        )
 5       Plaintiffs,                    )
                                        )Docket Number
 6            vs.                       )8:23-cv-03363-PX
                                        )
 7  WARREN KENNETH PAXTON, JR., in his  )
    official capacity as Attorney       )
 8  General of the State of Texas,      )
                                        )
 9       Defendant.                     )
    _____)
10
                    TRANSCRIPT OF TRO HEARING
11            BEFORE THE HONORABLE PAULA XINIS
               UNITED STATES DISTRICT COURT JUDGE
12            MONDAY, JANUARY 8, 2024, AT 12:30 P.M.


13


14  APPEARANCES:

15  On Behalf of the Plaintiff:

16       ABHA KHANNA, ESQUIRE
         Elias Law Group, LLP
17       1700 Seventh Avenue, Suite 2100
         Seattle, WA  98101
18       (206)656-0177

19       CHRISTOPHER D. DODGE, ESQUIRE
         JOSEPH POSIMATO, ESQUIRE
20       Elias Law Group, LLP
         250 Massachusetts Avenue NW, Suite 400
21       Washington, DC  20001
         (202)987-4928
22

23       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

24

25
```

```
 1    APPEARANCES CONTINUED:

 2    On Behalf of the Defendant:

 3         CHRISTOPHER LAVORATO, ESQUIRE
           Office of the Attorney General, Texas
 4         P.O. Box 12548
           6th Floor
 5         Austin, TX  78711
           (512)463-4380
 6
           GENE SCHAERR, ESQUIRE
 7         KENNETH KLUKOWSKI, ESQUIRE
           Schaerr Jaffe, LLP
 8         1717 K Street NW Suite 900
           Washington, DC  20006
 9         (202)787-1060

10    ALSO PRESENT:  Eric Hananoki

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2        (Court called to order.)

 3        DEPUTY CLERK:  The United States District Court of

 4   Maryland is now in session.  The Honorable Paula Xinis

 5   presiding.

 6        THE COURT:  Good afternoon, everybody.  You all can

 7   have a seat.

 8        Mr. Ulander?

 9        DEPUTY CLERK:  Yes, Your Honor.  The matter pending

10   before the Court is Civil Action Number PX23-3363, Media

11   Matters for America, et al., versus Warren Kenneth Paxton Jr.

12   The matter before this Court is a temporary restraining order

13   hearing.

14        Counsel, please identify yourselves for the record.

15        MS. KHANNA:  Good afternoon, Your Honor.  Abha Khanna

16   on behalf of plaintiffs.

17        With me at counsel table are our named plaintiff,

18   Mr. Hananoki, and as well as counsel Chris Dodge and Joseph

19   Posimato.

20        THE COURT:  Okay.  Good afternoon.  Thank you.

21        MR. SCHAERR:  Good afternoon, Your Honor.  Gene

22   Schaerr; I'm local counsel for the Texas AG's office.  And with

23   me is Mr. Chris Lavorato from the Texas AG's office, and my

24   colleague, Ken Klukowski.

25        THE COURT:  Okay.  Thank you all for being here and
```

1   for putting as much effort into this case as you have so that

2   we can have this hearing today on plaintiff's motion on

3   preliminary injunction and/or temporary restraining order.

4         Let me give you a little preview as to where I am because

5   I've thought long and hard about how to address the issues that

6   have been raised.

7         In response to plaintiff's motion, the defense has not

8   only filed a separate motion, but made the non -- not even

9   getting to the merits argument that there's lack of subject

10  matter, jurisdiction, personal jurisdiction, and I believe even

11  venue, that provisionally they have filed a separate motion

12  which has not yet been formally responded to by the plaintiffs.

13        And my view, provisionally, is that while the complaint

14  viewed in the light most favorable to the plaintiffs, I

15  believe, has jumped the broom on subject matter jurisdiction.

16  I do believe that you have pled enough for this to be ripe

17  constitutionally.

18        I'm stuck on personal jurisdiction.  And I do believe, at

19  least without yet hearing from you all, that the plaintiff has

20  not sufficiently pled personal jurisdiction.  But we can talk

21  about that.

22        What I would like to do today is really focus on that,

23  because I don't believe it's proper -- unless I make a

24  determination on personal jurisdiction in the plaintiff's

25  favor, I don't think it's proper to get into the merits at all.

1    And I know there has been some background conversation about

2    who will be called for whom as witnesses on the motion.  And I

3    do think that those conversations are important if I get to the

4    merits.  But before that, I think a proper treatment of

5    personal jurisdiction must be had.

6         So that's where I am.  And I would like to hear from you

7    all first on the defense's position that personal jurisdiction

8    in this forum is lacking.

9         Given that it is the defense's position, I know it's not

10   their motion, but since it's their position, I think we ought

11   to hear from them first, and then I'll turn to the plaintiff.

12              **MR. LAVORATO:**  Thank you, Your Honor.  Chris

13   Lavorato, again, from the Texas Attorney General's Office.

14        Your Honor, we agree that there is no personal

15   jurisdiction here.  And I do have some slides that I was going

16   to put up on the screen, if possible, that I can kind of walk

17   through this process with you in terms of talking about this

18   issue.

19        First of all, there's -- there's two separate and

20   distinct --

21              **THE COURT:**  We're in specific -- we're in -- we're in

22   did -- did you purposefully avail yourself of this

23   jurisdiction?  Not by coincidentally caused some injury --

24              **MR. LAVORATO:**  Right.

25              **THE COURT:**  -- or even negligently caused some

1  injury, but did you bring yourself into this forum?

2          **MR. LAVORATO:**  Exactly.

3          **THE COURT:**  That's where we are, right?

4          **MR. LAVORATO:**  Yes, Your Honor, that's exactly where

5  we're at.

6      And I'm going to cite cases that actually the plaintiff

7  cited within their brief.  They cite Carefirst, which is a case

8  that it's 126 F.3d 625, it reaffirmed the ESAB case on the

9  matter of personal jurisdiction.

10     And that particular case cites a U.S. Supreme Court case,

11 which basically says that some act by which the defendant

12 purposefully avails itself of the privilege of conducting

13 activities within the forum state, and thus invoking the

14 benefits of that particular state, it rises to the level of

15 where the defendant must actively seek and target the forum

16 state.

17     The facts in this particular case, Your Honor, are that,

18 number one, the CID, the civil investigation demand, was

19 directed as Media Matters, which is a Washington D -- it's a

20 District of Columbia corporation.  It has nothing to do with

21 Maryland.

22     It was served on Media Matters in the District of

23 Columbia.

24     The plaintiff in this case, Mr. Hananoki, is not a

25 plaintiff that we served with the CID.  They brought this

1   person in and --

2          **THE COURT:**  Well, you referenced the article and the

3   materials surrounding --

4          **MR. LAVORATO:**  Correct.

5          **THE COURT:**  -- at least one, maybe more, of

6   Mr. Hananoki's articles as a subject of interest for which you

7   wanted responsive documents?

8          **MR. LAVORATO:**  That's true.  There are two requests

9   in the CID.  There's 12 total, but there's two that mention his

10  name.

11         And we came to that conclusion, obviously, because it was

12  publicized that it was Mr. Hananoki that -- that wrote that

13  article or published that article.

14         Other than that, though, Your Honor, there is no --

15  absolutely no nexus with regard to the Texas attorney general's

16  direction of activities towards this particular state.

17         **THE COURT:**  And I'll give both sides an opportunity

18  to tell me this, but is there anything in the record currently

19  which suggests the attorney general had any contemporaneous

20  knowledge, even, that Mr. Hananoki lived or worked in Maryland?

21         **MR. LAVORATO:**  None, Your Honor.

22         **THE COURT:**  I didn't find any, but I -- again, I want

23  to hear from the plaintiff, but I didn't see anything.

24         **MR. LAVORATO:**  The first time that the Texas attorney

25  general learned of Mr. Hananoki was in connection with that

1    particular article.

2         And as a matter of fact, the first time a CID had ever

3    been served on Media Matters, as everybody here knows, is this

4    particular one.  Okay?

5         So there's absolutely no connection, no direct aim at the

6    state of Maryland.

7         And it's a pretty simple analysis with regard to what the

8    current case law is all the way up to the Supreme Court of the

9    United States.

10        **THE COURT:**  What -- what about *Calder?*  What if the

11   plaintiff gets up and says, well, *Calder* stands for this

12   proposition, that it's the effects -- you know, it's the

13   effects test.  And that the effect of this subpoena is to

14   essentially direct your aim at a reporter who lives and works

15   in Maryland?

16        **MR. LAVORATO:**  Well, anybody can say that, though,

17   Your Honor.  Anybody could make that particular argument that

18   because this has been directed at Media Matters, and I have

19   some relationship to Media Matters that I'm affected, and,

20   therefore, there's personal jurisdiction, that -- that --

21        **THE COURT:**  There's no limiting --

22        **MR. LAVORATO:**  There's no limiting.

23        **THE COURT:**  Yeah.

24        **MR. LAVORATO:**  It's as simple as that, Your Honor,

25   and that's where we're at.

```
 1          THE COURT:  All right.  Well, then let me turn to the

 2   plaintiff --

 3          MR. LAVORATO:  Sure.

 4          THE COURT:  -- and see what they have to say.

 5          MR. LAVORATO:  Sure.

 6          MS. KHANNA:  If you don't mind, Your Honor, I'll

 7   stand at the podium.

 8          THE COURT:  Sure, wherever you're comfortable.

 9          MS. KHANNA:  Can you take down the --

10      Thank you, Your Honor.  I appreciate your candor in

11   letting us know what is the -- what you're most interested in,

12   and want to make sure I address any concerns that the Court has

13   when it comes to personal jurisdiction.

14      I want to rest -- this Court to rest assured that this

15   Court sitting in this district has jurisdiction to hear this

16   case.

17      Mr. Paxton's CID directly targets both the past and the

18   ongoing Maryland-based activities, a Maryland resident.

19          THE COURT:  What evidence is there that Mr. Paxton

20   knew -- the attorney general knew that Mr. Hananoki was doing

21   any work in Maryland?

22          MS. KHANNA:  Well, I think it's telling, Your Honor,

23   that at no point in their papers have they asserted that they

24   did not know where Mr. Hananoki lived.

25          THE COURT:  But it's your burden.  I have to look at
```

1   the complaint in the light most favorable to you and find some

2   evidence of purposeful availment.  I mean, every case is clear.

3   There has to be something more than just fortuity, or finding

4   out later, and so where is it?

5          **MS. KHANNA:**  Certainly, Your Honor.

6      And the -- the -- whether they have shown us, or we know

7   exactly what was in their minds and what they knew of

8   Mr. Hananoki's residence, they knew that Mr. Hananoki was the

9   target of the investigation; they knew that Mr. Hananoki was

10  the source of the investigation to begin with --

11         **THE COURT:**  Frankly, you know, to be fair, the --

12  what you attach to the complaint, the actual CID has nine or

13  ten subject areas, right?  And the lion's share of them have to

14  do with Media Matters.  And we can go through them together,

15  but they have to do with the structure and the -- you know, I

16  can't remember the exact words, but I recall that there were

17  two of the nine that had to do with the articles that

18  Mr. Hananoki wrote.

19     Am I right about that?

20         **MS. KHANNA:**  Well, there were two of the nine that

21  specifically mentioned Mr. Hananoki by name.

22         **THE COURT:**  Okay.

23         **MS. KHANNA:**  But there were more of -- I think it's

24  12, actually, and we can walk through them --

25         **THE COURT:**  Sure.

1    **MS. KHANNA:**  -- but there were more of them that

2    actually hinged specifically on Mr. Hananoki's beat.  So when

3    it's seeking articles and information and documents related to

4    coverage of X more generally, coverage of its CEO, that is

5    Mr. Hananoki's beat, as alleged in our complaint and provided

6    undisputed here.

7        Mr. Hananoki -- I think Media Matters has published some,

8    what, 12 or 14 articles since February of this year

9    specifically on the Twitter -- the X platform, and since --

10   **THE COURT:**  Is there any facts in the CID or anywhere

11   in your complaint, again, that even though this is

12   Mr. Hananoki's beat, that the attorney general knew he plied

13   his trade in Maryland?  Like, he wrote in Maryland?  He created

14   these -- that's your position in the complaint, I believe, and

15   in the papers.  But, again, where is it that the AG knew?

16   **MS. KHANNA:**  So the purposeful availment is had here,

17   Your Honor, when they -- when the attorney general of Texas --

18   first of all, the fact that the attorney general of Texas

19   decided to shoot first and ask questions later not knowing --

20   **THE COURT:**  Well, even using your terms, in D.C.;

21   served it in D.C., served on your CEO, served it only as to

22   Media Matters, didn't serve it on Mr. Hananoki personally,

23   so --

24   **MS. KHANNA:**  Based solely on an article --

25   **THE COURT:**  Yeah.

1          **MS. KHANNA:**  -- that Mr. Hananoki researched, wrote,

2    and published in Maryland, documents based in Maryland, and the

3    chill felt in Maryland.

4          **THE COURT:**  Is there any public record -- any public

5    record -- if I go and read this article, is it going to say in

6    Mr. Hananoki's byline that he's a resident of Maryland?

7          **MS. KHANNA:**  Not in the byline, Your Honor.  But, of

8    course, the state attorney general of Texas has the full

9    investigative power at his fingertips to find out where is his

10   action -- where are his actions going to be felt.  He does not

11   get to show up basically at our client's front door to cause

12   ongoing injury and then say, "Whoopsie, I didn't know," or that

13   "I couldn't possibly have known," particularly where the --

14         **THE COURT:**  But that's not the test.  The test -- you

15   know, the focus here -- and I got to tell you, your reply spent

16   maybe a paragraph on this.  It was like the tail wagging the

17   dog.  It was at the end of the reply as if, you know, these are

18   not threshold issues, so that's one.

19         And, two, listen, constitutional principles are equally

20   important, right?  Whether it's -- and I'm not -- I'm not --

21   please don't take my questions as somehow giving short shrift

22   to the First Amendment.  If this case, in my view, in the end,

23   is properly here, we will be talking about the merits, right?

24   But there's another animating constitutional principle, and

25   that's due process.

 1          And the focus of the due process analysis in personal

 2     jurisdiction is about whether the defendant should be hailed

 3     into another state's forum, a foreign defendant.

 4          And the Court, the high court, Fourth Circuit, spent a

 5     long -- you know, fought long and hard about that line between

 6     actions that a defendant takes, which happened to cause injury,

 7     and actions which a defendant takes that allows this court to

 8     exercise jurisdiction over that defendant.

 9          And, again, on the face of the complaint, I haven't really

10     heard that I should be looking much further than the complaint

11     and the attachments, I -- I want to know what evidence there

12     is -- is your argument -- let me ask you this:

13          Is your argument a should-have-known?  Is it, you know,

14     attorney general surveying a CID of this nature should have

15     known he would be reaching into the state of Maryland when

16     doing so?

17          **MS. KHANNA:**  I believe -- yes, Your Honor.  And I

18     believe that he reasonably knew he was reaching well outside

19     his jurisdiction when he was -- sounds to me like we all agree

20     that the service of the demand in D.C. is somehow -- is

21     sufficient enough to invoke the powers of D.C.

22          **THE COURT:**  Right.  I mean, I don't think there's --

23     I don't know why you didn't bring it there, but that's for you

24     to decide, and I guess we'll talk about that in the future, but

25     you know.

1      **MS. KHANNA:**  Well, certainly if this court believes

2 that the proper action is to transfer venue or to transfer to

3 the D.C. court, I don't -- that -- that -- I understand the

4 Court's position.

5      But I think specifically here when it comes to the

6 jurisdiction of Maryland, it is reasonable for when Ken Paxton,

7 as the state attorney general, whose investigative power, he's

8 enforcing, he's invoking, to understand that when he's

9 targeting a D.C.-based company and its writers, and

10 specifically one journalist in particular, that the people who

11 live and work in the D.C. metropolitan area would be most

12 affected.

13      So it would include not just the location right at the

14 headquarters, but the -- but the people who live and work in

15 that area.

16      And so I don't think that Maryland is beyond the pale --

17      **THE COURT:**  So is it your position to say that, you

18 know, Mr. Hananoki wrote some of this article on a Starbucks in

19 Virginia, now the attorney general can be sued in Maryland,

20 Virginia and D.C.?

21      **MS. KHANNA:**  No, Your Honor, and that's because the

22 locus of the activities here are sufficient.

23      The ties are sufficient, where it's just not that he

24 happened to be sitting in a Starbucks in a state, it is the

25 place where he resides, it is the place where he is authorized

 1  to work.  It is the place where all the documents they are

 2  seeking in their demand are located.

 3        **THE COURT:**  But they knew none of that.  I mean,

 4  there's no evidence that they knew any of that when they served

 5  it on Media Matters, unless there's something I'm missing.

 6        **MS. KHANNA:**  No.  And to your point, Your Honor, I do

 7  believe there's a reasonableness standard when it comes to the

 8  attorney general executive authority to know who is he -- who

 9  is he targeting when he's targeting -- when he's just shooting

10  out these investigations along state lines.

11        **THE COURT:**  But I have found no case.  I mean, you've

12  cited me a number of cases.  I think it was Twitter didn't

13  really even get into the analysis.  So I can't -- I mean, that

14  district court opinion barely scratched the surface of personal

15  jurisdiction.

16        **MS. KHANNA:**  Twitter did cite *Calder*, Your Honor,

17  and --

18        **THE COURT:**  I'm sorry?

19        **MS. KHANNA:**  It did cite the *Calder* case.

20        **THE COURT:**  Right, but there have been so much --

21  there's been such development in the Fourth Circuit, and I

22  would say the Supreme Court, about *Calder* having been limited,

23  to some degree, to its facts, and its facts are very different

24  than this one.  I mean, there was at least a factual predicate

25  for a more specific targeting, right, of the Enquirer, looking

1   at this actress who everybody knows is a California based

2   actress, that's where she makes her money, that's where she

3   plies her trade, and the Enquirer really targeting that.  I

4   accept those facts as true.

5        I don't think we have the same here.  And it seems like a

6   lot of your argument is resting on this is an attorney general

7   conducting an investigation, and that's a pretty big shot.

8        So is there some other case that pushes the bounds as far

9   as you have of personal jurisdiction?  Because the other ones

10  really, you know, really their AG had gone into the forum and

11  went to a meeting, or the -- the subpoena itself was served on

12  the defendant -- on the -- on the plaintiff corporation in the

13  locale -- in the forum in which the fight about personal

14  jurisdiction occurred.  Like, I'm just looking for some sort of

15  parallel.

16       **MS. KHANNA:**  And I understand, Your Honor.  Let me be

17  very clear about the actual -- for one second, let's talk about

18  the effects, the *Calder*-based effects.

19       **THE COURT:**  Okay.

20       **MS. KHANNA:**  There's no question and there's no

21  reason to dispute that Mr. Hananoki lives in Maryland; that he

22  works in Maryland; that he wrote the article that instigated

23  this entire demand in Maryland; that all of his documents

24  related to that article and the related to the CID in general

25  are in Maryland; and that the chill that he's currently

1  experiencing as a result of this case and as a result of the

2  demand is happening ongoing currently in Maryland.  So to be

3  sure, the effects are being felt in Maryland, and I believe

4  that all of the case law recognizes those as ties.

5      What Your Honor has mentioned is about whether or not the

6  CID was specifically served in Maryland.  You're correct, it

7  was not.  It was served at his employer's headquarters in D.C.

8          **THE COURT:**  It was directed to Media Matters.

9          **MS. KHANNA:**  And it was directed at Media Matters --

10 directed at Media Matters by name while mentioning Mr. Hananoki

11 by name.

12         **THE COURT:**  Right, but the responder, the respondent

13 is going to be Media Matters.  And you can have -- I mean

14 there's all kinds of, you know, intricacies of this CID where

15 you can raise whether your employee or your agent has

16 responsive documents, whether you have them, if they are in

17 your possession, custody, or control.

18     But the -- but the bright line is that it is Media

19 Matters' obligation to respond, not Mr. Hananoki directly,

20 right?

21         **MS. KHANNA:**  Their obligation to respond -- they can

22 guarantee a response but they have no possession or control

23 over Mr. Hananoki's work, internal documents, research.

24         **THE COURT:**  Who is "they"?

25         **MS. KHANNA:**  Media Matters.

1          **THE COURT:**  Right.  That's my point.

2          **MS. KHANNA:**  Right.

3          **THE COURT:**  But your Media Matters is the plaintiff

4    who has to respond to the CID, not Mr. Hananoki.  And so if

5    your response to the CID is we don't have it, Mr. Hananoki has

6    it, now the AG has to decide do they serve Mr. Hananoki with a

7    CID.

8        They haven't done that yet.  We're not at that stage.  If

9    we were there, this would be a different conversation.

10          **MS. KHANNA:**  Yes, Your Honor.  And I understand the

11   concern.  I want to be very clear that the -- when our clients

12   read the demand --

13          **THE COURT:**  Yep.

14          **MS. KHANNA:**  -- they read Mr. Hananoki's work,

15   Mr. Hananoki's notes, Mr. Hananoki's articles as being the

16   subject of the demand, and it is Mr. Hananoki in conjunction

17   with Media Matters, generally, who is chilled.

18       I understand Your Honor's concern about what did they

19   know, or what should they have known or what could if they have

20   known.  And I hear what you're saying is it enough that they

21   probably should have known as the state investigatory arm,

22   before, you know, issuing a demand, or announcing in a press

23   release minutes after the Twitter lawsuit?  After the Elon Musk

24   lawsuit?  Should they have known?  Should they have

25   investigated?  Who they are actually affecting and where they

1   are affecting it?  Yes, I do believe that's true.

2       I also think, Your Honor, while it is our burden to

3   establish that this Court has Article III jurisdiction, where

4   the defendant has raised a personal jurisdiction defense and

5   has not asserted, in many assertions, that they have -- that

6   they did not know where Mr. Hananoki was located, that they

7   have forfeited that argument here as basis for --

8       **THE COURT:**  Why?  Why?  I'm looking at a facial

9   complaint.  I'm looking at the complaint -- a complaint, and I

10  have to take all facts in the light most favorable to you and

11  decide whether there is personal jurisdiction.  Why don't we

12  just say it that way.

13      I don't see any forfeiture or waiver of any argument or

14  claim.  Okay?

15      Maybe I had inartfully said it was your burden.  What I

16  mean by that is I'm looking at it as the four corners of the

17  complaint and all the attachments.  That's where I'm living.

18  Is that wrong?

19      **MS. KHANNA:**  No, Your Honor, I do believe -- that's

20  not wrong, of course.

21      But where the defendant has raised a personal jurisdiction

22  defense saying, well, you know, we've not done this -- this is

23  a factual question, right, that they are raising?  I believe

24  where they have asserted many things, they have not asserted

25  lack of knowledge for Mr. Hananoki.  And that's for good

1   reason.  And that probably is because they probably did know.

2      And I will just say, Your Honor, I just got a note --

3         **THE COURT:**  I don't know about that.  I believe their

4   response covers this because it's logical.

5      I mean, this was a very -- I agree with Mr. Lavorato, this

6   is a really straightforward argument.  This is not counting

7   angels on the head of a hypothetical pin.  I mean, this is what

8   in the complaint makes it even plausible that there was

9   purposeful availment of this court?  Not just of a person who

10  happened to live here who maybe worked on the article when the

11  CID was issued in D.C., but purposeful availment of the forum.

12     I mean, at best you're giving me some circumstantial

13  evidence of you knew Mr. Hananoki was involved.  But I don't

14  have anything that raises the AG knew where Mr. Hananoki

15  worked, lived to make this purposeful availment of this forum

16  plausible.

17        **MS. KHANNA:**  And with respect, Your Honor, I don't

18  believe that they have made an exact claim that they did not

19  know in their papers.  And I believe that's for good reason.

20     As my counsel just pointed out to me, in the Musk

21  complaint itself, which is incorporated into our complaint, in

22  Paragraph 17 --

23        **THE COURT:**  You incorporated a complaint into a

24  complaint?

25        **MS. KHANNA:**  The lawsuit, basically, which formed

1  the --

2      **THE COURT:**  Not the lawsuit.  You don't expect me to

3  go back and take all of those facts alleged by -- how am I

4  supposed to do that?

5      **MS. KHANNA:**  You don't have to take as true any of

6  the facts alleged in the complaint to know that Mr. Paxton was

7  basing his entire demand and basing his entire investigation

8  based solely on Musk's lawsuit against my clients.  And that

9  specific lawsuit identifies Mr. Hananoki as a Maryland-based

10  reporter in Paragraph 17 of that complaint.

11      **THE COURT:**  I'm not sure that I can go that far.

12  There is a complaint in Texas that identifies Media Matters and

13  Mr. Hananoki as a Maryland-based reporter.

14      **MS. KHANNA:**  There's not just a complaint in Texas,

15  there's the complaint that instigated this investigation by the

16  attorney general.

17      **THE COURT:**  And I'm not sure you made that argument

18  in your one-paragraph reply on personal jurisdiction.

19      **MS. KHANNA:**  And, Your Honor, with respect, I do not

20  believe that the attorney general made the argument that they

21  did not know where Mr. Hananoki resides for good reason, and

22  think that's because they did.  Because Mr. Musk certainly

23  knew.  And all of their information, and all of their basis for

24  bringing this investigation is because of Mr. Musk's lawsuit.

25      **THE COURT:**  Okay.  Well, then, let's go to -- give me

