**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 1:24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................... 3

Texas's DTPA and Defendant's CID Authority ................................................ 3

Factual Background .......................................................................................... 4

STANDARD OF REVIEW ................................................................................ 11

ARGUMENT ..................................................................................................... 11

I.     The Court Lacks Personal Jurisdiction over the Texas Attorney General. ................ 11

    A.     Plaintiff has not met the personal jurisdiction threshold under the District of Columbia long-arm statute. .......................................................... 12

        i.     Subsection (a)(3) does not support personal jurisdiction. ................... 13

        ii.     Subsection (a)(4) also does not support personal jurisdiction. ........... 15

    B.     Personal jurisdiction does not meet the requirements of Due Process because Attorney General Paxton does not have minimum contacts. ........... 15

        i.     Attorney General Paxton did not purposefully direct his conduct to the District of Columbia. ................................................................. 16

        ii.     Calder and the "effects test" are inapposite to this case. ................... 17

        iii.     First Amendment concerns do not change the personal jurisdiction analysis. ................................................................................ 18

II.     Media Matters has not Suffered Justiciable Injury. ................................................. 19

III.     Venue in the District of Columbia is Improper. ....................................................... 21

IV.     Media Matters has not Shown a First Amendment Violation. .................................. 22

V.     Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable. ............................................................................................................... 24

CONCLUSION ................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Bates v. C&S Adjusters, Inc.*,
  980 F.2d 865 (2d Cir. 1992) ................................................................................... 22

*Belle Fourche Pipeline Co. v. United States*,
  751 F.2d 332 (10th Cir. 1984) ............................................................................... 19

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) ........................................................................................... 11

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) ............................................................................................... 16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................................... 16, 17

*Calder v. Jones*, 465 U.S. 783 (1984) ........................................................................ 17

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 11

*Clapper v. Amnesty Int'l*,
  568 U.S. 398 (2013) ............................................................................................... 21

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ............................................................................... 15

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ............................................................................................... 12

*Dyson v. Dutko Ragen Homes & Investments*,
  No. 21-CV-02280 (APM), 2022 WL 1294484 (D.D.C. Apr. 27, 2022) ................... 14

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021) ........................................................................................... 16

*Forras v. Rauf*,
  812 F.3d 1102 (D.C. Cir. 2016) ........................................................................ 14, 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ............................................................................................... 15

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ................................................................................. 20

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ............................................................................. 12

*Health Commc'ns, Inc. v. Mariner Corp.*,
  860 F.2d 460 (D.C. Cir. 1988) ................................................................................. 2

*Helicopteros Nacionales de Colombia v. Hall*,
    466 U.S. 408 (1984) ................................................................................................. 16

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945) ................................................................................................. 12

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) ................................................................................................. 17

*Laird v. Tatum*,
    408 U.S. 1 (1972) ..................................................................................................... 21

*Leroy v. Great Western United Corp.*,
    443 U.S. 173 (1979) ........................................................................................... 21, 22

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023) ................................................................................. 16

*Lewis v. Younger*,
    653 F.2d 1258 (9th Cir. 1980) ................................................................................. 20

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................................. 11

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ................................................................................. 17

*Moncrief v. Lexington Herald-Leader Co.*,
    807 F.2d 217 (D.C. Cir. 1986) ................................................................... 13, 14, 17, 18

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. Cir. 1981) ................................................................................ 12

*Music Makers Holdings v. Sarro*,
    No. RWT-09-cv-1836, 2010 WL 2807805 (D. Md. July 15, 2010) ........................ 18

*Novartis Corp. v. FTC*,
    223 F.3d 783 (D.C. Cir. 2000) ................................................................................ 23

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004) ....................................................................................... 3

*Reisman v. Caplin*,
    375 U.S. 440 (1964) ................................................................................................. 19

*Reps. Comm. for Freedom of Press v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) ...................................................................... 1, 19, 20

*Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*,
    966 F. Supp. 1250 (D.D.C. 1997) ........................................................................... 23

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ........................................................................ 24

*Slate v. Kamau,*
  No. 20-CV-3732 (BAH), 2021 WL 3472438 (D.D.C. Aug. 6, 2021) ...................................... 14

*Stroman Realty v. Wercinski,*
  513 F.3d 476 (5th Cir. 2008)................................................................................................ 18

*Thompson v. Nat'l Football League,*
  No. 1:13-cv-367, 2014 WL 1646929 (W.D. Pa. Apr. 24, 2014)............................................ 22

*Twitter, Inc. v. Paxton,*
  56 F.4th 1170 (9th Cir. 2022)............................................................................ 2, 3, 18, 20, 21

*United States v. Kulukundis,*
  329 F.2d 197 (2d Cir. 1964)................................................................................................ 19

*Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,*
  259 F.2d 921 (D.C. Cir. 1958) ............................................................................................ 11

*Walden v. Fiore,*
  571 U.S. 277 (2014) .............................................................................................. 2, 16, 17