```
 1   a minute, since this seems to be a cornerstone of your
 2   argument, give me a minute to look at their response.
 3       And the response is at -- 33, thank you.
 4           MR. SCHAERR:  I believe it starts at Page 14, Your
 5   Honor.
 6           THE COURT:  Yes, I'm there.
 7       So then, I guess, Mr. Lavorato, you would agree with the
 8   plaintiff that you didn't raise the argument, that you didn't
 9   know Mr. Hananoki lived in Maryland?
10           MR. LAVORATO:  Your Honor, my argument is more
11   centered around the issue of -- that they have the burden.
12   They have the burden to show that there's personal
13   jurisdiction.
14       So whether or not the Texas attorney general has to
15   specifically state, "I didn't know," or "I don't know where
16   Mr. Hananoki lives" wouldn't be a requirement under the law.
17       You know --
18           THE COURT:  Are you saying kind of like the fact of
19   the matter is, you directed your investigation to Media Matters
20   in D.C. --
21           MR. LAVORATO:  Absolutely.
22           THE COURT:  -- is sort of where it begins and ends?
23           MR. LAVORATO:  Or else we would have served
24   Mr. Hananoki.
25           MS. KHANNA:  And, Your Honor, where this case begins
```

1    and ends is at the service of a demand in D.C., invokes for

2    jurisdiction in D.C., and if that's what Paxton's counsel is

3    saying today, we can understand that.  We would certainly

4    understand if this Court saw fit to move it to D.C. or if we

5    had to refile in D.C.

6              **THE COURT:**  I mean, that's where -- frankly, I just

7    think if you want a resolution that is fast and fair to both

8    sides, you would move it to D.C.  You would either authorize

9    that I transfer for lack of personal jurisdiction, with an

10   agreement from both sides that personal jurisdiction exists in

11   D.C., that way you're in the right forum.  That would probably

12   be the fastest way.  Or you can brief it.

13             **MR. LAVORATO:**  You want me to respond?

14             **THE COURT:**  Yeah.

15             **MS. KHANNA:**  Your Honor --

16             **THE COURT:**  I mean, it sounds like the plaintiff is

17   saying, if that's where we are, that would be the most --

18   because there's no disagreement, plaintiff, that personal

19   jurisdiction exists in D.C.

20             **MS. KHANNA:**  There's no disagreement that we have two

21   clients here, Media Matters based in D.C., Mr. Hananoki based

22   in Maryland.  We do believe that there is appropriate

23   jurisdiction here, but if that's not where the Court is

24   inclined to go, we have no objection to transferring it to D.C.

25   Certainly -- certainly the Court there has personal

1  jurisdiction as well.

2          **THE COURT:**  And then you can fight about whether

3  there's -- you know, if there's -- I don't think there's a

4  venue question.

5      But in any event, let me see what Mr. Lavorato says.

6          **MR. LAVORATO:**  My response to that, Your Honor, would

7  be that that particular issue, in terms of moving it to

8  Washington D.C., is something that needs to be briefed.

9          **THE COURT:**  Well, let me ask you a straight question,

10  then.

11          **MR. LAVORATO:**  Sure.

12          **THE COURT:**  Did you not argue that there is -- I

13  mean, didn't you -- I thought in your pleadings that you

14  referenced that there is personal jurisdiction in D.C.

15          **MR. LAVORATO:**  I don't think we went as far as to say

16  there is personal jurisdiction in Washington D.C. and that Ken

17  Paxton is accepting that notion.

18      I think that had they --

19          **THE COURT:**  The other thing that they could do,

20  correct, is dismiss this case and refile immediately in D.C.

21  There wouldn't be any -- right?

22          **MR. LAVORATO:**  Sure, they could do that.

23          **THE COURT:**  I mean --

24          **MR. LAVORATO:**  There's certainly not jurisdiction

25  here.

1          **THE COURT:**  Well, I guess -- I guess coming to any

2    agreement is going to be a tall order, but it -- that will be a

3    question, I guess, for you, plaintiff, is if you don't have an

4    agreement that transfer is appropriate to D.C., I think where

5    I'm left with this, is in fairness to you, because it does

6    sound like you would want to persist in arguments, and perhaps

7    even additional evidence, you know -- I understand that this

8    came in as a response to your PI.  One thing I can do is deny

9    the motion for TRO PI without prejudice.

10         I'm not reaching the merits.  It's not proper because I

11   really have a personal jurisdiction concern.  And then allow

12   you an opportunity to brief it more fully, the personal

13   jurisdiction question.

14         If it stays here, then I get those briefs.  I consider

15   them with a more careful eye because it's a threshold question,

16   and I decide.

17         And if I decide in your favor, then we can move to the

18   next step.  If I don't, then there is -- it's dismissed, the

19   whole case is dismissed, and we're done, right?

20         And in the interim, if you-all decide that you would just

21   prefer to file it in D.C., then I would imagine you can do

22   that.  But that seems to be the most equitable way of hashing

23   out this very important personal jurisdiction question.

24         Thoughts on that?

25          **MR. LAVORATO:**  Your Honor, I'm not going to disagree

```
 1  with that suggestion.  I think it's appropriate.  I think it's
 2  reasonable.
 3      And so from our position on that particular suggestion
 4  that you just made, I don't have an objection to that.
 5          MS. KHANNA:  And I don't want to say I don't have an
 6  objection to dismissal of our motion for TR -- dismissal of our
 7  complaint or for denial of a motion for TR --
 8          THE COURT:  I can also table it, too, but that seems
 9  to be -- I want the record to be clear that the reason why I'm
10  tabling it is because I -- I do not believe it's appropriate to
11  hear facts on the merits without nailing down the personal
12  jurisdiction question.
13          MS. KHANNA:  Absolutely, Your Honor.  And I
14  appreciate that concern.  I appreciate the effort to achieve a
15  fair resolution.
16      Like I said, we do not object to jurisdiction in D.C.
17  where we think it is certainly where our client's remained
18  chilled is there as well.
19          THE COURT:  Yeah.
20          MS. KHANNA:  And I believe that the defendant's
21  arguments in their papers and today all but concede that
22  there's jurisdiction in D.C.  I understand they are not willing
23  to do that on the record today, the same way that I can't
24  concede that we should dismiss this complaint altogether.
25          THE COURT:  Yeah, sure.
```

1              **MS. KHANNA:**  I do understand that if this Court does

2     not believe it has the authority to exercise jurisdiction, of

3     this case in this circuit, we can refile, as needed, to go into

4     D.C.

5              **THE COURT:**  And I appreciate that.

6         So where I am with that, is I don't -- I also don't

7     believe it's appropriate to reach a final conclusion about

8     personal jurisdiction when the posture of the case is a motion

9     for temporary restraining order or preliminary injunction.

10        For me to then reach beyond that and say I'm going to

11    finally decide the question of jurisdiction seems not prudent

12    because that motion is not right.

13        If I understand the docket as it is, the defendant moved

14    to dismiss on, I think, three grounds:  Subject matter,

15    personal jurisdiction, and venue.  And did so in a motion out

16    of abundance of caution, but raised the same arguments as a

17    defense to the PI.

18        My suggestion would be on the question of personal

19    jurisdiction, we have supplemental briefing.  And we can do

20    it -- the way I would suggest we do it, although I'll hear you

21    on it, is defendant goes first, since it's your motion.  Make

22    sure you have tagged all your bases; plaintiff responds;

23    defendant replies; and then I'll decide it.

24        I will turn to it as quickly as I can.  And then if I --

25    if I find there's personal jurisdiction, we'll reach -- and I

```
 1   can just table the PI, we'll reach it.

 2        Does that make sense to you, Ms. Khanna?

 3             MS. KHANNA:  Give me one moment to confer with my --

 4             THE COURT:  Sure, of course.

 5             MR. LAVORATO:  Your Honor, while they are conferring,

 6   it makes sense to us, so we're in agreement with what you just

 7   suggested.

 8             MS. KHANNA:  The plaintiffs are amenable to that

 9   resolution, Your Honor.  Thank you.

10             THE COURT:  Okay.  All right.  Then let's do this.

11        Defendants, unless you want a shorter time line, let's do

12   two weeks, two weeks, two weeks.

13             MR. LAVORATO:  That's fine.

14             THE COURT:  I don't think we need to -- you tell me,

15   though.  I would prefer to focus on the question of personal

16   jurisdiction than for you to brief all three grounds.

17        But that understanding, that's with the understanding that

18   if I deny your motion, we will move to the merits of the PI,

19   and we will also have -- well, what I'm trying to figure out,

20   frankly, is maybe -- maybe this is the best way to put it.

21        You all, again, give me your feedback on this.

22        I defer on the PI.  Your -- you're supplementing your

23   motion to dismiss, all grounds, right?

24             MS. KHANNA:  Yes.

25             THE COURT:  So that we're at the motion to dismiss
```

1  stage.

2       **MR. LAVORATO:**  Correct.

3       **THE COURT:**  Plaintiff will respond, you will reply,

4  and I'll reach that motion as quickly as possible.

5       If I deny it, then we're moving on, you're answering the

6  complaint, and we're hearing the merits of the PI.

7       If I grant it, then you're going to another forum most

8  likely.

9       Does that make sense to both sides, just to keep it

10  streamlined?

11       **MR. LAVORATO:**  It does to us.

12       **MS. KHANNA:**  Yes, Your Honor.  Except the only thing

13  we would request is that the two weeks, two weeks, two weeks

14  you mention as the briefing schedule, if the defendant is only

15  going to be briefing the personal jurisdiction aspect of it, of

16  the motion to dismiss, we have, on defendant's request, agreed

17  to an extension of the -- their answer, their motion to dismiss

18  pending resolution -- knowing that we were going to be having

19  this hearing.

20       **THE COURT:**  Right.

21       **MS. KHANNA:**  So I -- I would request that the Court

22  shorten the time for filing -- for defendants to file that

23  motion that's focused solely on personal jurisdiction so that

24  we can speed up --

25       **THE COURT:**  And that's where I think maybe it's hard

1  for all of us, not just -- everybody to talk in here at the

2  same time.

3       What I was -- I was revisiting that thought.

4            **MS. KHANNA:**  I'm sorry.

5            **THE COURT:**  Because I'm concerned about doing the

6  grounds for dismissal piecemeal.

7            **MS. KHANNA:**  I see.

8            **THE COURT:**  So the -- the defense, in their motion,

9  just -- it was like a one- or two-pager, right?  Said motion to

10 dismiss for subject matter, personal jurisdiction, venue.

11      My suggestion is that these pleadings address all of them.

12           **MS. KHANNA:**  Uh-huh.

13           **THE COURT:**  Because I think if I were a betting

14 person, I'm going to find subject matter jurisdiction.

15      If you convince me on personal jurisdiction, then it will

16 likely stay here, and so let's have all the jurisdictional

17 grounds briefed.

18           **MS. KHANNA:**  And I guess I would say just given the

19 extent of the briefing thus far on all of these issues, I think

20 that if the Court were willing to expedite that schedule a

21 little more so that we're not waiting, what, six weeks in order

22 to get those initial issues resolved, I think that would --

23 plaintiffs would request that we -- I don't think another two

24 weeks to brief issues that are partially, at least, been

25 briefed thus far require it.

1      If I were a betting person, I might say that the

2   defendants will have a hard time saying they didn't know where

3   Mr. Hananoki resided.

4          **THE COURT:**  Well, but that may not be -- that may be

5   my inartful question.  I mean, I agree with the law, which is

6   the thrust of this has to be purposeful availment of the

7   jurisdiction.  Knowledge may be one aspect of it.  That was an

8   illustrative way of my saying this seems very -- no more than

9   fortuitous, at least at its current iteration.  And that if I

10  were to find personal jurisdiction here, there's also no real

11  limiting principle to how far a defendant can be hauled into a

12  foreign forum.

13         **MS. KHANNA:**  Understood, Your Honor.

14         **THE COURT:**  In any event, you're asking for a

15  shortened briefing schedule.

16         **MS. KHANNA:**  Absolutely.

17         **THE COURT:**  Mr. Lavorato, you already have tread this

18  ground, it seems like it's going to be on -- we're not

19  expanding the record.  It is what it is, so --

20         **MR. LAVORATO:**  Your Honor, I don't think the two

21  weeks, two weeks, two weeks is unreasonable.  I think it's

22  pretty quick turnaround in and of itself.  We've just -- all of

23  us have just gone through the holidays doing a lot of this.

24  And, you know, everybody has worked hard.

25      But two weeks, two weeks, two weeks seems to be pretty

1  reasonable.

2          **THE COURT:**  Let's do two weeks, two weeks, one week.

3          **MR. LAVORATO:**  Fine.

4          **THE COURT:**  Because by that point, it's a reply.  And

5  I want it to really be a reply, not a rehashing of all the

6  arguments.

7          **MR. LAVORATO:**  We're okay with that.

8          **THE COURT:**  Okay.  So let's do that.

9          **MS. KHANNA:**  Thank you, Your Honor.

10         **THE COURT:**  In the interim, you can decide your --

11         **MS. KHANNA:**  Our next step.

12         **THE COURT:**  -- stakes and going elsewhere, but that

13  will give everybody really enough time to handle what, in my

14  view, is -- it's a fundamental constitutional question.  It's

15  not -- it's not merely procedural.  It really does matter in

16  that regard, and I just want to get it right.

17      So let's do two weeks, two weeks, one week.

18         **MS. KHANNA:**  I appreciate that, Your Honor.  Thank

19  you, Your Honor.

20         **THE COURT:**  I will memorialize this in just a short

21  letter order so that everyone is on the same page, and you have

22  the briefing schedule.  And the order will read that for the

23  reasons discussed during today's hearing, I'm going to defer on

24  the pending motion for preliminary injunction.  I'm going to

25  permit supplemental briefing on the defendant's motion to

```
1   dismiss at whatever ECF number that is, and I'll set out the
2   schedule.  And as soon as we get it all together, we'll do our
3   best to turn to it and get you a decision.  Okay?
4               MS. KHANNA:  Thank you, Your Honor.
5               MR. LAVORATO:  Thank you, Your Honor.
6               THE COURT:  Okay.  Thank you all for your time.  I
7   really appreciate it.
8               DEPUTY CLERK:  All rise.  This Honorable Court now
9   stands adjourned.
10      (Court adjourned at 1:06 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Paula J. Leeper, Federal Official Court Reporter, in

 5   and for the United States District Court for the District of

 6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7   the foregoing is a true and correct transcript of the

 8   stenographically-reported proceedings held in the

 9   above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12

13                         Dated this 9th day of January 2024.

14

15                         /S/ Paula J. Leeper

16                         _____

17                         Paula J. Leeper
                           Federal Official Reporter

18

19

20

21

22

23

24

25
```

```
DEPUTY CLERK: [3]
MR. LAVORATO: [31]   5/12 5/24 6/2 6/4 7/4 7/8 7/21
7/24 8/16 8/22 8/24 9/3 9/5 22/10 22/21 22/23
23/13 24/6 24/11 24/15 24/22 24/24 25/25 28/5
28/13 29/2 32/21 31/20 32/3 32/7 33/5
MR. SCHAERR: [2]   3/21 22/4
MS. KHANNA: [54]
THE COURT: [82]

/
/S [1]   34/15

0
0177 [1]   1/18

1
1060 [1]   2/9
12 [3]   7/9 10/24 11/8
12548 [1]   2/4
126 [1]   6/8
12:30 [1]   1/12
14 [2]   11/8 22/4
17 [2]   20/22 21/10
1700 [1]   1/17
1717 [1]   2/8
1:06 [1]   33/10

2
20001 [1]   1/21
20006 [1]   2/8
202 [2]   1/21 2/9
2024 [2]   1/12 34/12
206 [1]   1/18
2100 [1]   1/17
250 [1]   1/20
28 [1]   34/6

3
33 [1]   22/3
3363 [1]   3/10

4
400 [1]   1/20
4380 [1]   2/5
463-4380 [1]   2/5
4928 [1]   1/21

5
512 [1]   2/5

6
625 [1]   6/8
656-0177 [1]   1/18
6th [1]   2/4

7
753 [1]   34/6
787-1060 [1]   2/9
78711 [1]   2/5

8
8:23-cv-03363-PX [1]   1/6

9
900 [1]   2/8
98101 [1]   1/17
987-4928 [1]   1/21
9th [1]   34/12

A
ABHA [2]   1/16 3/15
about [20]   4/5 4/21 5/1 5/17 8/10 10/19 12/23 13/2
13/5 13/24 15/22 16/13 16/17 16/17 17/5 18/18 20/3
24/2 27/7 30/5
above [1]   34/9
above-entitled [1]   34/9
absolutely [5]   7/15 8/5 22/21 26/13 31/16
abundance [1]   27/16
accept [1]   16/4
accepting [1]   24/17
achieve [1]   26/14
act [1]   6/11
action [3]   3/10 12/10 14/2
actions [3]   12/10 13/6 13/7
actively [1]   6/15
activities [4]   6/13 7/16 9/18 14/22
actress [2]   16/1 16/2
actual [2]   10/12 16/17
actually [4]   6/6 10/24 11/2 18/25
additional [1]   25/7
address [3]   4/5 9/12 30/11
adjourned [2]   33/9 33/10
affected [2]   8/17 13/6
affecting [2]   18/25 19/1
after [2]   18/23 18/23
afternoon [4]   3/6 3/15 3/20 3/21
AG [4]   11/15 16/10 18/6 20/14
AG's [2]   3/22 3/23
again [6]   5/13 7/22 11/11 11/15 13/9 28/21
against [1]   21/8
agent [1]   17/15
agree [5]   5/14 13/19 20/5 22/7 31/5
agreed [1]   29/16
agreement [4]   20/10 25/2 25/4 28/6
AIDED [1]   1/23
aim [2]   8/5 8/14
al [2]   1/4 3/11
```

```
all [35]
allow [1]   20/14
allows [1]   13/7
along [1]   15/10
already [1]   31/17
also [6]   2/10 19/2 26/8 27/6 28/19 31/10
although [1]   27/20
altogether [1]   26/24
am [5]   4/4 5/6 10/19 21/3 27/6
amenable [1]   28/8
Amendment [1]   12/22
AMERICA [2]   1/4 3/11
analysis [3]   8/7 13/1 15/13
angels [1]   20/7
animating [1]   12/24
announcing [1]   18/22
another [4]   12/24 13/3 29/7 30/23
answer [1]   29/17
answering [1]   29/5
any [15]   7/19 7/22 9/12 9/21 11/10 12/4 12/4 15/4
19/13 19/13 21/5 24/5 24/21 25/1 31/14
anybody [2]   8/16 8/17
anything [3]   7/18 7/23 20/14
anywhere [1]   11/10
APPEARANCES [2]   1/14 1/25
appreciate [6]   9/10 26/14 26/14 27/5 32/18 33/7
appropriate [5]   23/22 25/4 26/1 26/10 27/7
are [25]   3/17 5/3 6/3 6/17 7/8 12/10 12/17 12/19
14/22 14/23 15/1 15/23 16/25 17/3 17/6 19/6 20/2
19/1 19/23 22/18 23/17 26/22 28/5 28/8 30/24
area [2]   14/11 14/15
areas [1]   10/13
argue [1]   24/12
argument [13]   4/9 8/17 13/12 13/13 16/6 19/7 19/13
20/6 21/17 21/20 22/2 22/8 22/10
arguments [4]   25/6 26/21 27/16 32/6
arm [1]   18/21
around [1]   22/11
article [11]   7/2 7/13 7/13 8/1 11/24 12/5 14/18
16/22 16/24 19/3 20/10
articles [5]   7/6 10/17 11/3 11/8 18/15
as [47]
ask [3]   11/19 13/12 24/9
asking [1]   31/14
aspect [2]   29/15 31/7
asserted [4]   9/23 19/5 19/24 19/24
assertions [1]   19/5
assured [1]   9/14
attach [1]   10/12
attachments [2]   13/11 19/17
attorney [19]   1/7 2/3 5/13 7/15 7/19 7/24 9/20
11/12 11/17 11/18 12/8 13/14 14/7 14/19 15/8 16/6
21/16 21/20 22/14
Austin [1]   2/5
authority [2]   15/8 27/2
authorize [1]   23/8
authorized [1]   14/25
avail [1]   5/22
availmeant [6]   10/2 11/16 20/9 20/11 20/15 31/6
avails [1]   6/12
Avenue [2]   1/17 1/20