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .............................................................................................................. 11

*Zazzali v. Swenson,*
  852 F. Supp. 2d 438 (D. Del. 2012) .................................................................................... 22

*Zirkle v. Dist. of Columbia,*
  830 A.2d 1250 (D.C. Cir. 2003) .......................................................................................... 11

**Statutes**

28 U.S.C. § 1391........................................................................................................................ 21

D.C. Code § 13-423 ............................................................................................................. 12, 13

Tex. Bus. & Com. Code § 17.44(a) ............................................................................................. 3

Tex. Bus. & Com. Code § 17.46(a) ............................................................................................. 3

Tex. Bus. & Com. Code § 17.46(b) ......................................................................................... 1, 3

Tex. Bus. & Com. Code § 17.61................................................................................... 4, 6, 20, 23

Tex. Bus. & Com. Code § 17.62......................................................................................... 4, 18

Tex. Bus. & Com. Code §§ 17.41-17.63 (DTPA) ................................................................. 3, 18

## INTRODUCTION

For the second time, seeking to have a federal court enjoin an ongoing State investigation, the motion by Plaintiff Media Matters for America (Media Matters) remains as meritless as it is extraordinary. And—as with their first short lived case, Media Matters has filed it in a court that lacks jurisdiction.

On November 18, 2023, it came to light that Media Matters had arguably made false and misleading statements about the inner workings of X.com (f/k/a Twitter). Texas's Deceptive Trade Practices Act (DTPA) makes it unlawful to "disparag[e] the . . . services[] or business of another by false or misleading representation of facts." Tex. Bus. & Com. Code § 17.46(b)(8). Accordingly, on November 20, Defendant Ken Paxton, in his capacity as Texas's Attorney General, initiated an investigation and issued a Civil Investigation Demand (CID) related to Media Matters' November 18, 2023 statements. To date, Defendant has not reached a conclusion about whether Media Matters violated the law. It is possible that Media Matters' conduct was not false or misleading, or that its conduct otherwise did not sufficiently affect trade or commerce in Texas to come within the scope of the DTPA. But that is precisely why the Attorney General launched an *investigation*—to find out.

Media Matters asks this Court to enter extraordinary and unprecedented relief to short-circuit that investigation under the premise that the investigation harms its First Amendment rights. That is not something federal courts do. "[A]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith so as to violate that right." *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Op. of Wilkey, J.). If this sufficed for a preliminary injunction, it would have "no logical stopping-point." *Id.* And for three threshold reasons, Media Matters' attempt to obtain this unprecedented relief fails and should be denied.

*First*, personal jurisdiction: The Texas Attorney General and his investigation do not have legally cognizable contacts with the District of Columbia. Although the CID was issued to Media Matters in the District of Columbia, *see, e.g.*, Declaration of Aria C. Branch, Ex. A. (ECF No. 4-5), for personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Indeed, binding precedent confirms that even far greater contacts with the District do not suffice for personal jurisdiction. *See, e.g.*, *Health Commc'ns, Inc. v. Mariner Corp.*, 860 F.2d 460, 464 (D.C. Cir. 1988) (no personal jurisdiction over Texas hotel management firm who retained D.C. company for employee training, after the company issued certificates and correspondence in D.C.). *Second*, venue: Contrary to Media Matters' assertion, it is untrue that "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia," *contra* Compl. ¶ 15. Even by Media Matters' telling, the overwhelming share of events giving rise to the CID involve Media Matters' potentially false or misleading disparagement of X.com. *See, e.g.*, Motion at 3–9. And those allegations are the subject of X Corp.'s lawsuit against Media Matters in the Northern District of Texas. To the extent this case is justiciable in any federal court, it belongs in that court with that related case.

*Third*, ripeness: Defendant's announcement of the investigation and issuance of a CID do not cognizably injure Media Matters. That is crystal clear under a host of precedent, including binding Supreme Court precedent. And it is ***especially*** clear because the only Circuit court to address this Defendant's specific CID authority concluded that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID. *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022). That is because, among other things, the "CID is not self-enforcing." *Id.* at 1176. Media Matters suffers no automatic penalties if it ignores the CID. Instead, for the Attorney General to enforce the CID, he would have to sue in a Texas state court, where

2

Media Matters would have the right to assert a First Amendment defense, or any other arguments. *Id.*

As explained in further detail below, Media Matters' merits arguments are all premature. And Media Matters also is not entitled to relief because it has acted inequitably and because, as a factual matter, it is plain that Media Matters has experienced no chill.

Media Matters' Motion should be denied.

## BACKGROUND

### Texas's DTPA and Defendant's CID Authority

Like many States, Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch. 17, subch. E. In Texas, the Deceptive Trade Practices Act (DTPA) protects consumers by prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 17.46(a). Deceptive trade practices are defined broadly to include, among other things, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," *id.* § 17.46(b)(5); inducing consumers to enter transactions by "failing to disclose information concerning goods or services which was known at the time of the transaction," *id.* § 17.46(b)(24); and, as particularly relevant here, "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* § 17.46(b)(8). By statute, these categories "shall be liberally construed." *Id.* § 17.44(a).