B
back [1]   21/3
background [1]   5/1
barely [1]   15/14
based [11]   9/18 11/24 12/2 14/9 16/1 16/18 21/8
21/9 21/13 23/21 23/21
bases [1]   27/22
basically [3]   6/11 12/11 20/25
basing [2]   21/7 21/7
basis [2]   19/7 21/23
be [41]
beat [3]   11/2 11/5 11/12
because [20]   4/4 4/23 7/11 8/18 14/21 16/9 20/1
20/4 21/22 21/22 21/24 25/9 25/10 25/15
22/10 27/12 30/5 30/13 32/4
been [9]   4/6 4/12 5/1 8/3 8/18 15/20 15/21 15/22
30/24
before [5]   1/11 3/10 3/12 5/4 18/22
begin [1]   10/10
begins [2]   22/22 22/25
behalf [3]   1/15 2/2 3/16
being [3]   3/25 17/3 18/15
believe [24]   4/10 4/15 4/16 4/18 4/23 11/14 13/17
13/18 15/7 17/3 19/1 19/19 19/23 20/18 20/19
21/20 22/4 23/22 26/10 26/20 27/2 27/7
believes [1]   14/1
benefits [1]   6/14
best [3]   20/12 28/20 33/3
betting [2]   30/13 31/1
between [1]   13/5
beyond [2]   14/16 27/17
big [1]   16/7
both [5]   7/17 9/17 23/7 23/10 29/9
bounds [1]   16/8
Box [1]   2/4
brief [5]   6/7 23/12 25/12 28/16 30/24
briefed [3]   24/8 30/17 30/25
briefing [7]   27/19 29/14 25/15 30/19 31/15 32/22
32/25
briefs [1]   25/14
bright [1]   17/18
bring [2]   6/1 11/23
bringing [1]   21/24
broke [1]   4/15
brought [1]   6/25
burden [5]   9/25 19/2 19/15 22/11 22/12
byline [1]   12/6 12/7

C
Calder [6]   8/10 8/11 15/16 15/19 15/22 16/18
```

```
Calder-based [1]   16/18
Calder-type [1]   15/16
called [3]   5/2, 5/2
came [2]   7/11 25/8
can [27]   3/6 4/2 4/20 5/16 8/16 9/9 10/14 10/24
14/19 17/13 17/15 17/21 21/11 23/3 23/12 24/2 25/8
25/17 25/21 26/8 27/3 27/19 27/24 28/1 29/24 31/11
32/10
can't [2]   10/16 15/13 26/23
candor [1]   9/10
capacity [1]   1/7
Carefirst [1]   6/7
careful [2]   25/15
case [21]   4/1 6/7 6/8 6/10 6/10 6/17 8/8 8/16 9/6
10/2 12/22 15/11 15/19 16/8 17/1 17/4 22/25 24/20
25/19 27/3 27/8
cases [2]   6/6 15/12
cause [2]   12/11 13/6
caused [2]   5/3 5/25
caution [1]   27/16
centered [1]   22/11
CEO [2]   11/4 11/21
certainly [8]   10/5 14/1 21/22 23/3 23/25 23/25
24/24 26/17
CERTIFICATE [1]   33/11
certify [1]   34/6
chill [2]   12/3 16/25
chilled [2]   18/17 26/18
Chris [3]   3/18 3/23 5/12
CHRISTOPHER [2]   1/19 2/3
CID [15]   6/18 6/25 7/9 8/2 9/17 10/12 11/10 13/14
16/24 17/6 17/14 18/4 18/5 18/7 20/11
circuit [3]   13/4 15/21 27/3
circumstantial [1]   20/12
cite [4]   6/6 6/7 15/16 15/19
cited [2]   6/7 15/12
cites [1]   6/10
civil [2]   3/10 6/18
claim [2]   19/14 20/18
clear [4]   10/2 16/17 18/11 26/9
client's [2]   12/11 26/17
clients [3]   18/11 21/8 23/21
coincidentally [1]   5/23
colleague [1]   3/24
Columbia [2]   6/20 6/23
comes [3]   9/13 14/5 15/7
comfortable [1]   9/8
coming [1]   25/1
company [1]   14/9
complaint [25]   4/13 10/1 10/12 11/5 11/11 11/14
13/9 13/10 19/9 19/9 19/17 20/8 21/11 20/21 20/23
20/23 20/24 21/6 21/10 21/12 21/14 21/15 26/7
26/24 29/6
COMPUTER [1]   1/23
COMPUTER-AIDED [1]   1/23
concede [2]   26/21 26/24
concern [4]   18/11 18/18 25/11 26/14
concerned [1]   30/5
concerns [1]   9/12
conclusion [2]   7/11 27/7
conducting [2]   6/12 16/7
confer [1]   28/3
Conference [1]   34/10
conferring [1]   28/5
conformance [1]   34/10
conjunction [1]   18/16
connection [2]   7/25 8/5
consider [1]   25/14
constitutional [3]   12/19 12/24 32/14
constitutionally [1]   4/17
contemporaneous [1]   7/19
CONTINUED [1]   2/1
control [2]   17/17 17/22
conversation [2]   5/1 18/9
conversations [1]   5/3
convince [1]   30/15
corners [1]   19/16
cornerstone [1]   22/1
corporation [2]   6/20 16/12
correct [5]   7/4 17/6 24/20 29/2 34/7
could [4]   8/17 18/19 24/19 24/22
couldn't [1]   12/13
counsel [6]   3/14 3/17 3/18 3/22 20/20 23/2
counting [1]   20/6
course [3]   12/8 19/20 28/4
court [30]   1/1 1/11 3/2 3/3 3/13 4/12 6/10 8/8
9/17 9/14 9/24 9/15 13/4 13/4 13/7 14/1 14/3 15/14
15/22 19/3 20/9 23/4 23/23 23/25 27/9 21 30/20
33/8 33/10 34/4 34/5
Court's [1]   14/4
coverage [2]   11/4 11/4
covers [1]   20/4
created [1]   11/13
current [2]   8/8 31/9
currently [3]   7/18 16/25 17/2
custody [1]   17/17
cv [1]   1/6