The DTPA also authorizes a number of enforcement mechanisms. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84–85 (Tex. 2004). As relevant here, the statute authorizes Defendant's Consumer Protection Division to issue a CID if the "division believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." Tex. Bus. & Com.

3

Code § 17.61(a). If the recipient chooses to provide documents, those documents generally may not be shared outside the Office of the Attorney General (OAG) except by consent or court order. *Id.* § 17.61(f). If the recipient objects to the CID, that recipient may affirmatively challenge it in Texas state court, *id.* § 17.61(g); or it may wait to see if the Attorney General chooses to bring an enforcement action (where the recipient may raise any defenses), *see id.* § 17.62(b). So long as the recipient of a CID does not seek to destroy documents, he will not face any penalty for declining to provide documents based on a good-faith objection to that CID. *Id.* §§ 17.61(g), 17.62(a), (c).

**Factual Background**

On November 16, 2023, Media Matters published a document titled "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content.*"[1] This publication made a number of serious and economically harmful allegations against X, an entity that employs people in Texas. Specifically, the document made accusations that X "plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party." *Id.* And the document claimed that Media Matters "found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." *Id.* Media Matters' document also reproduced what Media Matters claimed were images of those ads next to the Hitler or Nazi Party content. *Id.* Unsurprisingly, at least some of these advertisers appear to have withdrawn their advertisements from X. Indeed, that objective appears to have been the whole point of the document. Media Matters kept a running "update" of advertisers who had withdrawn their ads from X. *Id.* And, on the following day, Media Matters published another document—this one by a different author—

---

[1] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

stating that "No advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

On November 18, X issued a blog post alleging how Media Matters' document was false or misleading in multiple respects. X Safety, *Stand with X to protect free speech*, X Blog (Nov. 18, 2023), https://blog.twitter.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. The upshot of X's allegations is that Media Matters' document did not describe an organic experience on X's platform. Instead, X alleged that Media Matters jury-rigged an artificial experience that few, and perhaps zero, other users or advertisers would ever experience, and then publicized that artificial experience as if it were organic to create a misleading impression. *Id.* According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id.* The blog post claimed that Media Matters apparently achieved these outlier results by "curat[ing]" their account in a way that would generate these results. *Id.*

On November 20, 2023, Texas Attorney General Paxton announced an investigation into Media Matters for potential fraudulent activity. Branch Decl., Ex. B. His investigation began because he was "extremely troubled by" X's allegations about Media Matters' "manipulat[ions]." *Id.* The Attorney General, however, did not claim that Media Matters had broken the law, only that his office is "examining the issue closely." *Id.* Indeed, the Attorney General does not unreservedly accept X's allegations about what happened. Getting to the bottom of those claims is the whole point of the investigation.

Later that day, X Corp. filed a lawsuit against Media Matters in the Northern District of Texas over Media Matters' November 16 document. That lawsuit added significant detail to how

X believed that Media Matters had created a false depiction of the X platform. Specifically, X claimed that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers posts on X Corp.'s social media platform beside Neo-Nazi and white supremacist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Compl. ¶ 1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 (*X Lawsuit*). According to X, Media Matters accessed an old X account (one that would bypass X's "ad filter for new users") and then had that account follow content **only** "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id.* ¶ 8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id.* ¶ 10. The upshot, according to X, was an inauthentic—and objectively misleading—representation of the X platform experience. For example, X claimed that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for **only one** viewer (out of more than 500 million) on all of X: **Media Matters**." *Id.* ¶ 13 (emphasis original).

On November 21, the Attorney General's office issued a CID to Media Matters containing 12 requests for various documents. As is customary under the Texas DTPA, the Attorney General gave Media Matters until December 12, 2023—20 days from service—to respond to the CID. Branch Decl., Ex. A at 1; Tex. Bus. & Com. Code § 17.61(g) (contemplating "20 days").

Defendant's investigation is primarily designed to investigate three things: (1) the veracity of X's allegations that Media Matters essentially perpetrated a fraud and misrepresentation regarding its platform; (2) The nexus of Media Matters' conduct to Texas; and (3) the effect of

Media Matters' underlying conduct to trade and commerce, especially in the State of Texas. *See* Branch Decl., Ex. A at 7.