D
D.C [28]   11/20 11/21 13/20 13/21 14/3 14/11 14/20
17/7 20/11 22/20 23/1 23/2 23/4 23/5 23/8 23/11
23/19 23/21 23/24 24/14 24/16 24/20 25/4
D.C. [1]   14/9
D.C.-based [1]   14/9
Dated [1]   34/12
day [1]   34/12
DC [2]   1/21 2/8
decide [9]   13/24 18/6 19/11 25/16 25/17 25/20
27/11 27/23 32/10
decided [1]   11/19
decision [1]   33/3
defendant [17]   1/9 2/2 6/11 6/15 13/2 13/3 13/6
```

## D

defendant... [10] ... 25/23 27/15 27/21 27/23 29/14 31/11
defendant's [3] 26/20 29/16 32/25
defendants [3] 28/11 29/22 31/2
defense [5] 4/7 19/4 19/22 27/17 30/8
defense's [2] 5/7 5/9
defer [2] 28/22 32/23
degree [1] 15/23
demand [10] 6/18 13/20 15/2 16/23 17/2 18/12 18/16 18/22 21/7 23/1
denial [1] 26/7
deny [3] 25/8 28/18 29/5
determination [1] 4/24
development [1] 15/21
did [14] 5/22 5/22 6/1 9/24 15/16 15/19 18/18 19/6 20/1 20/18 21/21 21/22 24/12 27/15
didn't [11] 7/22 7/23 11/22 12/12 13/23 15/22 22/8 22/8 22/15 24/13 31/2
different [2] 15/23 18/9
direct [2] 8/5 8/14
directed [6] 6/19 8/18 17/8 17/9 17/10 22/19
direction [1] 7/16
directly [2] 9/17 17/19
disagree [1] 25/25
disagreement [2] 23/18 23/20
discussed [1] 32/23
dismiss [9] 24/20 26/24 27/14 28/23 28/25 29/16 29/17 30/10 33/1
dismissal [3] 26/6 26/6 30/6
dismissed [2] 25/18 25/19
dispute [1] 16/21
distinct [1] 5/20
district [10] 1/1 1/1 1/11 3/3 6/20 6/22 9/15 15/14 34/5 34/5
DIVISION [1] 1/2
do [33] 4/16 4/18 4/22 5/3 5/15 6/20 10/14 10/15 10/17 15/6 18/6 19/1 19/19 21/4 21/19 23/22 24/19 24/22 25/8 25/21 26/10 26/16 26/23 27/1 27/19 27/20 28/10 28/11 32/2 32/8 32/17 33/2 34/6
docket [2] 1/5 27/13
documents [7] 7/7 11/3 12/22 15/1 16/23 17/16 17/23
DODGE [2] 1/19 3/18
does [7] 12/10 25/5 27/1 28/2 29/9 29/11 32/15
dog [1] 12/17
doing [4] 9/20 13/16 30/5 31/23
don't [30] 4/23 4/25 9/6 12/21 13/22 13/23 14/3 14/16 16/5 18/5 19/11 19/13 20/13 20/17 21/2 21/5 22/15 24/3 24/15 25/3 25/18 26/4 26/5 26/5 27/6 27/6 28/14 30/23 31/20
done [3] 18/8 19/22 25/19
door [1] 12/11
down [2] 9/9 26/11
due [2] 12/25 13/1
during [1] 32/23

## E

ECF [1] 33/1
effect [1] 8/13
effects [5] 8/12 8/13 16/18 16/18 17/3
effort [2] 4/1 26/14
either [1] 23/8
Elias [2] 1/16 1/20
Elon [1] 18/23
else [1] 22/23
elsewhere [1] 32/12
employee [1] 17/15
employer's [1] 17/7
end [2] 12/17 12/22
ends [2] 22/22 23/1
enforcing [1] 14/8
enough [4] 4/16 13/21 18/20 32/13
Enquirer [2] 15/25 16/3
entire [3] 18/7 21/7 21/7
entitled [1] 34/9
equally [1] 12/19
equitable [1] 25/22
Eric [1] 2/10
ESAB [1] 6/8
ESQUIRE [6] 1/16 1/19 1/19 2/3 2/6 2/7
essentially [1] 8/14
establish [1] 19/3
et [2] 1/4 3/11
even [9] 4/8 4/10 5/25 7/20 11/11 11/20 15/13 20/8 25/7
event [2] 24/5 31/14
ever [1] 8/2
every [1] 10/2
everybody [3] 3/6 8/3 16/1 30/1 31/24 32/13
everyone [1] 32/21
evidence [6] 9/19 10/2 13/11 15/4 20/13 25/7
exact [2] 10/16 20/18
exactly [3] 6/2 6/4 10/7
Except [1] 29/12
executive [1] 15/8
exercise [2] 13/8 27/2
exists [2] 23/10 23/19
expanding [1] 31/19
expect [1] 12/2
expedite [1] 30/20
experiencing [1] 17/1
extension [1] 29/17
extent [1] 30/19
eye [1] 25/15

## F

F.3d [1] 6/8
face [1] 13/9
facial [1] 19/8
fact [3] 8/12 11/18 22/18
facts [9] 6/17 11/10 15/23 15/23 16/4 19/10 21/3 21/6 26/11

factual [2] 15/24 19/23
fairness [1] 27/...
far [6] 16/8 21/11 24/15 30/19 30/25 31/11
fast [1] 23/7
fastest [1] 23/12
favor [2] 4/25 25/17
favorable [3] 4/14 10/1 19/10
February [1] 11/8
Federal [2] 34/4 34/17
feedback [1] 28/21
felt [3] 12/3 12/10 17/3
fight [2] 16/13 24/2
figure [1] 28/19
file [2] 25/21 29/22
filed [2] 4/8 4/11
filing [1] 29/22
final [1] 27/7
finally [1] 27/11
find [6] 7/22 10/1 12/9 27/25 30/14 31/10
finding [1] 10/3
fine [2] 28/13 32/3
fingertips [1] 12/9
first [9] 5/7 5/11 5/19 7/24 8/2 11/18 11/19 12/22 27/21
fit [1] 23/4
Floor [1] 2/4
focus [2] 12/15 13/1 28/15
focused [1] 29/23
foregoing [1] 34/7
foreign [2] 13/3 31/12
forfeited [1] 19/7
forfeiture [1] 19/13
formally [1] 4/12
format [1] 34/9
formed [1] 20/25
fortuitous [1] 31/9
fortuity [1] 10/3
forum [12] 5/8 6/1 6/13 6/15 13/3 16/10 16/13 20/11 20/15 21/11 29/7 31/12
fought [1] 13/5
found [1] 15/11
four [1] 19/16
Fourth [2] 13/4 15/21
frankly [3] 10/11 23/6 28/20
front [1] 12/11
full [1] 12/8
fully [1] 25/12
fundamental [1] 32/14
further [1] 13/24
future [1] 13/24

## G

GENE [2] 2/6 3/21
general [18] 1/8 2/3 7/19 7/25 9/20 11/12 11/17 11/18 12/8 13/14 14/7 14/19 15/8 16/6 16/24 21/16 21/20 22/14
general's [2] 5/13 7/15
generally [2] 11/4 18/17
get [9] 4/25 5/3 12/11 15/13 25/14 30/22 32/16 33/2 33/3
gets [1] 8/11
getting [1] 4/9
give [7] 4/4 7/17 21/25 22/2 28/3 28/21 32/13
given [2] 5/9 30/18
giving [2] 12/21 20/12
go [7] 10/14 12/5 21/3 21/11 21/25 23/24 27/3
goes [1] 27/21
going [6] 5/15 6/6 12/5 12/10 17/13 25/2 25/25 27/10 29/7 29/18 30/14 31/18 31/22 32/24
gone [2] 16/10 31/23
good [7] 3/6 3/15 3/20 3/21 19/25 20/19 21/21
got [2] 12/15 20/2
grant [1] 29/7
GREENBELT [1] 1/2
ground [1] 31/18
grounds [5] 27/14 28/16 28/23 30/6 30/17
Group [2] 1/16 1/20
guarantee [1] 17/22
guess [6] 13/24 22/7 25/1 25/1 25/3 30/18

## H

had [9] 5/5 7/19 8/2 10/17 11/16 16/10 19/5 23/5 24/18
hailed [1] 13/2
Hananoki [35]
Hananoki's [10] 7/6 10/8 11/2 11/5 11/12 12/6 17/23 18/14 18/15 18/15
handle [1] 32/1
happened [3] 13/6 14/24 20/10
happening [1] 17/2
hard [5] 4/5 13/5 29/25 31/2 31/24
has [27] 4/7 4/12 4/15 4/19 5/1 6/20 8/18 9/12 9/15 10/3 10/12 11/7 12/8 17/5 17/15 18/4 18/5 18/6 19/3 19/14 19/21 22/14 23/25 27/2 31/6 31/24
hashing [1] 25/22
hauled [1] 31/11
have [56]
haven't [2] 13/9 18/8
having [2] 15/22 29/18
he [15] 11/12 11/13 11/13 12/10 13/15 13/18 13/18 13/19 14/23 14/25 14/25 15/9 15/9 16/21 16/22 16/25
he's [7] 12/16 14/7 14/8 14/8 14/9 15/9 16/25
head [1] 20/7
headquarters [2] 14/14 17/7
hear [7] 5/6 5/11 7/23 9/15 18/20 26/11 27/20
heard [1] 13/10
hearing [7] 1/10 3/13 4/2 4/19 29/6 29/19 32/23
held [1] 34/8
her [2] 16/2 16/3
here [19] 3/25 5/15 8/3 11/6 11/16 12/15 12/23 14/5 14/22 16/5 19/7 20/10 23/21 23/23 24/25 25/14 30/2
hereby [1] 34/6
high [1] 13/4
hinged [1] 11/2
his [11] 1/7 7/9 11/13 12/9 12/9 12/10 13/19 16/23 17/7 21/7 21/7
holidays [1] 31/23
Honor [46]
Honor's [1] 18/18
HONORABLE [1] 1/11 3/4 33/8
how [3] 4/5 23/3 31/11
huh [1] 30/12
hypothetical [1] 20/7

## I

I'll [7] 5/11 7/17 9/6 27/20 27/23 29/4 33/1
I'm [37] 3/22 4/18 6/6 8/19 12/20 12/20 13/5 15/18 16/14 19/18 19/9 19/16 19/17 21/11 21/17 22/6 25/5 25/10 25/25 26/9 27/10 28/19 31/4 30/5 30/14 32/23 32/24
I've [1] 4/5
identifies [1] 21/9 21/12
identify [1] 3/14
III [1] 19/1
illustrative [1] 31/8
imagine [1] 25/21
immediately [1] 24/20
important [3] 5/3 12/20 25/23
inartful [1] 31/5
inartfully [1] 19/15
inclined [1] 23/24
include [1] 14/13
incorporated [2] 20/21 20/23
information [2] 11/3 21/23
initial [1] 30/22
injunction [3] 4/3 27/9 32/24
injury [4] 5/23 6/1 12/12 13/6
instigated [2] 16/22 21/15
interest [1] 7/6
interested [1] 9/11
interim [2] 25/20 32/10
internal [1] 17/23
intricacies [1] 17/14
investigated [1] 18/25
investigation [8] 6/18 10/9 10/10 16/7 21/7 21/15 21/24 22/19
investigations [1] 15/10
investigative [2] 12/9 14/7
investigatory [1] 18/21
invoke [1] 13/21
invokes [1] 23/1
invoking [2] 6/13 14/8
involved [1] 20/13
is [119]
is the [1] 9/11
issue [3] 5/18 22/11 24/7
issued [1] 20/11
issues [5] 4/5 12/18 30/19 30/22 30/24
issuing [1] 18/22
it [89]
it's [32] 4/23 4/25 5/9 5/10 6/8 6/19 8/7 8/12 8/12 8/24 9/22 9/25 10/23 11/13 12/20 24/20 25/10 25/15 25/18 26/1 26/1 26/10 27/7 27/21 29/25 31/18 31/21 32/4 32/14 32/14 32/15
iteration [1] 31/9
its [5] 11/4 14/19 15/23 15/23 31/9
itself [4] 6/12 16/11 20/21 31/22

## J

Jaffe [1] 2/7
JANUARY [2] 1/12 34/12
JOSEPH [2] 1/19 3/18
journalist [1] 14/10
JR [2] 1/7 3/11
JUDGE [1] 1/11
Judicial [1] 34/10
jumped [1] 4/15
jurisdiction [56]
jurisdictional [1] 30/16
just [24] 10/3 14/13 14/23 15/9 16/14 19/12 20/2 20/2 20/9 20/20 21/14 23/6 25/20 26/4 28/1 28/6 29/9 30/1 30/9 31/18 31/22 31/23 32/16 32/20

## K

keep [1] 29/9
Ken [3] 3/24 14/6 24/16
KENNETH [3] 1/7 2/7 3/11
KHANNA [3] 1/16 3/15 28/2
kind [2] 5/16 22/18
kinds [1] 17/14
KLUKOWSKI [2] 2/7 3/24
knew [13] 9/20 9/20 10/7 10/9 11/12 11/15 13/18 15/3 15/4 20/13 20/14 21/23
know [37]
knowing [2] 11/19 29/18
knowledge [1] 7/20 19/25 31/7
known [7] 12/13 13/13 13/15 18/19 18/20 18/21 18/24
knows [2] 8/3 16/1

## L

lack [3] 4/9 19/25 23/9
lacking [1] 5/8
later [2] 10/4 11/19
LAVORATO [7] 2/3 3/23 5/13 20/5 22/7 24/5 31/17
law [6] 1/16 1/20 8/8 17/4 22/16 31/5
lawsuit [7] 18/23 18/24 20/25 21/2 21/8 21/9 21/24
learned [1] 7/25
Leeper [3] 4/19 7/5 15/24 30/24 31/9
left [1] 25/5

## L

**let** [6]  4/4 9/11 9/11 17/10 17/17 19/11
**let's** [8]  16/17 21/25 28/11 30/16 32/2 32/8 32/17
**letter** [1]  32/21
**letting** [1]  9/11
**level** [1]  6/14
**light** [3]  4/14 10/1 19/10
**like** [13]  4/22 5/6 11/13 12/16 13/19 16/5 16/14 22/18 23/16 25/6 26/11 30/9 31/18
**likely** [2]  29/8 30/16
**limited** [1]  15/22
**limiting** [3]  8/21 8/22 31/11
**line** [3]  13/5 17/18 28/11
**lines** [1]  15/10
**lion's** [1]  10/8
**listen** [1]  12/19
**little** [2]  4/4 30/21
**live** [3]  14/11 14/14 20/10
**lived** [4]  7/20 9/24 20/15 22/9
**lives** [3]  8/14 16/21 22/19
**living** [1]  19/17
**LLP** [3]  1/16 1/20 2/7
**local** [1]  3/22
**locale** [1]  16/13
**located** [2]  15/2 19/6
**location** [1]  14/13
**locus** [1]  14/22
**logical** [1]  20/4
**long** [3]  4/5 13/5 13/5
**look** [2]  9/25 22/2
**looking** [6]  13/10 15/25 16/14 19/8 19/9 19/16
**lot** [2]  16/6 31/23

## M

**made** [5]  4/8 20/18 21/17 21/20 26/4
**make** [7]  4/23 8/17 9/12 20/15 27/21 28/2 29/9
**makes** [3]  16/2 20/8 28/6
**many** [2]  19/5 19/24
**MARYLAND** [31]  1/1 3/4 6/21 7/20 8/6 8/15 9/18 9/18 9/21 11/13 11/13 12/2 12/2 12/3 12/6 13/15 14/6 14/16 14/19 16/21 16/22 16/23 16/25 17/2 17/3 17/6 21/9 21/13 23/20 23/21 24/9
**Maryland-based** [3]  9/18 21/9 21/13
**Massachusetts** [1]  1/20
**materials** [1]  7/3
**matter** [12]  3/9 3/12 4/10 4/15 6/9 8/2 22/19 27/14 30/10 30/14 32/15 34/9
**MATTERS** [21]  1/4 3/11 6/19 6/22 8/3 8/18 8/19 10/14 11/7 11/22 15/5 17/8 17/9 17/10 17/13 17/25 18/3 18/17 21/12 22/19 23/21
**Matters'** [1]  17/19
**may** [3]  31/4 31/4 31/7
**maybe** [7]  7/5 12/16 19/15 20/10 28/20 28/20 29/25
**me** [22]  3/17 3/23 4/4 7/18 9/1 13/12 13/19 15/12 16/16 20/12 20/20 21/2 21/25 22/2 22/13 24/5 24/9 27/10 28/3 28/14 28/21 30/15
**mean** [16]  10/2 13/22 15/3 15/11 15/13 15/24 17/13 19/16 20/5 20/7 20/12 23/6 23/16 24/13 24/23 31/5
**MEDIA** [22]  1/4 3/10 6/19 6/22 8/3 8/18 8/19 10/14 11/7 11/22 15/5 17/8 17/9 17/10 17/13 17/18 17/25 18/3 18/17 21/12 22/19 23/21
**meeting** [1]  16/11
**memorialize** [1]  32/20
**mention** [2]  7/9 29/14
**mentioned** [2]  10/21 17/5
**mentioning** [1]  17/10
**merely** [1]  32/15
**merits** [8]  4/9 4/25 5/4 12/23 25/10 26/11 28/18 29/6
**metropolitan** [1]  14/11
**might** [1]  31/1
**mind** [1]  9/6
**minds** [1]  10/7
**minute** [2]  22/1 22/2
**minutes** [1]  18/23
**missing** [1]  15/5
**moment** [1]  28/3
**MONDAY** [1]  1/12
**money** [1]  16/2
**more** [11]  7/5 10/3 10/23 11/1 11/4 15/25 22/10 25/12 25/15 30/21 31/8
**most** [8]  4/14 9/11 10/1 14/11 19/10 23/17 25/22 29/7
**motion** [24]  4/2 4/7 4/8 4/11 5/2 5/10 25/9 26/6 26/7 27/8 27/12 27/15 27/21 28/18 28/23 28/25 29/6 29/16 29/17 29/23 30/8 30/9 32/24 32/25
**move** [4]  23/4 23/8 25/17 28/18
**moved** [1]  27/13
**moving** [2]  24/7 29/5
**Mr.** [52]
**Mr. Hananoki** [33]  3/18 6/24 7/12 7/20 7/25 9/20 9/24 10/8 10/9 10/18 10/21 11/7 11/22 12/1 14/18 16/21 17/10 17/19 18/14 18/5 18/6 18/16 19/6 19/25 20/13 20/14 21/9 21/13 22/1 22/9 22/16 22/24 31/3
**Mr. Hananoki's** [10]  7/6 10/8 11/2 11/5 11/12 14/2 17/23 18/14 18/15 18/15
**Mr. Lavorato** [4]  20/5 22/7 24/5 31/17
**Mr. Musk's** [1]  21/24
**Mr. Musk's** [1]  21/24
**Mr. Paxton** [2]  9/19 21/6
**Mr. Paxton's** [1]  9/17
**Ms.** [1]  28/2
**Ms. Khanna** [1]  28/2
**much** [3]  4/1 13/10 15/20
**Musk** [3]  18/23 20/20 21/22
**Musk's** [2]  21/8 21/24
**must** [2]  5/5 6/15
**my** [15]  3/23 4/13 12/21 12/22 18/11 20/20 21/8 22/10 24/6 27/18 28/3 30/11 31/5 31/8 32/13

## N

**name** [4]  7/10 10/24 17/10 17/11
**named** [1]  3/17
**nature** [1]  13/14
**need** [1]  28/14
**needed** [1]  27/3
**needs** [1]  24/8
**negligently** [1]  5/25
**next** [2]  25/18 32/11
**nexus** [1]  7/15
**nine** [3]  10/12 10/17 10/20
**no** [21]  5/14 7/14 7/15 8/5 8/5 8/21 8/22 9/23 14/21 15/4 15/6 15/11 16/20 16/20 17/22 19/19 23/18 23/20 23/24 31/8 31/10
**non** [1]  4/8
**none** [2]  7/21 15/3
**not** [56]
**note** [1]  20/2
**notes** [1]  1/23 18/15
**nothing** [1]  6/20
**notion** [1]  24/17
**now** [4]  3/4 14/19 18/6 33/8
**number** [1]  1/5 3/10 6/18 15/12 33/1
**NW** [2]  1/20 2/8

## O

**object** [1]  26/16
**objection** [3]  23/24 26/4 26/6
**obligation** [2]  17/19 17/21
**obviously** [1]  7/11
**occurred** [1]  16/14
**office** [4]  2/3 3/22 3/23 5/13
**official** [4]  1/7 34/1 34/4 34/17
**okay** [32]  3/20 3/25 8/4 10/22 16/19 19/14 21/25 28/10 32/7 32/8 33/3 33/6
**one** [14]  6/18 7/5 8/4 12/18 14/10 15/24 16/17 21/18 25/8 28/3 30/9 31/7 32/2 32/17
**one-paragraph** [1]  21/18
**ones** [1]  16/9
**ongoing** [3]  9/18 12/12 17/2
**only** [4]  4/8 11/21 29/12 29/14
**opinion** [1]  13/14
**opportunity** [2]  7/17 25/12
**order** [8]  3/2 3/12 4/3 25/2 27/9 30/21 32/21 32/22
**other** [4]  7/14 16/8 16/9 24/19
**ought** [1]  5/10
**our** [12]  3/17 11/5 12/11 11/19 2 20/21 26/3 26/6 26/6 27/11 32/11 33/2
**out** [8]  10/4 12/9 15/10 20/20 25/23 27/15 28/19 33/1
**outside** [1]  13/8
**over** [2]  13/8 17/23

## P

**p.m** [2]  1/12 33/10
**P.O** [1]  2/4
**page** [2]  22/4 32/21 34/9
**pager** [1]  30/9
**pale** [1]  14/16
**papers** [4]  9/23 11/15 20/19 26/21
**paragraph** [4]  12/16 20/22 21/10 21/18
**parallel** [2]  16/15
**partially** [1]  30/24
**particular** [10]  6/10 6/14 6/17 7/16 8/1 8/4 8/17 14/10 24/7 26/3
**particularly** [1]  12/13
**past** [1]  9/7
**PAULA** [5]  1/11 3/4 34/4 34/15 34/16
**PAXTON** [6]  1/7 3/11 9/19 14/6 21/6 24/17
**Paxton's** [2]  9/17 23/2
**pending** [1]  3/9 29/18 32/24
**people** [2]  14/10 14/14
**perhaps** [1]  25/6
**permit** [1]  32/25
**persist** [1]  25/6
**person** [4]  7/1 20/9 30/14 31/1
**personal** [39]
**personally** [1]  11/22
**PI** [7]  25/8 25/9 27/17 28/1 28/18 28/22 29/6
**piecemeal** [1]  30/6
**pin** [1]  20/7
**place** [4]  14/25 14/25 15/1
**plaintiff** [18]  1/15 3/17 4/19 5/11 6/6 6/24 6/25 7/23 8/11 9/12 18/13 22/8 23/16 23/18 25/3 27/22 29/3
**plaintiff's** [3]  4/2 4/7 4/24
**plaintiffs** [6]  1/5 3/16 4/12 4/14 28/8 30/23
**platform** [1]  11/9
**plausible** [2]  20/8 20/16
**pleadings** [2]  24/13 30/11
**please** [2]  3/14 12/21
**pled** [2]  4/16 4/20
**plied** [1]  11/12
**plies** [1]  16/3
**podium** [1]  9/7
**point** [4]  9/23 15/6 18/1 32/4
**pointed** [1]  20/20
**POSMANTO** [2]  1/19 3/19
**position** [7]  5/7 5/9 5/10 11/14 14/4 14/17 26/3
**possession** [2]  17/17 17/22
**possible** [2]  7/6 24/9
**possibly** [1]  12/13
**posture** [1]  27/8
**power** [2]  12/9 14/7
**powers** [1]  13/21
**predicate** [1]  15/24
**prefer** [2]  25/21 28/15
**prejudice** [1]  25/9
**preliminary** [3]  4/3 27/9 32/24
**PRESENT** [2]  2/10
**presiding** [1]  3/5

**press** [1]  18/22
**previews** [1]  31/25
**previous** [1]
**principle** [2]  12/24 31/11
**principles** [1]  12/19
**privilege** [1]  6/12
**probably** [4]  18/21 20/1 20/1 23/11
**procedural** [2]  32/15
**proceedings** [1]  34/8
**process** [5]  12/7 12/25 13/1
**proper** [5]  4/23 4/25 5/4 14/2 25/10
**properly** [1]  12/23
**proposition** [1]  8/12
**provided** [1]  11/5
**provisionally** [2]  4/11 4/13
**prudent** [1]  27/11
**public** [2]  12/4 12/4
**publicized** [1]  7/12
**published** [3]  7/13 11/7 12/2
**purposeful** [6]  10/2 11/1 16/20 9/20 20/11 20/15 31/6
**purposefully** [2]  5/22 6/12
**pursuant** [1]  34/6
**pushes** [1]  16/8
**put** [2]  5/16 28/20
**putting** [1]  4/1
**PX** [1]  1/6
**PX23** [1]  3/10
**PX23-3363** [1]  3/10

## Q

**question** [14]  16/20 19/23 24/4 24/9 25/3 25/13 25/15 25/23 26/12 27/11 27/18 28/15 31/5 32/14
**questions** [2]  11/19 12/21
**quick** [1]  31/22
**quickly** [2]  23/24 29/4

## R

**raise** [2]  17/15 22/8
**raised** [4]  4/6 19/4 19/21 27/16
**raises** [1]  20/14
**raising** [1]  19/23
**reach** [5]  27/7 27/10 27/25 28/1 29/4
**reaching** [3]  13/15 13/18 25/10
**read** [4]  12/5 18/12 12/14 32/22
**reaffirmed** [1]  6/8
**real** [1]  31/10
**really** [12]  4/22 13/9 15/13 16/3 16/10 16/10 20/6 25/11 32/3 32/13 32/15 33/7
**reason** [5]  14/21 20/1 20/19 21/21 26/9
**reasonable** [3]  14/6 26/2 32/1
**reasonableness** [1]  15/7
**reasonably** [1]  13/18
**reasons** [1]  32/23
**recall** [1]  10/16
**recognizes** [1]  17/4
**record** [7]  3/14 7/18 12/4 12/5 26/9 26/23 31/19
**referenced** [2]  7/2 24/14
**refile** [3]  23/5 24/20 27/3
**regard** [3]  7/15 8/7 32/16
**regulations** [1]  34/10
**rehashing** [1]  32/5
**related** [3]  11/3 16/24 16/24
**relationship** [1]  8/19
**release** [1]  18/23
**remained** [1]  26/17
**remember** [1]  10/16
**replies** [1]  27/23
**reply** [6]  12/15 12/17 21/18 29/3 32/4 32/5
**reported** [1]  34/8
**reporter** [6]  8/14 21/10 21/13 34/1 34/4 34/17
**request** [4]  29/13 29/16 29/21 30/23
**request that** [1]  30/23
**requests** [1]  7/8
**require** [1]  30/25
**requirement** [2]  22/16
**research** [1]  17/23
**researched** [1]  12/1
**resided** [1]  31/3
**residence** [1]  10/8
**resident** [2]  9/18 12/6
**resides** [1]  14/25 21/21
**resolution** [4]  23/7 26/15 28/9 29/18
**resolved** [1]  30/22
**respect** [2]  20/17 21/19
**respond** [5]  17/19 17/21 18/4 23/13 29/3
**responded** [1]  4/12
**respondent** [1]  17/12
**responder** [1]  17/12
**responds** [1]  27/22
**response** [8]  4/7 17/22 18/5 20/4 22/2 22/3 24/6 25/8
**responsive** [2]  7/7 17/16
**rest** [2]  9/14 9/14
**resting** [1]  16/6
**restraining** [3]  3/12 4/3 27/9
**result** [2]  17/1 17/1
**revisiting** [1]  30/3
**right** [25]  5/24 6/3 9/1 10/13 10/19 12/20 12/23 13/22 14/13 14/20 15/20 15/25 17/12 17/20 18/1 18/2 19/23 23/11 24/21 25/19 27/12 28/10 28/23 29/20 30/9 32/16
**ripe** [1]  4/16
**rise** [1]  33/8
**rises** [1]  6/14

## S

**said** [3]  19/15 26/16 30/9
**same** [5]  16/5 26/23 27/16 30/2 32/21
**saw** [1]  23/4
**say** [13]  8/16 9/4 12/5 12/12 14/17 15/22 19/12 20/2 24/15 26/5 27/10 30/18 31/1
**saying** [7]  18/20 19/22 22/18 23/3 23/17 31/2 31/8

**S**

**says [3]** 6/11 8/8
**SCHAERR [5]** 2/6 2/7 3/22
**schedule [5]** 29/14 30/20 31/15 32/22 33/2
**scratched [1]** 15/14
**screen [1]** 5/16
**seat [1]** 3/7
**Seattle [1]** 1/17
**second [1]** 16/17
**see [5]** 7/23 9/4 19/13 24/5 30/7
**seek [1]** 6/15
**seeking [1]** 11/3 15/2
**seems [8]** 16/5 22/1 25/22 26/8 27/11 31/8 31/18 31/25
**sense [3]** 28/2 28/6 29/9
**separate [3]** 4/8 4/11 5/19
**serve [2]** 11/22 18/6
**served [11]** 6/22 6/25 8/3 11/21 11/21 11/21 15/4 16/11 17/6 17/7 22/23
**service [2]** 13/20 23/1
**session [1]** 3/4
**set [1]** 33/1
**Seventh [1]** 1/17
**share [1]** 10/13
**she [2]** 16/2 16/2
**shoot [1]** 11/19
**shooting [1]** 15/9
**short [2]** 12/21 32/20
**shorten [1]** 29/22
**shortened [1]** 31/15
**shorter [1]** 28/11
**shot [1]** 16/7
**should [9]** 13/2 13/10 13/13 13/14 18/19 18/21 18/24 18/24 26/24
**should-have-known [1]** 13/13
**show [2]** 12/11 22/12
**shown [1]** 10/6
**shrift [1]** 12/21
**sides [4]** 7/17 23/8 23/10 29/9
**simple [2]** 8/7 8/24
**since [5]** 5/10 11/8 11/9 22/1 27/21
**sitting [2]** 9/15 14/24
**six [1]** 30/21
**slides [1]** 5/15
**so [33]** 4/1 5/6 8/5 10/4 11/2 11/16 11/23 12/18 13/16 14/13 14/16 14/20 15/13 15/20 16/8 17/2 18/4 22/7 22/14 24/3 27/6 27/15 28/6 28/25 29/21 29/23 30/8 30/16 30/21 31/19 32/8 32/17 32/21
**solely [1]** 11/24 21/8 29/23
**some [13]** 5/1 5/15 5/23 5/25 6/11 8/19 10/1 11/7 14/18 15/23 16/18 16/14 20/12
**somehow [2]** 12/21 13/20
**something [3]** 10/3 15/5 24/8
**soon [1]** 33/2
**sorry [2]** 15/18 30/4
**sort [2]** 16/14 22/22
**sound [1]** 25/6
**sounds [2]** 13/19 23/16
**source [1]** 10/10
**specific [3]** 5/21 15/25 21/9
**specifically [7]** 10/21 11/2 11/9 14/5 14/10 17/6 22/15
**speed [1]** 29/24
**spent [2]** 12/15 13/4
**stage [2]** 18/8 29/1
**stakes [1]** 32/12
**stand [1]** 9/7
**standard [1]** 15/7
**stands [2]** 8/11 33/9
**Starbucks [2]** 14/18 14/24
**starts [1]** 22/4
**state [13]** 4/1 6/13 6/14 6/16 7/16 8/6 12/8 13/15 14/7 14/24 15/10 18/21 22/15
**state's [1]** 13/3
**STATES [6]** 1/1 1/11 3/3 8/9 34/5 34/11
**stay [1]** 30/16
**stays [1]** 25/14
**stenographically [1]** 34/8
**stenographically-reported [1]** 34/8
**STENOTYPED [1]** 1/23
**step [2]** 25/18 32/11
**straight [1]** 24/9
**straightforward [1]** 20/6
**streamlined [1]** 29/10
**Street [1]** 2/8
**structure [1]** 10/15
**stuck [1]** 4/18
**subject [8]** 4/9 4/15 7/6 10/13 18/16 27/14 30/10 30/14
**subpoena [2]** 8/13 16/11
**such [1]** 15/21
**sued [1]** 14/19
**sufficient [3]** 13/21 14/22 14/23
**sufficiently [1]** 4/20
**suggest [1]** 27/20
**suggested [1]** 28/7
**suggestion [4]** 26/1 26/3 27/18 30/11
**suggests [1]** 7/19
**Suite [1]** 1/17 1/20 2/8
**supplemental [2]** 27/19 32/25
**supplementing [1]** 28/22
**supposed [1]** 21/4
**Supreme [3]** 6/10 8/8 15/22
**sure [13]** 9/3 9/5 9/8 9/12 10/25 17/3 21/11 21/17 24/11 24/22 25/25 27/22 28/4
**surface [1]** 15/14
**surrounding [1]** 7/3
**surveying [1]** 13/14

**T**

**table [3]** 3/17 26/8 28/1
**tabling [1]** 26/10

**tagged [1]** 27/22
**take [3]** 17/20 23/19 27/3 32/1
**takes [1]** 13/6 13/7
**talk [4]** 4/20 13/24 16/17 30/1
**talking [2]** 5/17 12/23
**tall [1]** 25/2
**target [2]** 6/15 10/9
**targeting [5]** 14/9 15/9 15/9 15/25 16/3
**targets [1]** 9/17
**tell [3]** 7/18 12/15 28/14
**telling [1]** 9/12
**temporary [3]** 3/12 4/3 27/9
**ten [1]** 10/13
**terms [3]** 5/17 11/20 24/7
**test [3]** 8/13 12/14 12/14
**Texas [13]** 1/8 2/3 3/22 3/23 5/13 7/15 7/24 11/17 11/18 12/8 21/12 21/14 22/14
**than [6]** 7/14 10/3 13/10 15/24 28/16 31/8
**thank [11]** 3/20 3/25 5/12 9/10 22/3 28/9 32/9 32/18 33/4 33/5 33/6
**that [213]**
**that had [1]** 24/18
**that's [29]** 5/6 6/3 6/4 7/8 8/25 11/14 12/14 12/18 12/25 13/23 14/21 16/2 16/2 16/7 18/1 19/1 19/17 19/19 19/25 20/19 21/22 23/2 23/6 23/17 23/23 28/13 28/17 29/23 29/25
**their [17]** 5/10 5/10 6/7 9/23 10/7 15/2 16/10 17/21 20/3 20/19 21/23 21/23 22/2 26/2 29/17 29/17 30/8
**them [8]** 5/11 10/13 10/14 10/24 11/1 17/16 25/15 30/11
**then [19]** 5/11 9/1 12/12 21/25 22/7 24/2 24/10 25/11 25/14 25/17 25/18 25/21 27/10 27/23 27/24 28/10 29/5 29/7 30/15
**there [31]** 5/1 5/14 7/8 7/14 7/18 9/19 10/3 10/16 10/20 10/23 11/1 11/10 12/4 13/1 13/23 15/20 15/24 16/8 18/9 19/11 20/8 21/12 22/5 23/22 24/12 24/14 24/16 24/21 25/18 26/18
**there's [30]** 4/9 5/19 5/19 7/9 7/9 8/5 8/20 8/21 8/22 12/24 13/22 15/14 15/21 15/21 16/20 16/20 17/14 21/14 21/15 22/12 23/18 23/20 24/3 24/3 24/3 24/24 26/22 27/25 31/10
**therefore [1]** 8/20
**these [5]** 11/14 12/17 15/10 30/11 30/19
**they [50]**
**thing [3]** 24/19 25/8 29/2
**things [1]** 19/24
**think [31]** 4/25 5/3 5/4 5/10 9/22 10/23 11/7 13/22 14/5 14/16 15/12 16/5 19/2 21/22 23/7 24/3 24/15 24/18 25/4 26/1 26/17 27/14 28/14 29/25 30/13 30/19 30/22 30/23 31/20 31/21
**this [74]**
**those [6]** 5/3 16/4 17/4 21/3 25/14 30/22
**though [4]** 7/14 8/16 11/11 28/15
**thought [3]** 4/5 24/13 30/3
**Thoughts [1]** 25/24
**three [2]** 27/14 28/16
**threshold [2]** 12/18 25/15
**through [4]** 5/17 10/14 10/24 31/23
**thrust [1]** 31/6
**thus [3]** 6/13 30/19 30/25
**ties [2]** 14/23 17/4
**time [8]** 7/24 8/2 28/11 29/22 30/2 31/2 32/13 33/6
**today [5]** 4/2 4/22 23/3 26/21 26/23
**today's [1]** 32/23
**together [2]** 10/14 33/2
**too [1]** 26/8
**total [1]** 7/9
**towards [1]** 7/16
**TR [2]** 26/6 26/7
**trade [2]** 11/13 16/3
**transcript [3]** 1/10 34/7 34/9
**TRANSCRIPTION [1]** 1/23
**transfer [4]** 14/2 14/2 23/9 25/4
**transferring [1]** 23/24
**treat [1]** 31/17
**treatment [1]** 5/4
**TRO [2]** 1/10 25/9
**true [5]** 7/8 16/4 19/1 21/5 34/7
**trying [1]** 28/19
**turn [4]** 5/11 9/1 27/24 33/3
**turnaround [1]** 31/22
**Twitter [4]** 11/9 15/12 15/16 18/23
**two [25]** 5/19 7/8 7/9 10/17 10/20 12/19 23/20 28/12 28/12 28/12 29/13 29/13 30/9 30/23 31/20 31/21 31/21 31/25 31/25 31/25 32/2 32/2 32/17 32/17
**two-pager [1]** 30/9
**TX [1]** 2/5

**U**

**U.S [1]** 6/10
**U.S.C [1]** 34/6
**Uh [1]** 30/12
**Uh-huh [1]** 30/12
**Ulander [1]** 3/8
**under [1]** 22/16
**understand [11]** 14/3 14/8 16/16 18/10 18/18 23/3 23/4 25/7 26/22 27/1 27/13
**understanding [2]** 28/17 28/17
**Understood [1]** 31/13
**undisputed [1]** 9/16
**UNITED [6]** 1/1 1/11 3/3 8/9 34/5 34/11
**unless [3]** 4/23 15/5 28/11
**unreasonable [1]** 31/21
**up [5]** 5/16 6/8 8/17 12/11 29/24
**us [6]** 9/11 10/6 28/6 29/11 30/1 31/23
**using [1]** 11/20

**V**

**venue [5]** 4/11 14/2 24/4 27/15 30/10
**versus [1]** 3/11

**very [6]** 15/23 16/17 18/11 20/5 25/23 31/8
**viewed [1]** 12/16
**Virginia [2]** 14/19 14/20
**vs [1]** 1/6

**W**

**WA [1]** 1/17
**wagging [1]** 12/16
**waiting [1]** 30/21
**waiver [1]** 19/13
**walk [2]** 5/16 10/24
**want [13]** 7/22 9/12 9/14 13/11 18/11 23/7 23/13 25/6 26/5 26/9 28/11 32/5 32/16
**wanted [1]** 7/7
**WARREN [2]** 1/7 3/11
**was [33]** 5/15 6/18 6/22 7/11 7/12 7/25 9/20 10/7 10/8 10/9 12/16 12/17 13/18 13/19 15/12 15/24 16/11 17/6 17/7 17/7 17/8 17/9 19/6 19/15 20/5 20/9 20/11 20/12 21/3 6/19 30/3 30/9 31/7
**Washington [5]** 1/21 2/8 6/19 24/8 24/16
**way [9]** 8/8 19/12 23/11 23/12 25/22 26/23 27/20 28/20 31/8
**we [42]**
**we'll [4]** 13/24 27/25 28/1 33/2
**we're [14]** 5/21 5/21 5/21 6/5 8/25 18/8 25/19 28/6 28/25 29/5 29/6 31/2 31/18 32/7
**we've [2]** 19/22 31/22
**week [2]** 32/2 32/17
**weeks [18]** 28/12 28/12 28/12 29/13 29/13 30/21 30/24 31/21 31/21 31/21 31/25 31/25 32/2 32/2 32/17 32/17
**well [18]** 3/18 7/2 8/11 8/16 9/1 9/22 10/20 11/20 13/18 14/1 19/22 21/25 24/1 24/9 25/1 26/18 28/19
**went [2]** 16/11 24/15
**were [10]** 10/6 10/20 10/23 11/1 18/9 29/18 30/13 30/21 31/1 31/10
**what [29]** 4/22 8/7 8/10 8/10 8/10 9/4 9/11 9/11 9/19 10/7 10/7 10/12 11/8 13/11 17/5 18/18 18/19 18/19 19/16 19/25 20/7 23/2 24/5 28/6 28/19 30/3 30/21 31/19 32/13
**whatever [1]** 33/1
**when [16]** 9/13 11/2 11/17 11/17 13/15 13/19 14/5 14/18 15/4 15/7 15/9 15/9 18/11 20/10 27/8
**where [39]**
**wherever [1]** 9/8
**whether [9]** 10/6 12/20 13/2 17/5 17/15 17/16 19/11 22/14 24/2
**which [13]** 4/12 6/7 6/11 6/11 6/19 7/6 7/19 13/6 13/7 16/13 20/21 20/25 31/5
**while [4]** 4/13 17/10 19/2 28/5
**who [13]** 5/2 8/14 14/10 14/14 15/8 16/1 17/24 18/4 18/17 18/25 20/9 20/10
**whole [1]** 25/19
**whom [2]** 5/2
**Whoopsie [1]** 12/12
**whose [1]** 14/7
**why [5]** 13/23 19/8 19/8 19/11 26/9
**will [14]** 5/2 12/23 20/2 25/2 27/24 28/18 28/19 29/3 29/3 30/15 31/2 32/13 32/20 32/22
**willing [2]** 26/22 30/20
**without [3]** 4/19 25/9 26/11
**witnesses [1]** 5/2
**words [1]** 10/16
**work [6]** 9/21 14/11 14/14 15/1 17/23 18/14
**worked [4]** 7/20 20/10 20/15 31/24
**works [2]** 8/14 16/22
**would [26]** 4/22 5/6 13/15 14/11 14/13 15/22 18/9 22/7 22/23 23/3 23/8 23/8 23/11 23/17 24/6 25/6 25/20 25/21 27/18 27/20 28/15 29/13 29/21 30/18 30/22 30/23
**wouldn't [2]** 22/16 24/21
**writers [1]** 14/9
**wrong [2]** 19/18 19/20
**wrote [6]** 7/12 10/18 11/13 12/1 14/18 16/22

**X**

**XINIS [2]** 1/11 3/4

**Y**

**Yeah [5]** 8/23 11/25 23/14 26/19 26/25
**year [1]** 11/8
**Yep [1]** 18/13
**yes [8]** 3/9 6/4 13/17 18/10 19/1 22/6 28/24 29/12
**yet [3]** 4/12 4/19 18/8
**you [96]**
**you're [10]** 9/8 9/11 17/6 18/20 20/12 23/11 28/22 29/5 29/7 31/14
**you've [1]** 15/11
**you-all [1]** 25/20
**your [80]**
**yourself [2]** 5/22 6/1
**yourselves [1]** 3/14

# Exhibit I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. 23-cv-3363 |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

    A.   Texas's DTPA and Defendant's CID Authority ............................................ 3

    B.   Factual Background ................................................................................. 4

STANDARD OF REVIEW ..................................................................................... 10

ARGUMENT ...................................................................................................... 11

    I.      Media Matters has not Suffered Justiciable Injury. ..................................... 11

    II.     The Court Lacks Personal Jurisdiction over the Texas Attorney General. ................. 14

         A.   Defendant is not subject to general jurisdiction. .............................. 15

         B.   Defendant is not subject to specific jurisdiction. ............................. 15

    III.    Venue in Maryland is Improper. ............................................................... 17

    IV.   Media Matters has not Shown a First Amendment Violation. ........................ 19

    V.    Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is
         Inequitable. ......................................................................................... 20

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abbott v. Pastides,*
    900 F.3d 160 (4th Cir. 2018) ........................................................................ 13

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*
    293 F.3d 707 (4th Cir. 2002) ........................................................................ 15

*Barth v. District of Columbia,*
    No. 92-7093, 1993 WL 523999 (D.C. Cir. Dec. 14, 1993) ....................................... 24

*Bates v. C&S Adjusters, Inc.,*
    980 F.2d 865 (2d Cir. 1992) ........................................................................ 18

*Belle Fourche Pipeline Co. v. United States,*
    751 F.2d 332 (10th Cir. 1984) ................................................................ 11, 23

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ........................................................................ 10, 11

*Borowski v. DePuy, Inc.,*
    850 F.2d 297 (7th Cir. 1988) ........................................................................ 23

*Bulkley Assocs. v. Dep't of Industrial Relations,*
    1 F.4th 346 (5th Cir. 2021) ........................................................................ 18

*Calder v. Jones,*
    465 U.S. 783 (1984) ........................................................................ 15, 16