**Veracity**: To evaluate the veracity of X's allegations, the CID requests among other things, that Media Matters produce:

- "[D]ocuments sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. Branch Decl., Ex. A at 7 No. 8; *accord X Lawsuit* ¶ 29 (alleging Media Matters used an account that enabled it to "evade X's content filters for new users");

- "[D]ocuments sufficient to identify all X accounts, profiles, and members followed by the X accounts identified" in the bullet above. Branch Decl., Ex. A at 7 No. 9; *accord X Lawsuit* ¶ 30 ("alleging Media Matters "set its accounts to follow only 30 users" and that "*[a]ll* of these users were either already known for posting controversial content or were accounts for X's advertisers" (emphasis original)); and

- Media Matters' "external communications with" X during a critical 3-week time period. Branch Decl., Ex. A at 7 No. 10.

**Texas Nexus**: Texas's DTPA is, of course, a Texas statute. To evaluate the nexus of Media Matters' conduct with Texas, the CID requests that Media Matters produce:

- "[D]ocuments sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas." Branch Decl., Ex. A at 7 No. 2;

- "[D]ocuments sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas." Branch Decl., Ex. A at 7 No. 3; and

7

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Branch Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."). At least some of these advertisers are headquartered in Texas.

**Effect on trade and commerce**: Texas's DTPA is about trade and commerce, not merely misleading statements in the abstract. To evaluate the November 16 document's nexus to trade and commerce, the CID requests that Media Matters produce:

- "[D]ocuments" related to "Elon Musk's purchase of X." Branch Decl., Ex. A at 7 No. 4;

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Branch Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."); and

- "[D]ocuments sufficient to identify all direct and indirect sources of funding for" Media Matters' operation. Branch Decl., Ex. A at 7 No. 12.[2]

---

[2] Although Media Matters does not have a right to understand the possible theories of the Attorney General's investigation, Defendant lays out these specifics in detail for the benefit of the Court's evaluation. Documents regarding Media Matters' funding could be highly relevant to effects on trade and commerce because, for example, Media Matters may be funded by an economic competitor of Elon Musk or X.

Media Matters contends (ECF No. 4-1 at 3) it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since" the Attorney General announced his investigation. Media Matters' COO, for example, asserts that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation." Declaration of Cynthia Padera ¶ 23 (ECF No. 4-2). But it is almost impossible to square that with the public record. For example:

- On November 25 (after Defendant announced his investigation and issued the CID), Media Matters President Angelo Carusone stated on TV that "things [on X] appeared exactly the way we said, that ads were running alongside Nazi content." Fuller Decl., Ex. C.

- On the same day, Carusone said "Musk . . . doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.*

- On the same day, Carusone said X "still provides at this point a safe haven for extremists and disinformation." *Id.*

- On November 26, Carusone similarly said on TV that "Musk . . . engag[es] with some pretty extreme, you know, antisemitic, great replacement theory." Fuller Decl., Ex. D.

- On the same day, Carusone touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan accounts." *Id.*

- On December 3 Carusone went on TV to accuse X CEO Linda Yaccarino of coercing "advertising partners . . . to really align with the values of what X is trying to do." Fuller Decl., Ex. E.

- On December 18 Carusone went on TV to boast how Media Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." Fuller Decl., Ex. F.

- On November 21, 2023, Eric Hananoki reposted a social media message originally sent by a "Matthew Gertz," concerning the Texas Attorney General's office and a termination of a prior Assistant Attorney General. The date of the reposting occurs after the CID was issued to Media Matters. Fuller Decl., Ex. G.

- On December 12, 2023, the President of Media Matters, Angelo Carusone, reposted an article published by NBC News titled, "Media Matters sues Texas attorney general over response to Elon Musk dispute." Fuller Decl., Ex. H.

- On December 13, 2023, Angelo Carusone reposted a social media posting originally posted by a "Aaron Reichlin-Melnick", concerning an amicus brief from 2016 drafted by the Texas OAG. Fuller Decl., Ex. I.

- On December 12, 2023, Angelo Carusone reposted a social media posting from NBC News concerning Media Matters lawsuit against Texas Attorney General Paxton. Fuller Decl., Ex. J.

- On November 22, 2023, Angelo Carusone reposted two social media posts concerning the underlying facts of this case. Fuller Decl., Ex. K–L.

Defendant takes no position on whether Carusone's and Hananoki's speech *supra* is constitutionally protected. But their conduct clearly illustrates that Media Matters' speech has not been *chilled* and the claim that it is—should be scrutinized with caution based on the record.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). That burden is heavy: "[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) "As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1943–44 (internal quotations omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim or irreparable harm." *Zirkle v. Dist. of Columbia*, 830 A.2d 1250, 1257 (D.C. Cir. 2003) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006).

## ARGUMENT

## I.     The Court Lacks Personal Jurisdiction over the Texas Attorney General.

Although Media Matters' claims purportedly arise under the First Amendment, reaching the merits of this case would disturb another, equally important constitutional principle—due process—as this Court lacks personal jurisdiction over the Texas Attorney General. Media Matters initially brought this case in the State of Maryland—and voluntarily dismissed it there because of significant concerns raised by a federal district judge who rightfully questioned the issue of personal jurisdiction. Now, Media Matters has filed this suit in Washington, D.C., even though

11

D.C. does not support the court's jurisdiction here and Attorney General Paxton does not have cognizable contacts with the District of Columbia.