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,*
    334 F.3d 390, (4th Cir. 2003) ........................................................................ 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................ 13

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ........................................................................ 13

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ........................................................................ 11

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    141 S. Ct. 1017 (2021) ........................................................................ 16

*Golden Eagle Distrib. Corp. v. Burroughs Corp.,*
    801 F.2d 1531 (9th Cir. 1986) ........................................................................ 23

*Google, Inc. v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ........................................................................ 12, 21, 23

*Helicopteros Nacionales de Colombia v. Hall,*
    466 U.S. 408 (1984) ............................................................................... 15

*Ins. Co. of N. Am. v. Marina Salina Cruz,*
    649 F.2d 1266 (9th Cir. 1981) .............................................................. 17

*Jorgenson v. Volusia Cnty.,*
    846 F.2d 1350 (11th Cir. 1988) ............................................................ 24

*Laird v. Tatum,*
    408 U.S. 1, 11 (1972) ........................................................................... 13

*Leroy v. Great Western United Corp.,*
    443 U.S. 173 (1979) ........................................................................ 17, 18

*Letren v. Trans Union, LLC,*
    No. 15-3361-PX, 2017 WL 4098743 (D. Md. Sept. 15, 2017) ....... 21, 25

*Lewis v. Younger,*
    653 F.2d 1258 (9th Cir. 1980) ......................................................... 12, 23

*Maages Auditorium v. Prince George's Cnty.,*
    4 F. Supp. 3d 752 (D. Md. 2014) .......................................................... 11

*Matthews v. Freedman,*
    128 F.R.D. 194 (E.D. Pa. 1989) ........................................................... 23

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .............................................................................. 10

*Music Makers Holdings v. Sarro,*
    No. 09cv1836-RWT, 2010 WL 2807805 (D. Md. July 15, 2010) ......... 18

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship,*
    146 S.W.3d 79 (Tex. 2004) ..................................................................... 4

*Reisman v. Caplin,*
    375 U.S. 440 (1964) ............................................................ 11, 21, 23, 24

*Reps. Comm. for Freedom of Press v. AT&T,*
    593 F.2d 1030 (D.C. Cir. 1978) ............................................... 1, 12, 23

*RNC v. Pelosi,*
    602 F. Supp. 3d 1 (D.D.C. 2022) .......................................................... 21

*Safari Club Int'l v. Salazar,*
    852 F. Supp. 2d 102 (D.D.C. 2012) ...................................................... 20

*Sahyers v. Prugh, Holliday & Karatinos, P.L.,*
    560 F.3d 1241 (11th Cir. 2009) ............................................................. 24

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir. 2002) ................................................................ 19

*Stover v. O'Connell Assocs., Inc.*,
    84 F.3d 132 (4th Cir. 1996) .................................................................. 2, 15

*Stroman Realty v. Wercinski*,
    513 F.3d 476 (5th Cir. 2008) ...................................................................... 17

*Thompson v. Nat'l Football League*,
    No. 1:13-CV-00367, 2014 WL 1646929 (W.D. Pa. Apr. 24, 2014) ...................... 18

*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) .................................... 2, 12, 13, 14, 21, 23

*United States v. Kulukundis*,
    329 F.2d 197 (2d Cir. 1964) ...................................................................... 12

*Universal Leather v. Koro AR*,
    773 F.3d 553 (4th Cir. 2014) ...................................................................... 14

*Vitkus v. Blinken*,
    79 F.4th 352 (4th Cir. 2023) ...................................................................... 11

*Walden v. Fiore*,
    571 U.S. 277 (2014). .............................................................................. 2, 16

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................... 10

*Young v. New Haven Advoc.*,
    315 F.3d 256 (4th Cir. 2002) ...................................................................... 16

*Zazzali v. Swenson*,
    852 F. Supp. 2d 438 (D. Del. 2012) .......................................................... 18

**Statutes**

28 U.S.C. § 1391 ............................................................................................ 17

Tex. Bus. & Com. Code § 17.44 .................................................................... 4

Tex. Bus. & Com. Code § 17.46 ................................................................ 1, 3, 4

Tex. Bus. & Com. Code § 17.60 .................................................................... 22

Tex. Bus. & Com. Code § 17.61 .................................................. 4, 7, 12, 20, 23

Tex. Bus. & Com. Code § 17.62 .................................................................... 4

Tex. Bus. & Com. Code ch. 17, subch. E ...................................................... 3

**Rules**

Fed. R. Civ. P. 11(c) ......................................................................................... 3

Local Rule 101.1.b. ........................................................................................... 24

**Other Authorities**

Compl.,
*X Corp. v. Media Matters*,
No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ........................................ 6, 7, 8, 9, 18

Matt Gertz,
*It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023) ................................... 5

Eric Hananoki,
*As Musk endorses antisemitic conspiracy theory, X has been placing ads
for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*,
Media Matters (Nov. 16, 2023, updated Nov. 17, 2023) ........................................ 4, 5

Order,
*Texas All. for Retired Ams. v. Hughs*,
28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101 .................................. 22

X Safety,
*Stand with X to protect free speech,* X Blog (Nov. 18, 2023) .................................. 5, 6

## INTRODUCTION

In seeking to have a federal court enjoin an ongoing State investigation, the motion by Plaintiff Media Matters for America (Media Matters) is as meritless as it is extraordinary. On November 18, 2023, it came to light that Media Matters had arguably made false and misleading statements about the inner workings of X Corp. (f/k/a Twitter). Texas's Deceptive Trade Practices Act (DTPA) makes it unlawful to "disparag[e] the . . . services[] or business of another by false or misleading representation of facts." Tex. Bus. & Com. Code § 17.46(b)(8). Accordingly, on November 20, Defendant Ken Paxton, in his capacity as Texas's Attorney General, initiated an investigation. To date, Defendant has not reached a conclusion about whether Media Matters violated the law. It is possible that Media Matters' conduct was not false or misleading, or that its conduct otherwise did not sufficiently affect trade or commerce in Texas to come within the scope of the DTPA. But that is precisely why the Attorney General launched an *investigation*—to find out.

Media Matters asks this Court to enter extraordinary and unprecedented relief to short-circuit that investigation under the premise that the investigation harms its First Amendment rights. That is not something federal courts do. "[A]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith so as to violate that right." *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Op. of Wilkey, J.). If this sufficed for a preliminary injunction, it would have "no logical stopping-point." *Id.* And for three threshold reasons, Media Matters' attempt to obtain this unprecedented relief fails.

*First*, ripeness. Defendant's announcement of the investigation and issuance of a Civil Investigative Demand (CID) do not cognizably injure Media Matters. That is crystal clear under a

host of precedent, including binding Supreme Court precedent. And it is ***especially*** clear because the only Circuit court to address this Defendant's specific CID authority concluded that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 (9th Cir. 2022). That is because, among other things, the "CID is not self-enforcing." *Id.* at 1176. Media Matters suffers no automatic penalties if it ignores the CID. Instead, for the Attorney General to enforce the CID, he would have to sue in Texas State Court, where Media Matters would have the right to assert a First Amendment defense, or any other arguments. *Id.* Media Matters conspicuously failed to even cite this authority in its Renewed Motion for Temporary Restraining Order and Preliminary Injunction (the Renewed Motion).

*Second*, personal jurisdiction. The Texas Attorney General and his investigation have **zero** cognizable contacts with Maryland. The CID was issued to Media Matters in the District of Columbia. *See, e.g.*, Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (ECF No. 20-5). Although Plaintiff Eric Hananoki allegedly resides in Maryland, he was not the recipient of the CID. Nor is he the subject of the Attorney General's investigation. Nor can the CID be enforced against him. And regardless, for personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Indeed, binding precedent confirms that even far greater contacts with this State do not suffice for personal jurisdiction. *See, e.g.*, *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm" who retained "Maryland investigation companies to provide it with information about Maryland subjects, including the plaintiff in this case").

*Third*, venue. Contrary to Media Matters' assertion, it is untrue that "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland," *contra* Compl. ¶ 13. Even by Media Matters' telling, the overwhelming share of events giving rise to the investigation involve Media Matters' potentially false or misleading disparagement of X.com. *See, e.g.*, Renewed Motion at 3-8. And those allegations are the subject of X Corp.'s lawsuit against Media Matters in the Northern District of Texas. To the extent this case is justiciable in any federal court, it belongs in that court with that related case.

As explained in further detail below, moreover, Media Matters' merits arguments are all premature. And Media Matters also is not entitled to relief because it has acted inequitably in multiple respects. It has misled the Court about whether it was chilled by Defendant's investigation, violated its duty of candor to the Court about various other aspects of this matter, and engaged in flagrantly un-collegial litigation conduct. *See infra* at 20-25; *cf.* Fed. R. Civ. P. 11(c).

Media Matters' Renewed Motion should be denied.

## BACKGROUND

### A.    Texas's DTPA and Defendant's CID Authority

Like many States, Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch. 17, subch. E. In Texas, the Deceptive Trade Practices Act (DTPA) protects consumers by prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 17.46(a). Deceptive trade practices are defined broadly to include, among other things, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," *id.* § 17.46(b)(5); inducing consumers to enter transactions by "failing to

disclose information concerning goods or services which was known at the time of the transaction," *id.* § 17.46(b)(24); and, as particularly relevant here, "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* § 17.46(b)(8). By statute, these categories "shall be liberally construed." *Id.* § 17.44(a).

The DTPA also authorizes a number of enforcement mechanisms. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84-85 (Tex. 2004). As relevant here, the statute authorizes Defendant's Consumer Protection Division to issue a CID if the "division believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." Tex. Bus. & Com. Code § 17.61(a). If the recipient chooses to provide documents, those documents generally may not be shared outside the Office of the Attorney General (OAG) except by consent or court order. *Id.* § 17.61(f). If the recipient objects to the CID, that recipient may affirmatively challenge it in Texas state court, *id.* § 17.61(g); or it may wait to see if the Attorney General chooses to bring an enforcement action (where the recipient may raise any defenses), *see id.* § 17.62(b). So long as the recipient of a CID does not seek to destroy documents, he will not face any penalty for declining to provide documents based on a good-faith objection to that CID. *Id.* §§ 17.61(g), 17.62(a), (c).

### B.    Factual Background

On November 16, 2023, Media Matters published a document titled "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*."[1] This document made a number of serious and economically harmful

---

[1] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023, updated Nov. 17, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

Media Matters claims (at 2) that "Hananoki"—not Media Matters—published this document. Although Hananoki is listed as the author, there is no evidence in the public record or the record before this Court that Hananoki *published*

allegations against X Corp., an entity that employs people in Texas. Specifically, the document claimed that X "plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party." *Id.* And the document claimed that Media Matters "found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." *Id.* Media Matters' document also reproduced what Media Matters claimed were images of those ads next to the Hitler or Nazi Party content. *Id.* Unsurprisingly, at least some of these advertisers appear to have withdrawn their advertisements from X. Indeed, that objective appears to have been the whole point of the document. Media Matters kept a running "update" of advertisers who had withdrawn their ads from X. *Id.* And, on the following day, Media Matters published another document—this one by a different author—stating that "No advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

On November 18, X issued a blog post alleging how Media Matters' document was false or misleading in multiple respects. X Safety, *Stand with X to protect free speech,* X Blog (Nov. 18, 2023), https://blog.twitter.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. The upshot of X's allegations is that Media Matters' document did not describe an organic experience on X's platform. Instead, X alleged that Media Matters jury-rigged an artificial experience that few, and perhaps zero, other users or advertisers would ever experience, and then publicized that artificial experience as if it were organic to create a misleading impression. *Id.* According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that

---

the document. On the contrary, the document was published on Media Matters' website and, according to Media Matters' declarant, Hananoki is an employee of Media Matters. Padera Decl. ¶ 15.

Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id.* The blog post claimed that Media Matters apparently achieved these outlier results by "curat[ing]" their account in a way that would generate these results. *Id.*

On November 20, 2023, the Attorney General announced an investigation into Media Matters for potential fraudulent activity. Dodge Decl., Ex. B. His investigation began because he was "extremely troubled by" X's allegations about Media Matters' "manipulat[ions]." *Id.* The Attorney General, however, did not claim that Media Matters had broken the law, only that his office is "examining the issue closely." *Id.* Indeed, the Attorney General does not unreservedly accept X's allegations about what happened. Getting to the bottom of that is the whole point of the investigation.

Later that day, X Corp. filed a lawsuit against Media Matters in the Northern District of Texas over Media Matters' November 16 document. That lawsuit added significant detail to how X believed that Media Matters had created a false depiction of the X platform. Specifically, X claimed that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers posts on X Corp.'s social media platform beside Neo-Nazi and white supremacist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Compl. ¶ 1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ("*X Lawsuit*"). According to X, Media Matters accessed an old X account (one that would bypass X's "ad filter for new users") and then had that account follow content **only** "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id.* ¶ 8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id.* ¶ 10. The upshot, according to X, was an

inauthentic—and objectively misleading—representation of the X platform experience. For example, X claimed that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for **only one** viewer (out of more than 500 million) on all of X: **Media Matters**." *Id.* ¶ 13 (emphasis original).

On November 21, the Attorney General's office issued a CID to Media Matters requesting multiple sets of documents. As is customary under the Texas DTPA, the Attorney General gave Media Matters until December 12, 2023—20 days from service—to respond to the CID. Dodge Decl., Ex. A at 1; Tex. Bus. & Com. Code § 17.61(g) (contemplating "20 days"). Media Matters suggests (at 2) that the CID was not served until "December 1." That is highly misleading; Media Matters had already engaged OAG *about the CID* before December 1. *See* Declaration of Levi Fuller ("Fuller Decl."), Ex. B (OAG's December 1 email memorializing that Media Matters' counsel "call[ed] yesterday"—November 30—regarding CID); *see also infra* at 22-23.

Defendant's investigation is primarily designed to investigate three things: (1) the veracity of X's allegations; (2) The nexus of Media Matters' conduct to Texas; and (3) the effect of Media Matters' underlying conduct to trade and commerce. *See* Dodge Decl., Ex. A at 7.

**Veracity**: To evaluate the veracity of X's allegations, the CID requests among other things, that Media Matters produce:

- "[D]ocuments sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. Dodge Decl., Ex. A at 7 No. 8; *accord X Lawsuit* ¶ 29 (alleging Media Matters used an account that enabled it to "evade X's content filters for new users");

7

- "[D]ocuments sufficient to identify all X accounts, profiles, and members followed by the X accounts identified" in the bullet above. Dodge Decl., Ex. A at 7 No. 9; *accord X Lawsuit* ¶ 30 (alleging Media Matters "set its accounts to follow only 30 users" and that "[*a*]*ll* of these users were either already known for posting controversial content or were accounts for X's advertisers" (emphasis original)); and

- Media Matters' "external communications with" X during a critical 3-week time period. Dodge Decl., Ex. A at 7 No. 10.

**Texas Nexus**: Texas's DTPA is, of course, a Texas statute. To evaluate the nexus of Media Matters' conduct with Texas, the CID requests that Media Matters produce:

- "[D]ocuments sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas." Dodge Decl., Ex. A at 7 No. 2;

- "[D]ocuments sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas." Dodge Decl., Ex. A at 7 No. 3; and

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."). At least some of these advertisers are headquartered in Texas.

**Effect on trade and commerce**: Texas's DTPA is about trade and commerce, not merely misleading statements in the abstract. To evaluate the November 16 document's nexus to trade and commerce, the CID requests that Media Matters produce:

- "[D]ocuments" related to "Elon Musk's purchase of X." Dodge Decl., Ex. A at 7
  No. 4;

- Media Matters' "external communications" with the advertisers at the center of the
  controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11;
  *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was
  purposefully directed at, among others, relationships with advertisers who are
  located in, have a significant presence in, or transact substantial business in
  Texas."); and

- "[D]ocuments sufficient to identify all direct and indirect sources of funding for"
  Media Matters' operation. Dodge Decl., Ex. A at 7 No. 12.[2]

Media Matters contends (at 3) it "ha[s] been chilled from publishing additional criticism
or coverage of X or Musk since" the Attorney General announced his investigation. Media
Matters' COO, for example, asserts that there is a "culture of fear within Media Matters" to
"speak[] on any topic related to the subject of the investigation." Declaration of Cynthia Padera
¶ 18 ("Padera Decl."), ECF No. 20-2. But it is almost impossible to square that with the public
record. For example:

- On November 25 (after Defendant announced his investigation and issued the CID),
  Media Matters President Angelo Carusone stated on TV that "things [on X] appeared
  exactly the way we said, that ads were running alongside Nazi content." Fuller Decl.,
  Ex. D.

---

[2] Although Media Matters does not have a right to understand the possible theories of the Attorney General's
investigation, Defendant lays out these specifics in detail for the benefit of the Court's evaluation. Documents
regarding Media Matters' funding could be highly relevant to effects on trade and commerce because, for example,
Media Matters may be funded by an economic competitor of Elon Musk or X.

- On the same day, Carusone said "Musk . . . doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.*

- On the same day, Carusone said X "still provides at this point a safe haven for extremists and disinformation." *Id.*

- On November 26, Carusone similarly said on TV that "Musk . . . engag[es] with some pretty extreme, you know, antisemitic, great replacement theory." Fuller Decl., Ex. E.

- On the same day, Carusone touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan accounts." *Id.*

- On December 3 Carusone went on TV to accuse X CEO Linda Yaccarino of coercing "advertising partners . . . to really align with the values of what X is trying to do." Fuller Decl., Ex. F.

- On December 18 Carusone went on TV to boast how Media Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." Fuller Decl., Ex. G.

Defendant takes no view on whether Carusone's speech *supra* is constitutionally protected. But his conduct clearly illustrates that Media Matters' speech has not been *chilled*.

### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). That burden is heavy: "[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "As a matter of

equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1943-44 (internal quotations omitted); *See also Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). The possibility that adequate relief will be available at a later date weighs heavily against a claim of irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)). The same standards apply for a temporary restraining order. *Maages Auditorium v. Prince George's Cnty.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

## ARGUMENT

### I.      Media Matters has not Suffered Justiciable Injury.

The accepted rule since at least the Supreme Court's 1964 *Reisman v. Caplin* decision is that an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it. 375 U.S. 440 (1964). In *Reisman*, the recipient of an administrative request for documents was not obligated to produce anything until after the agency brought an "enforcement action" where the recipient would be afforded "a judicial determination" of the lawfulness of the request and the viability of any of his defenses. *Id.* at 446. That "opportunity for judicial review before any coercive sanctions may be imposed" was an adequate "remedy"; and the court would not permit the recipient of the request to short-circuit this process by preemptively seeking an injunction in federal court. *Id.* at 450. *Reisman* is now widely understood as having "announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984); *see also United States v.*

*Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.) (explaining *Reisman* "seems to destroy the basis underlying decisions of this court which authorized applications to vacate [non-self-executing subpoenas] (and appeals from their denial) in advance of any judicial proceeding by the Government for their enforcement").

The presence of a First Amendment claim changes nothing. As a respected D.C. Circuit judge put it, "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly trampled on, and then seek an injunction against the investigation on that basis. *Reps. Comm. For Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Wilkey, J.). That "approach has no logical stopping-point" and, if ever entertained, would mire the federal courts in a flood of litigation to short-circuit investigations before the investigations can even determine whether the subject has broken the law. *Id.* No wonder the courts have rejected these kinds of actions for an injunction, even when the First Amendment is at issue. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (concluding, in First Amendment context, that an "administrative subpoena is not ripe for review" because it is not "self-executing"). Instead, as then-Judge Anthony Kennedy put it in a similar context, Media Matters "can properly litigate [its legal arguments] if and when the Attorney General attempts to enforce [state] law against [it] after the completion of his investigation." *Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980). Or, Media Matters could take advantage of the procedures that the DTPA offers to challenge the CID. *See* Tex. Bus. & Com. Code § 17.61(g). But Media Matters cannot seek pre-enforcement review of the CID in federal court.

The Ninth Circuit's decision in *Twitter, Inc. v. Paxton* removes any conceivable doubt about whether Media Matters has already suffered cognizable injury. 56 F.4th 1170. In that case, Twitter sought an injunction against this same Defendant—Attorney General Paxton—after he

initiated a DTPA investigation and served a CID on Twitter. Twitter alleged materially similar

First Amendment harm as Media Matters alleges here, *id.* at 1175 (Twitter declarant alleging "the

CID and associated investigation chill Twitter's speech") and identified statements from

Defendant that it believed showed retaliatory intent, *id.* at 1172 (Defendant stated Twitter was "the

left's Chinese-style thought police" and vowed to "fight them with all I've got"). The court

concluded, however, that "Twitter has not suffered an Article III injury because the CID is not

self-enforcing." *Id.* at 1176. After all, Twitter—like Media Matters here—"never faced any

penalties for its refusal to comply with the CID." *Id.* And all the actions Twitter claimed to have

taken to self-censor in response to the CID were—much like Media Matters' alleged actions

here—"self-inflicted because the actions were voluntary." *Id.*; *accord Clapper v. Amnesty Int'l

USA*, 568 U.S. 398, 418 (2013).

　　　None of Media Matters' First Amendment authority supports a contrary outcome. By and

large, courts adjudicate First Amendment "retaliation" cases only where "the challenged exercise

of governmental power was regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*,

408 U.S. 1, 11 (1972). "In none of" the Supreme Court's cases does "the chilling effect arise

merely from the individual's knowledge that a governmental agency was engaged in certain

activities," *id.*, or from a non-self-executing CID. Media Matters' case citations (at 18-19) are

illustrative. For example, in one of Media Matters' authorities—*Abbott v. Pastides*—the Fourth

Circuit explained that the government entity's process of "gather[ing] information—the 'who,

what, when, whys, and hows' of [an] [e]vent"—did ***not*** establish cognizable injury. 900 F.3d 160,

166, 171 (4th Cir. 2018). That is exactly what the Attorney General is engaged in here. In *Cooksey

v. Futrell*, the court found adequate First Amendment harm, by contrast, because the defendant

state agency threatened "an injunction" against the plaintiff, returned a "red-pen mark-up" of

13

plaintiff's speech, and issued "unsolicited written and oral correspondence" explaining that plaintiff's "speech violated the" law. 721 F.3d 226, 236-37 (4th Cir. 2013). Here, nothing like that has happened—the Attorney General has not even determined whether Media Matters violated the law. And in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the court did not discuss standing, and the plaintiffs there "would have had no opportunity to challenge any aspect of the investigation until formal charges were brought, at which point they could have faced a large fine," *Twitter*, 56 F.4th at 1177. That is why the Ninth Circuit in *Twitter* concluded that its own *White v. Lee* opinion was inapposite in this exact setting.

## II.    The Court Lacks Personal Jurisdiction over the Texas Attorney General.

This Court also lacks personal jurisdiction over Attorney General Paxton. He has **zero** contacts with Maryland, and it is in any event only the truly extraordinary case where a State Attorney General will be subject to jurisdiction in another jurisdiction's courts.

For "a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 396 (4th Cir. 2003). "Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution," so the two inquiries "merge[]" into one here. *Id.* at 396-97. Personal jurisdiction comes in two forms: general and specific. Media Matters cannot meet its burden to show either. *See Universal Leather v. Koro AR*, 773 F.3d 553, 558 (4th Cir. 2014) (holding "plaintiff has the burden of making a prima facie showing").

### A.    Defendant is not subject to general jurisdiction.

General jurisdiction is obviously inapplicable here: Defendant does not have the requisite "continuous and systematic" contacts with Maryland for that exercise of jurisdiction. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415-16 (1984).