To establish personal jurisdiction over a non-resident defendant, District of Columbia courts "must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). "The District of Columbia 'long-arm statute' enumerates the various acts of a nonresident defendant which support the assertion of personal jurisdiction." *Mouzavires v. Baxter*, 434 A.2d 988, 990 (D.C. Cir. 1981). Personal jurisdiction comports with due process only when the defendant has "minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

The statutory and constitutional inquiries merge when the state's long-arm statute "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). However, not all provisions of the D.C. long-arm statute are coextensive with the Due Process Clause. *See Mouzavires*, 434 A.2d at 990–91.

### A.      Plaintiff has not met the personal jurisdiction threshold under the District of Columbia long-arm statute.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler*, 571 U.S. at 125. The District of Columbia long-arm statute, D.C. Code § 13-423, provides in relevant part:

>    (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
>    . . .
>    (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

>(4) causing tortious injury in the District of Columbia by an act or omission outside
>the District of Columbia if he regularly does or solicits business, engages in any
>other persistent course of conduct, or derives substantial revenue from goods used
>or consumed, or services rendered, in the District of Columbia[.]

*Id.* Although Media Matters fails to specify the application of a particular subsection, "Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort." Mem. Supp. Pls.' Mot. TRO/PI, ECF No. 4-1 at 22. Therefore, the only relevant statutory justifications for this Court's jurisdiction are subsections (a)(3) and (a)(4), which pertain to tortious injury. *See* D.C. Code § 13-423.

> i.     *Subsection (a)(3) does not support personal jurisdiction.*

Subsection (a)(3) is a "precise and intentionally restricted tort section, which stops short of the outer limits of due process, and which confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts." *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986) (citations and internal quotation marks omitted). This Court does not have personal jurisdiction under subsection (a)(3) because Media Matters fails to establish that Attorney General Paxton's alleged tortious conduct occurred in D.C. Rather, Attorney General Paxton issued the CID in Texas, and the investigation is occurring in Texas to determine whether Media Matters engaged in fraud or deceptive trade practices that put Texans at risk.

Despite the clear limits of subsection (a)(3), Media Matters mistakenly asserts that "the District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause." ECF No. 4-1 at 23. And, Media Matters attempts—unsuccessfully—to establish that the mere acts of issuing the CID and serving it in D.C. are sufficient to establish jurisdiction. This contention fails for two reasons.

First, District of Columbia courts have repeatedly held that "mailing a letter or other material into Washington, DC from outside of the District does not qualify as an 'act . . . in the District of Columbia within the meaning of subsection (a)(3)." *Slate v. Kamau*, No. 20-CV-3732 (BAH), 2021 WL 3472438, at *6 (D.D.C. Aug. 6, 2021) (internal citations omitted); *accord Moncrief*, 807 F.2d at 219–22 (holding that "no act occurred within the District of Columbia" when "the libelous article was printed, and the newspapers were mailed, outside of the District of Columbia."). Thus, the fact that Attorney General Paxton used a common carrier to deliver the CID to Media Matters' headquarters is not a sufficient basis to establish personal jurisdiction.

Media Matters nonetheless claims that "jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District, causing a substantial and predictable chill to Media Matters." ECF No. 4-1 at 22. This is incorrect because the D.C. Circuit explicitly rejects the theory that the "injury is part of the tort . . . because such a theory would obliterate subsection (3)'s careful distinction between injury' and act." *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (internal quotation marks omitted). Even if the alleged chilling effect occurred in D.C., that does not mean that the alleged tortious conduct occurred in D.C. Thus, the fact that Media Matters is "at home" in D.C., its place of incorporation, has no bearing on the application of the long-arm statute to Attorney General Paxton's conduct.

Second, Media Matters' claim also rests on the assumption that retaining a process server to serve the CID in D.C. is sufficient to establish jurisdiction. Yet, "limited communications initiated from outside the District of Columbia to a District resident do not qualify as an act 'in the District' for purposes of § 13-423(a)(3)." *Dyson v. Dutko Ragen Homes & Investments*, No. 21-CV-02280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022). Thus, like delivering a letter

from Texas, Attorney General Paxton's use of a process server to serve the CID on Media Matters is not a sufficient basis to establish personal jurisdiction either.

ii. *Subsection (a)(4) also does not support personal jurisdiction.*

By contrast, subsection (a)(4) of the D.C. long-arm statute "permits an exercise of jurisdiction over a tortious act or omission committed outside the District that causes injury within the District if, and only if, the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered" in the District. *Forras*, 812 F.3d at 1107. "[B]ecause the harm-generating act (or omission) occurred outside, the statute calls for something more. The 'something more' or 'plus factor' . . . serve[s] to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).