### B.    Defendant is not subject to specific jurisdiction.

Specific jurisdiction is also lacking. Specific jurisdiction turns on a three-part test: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (alterations omitted).

***No Purposeful Availment:*** First, there is no credible argument that Defendant "purposefully availed" himself of the privilege of conducting activities in Maryland. *ALS Scan*, 293 F.3d at 712. On the contrary, Defendant announced his investigation in Texas, Dodge Decl., Ex. B, and issued the CID to Plaintiff Media Matters in the District of Columbia, Dodge Decl., Ex. A.

Even far greater contacts with Maryland would not support personal jurisdiction. After all, the Fourth Circuit has held that even an out-of-state "investigation" that actually retains ***Maryland*** "companies to provide . . . information about Maryland subjects" is not sufficient for personal jurisdiction over the out-of-state investigator. *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm").

Media Matters is wrong (Renewed Motion at 3; Compl. ¶ 12) in claiming that the Attorney General has taken any actions "intentionally directed towards Maryland." Media Matters' argument relies (*see* Compl. ¶ 12) on the "effects" test for personal jurisdiction announced in *Calder v. Jones*, where the Court concluded that two Floridians who had defamed a Californian

15

were subject to personal jurisdiction in California for the tort. 465 U.S. 783 (1984). The Floridians published a story that "impugned the professionalism of" the Californian, whose "career was centered in California," the story "was drawn from California sources," and "the brunt of the harm" was suffered in California. *Id.* at 788-89. Moreover, the story was published in a periodical whose "largest circulation" was in California. *Id.* at 790. That is plainly nothing like this case, but Media Matters attempts to place Plaintiff Hananoki in a position analogous to the *Calder* Californian. Namely, Media Matters contends that the November 16 document was "written by Hananoki," that Hananoki's preparation and authorship of the document occurred "in the District of Maryland," and that Defendant's CID is seeking material "in this District." Compl. ¶ 12.

Media Matters' argument is fatally flawed at multiple steps.

*First*, it is well-established that "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. "[T]he place of a plaintiff's injury and residence *cannot* create a defendant's contact with the forum state." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1031 (2021). Instead, this Court must look at "whether the defendant has expressly aimed or directed [his] conduct toward the forum state." *Young v. New Haven Advoc.*, 315 F.3d 256, 262 (4th Cir. 2002). And here, Defendant's conduct was not in any sense "aimed" at Maryland—indeed, his CID was issued to, and served in, the District of Columbia, where Media Matters resides. At the very most, Defendant's conduct indirectly affected a Maryland resident (it did not, *see infra* next paragraph). But that is a far cry from the Attorney General "expressly aim[ing] or direct[ing] his conduct" toward Maryland. *Id.*

*Second*, while this binding authority alone is fatal for Media Matters, the reality is a great deal worse for it because, even under Media Matters' legally flawed theory, the possibility of personal jurisdiction hinges on *Hananoki*. Compl. ¶ 12. But Hananoki is a straw plaintiff.

Defendant is not investigating Hananoki. *See* Dodge Decl., Ex. B. Defendant did not serve Hananoki with a CID. *See* Dodge Decl., Ex. A at 1. And Defendant therefore cannot enforce the CID against Hananoki. Tex. Bus. & Com. Code § 17.62(b) (enforcement against entity that was "***served***" with CID (emphasis added)).[3]

*Exercising Jurisdiction would be Unreasonable*:  It would also be highly unreasonable for this Court to exercise jurisdiction over the Attorney General of Texas because of the resulting extreme "conflict with the sovereignty of the defendant's [S]tate." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). The "sovereign status of a defendant militates against the reasonableness of jurisdiction." *Id.* at 1272. And the default rule is that state agencies should not "have to defend [their] attempt to enforce [state] laws "—much less mere investigations under those laws—"in courts throughout the nation." *Stroman Realty v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008).

## III.   Venue in Maryland is Improper.

Venue is also improper here for similar reasons.

Media Matters claims "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland, where nearly all of Hananoki's work occurred." Compl. ¶ 13 (citing 28 U.S.C. § 1391(b)(2)). Of course, like Media Matters' personal jurisdiction argument, this theory depends on Hananoki's presence as a straw plaintiff.

And, in any event, the Supreme Court has rejected this approach to venue. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173 (1979). The

---

[3] It is particularly bizarre that Media Matters would use Hananoki as a straw plaintiff in an attempt to invoke this Court's jurisdiction when 10 of its 11 listed counsel are not even admitted here, Renewed Motion at 31-32, and when Media Matters itself is "incorporated," and has "its principal place of business in" the "District of Columbia." Compl. ¶ 15.

corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185-86. Based on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.[4]

That venue is proper in Texas alone is especially obvious here because *X already filed a lawsuit in Texas against Media Matters for the same conduct Defendant is investigating*. *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.). That case clearly involves a "related" set of facts, and courts commonly look to relatedness when determining where venue is proper. *See Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012) ("A motion to transfer may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."); *Thompson v. Nat'l Football League*, No. 1:13-CV-00367, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014) (same).[5] Moreover, it is quite likely

---

[4] Congress's amendment of the venue statute in 1990 (after *Leroy*) is irrelevant to this point because, while that amendment clarified that venue can be proper in multiple districts, the Court's decision in *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 384-85; *accord Bates v. C&S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (observing, post-amendment, that "*Leroy* . . . remain[s] [an] important source[] of guidance").

[5] Transfer is unwarranted because, as explained *supra* at 11-14, this case is not justiciable in *any* federal court. But if the Court thinks this case is justiciable, then the Northern District of Texas is manifestly the proper place for it to be litigated.

The District of Columbia would not be a proper venue under *Leroy*, and Defendant is also not subject to personal jurisdiction there. While Media Matters' case for personal jurisdiction over Defendant would not be as obviously foreclosed in D.C. as it is here, Defendant's contact with D.C.—namely, the service of a CID there—does not suffice for personal jurisdiction. *See, e.g.*, *Music Makers Holdings v. Sarro*, No. 09cv1836-RWT, 2010 WL 2807805, at *5 (D. Md. July 15, 2010) ("[R]ecent out-of-circuit court of appeals decisions have analyzed the issue in a variety of contexts and have uniformly held that cease-and-desist letters alone do not establish personal jurisdiction."); *cf. Bulkley Assocs. v. Dep't of Industrial Relations*, 1 F.4th 346, 353-54 (5th Cir. 2021) (explaining how the Fifth Circuit recognizes this rule but that the court deviated once when the New Jersey Attorney General threatened to "halt

that that court will eventually address all of the arguments Media Matters has made here if X Corp. seeks the same material in discovery.

## IV.   Media Matters has not Shown a First Amendment Violation.

Media Matters also cannot show that the Attorney General violated its First Amendment rights.

Media Matters admits (at 14) that, to succeed on its retaliation claim, it must show that it "engaged in protected First Amendment activity" and that Defendant took responsive action in retaliation for that activity. But Media Matters cannot possibly show *on this record* that the activity at issue in the Attorney General's investigation was protected First Amendment activity. Instead, it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for both "literally false" statements and statements that, "although literally true, [are] likely to mislead and to confuse" viewers. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to deceive viewers, but deliberately designed to do so. If that is the case, then it is hard to see how that same speech is constitutionally protected.

The Attorney General does not unreservedly take X Corp.'s allegations against Media Matters at face value, and he does not ask this Court to do so. But that is the point of Defendant's *investigation*. Among other things, Defendant's investigation will shed significant light on whether Media Matters' speech was actually First Amendment-protected—*i.e.*, whether it was likely, or deliberately designed, to mislead. Media Matters' suit functionally asks the Court to assume the

---

[plaintiff's] activity nationwide, including activity [in Texas] that had no connection to New Jersey property or residents").

conclusion of that investigation in a way that will be favorable to Media Matters. But the appropriate course is to see what the investigation actually yields.[6]

## V.   Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable.

Media Matters' arguments about irreparable harm also are not equitable. And its meritless harm argument, coupled with various other misrepresentations and lack of candor, raises serious questions about its good faith.

As to the alleged harm: "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable."

---

[6] Media Matters' other merits arguments (at 22-27) also do not support its request that the Court enjoin Defendant. Media Matters can litigate whether Defendant's demand is "overbroad, unreasonable" or "seeks to pry into matters protected by the First Amendment" under the procedures the DTPA provides. Tex. Bus. & Com. Code § 17.61(g). Or, like any other party, it can meet and confer with Defendant about the overbreadth, etc., in an attempt to narrow the requests. And at least some requests are *plainly* not overbroad, unreasonable, or seeking First Amendment protected material. *See, e.g.*, Dodge Decl., Ex. A at 7 No. 9 (narrowly tailored request for a mere three weeks of "external communications" between Media Matters and X Corp); *id.* No. 10 (similar request for communications between Media Matters and advertisers). So the sweeping relief that Media Matters seeks cannot be granted on these arguments.

Media Matters' argument about whether it is subject to personal jurisdiction in Texas fares no better. Defendant's investigation is intended in part to evaluate that exact question. *See supra* at 8-9 (explaining how some requests are intended to evaluate the breadth of Media Matters' contacts with Texas). In that respect, the CID accomplishes much the same purpose as jurisdictional discovery. Just like when jurisdictional discovery is ordered, it would make no sense here to conclude Media Matters is not subject to jurisdiction in Texas without first flushing out the facts necessary to determine whether that is true.

But Media Matters' irreparable harm argument is actually a great deal more inequitable than that. Namely, Media Matters refused Defendant's offer to extend **greater** relief than **any** authority requires. Defendant's office offered to stipulate that it would not enforce the CID, or even take any related judicial or enforcement action, for months. ECF No. 28-1 at 5. That is the customary way that government enforcers relieve parties of any potential irreparable harm and allow courts time to more carefully consider a case. *See, e.g.*, *RNC v. Pelosi*, 602 F. Supp. 3d 1, 15 (D.D.C. 2022). But Media Matters refused this stipulation and insisted on pressing forward with its preliminary injunction motion on the grounds that "mere delay" of CID enforcement did not remedy its alleged injury. ECF No. 28-1 at 4. "Mere delay," however, is the **same thing** a preliminary injunction offers. Defendant recognizes that, in the absence of agreement, this Court had a judicial responsibility to require "full briefing" to "assess the strength" of Media Matters' harm argument, and to proceed with its scheduled preliminary injunction hearing. ECF No. 31. But, as the full briefing, and an overwhelming line of case law, shows (*see, e.g.*, *Reisman*, *Google v. Hood*, *Twitter v. Paxton*), Media Matters is not entitled to **any** relief in federal court. Media Matters' rejection of Defendant's offer to give the company far more than any authority requires was inequitable conduct. *See, e.g.*, ECF No. 28-1 at 5 (email putting Media Matters on notice of *Google* and *Twitter* holdings).

This conduct is independently unbecoming of officers of the Court, like Media Matters' counsel. *Accord Letren v. Trans Union, LLC*, No. 15-3361-PX, 2017 WL 4098743, at *5 (D. Md. Sept. 15, 2017) (Xinis, J.) (a "primary purpose" of sanctions is to "deter parties and their counsel from pursuing unnecessary . . . litigation"). And unfortunately, this conduct has been undertaken in combination with multiple misrepresentations and lack of candor.

*First*, misrepresentations. Media Matters contends it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation," Renewed Motion at 3, and that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation," Padera Decl. ¶ 18. Someone evidently forgot to tell this to Media Matters' President, because he has been on TV at least four times since the Attorney General announced his investigation, where he has made materially the same—and even more aggressive—claims against X and Musk as those made in the November 16 document. *See supra* at 9-10. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* at 9-10. It is not apparent how Media Matters can possibly square that with its assertion here that it has been chilled from criticizing X or Musk, or that it does not want to speak on matters related to the Attorney General's investigation.

Media Matters also makes (at 10) the highly misleading assertion that Defendant's November 21 CID was served on "December 1." FedEx records show that it was delivered and accepted at Media Matters' office on November 22. Fuller Decl., Ex. A; *see* Tex. Bus. & Com. Code § 17.60(d)(3) (service). And there is **no question** Media Matters **actually** received it before December 1 because, by November 30, it had hired counsel who had already reached out to Defendant's office about the CID. *See* Fuller Decl., Ex. B (memorializing this phone call). But at that point, OAG realized that Media Matters had chosen a law firm whose name partner was recently sanctioned for lack of candor to a court. Order, *Texas All. for Retired Ams. v. Hughs*, 28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101 (Mar. 11, 2021 Order). OAG concluded, in an extreme abundance of caution and to preempt any possibility of gamesmanship, that it would

re-serve Media Matters through a professional process server—this time through Media Matters' chosen law firm, which was accomplished on December 1. *See* Fuller Decl., Ex. C. Plainly, however, that was not the only time Defendant served Media Matters. And this misrepresentation is material because it created the misimpression that Defendant had given Media Matters only a 12-day window to respond to the CID, Renewed Motion at 10, whereas the DTPA contemplates a default 20-day window for CID recipients to seek review in Texas State court, Tex. Bus. & Com. Code § 17.61(g).

***Second***, lack of candor. Media Matters failed to bring to the Court's attention the veritable mountain of authority holding that non-self-executing document demands are not reviewable in federal court. *See, e.g.*, *Reisman*, 375 U.S. 440; *Belle Fourche Pipeline*, 751 F.2d 332; *Reps. Comm. for Freedom of Press*, 593 F.2d 1030; *Google*, 822 F.3d 212; *Lewis*, 653 F.2d 1258; *Twitter* 56 F.4th 1170. "Although this line of cases contains no controlling decisions by the Court of Appeals for ***this*** circuit, the sheer volume of uniformly contrary decisions from other courts, as well as dictum from leading Supreme Court opinions, constituted more than adequate authority to put plaintiff's counsel on notice that his [arguments] were not well grounded in law and that sanctions would be in order unless counsel bolstered his assertions with at least a modicum of argument for extension, modification, or reversal of existing law." *Matthews v. Freedman*, 128 F.R.D. 194, 202 (E.D. Pa. 1989) (emphasis added). After all, "[a] lawyer should not be able to proceed with impunity in real or feigned ignorance of authorities which render his argument meritless." *Golden Eagle Distrib. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir. 1986). *Borowski v. DePuy, Inc.,* 850 F.2d 297, 304-05 (7th Cir. 1988) (reprimanding counsel's "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist[]" (internal citation omitted)).

Granted, Media Matters was entitled to contend that the Supreme Court's *Reisman* decision does not control because it did not address the First Amendment. But the Ninth Circuit addressed *exactly* that argument in *Twitter* and nevertheless concluded in this exact context that the suit was not justiciable. 56 F.4th at 1178-79. And of course, Media Matters also was entitled to pursue a Circuit split with the Ninth Circuit. But Media Matters' counsel was not ethically permitted to fail to even ***apprise*** this Court of all this authority, much less the sole Circuit court case (*Twitter*) addressing this precise scenario. *Accord, e.g.*, *Jorgenson v. Volusia Cnty.*, 846 F.2d 1350 (11th Cir. 1988) (sanctions); *Barth v. District of Columbia*, No. 92-7093, 1993 WL 523999, at *4 (D.C. Cir. Dec. 14, 1993) (Henderson, J., concurring) (counsel's "ability to distinguish the omitted cases when pressed to do so should not excuse its lack of candor in its pleadings").

***Third***, Media Matters' gamesmanship and lack of collegiality have imposed unnecessary burdens on Defendant and the Court. It is well established that "civility and collegiality" in litigation are in the public interest and "greatly advance[] judicial efficiency" by promoting "inexpensive determination of every action and proceeding." *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245 (11th Cir. 2009). But multiple of Media Matters' litigation tactics have undermined judicial efficiency and unnecessarily raised the costs of litigation. Media Matters, for example, enlisted Hananoki as a straw plaintiff as part of an apparent effort to establish personal jurisdiction over Defendant in Maryland. *See supra* at 16-17. That needlessly forced Defendant to expend resources on outside counsel. *See, e.g.*, Local Rule 101.1.b. Media Matters has offered no reason why it enlisted Hananoki in this gambit when it could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred.

In addition, there are significant indicia here that Media Matters "knowingly or recklessly raise[d] a frivolous argument, or argue[d] a meritorious claim for the purpose of harassing an opponent." *Letren*, 2017 WL 4098743, at *6. Namely, Media Matters offered no comprehensible explanation why it forced Defendant's counsel, and this Court, to expend resources over the Holiday break. As noted earlier, the Attorney General offered to stipulate not to enforce the CID, or take any related action, for a period to allow a more reasonable briefing schedule and more reasonable time for this Court to evaluate the claims. *See* ECF No. 28-1. When the Attorney General implored Media Matters to explain how this did not moot any possible urgency on the Renewed Motion, Media Matters responded that its "complaint and motion speak for themselves." *Id.* But that is nonsensical—the complaint and motion were filed *before* Defendant offered his stipulation, and do not address the stipulation. Media Matters also contended that "mere delay" of enforcement would not remedy its injury. *Id.* But "mere delay" is the same thing a preliminary injunction accomplishes. And, in any event, the Attorney General did not propose the stipulation as a full-blown substitute for the preliminary injunction—rather, it was offered merely to elongate the briefing and hearing schedule on that motion so that the parties and this Court would not be burdened over the Holidays.

## CONCLUSION

The Court should deny Plaintiffs' Renewed Motion.

Dated: December 30, 2023

Respectfully submitted,

*/s/ Gene C. Schaerr*
GENE C. SCHAERR (D. Md. # 22340)
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC  20006
gschaerr@schaerr-jaffe.com

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

*/s/ Ryan S. Baasch*
RYAN S. BAASCH*
(signed by Gene C. Schaerr with
permission of Ryan S. Baasch)
Division Chief
Consumer Protection Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-9917
ryan.baasch@oag.texas.gov

CHRIS LAVORATO*
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant*
*Ken Paxton, Attorney General*
*of the State of Texas*

**CERTIFICATE OF SERVICE**

I, Gene C. Schaerr, hereby certify that on December 30, 2023, I electronically filed Defendant's Opposition to Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction with the Clerk for the United States District Court of Maryland using the CM/ECF system, which shall send electronic notification to counsel of record.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| MAURA TRACY HEALEY, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND NEVADA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* AND BACKGROUND ........................................................1

ARGUMENT ......................................................................................................2

    I.    Attorneys General should act impartially. ...............................................2

        A.   Attorneys General should not employ legal power to tip the
            scales in a policy debate. ......................................................3

            1.   Targeting critics. ...........................................................4

            2.   Abusing subpoena power....................................................5

        B.   Climate change is the subject of legitimate international
            debate. ........................................................................6

    II.   Politicized investigations undermine public confidence.............................9

CONCLUSION ...................................................................................................9

### INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at p.1.

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

ARGUMENT

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

## I.    Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*

[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

2

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See, e.g.,* TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

### A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see, e.g., Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

3

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1.    Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

### 2.   Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

### B.   Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

> I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id*. at p.10.
  [9] *Id*. at p.4.
  [10] *Id*. at p.7.
  [11] *Id*.
  [12] *Id*.
  [13] *Id*. at p.6.

## II.    Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### Conclusion

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra*.

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra*, at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

# Exhibit K

# 18-1170

## In the United States Court of Appeals
## for the Second Circuit

---

EXXON MOBIL CORPORATION,

*Plaintiff-Appellant*,

*v.*

MAURA TRACEY HEALEY, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF MASSACHUSETTS, AND
BARBARA D. UNDERWOOD, ATTORNEY GENERAL OF NEW YORK,
IN HER OFFICIAL CAPACITY,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Southern District of New York, Manhattan Division

---

**BRIEF FOR TEXAS AND ELEVEN ADDITIONAL STATES
AS AMICI CURIAE IN SUPPORT OF APPELLANT AND
URGING REVERSAL**

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant
  Attorney General

JAMES E. DAVIS
Deputy Attorney General for
  Civil Litigation

DAVID J. HACKER
Special Counsel for Civil Litigation
david.hacker@oag.texas.gov
Office of the Attorney General
P.O. Box 12548 (MC 001)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Counsel for Amici Curiae

# TABLE OF CONTENTS

Page

Table of Authorities ...........................................................................ii

Interest of Amici Curiae .....................................................................1

Summary of the Argument .................................................................2

Argument ............................................................................................3

    I.    Attorneys General Must Act Impartially ..................................3

        A.    Attorneys general may not employ legal power to suppress a viewpoint in a public policy debate. ......................................5

            1.    The New York and Massachusetts Attorneys General are targeting critics. ................................................7

            2.    The New York and Massachusetts Attorneys General are abusing their power. ................................ 11

        B.    Climate change is the subject of legitimate international debate. ......................................................... 13

    II.    Politicized investigations undermine public confidence. .......... 16

Conclusion ....................................................................................... 19

Certificate of Service .........................................................................20

Certificate of Compliance .................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abrams v. United States,*
    250 U.S. 616 (1919) ........................................................................ 7–8

*AFL-CIO v. Fed. Elec. Comm'n,*
    333 F.3d 168 (D.C. Cir. 2003) ........................................................ 11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................... 8

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ............................................................................ 7

*Berger v. United States,*
    295 U.S. 78 (1935) ............................................................................ 3

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................ 11

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) .......................................................................... 5

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ....................................................................... 5, 6

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) .......................................................................... 7

*Connick v. Myers,*
    461 U.S. 138 (1983) .......................................................................... 6

*Cornelius v. NAACP,*
    473 U.S. 788 (1985) .......................................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ........................................................................ 14

*Donaldson v. Read Magazine, Inc.,*
    333 U.S. 178 (1948) ........................................................................... 4

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
    472 U.S. 749 (1985) ......................................................................... 13

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................... 5

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
    264 U.S. 298 (1924) ......................................................................... 11

*First Nat'l Bank of Bos. v. Bellotti,*
    435 U.S. 765 (1978) ......................................................................... 13

*Gaidon v. Guardian Life Ins. Co. of Am.,*
    750 N.E.2d 1078 (N.Y. 2001) ......................................................... 13

*Hill v. Colorado,*
    530 U.S. 703 (2000) ........................................................................... 7

*Johnson v. United States,*
    333 U.S. 10 (1948) ........................................................................... 17

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) ........................................................................... 7

*Lacey v. Maricopa Cty.,*
    693 F.3d 896 (9th Cir. 2012) ........................................................... 12

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y.*
    *Harbor,*
    667 F.2d 267 (2d Cir. 1981) ........................................................... 12

*Illinois ex rel. Madigan v. Telemarketing Assocs.,*
    538 U.S. 600 (2003) ........................................................................... 4

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n,*
    429 U.S. 167 (1976) ......................................................................... 10

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ........................................................................... 2

*Members of the City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) .................................................................. 5–6