This Court does not have personal jurisdiction under subsection (a)(4) because there is no "plus factor" that would establish a connection with the District of Columbia within the meaning of the statute. Attorney General Paxton does not solicit or do business, engage in other persistent conduct, or derive any revenue from services in D.C. In short, even if this Court were to accept the premise that issuing the CID in Texas amounted to tortious conduct, personal jurisdiction is not proper in the District of Columbia.

**B.    Personal jurisdiction does not meet the requirements of Due Process because Attorney General Paxton does not have minimum contacts.**

Even if this Court were to find that the District of Columbia long-arm statute applies, "[t]he Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011). There are two types of personal jurisdiction under the Constitution: general jurisdiction exists when a defendant is "essentially at home" in the forum state, and specific

jurisdiction exists for non-resident defendants based on the contacts between the defendant, forum state, and controversy. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

General jurisdiction is inapplicable here because Attorney General Paxton does not have the requisite "continuous and systematic" contacts with the District of Columbia. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415–16 (1984). Specific jurisdiction is the only possible basis, but it does not comport with due process in this case either because Attorney General Paxton did not sufficiently direct his contacts to D.C.

The D.C. Circuit considers two factors when determining whether specific jurisdiction exists. First, the defendant must have "purposefully directed" conduct directed at the forum state "such that he should reasonably anticipate being haled into court there." *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Second, "a plaintiff's claims must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Id.* (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 256 (2017)).

> i.  *Attorney General Paxton did not purposefully direct his conduct to the District of Columbia.*

Purposeful direction "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475 (internal citations omitted). Therefore, under the Supreme Court's *Walden* decision, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 286.

Media Matters errs in citing *Walden* to argue that sending the CID and serving it in D.C. establish purposeful direction and foreseeability. ECF No. 4-1 at 21. And, the Court in *Walden* noted that contact with the forum state "through an agent, goods, mail, or some other means—is

certainly a *relevant* contact." *Walden,* 571 U.S. at 285 (emphasis added). Yet, *Walden* described the requisite contact as more substantial and sustained, such as "entering a contractual relationship that 'envisioned continuing and wide-reaching contacts'" or circulating magazines to 'deliberately exploi[t]' a market . . . ." *Id.* (first citing *Burger King Corp.*, 471 U.S. at 479–80, then citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 773–74 (1984)). To the extent that Attorney General Paxton had any contact with the District of Columbia, it was more attenuated than the type of ongoing business relationship described in *Walden*.

> ii.   *Calder and the "effects test" are inapposite to this case.*

Media Matters' specific jurisdiction argument relies even more heavily on *Calder v. Jones*, 465 U.S. 783 (1984), which also points against a finding of personal jurisdiction here. In *Calder*, the Supreme Court found that a California Superior Court had jurisdiction over the Florida-based reporters for the *National Enquirer*, a nationally circulated magazine, after the magazine published an allegedly libelous article about a California actress. *Id.* at 791. Personal jurisdiction was appropriate because the magazine's "actions were expressly aimed at California." *Id.* at 789.

Some courts now apply *Calder* in a three-step "effects test": "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *See, e.g.*, *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007); ECF No. 4-1 at 22.

However, *Calder* and the effects test are inapposite to this case. As explained above, subsection (a)(3) of the D.C. long-arm statute "stops short of the outer limits of due process" because both the tortious conduct *and* injurious effect must occur in the District of Columbia. *Moncrief*, 807 F.2d at 221; *see supra* at 12–14. Thus, a plaintiff in D.C. cannot rely on *Calder* to establish jurisdiction for tortious injury over non-resident defendants unless the complained-of

tortious act occurred in D.C. This case does not meet that threshold because General Paxton issued

the CID in Texas. Indeed, the CID was lawfully issued under Texas's Deceptive Trade Practices

Act, Tex. Bus. & Com. Code §§ 17.41-17.63 (DTPA). And, under the DTPA, a CID is not self-

executing, and the Attorney General may enforce it only by filing a "petition" in State court for an

"order of the court for enforcement" of the CID. *Id.* § 17.62(b). The fact that Media Matters claims

that its speech has been chilled, is a voluntary response, and federal courts have held that the non-

self-executing nature of a DTPA CID renders challenges identical to Media Matters' suit here as

non-ripe. *See, e.g.*, *Twitter*, 56 F.4th at 1176.

> iii.   *First Amendment concerns do not change the personal jurisdiction analysis.*

*Calder* does apply to this case for a different reason—because the Court in *Calder*

"reject[ed] the suggestion that First Amendment concerns enter into the jurisdictional analysis."

*Moncrief*, 807 F.2d at 222. And in *Moncrief*, the D.C. Circuit extended *Calder*'s restriction on

courts considering First Amendment concerns in the personal jurisdiction analysis even further.