*Mills v. Alabama,*
    384 U.S. 214 (1966) ...................................................................... 5

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) .......................................................... 5

*NAACP v. Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) .................................................................... 11

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) .............................................................. 2–3

*Near v. Minnesota,*
    283 U.S. 697 (1931) ...................................................................... 7

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ...................................................................... 6

*Okla. Press Publ'g Co. v. Walling,*
    327 U.S. 186 (1946) .................................................................... 11

*Pebble Ltd. P'ship v. EPA,*
    310 F.R.D. 575 (D. Alaska 2015) ................................................ 12

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2009) ..................................................... 12

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972) ........................................................................ 5

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ................................................................ 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................. 5, 6

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ...................................................................... 7

*Smith v. Cty. of Suffolk*,
   776 F.3d 114 (2d Cir. 2015) .................................................................. 17

*Stanford v. Texas*,
   379 U.S. 476 (1965) ............................................................................. 11

*Texas v. Johnson*,
   491 U.S. 397 (1989) ............................................................................... 5

*Underwager v. Salter*,
   22 F.3d 730 (7th Cir. 1994) ................................................................. 14

*United States v. Costa*,
   356 F. Supp. 606 (D.D.C. 1973) .......................................................... 16

*United States v. Kokinda*,
   497 U.S. 720 (1990) ............................................................................. 10

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ............................................................... 7

## Statutes

Mass. Gen. Laws ch. 93A, § 2 ................................................................. 12

Mass. Gen. Laws ch. 260, § 5A .............................................................. 12

Tex. Bus. & Com. Code §§ 17.46, 17.47, 17.60, 17.61 ............................. 4

## Other Authorities

Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC
   Report on Scientific Consensus*, Nongovernmental International Panel on
   Climate Change (NIPCC) (Heartland Inst. 2016) ............................. 13

Karl Popper, The Logic of Scientific Discovery (1959) ......................... 14

Matt Ridley, *The Climate Wars and the Damage to Science*, Global Warming
   Policy Foundation Essay 3 at 3 (2015) .................................... 14, 15, 16

Model Rules of Prof'l Conduct r.3.8 cmt. (Am. Bar Ass'n 2016) ............. 3

# Interest of Amici Curiae

Plaintiff-Appellant Exxon Mobil Corporation ("ExxonMobil") challenges the validity of a civil investigative demand ("CID") issued by the Attorney General of Massachusetts, and a subpoena issued by the Attorney General of New York. The Attorneys General issued these instruments to investigate ExxonMobil's supposed violations of consumer protection laws through marketing and selling of fossil fuel-derived products and securities. ExxonMobil filed the underlying lawsuit against the Attorneys General claiming that the CID and subpoena violate its constitutional rights and common law, and are preempted by federal law.

Amici are the States of Texas, Alabama, Arkansas, Georgia, Louisiana, Maine, Michigan, Mississippi, Nebraska, Oklahoma, South Carolina, and Wisconsin, which possess sovereign authority to investigate violations of law. Their chief legal officers have long used that power—including through the issuance of CIDs or subpoenas—to identify and remedy unlawful conduct. This power, however, does not include the right to engage in unrestrained investigative excursions based on pretext to promote one side of an international public policy debate, or chill the expression of viewpoints in those debates.

Soon after the New York and Massachusetts Attorneys General issued their subpoena and CID, several attorneys general expressed their concerns about their tactics in an open letter. Jt. App. 902–05. The letter condemned the actions of the New York and Massachusetts Attorneys General, stating the "effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." *Id.* at 902. The signatories, representing a wide range of viewpoints on climate

change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech." *Id*. As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate." *Id*. at 904. The letter called upon the New York and Massachusetts Attorneys General to "stop policing viewpoints." *Id*. at 905.

The unconstitutional abuse of investigative power that forms the basis for ExxonMobil's complaint concerns Amici States because state attorneys general possess an inherent duty to preserve their roles as evenhanded enforcers of the law. Thus, Amici States have a direct and vital interest in the issues before the Court and submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## Summary of the Argument

This is not a case about the scientific validity of climate change. It's about a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it. The freedom to express a viewpoint unpopular with the government is the very basis for the First Amendment. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). In fact, the Supreme Court reiterated just last term that "governments have no power to

restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quotation marks omitted).

Alongside their oaths to uphold the Constitution, state attorneys general have a constitutional duty to act dispassionately. Attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Model Rules of Professional Conduct express this distinctive role: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Model Rules of Prof'l Conduct r.3.8 cmt. (Am. Bar Ass'n 2016).

Here, the New York and Massachusetts Attorneys General are not using their power in an impartial manner. Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints. In doing so, they are violating ExxonMobil's constitutional rights, abusing their power, and eroding public confidence in public officers. The district court erred in dismissing ExxonMobil's well-pleaded complaint.

# ARGUMENT

## I.  Attorneys General Must Act Impartially.

New York and Massachusetts' investigations are the product of a cultural movement "committed to aggressively protecting and building upon the recent progress

the United States has made in combatting climate change." Jt. App. 97. The common-interest agreement between the attorneys general who passionately believe in climate change underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination of *accurate* information about climate change."[1] *Id.* at 654 (emphasis added). In other words, the tactics of the New York and Massachusetts Attorneys General are part of an "aggressive approach" to silence dissenting viewpoints by policing the "truth" about climate change in the marketplace of ideas. *Id.* at 98.

While Amici States have authority to conduct investigations to protect consumers, unveil fraud, and stop deceptive trade practices, these inquiries must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See, e.g.*, Tex. Bus. & Com. Code §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

---

[1] This ideology was on full display at the March 29, 2016 press conference of the so-called "AGs United for Clean Power." Former Vice President Al Gore alleged that commercial interests (such as ExxonMobil) are "committing fraud in their communications." Jt. App. 472.

4

## A. Attorneys general may not employ legal power to suppress a viewpoint in a public policy debate.

The authority to investigate fraud does not legitimize the chilling of constitutional freedom to engage in an ongoing policy debate of international importance. The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.") (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).

Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech and expressive conduct for the mere disapproval of the ideas expressed. *See Texas v. Johnson*, 491 U.S. 397, 406 (1989) (expressive conduct); *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940) (speech). And the "'loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'" *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S.

789, 804 (1984) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) (noting that "government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. And these protections extend to private corporations. *Citizens United*, 558 U.S. at 342-43.

While the New York and Massachusetts Attorneys General claim interests in consumer protection and prevention of securities fraud as the basis for their actions, proffering what may be on their face "reasonable grounds" for these actions does not save them from being "a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The actions of New York and Massachusetts before and after the March 29, 2016 press conference show that their investigations and document requests are designed to chill speech about climate change. This is exactly the type of speech the First Amendment protects. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (stating that the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

### 1. The New York and Massachusetts Attorneys General are targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597-603 (1967).

New York and Massachusetts' actions chill ExxonMobil's (and others') speech on the topic of climate change. *See White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) (holding that a federal investigation into opponents of a housing project chilled their speech in violation of the First Amendment). Using government power to suppress one side of a policy debate is a prior restraint on speech, which is tantamount to censorship. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963); *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Labeling a so-called investigation (into an unsettled area of science and public policy) as "fraud" certainly "raise[s] the specter that the Government [is] effectively driv[ing] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

If our society refuses to tolerate both the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of indoctrination. As Justice Holmes put it:

[W]hen men have realized that time has upset many fighting faiths, they
may come to believe even more than they believe the very foundations of

Case 16-911467 Document 41, 03/16/2019, 2508589, Page 4 of 20

their own conduct that the ultimate good desired is better reached by free
trade in ideas—that the best test of truth is the power of the thought to get
itself accepted in the competition of the market, and that truth is the only
ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

ExxonMobil's complaint is full of *prima facie* evidence, obtained without discovery, that the New York and Massachusetts Attorneys General marshaled a well-planned effort to silence ExxonMobil and other "climate deniers" through the abusive use of CIDs and investigative subpoenas. As the complaint avers, and which the Court must accept as true at this stage of the case, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the purpose of New York and Massachusetts' subpoenas and CID is to "delegitimize ExxonMobil as a political actor," Jt. App. 410 ¶48.

In November 2015, after issuing the subpoena to ExxonMobil, Attorney General Schneiderman publicly declared the purpose of his investigation was to investigate ExxonMobil's alleged "shift" in "point of view" on climate change. Jt. App. 401 ¶22, 573.

In January 2016, according to emails discussing the planning of the meeting, attorneys and activists met at the offices of the Rockefeller Family Fund in New York City to discuss goals of an "Exxon campaign," which sought "to delegitimize [ExxonMobil] as a political actor" and "to force officials to disassociate themselves from Exxon." Jt. App. 410 ¶48. The goals of the "Exxon campaign" are:

- To establish in the public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) towards climate chaos and grave harm.

- To delegitimize Exxon as a political actor.

- To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.

- To call into question climate advantages of fracking, compared to coal.

- To drive divestment from Exxon.

- To drive Exxon and climate change into the center of the 2016 election cycle.

*Id.*

Then at the March 2016 press conference, the New York and Massachusetts Attorneys General declared their campaign of viewpoint discrimination against ExxonMobil:

- Attorney General Healey and Attorney General Schneiderman spoke about the negative effects of climate change and the importance of taking action in the fight against climate change. *Id.* at 402–03, 467–70, 478–79.

- Attorney General Schneiderman reminded everyone of his ongoing investigation of ExxonMobil and Attorney General Healey reiterated that companies in the fossil fuel industry, such as ExxonMobil, must be held accountable for deceiving investors and the public. *Id.* at 406–07, 469, 478.

- Attorney General Healey stated that there was a troubling disconnect between what ExxonMobil knew about climate change and what ExxonMobil told investors and the public regarding climate change. *Id.* at 406–07, 478.

In other words, the New York and Massachusetts Attorneys General declared ExxonMobil's (and others') views on climate change to be "deceiv[ing]" or incorrect. *Id.* at 404 ¶32, 478. That is textbook viewpoint discrimination against ExxonMobil's alleged views on climate change. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality) (viewpoint discrimination involves an "inten[t] to discourage one viewpoint and advance another") (citations and internal quotation marks omitted); *Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976) ("to permit one side of a debatable public question to have a monopoly in expressing its views . . .is the antithesis of constitutional guarantees") (footnote omitted).

Moreover, immediately before the March 29, 2016 AGs United for Clean Power press conference, the attorneys general met with Mr. Matthew Pawa, an attorney and climate change activist, and Mr. Peter Frumhoff, a climate change activist and director of science and policy at the Union of Concerned Scientists. Jt. App. 408–09. Messrs. Pawa and Frumhoff are well-known for their desire to punish climate deniers and promotion of "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation" and "strategies to win access to internal documents" of fossil fuel companies. *Id.* at 409 ¶46.

To conceal the coordinated nature of New York and Massachusetts' intended censorship, the day after the AGs United for Clean Power press conference, Mr. Pawa asked the Office of the New York Attorney General how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door

10

meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa "to not confirm that you attended or otherwise discuss the event." *Id.* at 410–11 ¶50. These actions are the hallmark of an organized campaign to engage in unconstitutional viewpoint discrimination and chill speech.

###    2.   The New York and Massachusetts Attorneys General are abusing their power.

New York and Massachusetts are abusing the power reserved to them under the U.S. Constitution, and under their own laws governing the administration and use of that power. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas*, 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Government abuse of subpoena power runs afoul of the First Amendment. "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. Fed. Elec. Comm'n*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists)). Thus, the government must have a compelling interest for the

11

disclosure of such information from private parties. *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (citing cases). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the [Phoenix] New Times's website" because subpoenas would "chill speech"); *Local 1814*, 667 F.2d at 272 (holding disclosure of contributors would chill speech); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

The tactics of the New York and Massachusetts Attorneys General—seeking over 40 years of documents and communications with third party organizations deemed on the wrong side of the climate debate—exceed their lawful powers. Jt. App. 401 ¶22, 417 ¶66, 419–20 ¶71. Massachusetts is subject to a four-year statute of limitations for the law it purportedly seeks to enforce. Mass. Gen. Laws ch. 260, § 5A (referring to Mass. Gen. Laws ch. 93A, § 2). And New York limits the Attorney

General's investigatory period to three years. *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082–83 (N.Y. 2001).

The Constitution safeguards the freedom to engage in open and candid discussions about significant issues. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). But the mere occurrence of such discussions is threatened by the chill of "investigations" hanging in the air. Thus, New York and Massachusetts' actions not only seek to silence certain participants in a public debate, but also harm everyone, stifling consumers and those seeking information in order to evaluate various viewpoints.

## B.  Climate change is the subject of legitimate international debate.

The New York and Massachusetts Attorneys General falsely presume that the scientific debate about climate change is settled, along with the related and equally important debate on how to respond to what science has found. Yet, the most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate remains unsettled, the research is far from complete, and the path forward is unclear. "Scientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[2] as do many others.

---

[2] Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, Nongovernmental International Panel on Climate Change (NIPCC) (Heartland Inst. 2016), http://climatechangereconsidered.org/.

Moreover, science does not teach the public policy response to its data and findings; it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). But scientific theories are subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity, and not the finality sought through litigation and legal maneuvers. Disastrous results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[3] Unfortunately,

---

[3] Matt Ridley, *The Climate Wars and the Damage to Science*, Global Warming Policy Foundation Essay 3 at 3 (2015), http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the *Economist*, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book *The Evolution of Everything* was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The "bad idea" in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[4]

Even the premise that "97% of all climate scientists agree on climate change" is pseudo-science. This self-serving conclusion is derived from a poll involving only seventy-nine scientists—hardly a statistically-relevant sample.[5] Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it is dangerous.[6] A more recent poll of 1854 members of the American Meteorological

---

the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.

*Id.* at 10.

[4] *Id.* at 4.

[5] *Id.* at 7.

[6] *Id.*

Society found 52% believe climate change is man-made.[7] Indeed, throughout all aspects of society,

> there has been a systematic and thorough campaign to rule out the middle ground [on climate change] as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word "denier", with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[8]

With the debate concerning the scope and sources of climate change still raging in scientific and public circles, the New York and Massachusetts Attorneys General are using their powers to not only tilt the scales in favor of one side, but also to prevent dissenters from sharing their points of view.

## II. Politicized investigations undermine public confidence.

The press conference of the "AGs United for Clean Power" demonstrates that Massachusetts and New York commenced their investigations precisely for the reasons the First Amendment forbids. "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas." Jt. App. 685.

Allowing law enforcement to violate constitutional rights is to "violate the sacred trust of the people." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses,

---

[7] *Id.*

[8] *Id.* at 6.

papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

The New York and Massachusetts Attorneys General repeat an unfortunate history of law enforcement soiled with political ends. That the statements and workings of the "AGs United for Clean Power" are one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[9] Viewpoint discrimination exists when the government silences speech, *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), and although animus is not necessary to prove viewpoint discrimination, it is sufficient, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015). New York and Massachusetts revealed their retaliatory animus toward ExxonMobil through public statements targeting "climate deniers." Jt. App. 397 ¶10, 401 ¶22, 402 ¶25, 574. The purpose of their campaign, by their own admission, is "to delegitimize Exxon as a political actor," and, "to force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price

---

[9] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." Jt. App. 900. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AGs United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle law-suit that used federal courts to try to force the adoption of the federal energy regulations that became the [EPA's] 'Power Plan.'" *Id.* at 893.

17

on carbon, etc." *Id.* at 410 ¶48, 525. This clear, *prima facie* evidence of animus shows that the motives of the New York and Massachusetts Attorneys General is not to uncover the truth and pursue justice, but rather to fulfill an improper agenda unworthy of a sovereign's chief law enforcement official. Where the express and recorded goal of government actors is to politically delegitimize an opposing viewpoint, the proper role of government is awry and room for federal court intervention is permitted. The New York and Massachusetts Attorneys General viewpoint-based investigations, laced with animus toward the investigated party, are unconstitutional and an abuse of authority.

# Conclusion

The Court should reverse the judgment of the district court and remand this case for further proceedings.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

Christopher M. Carr
Attorney General of Georgia

JEFF LANDRY
Attorney General of Louisiana

PAUL R. LEPAGE
Governor of Maine

BILL SCHUETTE
Attorney General of Michigan

PHIL BRYANT
Governor of Mississippi

DOUG PETERSON
Attorney General of Nebraska

MIKE HUNTER
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

BRAD SCHIMEL
Attorney General of Wisconsin

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant
   Attorney General

JAMES E. DAVIS
Deputy Attorney General for
   Civil Litigation

/s/ David J. Hacker

DAVID J. HACKER
Special Counsel for Civil Litigation
david.hacker@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 001)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

On August 10, 2018, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ David J. Hacker
DAVID J. HACKER

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,748 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word 2016 (the same program used to calculate the word count).

/s/ David J. Hacker
DAVID J. HACKER

# Exhibit L

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## MANHATTAN DIVISION

EXXON MOBIL CORPORATION,

    *Plaintiff,*

v.

ERIC TRADD SCHNEIDERMAN,
Attorney General of New York, in
his official capacity, and MAURA TRACY
HEALEY, Attorney General of
Massachusetts, in her official capacity,

    *Defendants.*

No. 1:17-cv-02301-VEC

---

## BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND ARKANSAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S REQUEST TO LIFT THE STAY OF DISCOVERY AND IN OPPOSITION TO DEFENDANTS' REQUESTS FOR DISMISSAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................................. 1

ARGUMENT ............................................................................................................. 2

    I.    Attorneys general are to act impartially. ........................................................ 3

         A.    Attorneys general may not employ legal power to suppress a
               viewpoint in a policy debate. ................................................................ 4

               1.    Defendants are targeting critics. ................................................. 5

               2.    Defendants are abusing their power. ........................................... 8

         B.    Climate change is the subject of legitimate international
               debate. ................................................................................................. 10

    II.    Politicized investigations undermine public confidence. ............................. 13

    III.  Bad faith gives the Court jurisdiction to resolve the dispute. ..................... 14

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*Abrams v. United States,*
    250 U.S. 616 (1919) ................................................................................................. 6

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) ................................................................................. 9

*Ballard v. Wilson,*
    856 F.2d 1568 (5th Cir. 1988) ............................................................................... 15

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ................................................................................................... 6

*Berger v. United States,*
    295 U.S. 78 (1935) ................................................................................................... 2

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ..................................................................................................... 9

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ................................................................................................. 4

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ................................................................................................. 5

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) ................................................................................................. 6

*Connick v. Myers,*
    461 U.S. 138 (1983) ................................................................................................. 5

*Cornelius v. NAACP,*
    473 U.S. 788 (1985) .............................................................................................. 4, 5

*Cullen v. Fliegner,*
    18 F.3d 96 (2d Cir. 1994) ......................................................................... 15, 16, 17

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ............................................................................................... 11

*Diamond "D" Const. Corp. v. McGowan,*
    282 F.3d 191 (2d Cir. 2002) ..................................................................... 14, 15, 16

*Donaldson v. Read Magazine, Inc.*,
  333 U.S. 178 (1948) ........................................................................ 3

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) ...................................................................... 10

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................ 4

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
  264 U.S. 298 (1924) ........................................................................ 9

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ...................................................................... 10

*Hill v. Colorado*,
  530 U.S. 703 (2000) ........................................................................ 5

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
  14 F. Supp. 3d 99 (E.D.N.Y. 2014) .............................................. 10

*Huffman v. Pursue, Ltd.*,
  420 U.S. 59 (1975) ........................................................................ 14

*Johnson v. United States*,
  333 U.S. 10 (1948) ........................................................................ 13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) ........................................................................ 5

*Kugler v. Helfant*,
  421 U.S. 117 (1975) ...................................................................... 14

*Lacey v. Maricopa Cty.*,
  693 F.3d 896 (9th Cir. 2012) ......................................................... 9

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y.
  Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) .................................... 9

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
  538 U.S. 600 (2003) ........................................................................ 3

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
  429 U.S. 167 (1976) ........................................................................ 7

*McGuire v. Reilly*,
  386 F.3d 45 (1st Cir. 2004) ............................................................ 4