*Id.* at 223–24. Specifically, the court announced that the First Amendment does not affect the

determination of whether speech-related activity falls under subsection (a)(4) of the District of

Columbia long-arm statute. *Id.*

Thus, First Amendment concerns do not change the analysis on whether this Court has

personal jurisdiction over Attorney General Paxton. To the extent that Media Matters believes it

experienced a heightened chill because Attorney General Paxton exercised the official powers of

his office, that similarly does not affect the personal jurisdiction analysis. The default rule is that

state agencies should not "have to defend [their] attempt to enforce [state] laws "—much less mere

investigations under those laws—"in courts throughout the nation." *Stroman Realty v. Wercinski*,

513 F.3d 476, 487 (5th Cir. 2008); *accord Music Makers Holdings v. Sarro*, No. RWT-09-cv-

1836, 2010 WL 2807805, at *5 (D. Md. July 15, 2010) ("[R]ecent out-of-circuit court of appeals

decisions have analyzed the issue in a variety of contexts and have uniformly held that cease-and-desist letters alone do not establish personal jurisdiction."). For the reasons explained above, personal jurisdiction is absent here.

## II.   Media Matters has not Suffered Justiciable Injury.

Even if the Court has jurisdiction and venue were proper, Media Matters has suffered no judicially cognizable injury.  The accepted rule since at least the Supreme Court's 1964 *Reisman v. Caplin* decision is that an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it. 375 U.S. 440 (1964). In *Reisman*, the recipient of an administrative request for documents was not obligated to produce anything until after the agency brought an "enforcement action" where the recipient would be afforded "a judicial determination" of the lawfulness of the request and the viability of any of his defenses. *Id.* at 446. That "opportunity for judicial review before any coercive sanctions may be imposed" was an adequate "remedy"; and the court would not permit the recipient of the request to short-circuit this process by preemptively seeking an injunction in federal court. *Id.* at 450. *Reisman* is now widely understood as having "announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984); *see also United States v. Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.) (explaining *Reisman* "seems to destroy the basis underlying decisions of this court which authorized applications to vacate [non-self-executing subpoenas] (and appeals from their denial) in advance of any judicial proceeding by the Government for their enforcement").

The presence of a First Amendment claim changes nothing. As a respected D.C. Circuit judge put it, "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly trampled on, and then seek an injunction against the investigation on that basis. *Reps. Comm. for Freedom of Press,* 593 F.2d at 1070

19

(Wilkey, J.). That "approach has no logical stopping-point" and, if ever entertained, would mire the federal courts in a flood of litigation to short-circuit investigations before the investigations can even determine whether the subject has broken the law. *Id.* No wonder the courts have rejected these kinds of actions for an injunction, even when the First Amendment is at issue. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (concluding, in First Amendment context, that "administrative subpoena is not ripe for review" because it is not "self-executing"). Instead, as then-Judge Anthony Kennedy put it in a similar context, Media Matters "can properly litigate [its legal arguments] if and when the Attorney General attempts to enforce [state] law against [it] after the completion of his investigation." *Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980). Or, Media Matters could take advantage of the procedures that the DTPA offers to challenge the CID. *See* Tex. Bus. & Com. Code § 17.61(g). But Media Matters cannot seek pre-enforcement review of the CID in federal court.

The Ninth Circuit's decision in *Twitter, Inc. v. Paxton* removes any conceivable doubt about whether Media Matters has suffered cognizable injury. 56 F.4th 1170. In that case, Twitter sought an injunction against this same Defendant—Attorney General Paxton—after he initiated a DTPA investigation and served a CID on Twitter. Twitter alleged materially similar First Amendment harm as Media Matters alleges here, *id.* at 1175 (Twitter declarant alleging "the CID and associated investigation chill Twitter's speech") and identified statements from Defendant that it believed showed retaliatory intent, *id.* at 1172 (Defendant stated Twitter was "the left's Chinese-style thought police" and vowed to "fight them with all I've got"). The court concluded, however, that "Twitter has not suffered an Article III injury because the CID is not self-enforcing." *Id.* at 1176. After all, Twitter—like Media Matters here—"never faced any penalties for its refusal to comply with the CID." *Id.* And all the actions Twitter claimed to have taken to self-censor in

response to the CID were—much like Media Matters' alleged actions here—"self-inflicted because the actions were voluntary." *Id.*; *Clapper v. Amnesty Int'l*, 568 U.S. 398, 418 (2013).

None of Media Matters' First Amendment authority supports a contrary outcome. By and large, courts adjudicate First Amendment "retaliation" cases only where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). "In none of" the Supreme Court's cases does "the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities," *id.*, or from a non-self-executing CID. Media Matters' case citations (ECF No. 4-1 at 28–29) are illustrative.

## III.   Venue in the District of Columbia is Improper.

Venue is also improper here for similar reasons.

Media Matters claims "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia." Compl. ¶ 15 (citing 28 U.S.C. § 1391(b)(2)). Of course, like Media Matters' personal jurisdiction argument, this theory depends on the plaintiff's residence rather than the defendant's residence.