*Members of the City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ........................................................................................... 4

*Mills v. Alabama,*
    384 U.S. 214 (1966) ........................................................................................... 4

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................................................. 4

*NAACP v. Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ........................................................................................... 9

*Near v. Minnesota,*
    283 U.S. 697 (1931) ........................................................................................... 6

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ........................................................................................... 5

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,*
    477 U.S. 619 (1986) ......................................................................................... 14

*Okla. Press Publ'g Co. v. Walling,*
    327 U.S. 186 (1946) ........................................................................................... 8

*Pebble Ltd. P'ship v. EPA,*
    310 F.R.D. 575 (D. Alaska 2015) .................................................................. 10

*Perez v. Ledesma,*
    401 U.S. 82 (1971) ........................................................................................... 14

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2009) .......................................................................... 9

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972) ............................................................................................. 4

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ........................................................................................... 4

*Schlagler v. Phillips,*
    166 F.3d 439 (2d Cir. 1999)............................................................................ 16

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ........................................................................................... 6

*Smith v. Cty. of Suffolk*,
    776 F.3d 114 (2d Cir. 2015)................................................................................ 16

*Stanford v. Texas*,
    379 U.S. 476 (1965) .......................................................................................... 9

*Texas v. Johnson*,
    491 U.S. 397 (1989) .......................................................................................... 4

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) ............................................................................. 11

*United States v. Costa*,
    356 F. Supp. 606 (D.D.C. 1973)...................................................................... 13

*United States v. Kokinda*,
    497 U.S. 720 (1990) .......................................................................................... 7

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................................... 5

*Younger v. Harris*,
    401 U.S. 37 (1971) .................................................................................... 14, 15

**State Cases**

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    750 N.E.2d 1078 (N.Y. 2001)......................................................................... 10

**State Statutes**

MASS. GEN. LAWS Chapter 93A, § 2............................................................................ 10

MASS. GEN. LAWS Chapter 260, § 5A........................................................................... 10

TEX. BUS. & COM. CODE § 17.46 .................................................................................. 3

TEX. BUS. & COM. CODE § 17.47 ............................................................................ 3, 16

TEX. BUS. & COM. CODE § 17.60 ............................................................................ 3, 16

TEX. BUS. & COM. CODE § 17.61 ............................................................................ 3, 16

**Rules**

N.Y. C.P.L.R. 214 ....................................................................................................... 10

MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982)............................................. 2

## Other Authorities

Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016), *video available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across ......................................................................................... 3

Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available at* http://climatechangereconsidered.org/ .............................................. 11

Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959) ............................. 11

Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at 3 (Global Warming Policy Foundation 2015), *available at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf ...................... 11, 12

Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* Daily Caller (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt ...................................................... 13

Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/news/852.pdf ................................................................................... 1, 2, 13

Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article/2207/5 ......................................................... 13

Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across ....................................................... 3

Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available at* http://www.nationalreview.com/article/435470/climate-change-attorneys-general ................................................. 11

Case 1:24-cv-00447-APM   Document 45   Filed 04/26/17   Page 167 of 186

# INTEREST OF *AMICI CURIAE*

Exxon Mobil Corporation ("Plaintiff") is challenging the validity of a Civil Investigative Demand ("CID"), a state civil administrative subpoena, issued by the Attorney General of Massachusetts, and a subpoena issued by the Attorney General of New York (collectively, "Defendants"). Defendants issued these instruments to investigate Plaintiff's supposed violations of consumer protection laws through marketing and selling of fossil fuel-derived products and securities. Plaintiff seeks relief from complying with the CID and subpoena, claiming bad faith and violations of its constitutional rights.

*Amici* possess sovereign authority to investigate violations of law. Their chief legal officers have long used that power—including the issuance of CIDs or subpoenas—to identify and remedy unlawful conduct. This power, however, does not include the right to engage in unrestrained, pretextual investigative excursions to promote one side of an international public policy debate, or chill the expression of viewpoints in those debates.

Several attorneys general expressed their concerns about Defendants' tactics in an open letter last year.[1] The letter condemns the actions of Defendants and others, stating the "effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake."[2] The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at 3.

debate undermines the trust invested in our offices and threatens free speech."[3] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate."[4] Defendants should "stop policing viewpoints."[5]

*Amici* are concerned about the unconstitutional abuse of investigative power. Their inherent interest in preserving their roles as evenhanded enforcers of the law creates direct and vital interests in the issues before the Court.

## ARGUMENT

Attorneys general have a constitutional duty to act dispassionately. As the Supreme Court explained, attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role is also expressed in the Model Code of Professional Responsibility: "The responsibility of a public prosecutor differs from that of the usual advocate; his [or her] duty is to seek justice, not merely to convict." MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982).

Here, Defendants are not using their power in an impartial manner. Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints. This is bad faith.

---

[3] *Id.* at 3.

[4] *Id.* at 5.

[5] *Id.* at 6.

## I.   Attorneys general are to act impartially.

Defendants' investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[6] The common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination of *accurate* information about climate change." ECF No. 57 at 3 (emphasis added).[7] In other words, Defendants' tactics are part of an "aggressive approach" to silence dissenting viewpoints by policing the "truth" about climate change in the marketplace of ideas.[8]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, inquiries must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

---

[6] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

[7] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil), *video available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across. Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications." *Id.*

[8] *Id.*

3

## A.   Attorneys general may not employ legal power to suppress a viewpoint in a policy debate.

The authority to investigate fraud does not allow the chilling of constitutional freedom to engage in an ongoing policy debate of international importance. The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.") (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).

Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), and expressive conduct, *Texas v. Johnson*, 491 U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. After all, the "'loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'" *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) ("government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

And these protections extend to private corporations. *Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010).

While Defendants claim interests in consumer protection and prevention of securities fraud as the basis for their actions, proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The actions of Defendants before and after the March 29, 2016 press conference show their investigations and document requests are designed to chill speech about climate change. And yet the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

### 1. Defendants are targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597–603 (1967).

Defendants' actions chill Plaintiff's (and others') speech on the topic of climate change. *See White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) (holding that a federal investigation into opponents of a housing project chilled their speech in violation of the First Amendment). Using government power to suppress one side of a policy debate is a prior restraint on speech. Governmentally imposed prior restraints on

speech are tantamount to censorship. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963); *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Labeling a so-called investigation (into an unsettled area of science and public policy) as "fraud" certainly "raise[s] the specter that the Government [is] effectively driv[ing] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

If our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of indoctrination. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

The record in this case is full of *prima facie* evidence, obtained without discovery, that Defendants marshaled a well-planned effort to silence Plaintiff and other "climate deniers" through the abusive use of CIDs and investigative subpoenas. Prior to transferring this case, Judge Kinkeade identified some of the most salient, undisputed, and disturbing facts:

> Attorney General Healey, Attorney General Schneiderman, several other states' attorneys general, and former Vice President Al Gore spoke at the AGs United for Clean Power press conference. At that press conference the attorneys general spoke about the negative effects of climate change and the importance of taking action in the fight against climate change. Attorney General Schneiderman reminded everyone of his ongoing investigation of Exxon and Attorney General Healey reiterated that companies in the fossil fuel industry, such as Exxon, must be held accountable for deceiving investors and the public. Attorney General Healey stated that there was a troubling disconnect between what Exxon knew about climate change and what Exxon told investors and the public regarding climate change.

6

Order 12, ECF No. 180. In other words, Defendants declared Plaintiff's (and others') views on climate change to be "deceiving" or incorrect. That is textbook viewpoint discrimination and animus toward Plaintiff's (and others') alleged views on climate change. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality) (viewpoint discrimination involves an "inten[t] to discourage one viewpoint and advance another") (citations and internal quotation marks omitted); *Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976) ("to permit one side of a debatable public question to have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees") (footnote omitted).

Judge Kinkeade also described Defendants' "campaign" to "delegitimize Exxon as a political actor." Order 6. The court wrote that in "January 2016, according to emails discussing the planning of the meeting, attorneys and activists met at the offices of the Rockefeller Family Fund in New York City, New York to discuss goals of an 'Exxon campaign,' which sought 'to delegitimize [Exxon] as a political actor' and 'to force officials to disassociate themselves from Exxon.'" *Id*. According to Judge Kinkeade:

> In the emails discussing the planning of the meeting at the Rockefeller Family Fund provided to the Court (the existence of these remarks is not disputed by either Attorney General Healey or Attorney General Schneiderman), the goals of the "Exxon campaign" are:
>
> - To establish in the public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) towards climate chaos and grave harm.
> - To delegitimize Exxon as a political actor. To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.
> - To call into question climate advantages of fracking, compared to coal.
> - To drive divestment from Exxon.
> - To drive Exxon and climate change into the center of the 2016 election cycle.

*Id.* at 6–7. Moreover, immediately before the March 29, 2016 AGs United for Clean Power press conference, "Mr. [Matthew] Pawa, an attorney and climate change activist, and Mr. [Peter] Frumhoff, a climate change activist and director of science and policy at the Union of Concerned Scientists, presented to the attorneys general." *Id.* at 7. Moreover, in "2012, Mr. Pawa presented at a workshop organized by Mr. Frumhoff which discussed, among other things related to climate change, 'the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation' and 'strategies to win access to internal documents' of fossil fuel companies." *Id.* The draft agenda of Defendants' meeting with Messrs. Pawa and Frumhoff "stated that the meeting would include presentations on the 'imperative of taking action now on climate change,' presented by Mr. Frumhoff, and 'climate change litigation,' presented by Mr. Pawa." *Id.* at 8.

To conceal the coordinated nature of Defendants' intended censorship, "Mr. Pawa emailed the Office of the New York Attorney General to ask how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa 'to not confirm that you attended or otherwise discuss the event.'" *Id.* These actions are the hallmark of an organized campaign to engage in unconstitutional viewpoint discrimination and chill speech.

### 2.   Defendants are abusing their power.

Massachusetts and New York are abusing the power reserved to them under the U.S. Constitution, and under their own laws governing the administration and use of that power. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements

of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Government abuse of subpoena power runs afoul of the First Amendment. "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists)). Thus, the government must have a compelling interest for the disclosure of such information from private parties. *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (citing cases). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

 For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the [Phoenix] New Times's website" because subpoenas would "chill speech"); *Local 1814*, 667 F.2d at 272 (holding disclosure of contributors

would chill speech); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

Defendants' tactics—seeking over 40 years of documents—exceed their lawful powers. *See, e.g.*, First Am. Compl. Ex. "EE" at App. 257–58, ECF No. 101-6, and Ex. "II" at App. 297, ECF No. 101-7. Massachusetts is subject to a four-year statute of limitations for the law it purportedly seeks to enforce. MASS. GEN. LAWS ch. 260, § 5A (referring to MASS. GEN. LAWS ch. 93A, § 2). And New York limits the Attorney General's investigatory period to three years. *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 14 F. Supp. 3d 99, 103 (E.D.N.Y. 2014); *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082 (N.Y. 2001); N.Y. C.P.L.R. 214.

The Constitution safeguards the freedom to engage in open and candid discussions about significant issues. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). But the mere occurrence of such discussions is threatened by the chill of "investigations" hanging in the air. Thus, Defendants' actions not only seek to silence certain participants in a public debate, but harm everyone, stifling consumers and those seeking information in order to evaluate various viewpoints.

## B. Climate change is the subject of legitimate international debate.

Defendants falsely presume that the scientific debate regarding climate change is settled, along with the related and equally important debate on how to respond to what science has found. Yet, the most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate remains unsettled, the research far from complete, and the path forward unclear.

"Scientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[9] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). But since it is almost never possible for all relevant data to be marshaled, scientific theories are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity, and not the finality sought through litigation and legal maneuvers. Disastrous results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[10] Unfortunately,

---

[9] Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available at* http://www.nationalreview.com/article/435470/climate-change-attorneys-general; Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available at* http://climatechangereconsidered.org/.

[10] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at 3 (Global Warming Policy Foundation 2015), *available at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

     I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and

11

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The "bad idea" in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[11]

Even the premise that "97% of all climate scientists agree on climate change" is pseudo-science. This self-serving conclusion is derived from a poll involving only seventy-nine scientists[12]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it is dangerous.[13] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[14] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word "denier", with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[15]

--------

dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.

*Id.* at 10.

[11] *Id.* at 4.

[12] *Id.* at 7.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 6.

## II.    Politicized investigations undermine public confidence.

The press conference of the "AG's United for Clean Power" demonstrates that Massachusetts and New York commenced their investigations precisely for the reasons the First Amendment forbids.[16] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[17]

Allowing law enforcement to violate constitutional rights is to "violate the sacred trust of the people." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with the exercise of law enforcement soiled with political ends rather than legal ones. Massachusetts and New York now repeat that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[18]

---

[16] *See supra* note 7.

[17] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article/2207/5.

[18] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See supra* note 1 at 2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kan-sas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

III.    **Bad faith gives the Court jurisdiction to resolve the dispute.**

Defendants seek to evade the jurisdiction of the Court through *Younger* abstention. Defs.' Mot. to Dismiss, ECF No. 125 at 20–22. In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that federal courts should abstain from hearing claims brought by a person currently being prosecuted in state court for a matter giving rise to that claim. This doctrine was extended later to state civil proceedings, *Huffman v. Pursue, Ltd.*, 420 U.S. 59 (1975), and administrative proceedings, *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986). Thus, *Younger* abstention prevents the Court from interfering with (1) an ongoing state proceeding, (2) that raises an important state interest, and (3) that allows the federal plaintiff an adequate opportunity for judicial review of federal constitutional claims. *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).

But *Younger* abstention has an exception—where the prosecution is in bad faith or part of some pattern of harassment against the person or entity. *Younger*, 401 U.S. at 56. Admittedly, circumstances of legitimate bad faith are rare.

> Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

*Perez v. Ledesma*, 401 U.S. 82, 85 (1971); *see also Kugler v. Helfant*, 421 U.S. 117, 124–25 (1975). However, in this case, the allegations by Plaintiff, and the *prima facie* evidence of bad faith, are worthy of exploration and may preclude the Court from abstaining. *See* ECF Nos. 9 (20–22), 57 (1–4, 7–8), 60 (17–22), 90 (throughout), 127 (10–12), 144 (throughout), 165 (19–23), 167 (14–17).

To validly invoke the bad faith exception to *Younger*, a court must go beyond the face of a CID or subpoena, as "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it."

14

*Younger*, 401 U.S. at 54. Here, the mere issuance of a CID or subpoena does not constitute bad faith any more than does the issuance of "thirty-six parking tickets" to a single individual. *Ballard v. Wilson*, 856 F.2d 1568, 1571 (5th Cir. 1988). Indeed, the existence of an instrument, in and of itself, is insufficient to sustain bad faith. In *Ballard*, for example, "there [was] nothing in the record to suggest that the citations result from the bad faith of the city officials instead of [the individual]'s own parking habits." *Id*. Here, however, the Plaintiff has alleged, and placed into evidence, undisputed facts that go beyond the face of the instruments themselves and are *prima facie* evidence of bad faith. If sustained, these facts constitute a nefarious purpose behind the CID and subpoena that negate notions of abstention.

Moreover, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994). For example, the exception is met when a proceeding is "'brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution of proceeding is otherwise brought in bad faith or for the purpose to harass.'" *Diamond "D" Const.*, 282 F.3d at 199 (quoting *Cullen*, 18 F.3d at 103–04). And where a district court has already found that Defendants are engaged in a "campaign" to "delegitimize Exxon as a political actor" and "force officials to disassociate themselves from Exxon," Order 6 (quotations omitted), further fact-finding is warranted.

In the Second Circuit, this very kind of improper "subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry [of bad faith]." *Diamond "D" Const.*, 282 F.3d at 199 (citations omitted). To be sure, a "state proceeding that is legitimate in its purpose, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will *not* warrant the application of the bad faith exception." *Id*. (emphasis added). But when "the facts show that the prosecution is in retaliation for past speech or shows a pattern of prosecution to inhibit speech beyond the acts being prosecuted, the

15

exception should apply and abstention may be improper." *Schlagler v. Phillips*, 166 F.3d 439, 443 (2d Cir. 1999). Thus, the federal plaintiff must show that the Massachusetts CID and/or New York subpoena was initiated with and/or is animated by a retaliatory, harassing, or other illegitimate motive, *Diamond "D" Const.*, 282 F.3d at 199, such as animus, *Cullen*, 18 F.3d at 104.[19]

Because attorneys general enjoy broad authority and latitude in issuing civil investigative demands,[20] the exploration of bad faith in the context presented here involves the heavy burden of overcoming that discretion. Indeed, if federal courts were to routinely entertain fact-finding expeditions into allegations of bad faith, it would undercut the broad and necessary authority of government to pursue legitimate investigations of potential violations of law. Moreover, routine resorts to federal courts undermine *Younger's* essence—"concern for comity toward our co-equal sovereigns." *Diamond "D" Const.*, 282 F.3d at 199–200. "This comity and the deference to states it often requires is the cornerstone of our federal system." *Id.* at 200. As such, only in the most extreme circumstances, with clear *prima facie* evidence of improper motivation in hand, should a federal court entertain further exploration into the potential bad faith actions of attorneys general.

This case, however, meets this extremely high burden and may serve as an exception to the rule. Defendants' actions constitute unlawful viewpoint discrimination. Viewpoint discrimination is demonstrated through government animus toward speech, *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), a

---

[19] In *Cullen*, the Second Circuit held that the bad faith exception to *Younger* applied and the federal court did *not* need to abstain. 18 F.3d at 104. There, a teacher was disciplined after he distributed leaflets opposing the re-election of certain school board members. Because of the specific, articulated facts of past history of personal conflict between Cullen and the school board, and the strictly *ad hominem* manner in which the school board had disciplined him, the court found the disciplinary proceeding was retaliatory in nature and calculated to chill First Amendment expressive activity. *Id.*

[20] *See, e.g.*, TEX. BUS. & COM. CODE §§ 17.47, 17.60 17.61.

necessary component for the bad faith exception to *Younger*, *Cullen*, 18 F.3d at 104. Although animus is not necessary to prove viewpoint discrimination, it is sufficient. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

Defendants' retaliatory animus toward Plaintiff is readily shown through their public statements about going after "climate deniers" and "skeptics."[21] The purpose of Defendants' campaign, by their own admission, is "to delegitimize Exxon as a political actor," and, "to force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc." This clear, *prima facie* evidence of bad faith shows that Defendants' motive is not to uncover the truth and pursue justice, but rather fulfill an improper agenda unworthy of a sovereign's chief law enforcement official. And because this evidence shows that the basis for the Defendants' actions is illegitimate—and premised on an unconstitutional animus toward a viewpoint about climate change—further analysis of the bad faith exception to *Younger* is warranted. *Cullen*, 18 F.3d at 104.

Permitting the exploration of the bad faith exception to *Younger* in this unique instance does not otherwise undercut the ability of attorneys general to conduct civil administrative investigations. Indeed, general claims of bad faith unsupported by the overwhelming and specific *prima facie* evidence of unconstitutional purposes presented here will not shield the objects of legitimate government investigations from their purposes and ends. But where the express and recorded goal of the government actors is to politically delegitimize an opposing viewpoint, the proper role of government is awry and room for federal court intervention is permitted. The *Younger* bad faith exception applies precisely because this is the unusual case.

---

[21] *See supra* notes 6 and 7.

17

Defendants' viewpoint-based investigations laced with animus toward the party being investigated, are unconstitutional and an abuse of authority.

## CONCLUSION

*Amici* aver that the Court should grant Plaintiff's requested relief and deny Defendants' requests for dismissal.

Respectfully submitted this the 19th day of April, 2017,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

STEVE MARSHALL
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

MIKE HUNTER
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

LESLIE RUTLEDGE
Attorney General of Arkansas

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant
Attorney General

AUSTIN R. NIMOCKS**
Associate Deputy Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE*
Associate Deputy Attorney General
Texas Bar No. 12216500
andrew.leonie@oag.texas.gov

DAVID J. HACKER**
Senior Counsel

JOEL STONEDALE
Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*Application for admission *pro hac vice*
filed.
**Application for admission *pro hac vice*
forthcoming.

*ATTORNEYS FOR AMICI CURIAE*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.


*/s/ Andrew D. Leonie III*
Andrew D. Leonie III