And, in any event, the Supreme Court has rejected this approach to venue. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173 (1979). The corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185–86. Based

on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.[3]

That venue is proper in Texas alone is especially obvious here because *X already filed a lawsuit in Texas against Media Matters for the same conduct Defendant is investigating*. *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.). That case clearly involves a "related" set of facts, and courts commonly look to relatedness when determining where venue is proper. *See Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012) ("A motion to transfer may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."); *Thompson v. Nat'l Football League*, No. 1:13-cv-367, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014) (same).[4] Moreover, it is quite likely that that court will eventually address all of the arguments Media Matters has made here if X Corp. seeks the same material in discovery.

## IV.   Media Matters has not Shown a First Amendment Violation.

Media Matters also cannot show that the Attorney General violated its First Amendment rights.

Media Matters admits (ECF No. 4-1 at 24) that, to succeed on its retaliation claim, it must show that it "engaged in conduct protected under the First Amendment" and that Defendant took responsive action in retaliation for that activity. But Media Matters cannot possibly show *on this record* that the activity at issue in the Attorney General's investigation was protected First

---

[3] Congress's amendment of the venue statute in 1990 (after *Leroy*) is irrelevant to this point because, while that amendment clarified that venue can be proper in multiple districts, the Court's decision in *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 384–85; *accord Bates v. C&S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (observing, post-amendment, that "*Leroy* . . . remain[s] [an] important source[] of guidance").

[4] Transfer is unwarranted because, as explained *supra* at 19–21, this case is not justiciable in *any* federal court. But if the Court thinks this case is justiciable, then the Northern District of Texas is manifestly the proper place for it to be litigated.

Amendment activity. Instead, it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for statements that, while "literally true," are "nevertheless likely to mislead or confuse consumers." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1268 (D.D.C. 1997). *See also Novartis Corp. v. FTC*, 223 F.3d 783, 787 & n.3 (D.C. Cir. 2000). And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to deceive viewers, but deliberately designed to do so. If that is the case, then it is hard to see how that same speech is constitutionally protected.

The Attorney General does not unreservedly take X Corp.'s allegations against Media Matters at face value, and he does not ask this Court to do so. But that is the point of Defendant's *investigation*. Among other things, Defendant's investigation will shed significant light on whether Media Matters' speech was actually First Amendment-protected—*i.e.*, whether it was likely, or deliberately designed, to mislead. Media Matters' suit functionally asks the Court to assume the conclusion of that investigation in a way that will be favorable to Media Matters. But the appropriate course is to see what the investigation actually yields.[5]

---

[5] Media Matters' other merits arguments (ECF No. 4-1 at 35-39) also do not support its request that the Court enjoin Defendant. Media Matters can litigate whether Defendant's demand is "overbroad, unreasonable" or "seeks to pry into matters protected by the First Amendment" under the procedures the DTPA provides. Tex. Bus. & Com. Code § 17.61(g). Or, like any other party, it can meet and confer with Defendant about the overbreadth, etc., in an attempt to narrow the requests. And at least some requests are ***plainly*** not overboard, unreasonable, or seeking First Amendment protected material. *See, e.g.*, Branch Decl., Ex. A at 7 No. 9 (narrowly tailored request for a mere three weeks of "external communications" between Media Matters and X Corp); *id.* No. 10 (similar request for communications between Media Matters and advertisers). So, the sweeping relief that Media Matters seeks cannot be granted on these arguments.

Media Matters' argument about whether it is subject to personal jurisdiction in Texas fares no better. Defendant's investigation is intended in part to evaluate that exact question. *See supra* at 8–9 (explaining how some requests are intended to evaluate the breadth of Media Matters' contacts with Texas). In that respect, the CID accomplishes much the same purpose as jurisdictional discovery. Just like when jurisdictional discovery is ordered, it would make no sense here to conclude Media Matters is not subject to jurisdiction in Texas without first flushing out the facts necessary to determine whether that is true.

## V.   Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable.

Media Matters' arguments about irreparable harm also are not equitable. And its meritless harm argument, coupled with various other misrepresentations and lack of candor, raises serious questions about its good faith.

As to the alleged harm: "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable." In addition, it is factually untrue that Media Matters contends it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation," Motion at 9, and that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation," Padera Decl. ¶ 23. Someone evidently forgot to tell this to Media Matters' President, because he has been on TV at least four times since the Attorney General announced his investigation, where he has made materially the same—and even more aggressive—claims against X and Musk as those made in the November 16 document. *See supra* at 9–10. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* at 9–10. It is not apparent how Media Matters can possibly

square that with its assertion here that it has been chilled from criticizing X or Musk, or that it does

not want to speak on matters related to the Attorney General's investigation.

**CONCLUSION**

The Court should deny Plaintiffs' Motion.


Dated: January 25, 2024

*/s/ Gene C. Schaerr*
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

CHRISTOPHER LAVORATO*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas*