IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>              Defendant. | Civil Action No. 24-cv-147-APM |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.     This Court has specific personal jurisdiction over Paxton. ............................ 2

          A.     This Court has personal jurisdiction under D.C.'s long-arm statute.................. 2

          B.     Exercising personal jurisdiction over Paxton is consistent
               with due process. ........................................................................... 12

    II.    Venue in the District of Columbia is proper. ............................................... 16

    III.   Plaintiffs' claims are ripe for adjudication. ................................................. 17

    IV.   The equities strongly favor issuing the requested preliminary injunction. .................. 24

CONCLUSION.............................................................................................................. 25

CERTIFICATE OF SERVICE ...................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akhmetshin v. Browder*,
   275 A.3d 290 (D.C. 2022) ...................................................................11

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,
   1 F.4th 180 (4th Cir. 2021) ................................................................18

*Balsly v. W. Mich. Debt Collections, Inc.*,
   No. 3:11CV642-DJN, 2012 WL 628490 (E.D. Va. Feb. 27, 2012) ................6, 7, 12

*Barnstead Broad. Corp. v. Offshore Broad. Corp.*,
   869 F. Supp. 35 (D.D.C. 1994) .............................................................3

*Brett v. Brennan*,
   404 F. Supp. 3d 52 (D.D.C. 2019) ......................................................3, 12

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ............................................................................11

*Calder v. Jones*,
   465 U.S. 783 (1984) ............................................................................14

*Chamber of Com. of the U.S. v. FEC*,
   69 F.3d 600 (D.C. Cir. 1995) ...............................................................17

*Clark v. Libr. of Cong.*,
   750 F.2d 89 (D.C. Cir. 1984) ...........................................................17, 23

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ...............................................................25

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) ...........................................................18, 19

*Crane v. Carr*,
   814 F.2d 758 (D.C. Cir. 1987) ...............................................................8

*Dawson-Austin v. Austin*,
   968 S.W.2d 319 (Tex. 1998) .................................................................24

*Def. Distributed v. Grewal*,
   971 F.3d 485 (5th Cir. 2020) ......................................................13, 14, 15

*District of Columbia v. Exxon Mobil Corp.*,
  89 F.4th 144 (D.C. Cir. 2023) .................................................................10

*Dyson v. Dutko Ragen Homes & Investments*,
  No. 21-CV-02280, 2022 WL 1294484 (D.D.C. Apr. 27, 2022) ...................................7

*Edgar v. Haines*,
  2 F. 4th 298 (4th Cir. 2021) ..........................................................18, 19, 25

*Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs*,
  355 A.2d 808 (D.C. 1976) ...............................................................4, 7

*Exelon Generation Co., LLC v. Grumbles*,
  380 F. Supp. 3d 1 (D.D.C. 2019) ..............................................................17

*FTC v. Endo Pharms. Inc.*,
  82 F.4th 1196 (D.C. Cir. 2023) ...............................................................3

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ................................................................21

*Guest v. Provident Funding Assocs.*,
  No. 3:12-CV-224, 2013 WL 1003524 (S.D. Ohio Mar. 13, 2013) ...............................6

*Gulf Ins. Co. v. Glasbrenner*,
  417 F.3d 353 (2d Cir. 2005) .................................................................17

*Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*,
  520 F. Supp. 67 (E.D. Mich. 1981) ...........................................................6

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) ...........................................................18

*Heller v. Nicholas Applegate Cap. Mgmt. LLC*,
  498 F. Supp. 2d 100 (D.D.C. 2007) ..........................................................12

*Hindu Am. Found. v. Viswanath*,
  646 F. Supp. 3d 78 (D.D.C. 2022) ....................................................2, 3, 8, 10

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010) ...........................................................8

*Jackson v. Loews Washington Cinemas, Inc.*,
  944 A.2d 1088 (D.C. 2008) ...................................................................4

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ................................................................17

iv

*Kalman v. Cortes*,
    646 F. Supp. 2d 738 (E.D. Pa. 2009) ...................................................................16

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984)...............................................................................................14

*Kramer v. Grossman*,
    No. 13-cv-1745-ELH, 2014 WL 937146 (D. Md. Mar. 10, 2014) .........................19

*Laird v. Tatum*,
    408 U.S. 1 (1972)..............................................................................................22, 23

*Leroy v. Great Western United Corp.*,
    443 U.S. 173 (1979)...............................................................................................17

*Lewy v. S. Poverty Law Ctr.*,
    723 F. Supp. 2d 116 (D.D.C. 2010) ..........................................................8, 10, 12

*Margoles v. Johns*,
    483 F.2d 1212 (D.C. Cir. 1973) ..........................................................................5, 7

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ...............................................................................14

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. 1981) .....................................................................................4, 5

*Music Makers Holdings, LLC v. Sarro*,
    No. RWT 09cv1836, 2010 WL 2807805 (D. Md. July 15, 2010)..........................15

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983) ...............................................................................11

*Novack v. Nat'l Hot Rod Ass'n*,
    231 A.2d 22 (Md. 1967) ...........................................................................................5

*Reisman v. Caplin*,
    375 U.S. 440 (1964)..........................................................................................21, 22

*Reporters Committee for Freedom of Press v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) .............................................................................22

*Rusesabagina v. Republic of Rwanda*,
    No. CV 22-469, 2023 WL 2562692 (D.D.C. Mar. 16, 2023).................................4

*S.C. Citizens for Life, Inc. v. Krawcheck*,
    301 F. App'x 218 (4th Cir. 2008) ..........................................................................19

*S.C. State Conf. of NAACP v. Wilson,*
  No. 2:23-CV-01121-DCN, 2023 WL 5207978 (D.S.C. Aug. 14, 2023) ...............................18

*Schleit v. Warren,*
  693 F. Supp. 416 (E.D. Va. 1988) ...................................................................................6, 7, 12

*Simon v. United States,*
  644 F.2d 490 (5th Cir. 1981) ................................................................................................6, 7

*Soundboard Ass'n v. FTC,*
  888 F.3d 1261 (D.C. Cir. 2018) ...............................................................................................18

*Steinberg v. Int'l Crim. Police Org.,*
  672 F.2d 927 (D.C. Cir. 1981) ...................................................................................................5

*Stroman Realty, Inc. v. Wercinski,*
  513 F.3d 476 (5th Cir. 2008) ............................................................................................14, 15

*Trump v. Comm. on Ways & Means, U.S. House of Representatives,*
  415 F. Supp. 3d 98 ...................................................................................................................11

*Turner v. Abbott,*
  53 F. Supp. 3d 61 (D.D.C. 2014) .............................................................................................11

*Twitter v. Paxton,*
  56 F.4th 1170 (9th Cir. 2022) ...................................................................................19, 20, 21

*United States v. Ferrera,*
  54 F.3d 825 (D.C. Cir. 1995) ...................................................................................................15

*Unity08 v. FEC,*
  596 F.3d 861 (D.C. Cir. 2010) .................................................................................................19

*Van Wagenberg v. Van Wagenberg,*
  215 A.2d 812 (Md. 1966) ...........................................................................................................5

*Walden v. Fiore,*
  571 U.S. 277 (2014).................................................................................................12, 13, 14

**Statutes**

28 U.S.C. § 1391(b)(2) ...................................................................................................................16

D.C. Code § 13-423(a)..........................................................................................................2, 4, 6

D.C. Code § 13-423(a)(1) .................................................................................................................2

D.C. Code § 13-423(a)(3) ...........................................................................................................5, 7

D.C. Code § 13-423(a)(4) ...................................................................................................8

Tex. Bus. & Com. Code Ann. § 17.45(8) ...........................................................................4

Tex. Bus. & Com. Code Ann. § 17.46 .................................................................................4

Tex. Bus. & Com. Code Ann. § 17.47 .................................................................................4

Tex. Bus. & Com. Code Ann. § 17.60 .................................................................................4

Tex. Bus. & Com. Code Ann. § 17.61 .......................................................................4, 7, 24

Tex. Bus. & Com. Code Ann. § 17.501 ...............................................................................4

Va. Code § 8.01–328.1(A)(3) ..............................................................................................6

**Other Authorities**

Tex. Const., art. IV, § 22 .....................................................................................................4

## INTRODUCTION

Media Matters is a District of Columbia–based media organization currently subject to a retaliatory investigation and punitive civil investigative demand (the "Demand") issued by the Attorney General of Texas, despite having no meaningful connection to that state. In targeting Media Matters, Attorney General Paxton hired and dispatched an agent into the District of Columbia first to serve the Demand on Media Matters at its headquarters here, and then again to complete service on Media Matters's counsel. When he was asked if Paxton had "directed [his] investigation to Media Matters in D.C." during a hearing in a prior action, Paxton's counsel responded with one word: "Absolutely." Branch Decl., ECF No. 4–5, Ex. H, Tr. 22:18–20. And it is clear why: Media Matters is headquartered and has its only office in the District, and the vast majority of the documents sought by the overbroad Demand were generated, and are stored, here. Paxton has in every meaningful sense aimed his conduct towards, and imposed his authority on, the District of Columbia to retaliate against a D.C.-based non-profit, chilling its speech here in the process.

Rather than explain how his out-of-state investigation is lawful, Paxton's opposition focuses almost entirely on procedural arguments. But none have merit. The District of Columbia's long-arm statute provides several independently sufficient bases for exercising personal jurisdiction over Paxton, and doing so here comports with due process. Paxton's ripeness claims are also easily rejected. The law is clear that where a state actor's conduct threatens to chill, and is in fact chilling, protected speech and association—as Plaintiffs have shown Paxton's Demand does—Plaintiffs may bring a pre-enforcement challenge. Even *Twitter v. Paxton*, a case upon which Paxton heavily relies, *supports* finding that Plaintiffs' retaliation claim is ripe, and rejects much of Paxton's other case law. His remaining, largely half-hearted, arguments on venue and the balance of the equities are also unavailing and pose no obstacle to preliminary relief.

1

At bottom, Plaintiffs' motion is about whether the First Amendment truly guarantees that reporters and media organizations are free to speak their minds about the issues of the day without fear that overreaching state officials will use the power of the state to retaliate, including by making unreasonable and ongoing demands for their documents and communications. As Plaintiffs have shown, such retaliation chills speech in a manner that makes it impossible for an organization like Media Matters—or a reporter like Eric Hananoki—to do their job. Because the First Amendment prohibits such interference, and because without an injunction Plaintiffs will continue to suffer the irreparable harm of an ongoing chill of their core protected speech and activities, the motion should be granted.

## ARGUMENT

### I.    This Court has specific personal jurisdiction over Paxton.

#### A.    This Court has personal jurisdiction under D.C.'s long-arm statute.

This Court has three separate grounds to exercise personal jurisdiction over Paxton under D.C.'s long-arm statute, D.C. Code § 13-423(a)(1), (3)–(4). *First*, Paxton has transacted and is currently transacting business in the District, permitting the Court's exercise of jurisdiction up to the limits of due process under subsection (a)(1). *See Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 92–93 (D.D.C. 2022) (Mehta, J.). *Second*, by sending his agent into the District to serve the Demand, Paxton effected a tortious act here that caused and continues to cause injury in D.C., bringing him within subsection (a)(3). *Third*, even if Paxton had not committed any tortious act in the District, jurisdiction still exists under subsection (a)(4) because Paxton caused tortious injury here and is engaged in a "persistent course of conduct" in the District.

**D.C. Code § 13-423(a)(1).** *First*, the Court has personal jurisdiction under subsection (a)(1) of the D.C. long-arm statute because Paxton is "transacting . . . business" in the District of Columbia. Plaintiffs' opening brief specifically identified subsection (a)(1) as a basis for

jurisdiction, noting that this prong is congruent with the permissible limits of personal jurisdiction under the Due Process Clause. Pls.' Mem. 23, ECF No. 4-1 ("Mem"); *see also Viswanath*, 646 F. Supp. 3d at 92 (explaining where a defendant is transacting *any* business in the District of Columbia, "the long-arm statute and due process inquiry merge into one"). Paxton's response ignores this argument altogether, wrongly asserting that "Media Matters fails to specify the application of a particular subsection" of the long-arm statute, Def.'s Resp. 13, ECF No. 26 ("Opp'n"). "It is well-understood that 'if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.'" *Brett v. Brennan*, 404 F. Supp. 3d 52, 59 (D.D.C. 2019) (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)). By ignoring subsection (a)(1) where Plaintiffs expressly relied upon it, Paxton has forfeited any argument that his conduct is not within the scope of that subsection. *See FTC v. Endo Pharms. Inc.*, 82 F.4th 1196, 1206–07 (D.C. Cir. 2023) (personal jurisdiction is a waivable defense); *see also Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 38–39 (D.D.C. 1994). The Court may therefore proceed directly to the constitutional analysis. *See infra* Section I.B.[1]

But, in any event, the Court has ample grounds to find that Paxton is "transacting . . . business" in the District of Columbia within the meaning of the statute. District of Columbia courts have long held that "the words 'transacting any business' should be given an expansive

---

[1] Paxton's failure to address subsection (a)(1) is particularly notable because Plaintiffs were not required to brief personal jurisdiction in the affirmative; that was Paxton's burden, as lack of personal jurisdiction is *his* affirmative defense. Plaintiffs explained why this Court has personal jurisdiction over Paxton in their brief because they knew that, despite having argued in a prior action filed in Maryland that Plaintiffs "could have instead sued in . . . the District of Columbia," Branch Decl., Ex. I at 24, Paxton was unwilling to stipulate to transfer and accordingly was likely to try to avoid responding to Plaintiffs' constitutional arguments by again disputing jurisdiction, *id.*, Ex. H, Tr. 24:15–17. That Paxton failed to comprehensively respond supports finding that he forfeited any argument as to subsection (a)(1)'s applicability.

interpretation." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981). Even "'a single act may be sufficient to constitute transacting business' so long as that contact is 'voluntary and deliberate, rather than fortuitous.'" *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008) (quoting *Baxter*, 434 A.2d at 992, 995); *see also Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs*, 355 A.2d 808, 810–11 (D.C. 1976) (explaining that even a "small amount" of activity suffices). Whether business is transacted "in person or by an agent" does not change the analysis. *Rusesabagina v. Republic of Rwanda*, No. CV 22-469, 2023 WL 2562692, at *6 (D.D.C. Mar. 16, 2023); *see also* D.C. Code § 13-423(a) (granting courts personal jurisdiction "over a person[] who acts directly or by an agent").

As the Attorney General of Texas, Paxton's "business" includes exercising authority under the Texas Deceptive Trade Practices Act—the authority he asserts here—to issue civil investigative demands and enforce Texas's trade practices law. *See* Tex. Bus. & Com. Code Ann. §§ 17.45(8), 17.46–17.47, 17.501, 17.60–17.61. Paxton himself asserted that his investigation is *part of his business* as Attorney General, publicly stating he has a constitutional "obligation" to "look at any fraudulent activity of a corporation" and to "oversee charitable organizations." Branch Decl., Ex. D, Tr. 2:6–18; *see also* Tex. Const., art. IV, § 22. While Plaintiffs dispute the lawfulness of Paxton's D.C.-focused investigation, it is plain that by issuing the Demand to a D.C.-based media organization; serving it in the District of Columbia through an agent sent into the District; and ordering Media Matters to provide documents created and maintained here, Paxton is "transacting" his usual law-enforcement "business" in this jurisdiction.[2]

---

[2] It is immaterial that Paxton's investigative acts are not commercial in nature. Maryland's highest court explained that, under that state's substantively identical long-arm statute, the "transacting any business" prong is "not necessarily limited to acts which are a part of commerce or of

Paxton also "transact[ed] . . . business" in the District of Columbia, in the narrower sense of engaging in commercial activity, by engaging a process server as an agent to effectuate service. Paxton's employee, Assistant Attorney General Fuller, affirmed he hired "a professional process service" to serve the Demand "on Defendant's counsel" at an address within the District. Fuller Decl., ECF No. 26-1, ¶ 3 & Ex. B. And although Paxton omits mention of it, that same process server also attempted to serve the Demand at Media Matters's D.C. office, appearing at its front door and seeking admittance. Reese Decl., ¶ 4. It is "well-settled" that "the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which *cause a consequence* here." *Baxter*, 434 A.2d at 992 (emphasis added). Paxton's contracting with a process server caused Media Matters to be served with the Demand, which has chilled its protected activities in D.C. *See* Mem. 26–33.

**D.C. Code § 13-423(a)(3).** *Second*, the Court has personal jurisdiction under subsection (a)(3) because Paxton is "causing tortious injury in the District of Columbia by an act" taken here. Paxton apparently does not dispute that Plaintiffs' alleged injuries resulting from his retaliatory conduct have been sustained, in substantial part, in the District, *see* Opp'n 13–14, instead arguing only that he has not taken any "act" in the District that contributed to those injuries. Opp'n 14–15.

---

transactions for profit, but include acts which constitute a purposeful activity within the State." *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 26 (Md. 1967); *see also Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 820–21 (Md. 1966) ("transacting business" prong "is not limited in terms to commercial transactions"). This Maryland precedent has been favorably cited by the D.C. Circuit. *See e.g.*, *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *Margoles v. Johns*, 483 F.2d 1212, 1220–21 & n.14 (D.C. Cir. 1973). Judge Skelly Wright also adopted the reasoning of *Novack* in concluding that subsection (a)(1) of the D.C. long-arm statute provided personal jurisdiction over Interpol for conveying a criminal notification into the District of Columbia—facts similar to those here—noting the "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit." *Steinberg*, 672 F.2d at 933 (Skelly Wright, J., concurring) (citing *Novack*, 231 A.2d at 26).

But that is false. He purposefully directed his agent into the District to serve the Demand on Media Matters here, an act that caused tortious injury in the District.

When an "alleged tort[]" is "'*effected* by service of process,'" courts have consistently held that the state where process was served has personal jurisdiction over the alleged tortfeasor. *Guest v. Provident Funding Assocs.*, No. 3:12-CV-224, 2013 WL 1003524, at *4 (S.D. Ohio Mar. 13, 2013) (quoting *Schleit v. Warren*, 693 F. Supp. 416, 419–22 (E.D. Va. 1988)); *see also, e.g.*, *Simon v. United States*, 644 F.2d 490, 498–99 (5th Cir. 1981) (exercising statutory personal jurisdiction over out-of-state defendant based on agent's in-state service of an improper subpoena ticket); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) ("Therefore, since it is alleged that the service of process in a maliciously instituted lawsuit was the tortious act, Defendants are properly within the jurisdiction of this Court.").

Courts applying Virginia's long-arm statute—in particular, Va. Code § 8.01–328.1(A)(3), which is materially identical to (a)(3) of D.C.'s long-arm statute—have held that they have personal jurisdiction "to hold an attorney liable for torts which originate with the attorney and are technically completed by service of process." *Schleit*, 693 F. Supp. at 420; *cf. Balsly v. W. Mich. Debt Collections, Inc.*, No. 3:11CV642-DJN, 2012 WL 628490, at *5 (E.D. Va. Feb. 27, 2012) (citing *Vishay Intertechnology, Inc. v. Delta Int'l Corp*, 696 F2d 1062, 1067 (4th Cir. 1982)). *Schleit* is directly on point. There, the court exercised statutory personal jurisdiction under Va. Code § 8.01–328.1(A)(3) based on out-of-state attorneys' in-state service of process. *Schleit*, 693 F. Supp. at 421. The court reasoned that because the process server was "the defendants' agent" and was "physically present in the state," the "'act' requirement of section (A)(3)" was met. *Id.*

Not only does the relevant Virginia long-arm provision mirror subsection (a)(3), but in enacting D.C. Code § 13-423(a), Congress intended to "provide the District with a long-arm statute

equivalent in scope to those already in effect in Maryland and Virginia." *Env't Rsch. Int'l*, 355 A.2d at 810 & n.3 (collecting legislative history); *see also Margoles*, 483 F.2d at 1215–16 (similar). For that reason, "to the extent that [Virginia courts] have spoken on the reach of their long-arm statute[]," D.C. courts typically "welcome their guidance." *Env't Rsch. Int'l*, 355 A.2d at 810.

This Court should do the same and hold that Paxton's use of an agent to effect service in the District was "an act" "causing tortious injury" under subsection (a)(3). "Under the facts of the present case, the defendant['s] agent *was* physically present in the state, consequently nullifying the argument that the 'act' requirement of [subsection (a)(3)] was not fulfilled." *Schleit*, 693 F. Supp. at 421. Moreover, service of process "technically completed," *id.* at 420, Paxton's tortious act. A Texas civil investigative demand imposes duties upon the respondent only after the "demand is served." Tex. Bus. & Com. Code Ann. § 17.61(h); *see also id.* § 17.61 (a), (d), (i). Accordingly, service by Paxton's agent in the District was "a cause-in-fact, or substantial factor, in the tort." *Simon*, 644 F.2d at 498–99. That suffices for jurisdiction under subsection (a)(3).

To argue otherwise, Paxton cites *Dyson v. Dutko Ragen Homes & Investments*, but he mischaracterizes the holding of that case. *See* Opp'n 14–15. While this Court held there that "limited communications initiated from outside the District of Columbia" do not qualify as "an act 'in the District' for purposes of § 13-423(a)(3)," *Dyson*, No. 21-CV-02280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022), the communications in question consisted of "one text message, a single email, and two phone calls," *id.*, rather than physically dispatching an agent *into* the forum to serve process in person. *See* Fuller Decl., ¶ 3. Courts have distinguished such physical service of process from mere phone calls or letters when finding that similar acts suffice for (a)(3)-equivalent jurisdiction. *See Schleit*, 693 F. Supp. at 421; *cf. Balsly*, 2012 WL 628490, at *5 ("[T]his

7

is not a case, as Defendants contend, where the Court must determine whether the mere use of the United States mails to serve pleadings supports jurisdiction." (quoting *Hori*, 520 F. Supp. at 70)).

**D.C. Code § 13-423(a)(4).** *Third*, even if all of Paxton's tortious activity occurred in Texas, the Court has personal jurisdiction under subsection (a)(4) because Paxton is "causing tortious injury" in the District while also engaged in a "persistent course of conduct" here. Subsection (a)(4)'s "persistent course of conduct 'plus factor' is satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'- based jurisdiction." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987) (R.B. Ginsburg, J.). "The 'something more' or 'plus factor' does not itself supply the basis for the assertion of jurisdiction," but serves to "filter out cases in which the inforum impact is an isolated event." *Id.* Accordingly, this prong grants jurisdiction even where the defendant's conduct in D.C. is "unrelated" to the acts giving rise to plaintiffs' claims, *id.*, and courts consider "the totality of defendants' contacts," aggregating even contacts that do not relate to one another or to the subject matter of the claim over which jurisdiction is sought. *Lewy v. S. Poverty Law Ctr.*, 723 F. Supp. 2d 116, 126 (D.D.C. 2010) (collecting cases); *see also IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 162 (D.D.C. 2010) (similar). The contacts simply must be "continuing in character" but "need not be great." *Viswanath*, 646 F. Supp. 3d at 94 (cleaned up).

Paxton again does not dispute the location of Plaintiffs' alleged injury, instead simply arguing that "there is no 'plus factor.'" Opp'n 15. But Paxton provides no analysis to support that claim; he just asserts in conclusory fashion that he "does not solicit or do business, engage in other persistent conduct, or derive any revenue from services in D.C." *Id.* In truth, Paxton has long been engaged in a persistent course of conduct in the District of Columbia, including through (i) regular speaking engagements and attending rallies in the District (both by Paxton himself and agents in

8

his office), (ii) voluntary and frequent participation in litigation in D.C. courts, and (iii) numerous campaign-related activities, such as fundraising and disbursing campaign funds here.

First, Paxton routinely travels to the D.C. to promote the Texas Attorney General Office's work and related matters. For example, Paxton traveled to the District in April 2023 to speak at the Heritage Foundation's 50th anniversary summit about his office's work on election fraud. Dodge Decl., Ex. M; *see also id.*, Ex. N (prior example of Paxton speaking in-person at Heritage Foundation). Paxton also visited the District of Columbia on March 7, 2019, and November 18, 2017, to speak about his office's work at events organized by the Federalist Society. *Id.*, Ex. O. And he participated in a DOJ press conference to discuss state and federal responses to the opioid epidemic on February 27, 2018. *Id.*, Ex. P. Paxton also spoke at then-President Trump's January 6, 2021 rally at the U.S. Capitol, where he touted twelve separate lawsuits "his office pushed in Texas leading up to the election." *Id.*, Ex. Q. The day prior, Paxton lent his name to a robocall urging supporters to join him "in DC tomorrow 2 fight for the integrity of our elections!", *id.*, Ex. R, encouraging others to join him in the District to rally in support of the former President.

Paxton's agents also frequently visit D.C. to speak about his office's work—including the Texas Attorney General's Office's Consumer Protection Division and its work related to content moderation on social media platforms. *See, e.g.*, *id.*, Ex. S (former Texas Solicitor General Judd Stone speaking at Federalist Society event in October 2022). Assistant Attorney General Ryan Baasch, chief of the Consumer Protection Division—the same Division that issued the Demand to Plaintiffs—spoke at Federalist Society events in the District of Columbia at least twice in the past year alone, on May 30 and June 28, 2023. *Id.*, Exs. T, U. The topic of Baasch's June 28 remarks was content moderation on social media, and the title of the panel was "When Twitter Speaks: Control, Access, and the Role of States." *Id.*, Ex. U. In fact, just *two days ago* Paxton "assigned

9

[his] First Assistant Attorney General . . . to testify in the United States Congress" about the so-called "Southern Border Invasion." Dodge Decl., Ex. V. This activity establishes "continuing" conduct, *Viswanath*, 646 F. Supp. 3d at 94, sufficient to serve as a "plus factor" for jurisdiction under subsection (a)(4). *See Lewy*, 723 F. Supp. 2d at 128 (finding a "persistent course of conduct" under subsection (a)(4) where defendant had been "sending employees to the District for conferences and meetings with nongovernmental organizations," among other contacts).

Second, Paxton is a frequent, voluntary participant in litigation in D.C. courts. As Attorney General, Paxton has filed *at least* nine amicus briefs in D.C. federal court,[3] directly intervened in at least five matters in courts here,[4] and been a petitioner or plaintiff in the District at least nine times.[5] In all, Paxton has chosen to litigate in this venue on dozens of occasions, not counting Supreme Court appearances and cases in this district naming him as a defendant. Paxton has even staked out views about the District of Columbia's own policy choices, including whether it could pursue actions under D.C. law in D.C. courts. *See District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 157 (D.C. Cir. 2023) (affirming remand to D.C. Superior Court of action filed against Exxon Mobil under D.C. Code, over federalism arguments raised by Paxton as amicus curiae).

---

[3] *See, e.g.*, *Cent. United Life Ins. Co. v. Burwell*, No. 15-5310 (D.C. Cir.); *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir.); *Home Care Ass'n of Am. v. Weil*, No. 15-5018 (D.C. Cir.); *Barker v. Conroy*, No. 17-5278 (D.C. Cir.); *Illinois v. Ferriero*, No. 21-5096 (D.C. Cir.); *Wrenn v. D.C.*, Nos. 16-7025, 16-7067 (D.C. Cir.); *In re Flynn*, No. 20-5143 (D.C. Cir.); *D.C. v. Exxon Mobil Corp.*, No. 22-7163 (D.C. Cir.); *J.D. v. Azar*, No. 18-5093 (D.C. Cir.).

[4] *See, e.g.*, *Sierra Club v. EPA*, No. 20-1121 (D.C. Cir.); *Am. Lung Ass'n v. EPA*, No. 19-1140 (D.C. Cir.); *Sierra Club v. EPA*, No. 15-1465 (D.C. Cir.); *Air All. Houston v. EPA*, No. 17-1155 (D.C. Cir.); *Clean Wisconsin v. EPA*, No. 18-1203 (D.C. Cir.).

[5] *See, e.g.*, *Arizona v. EPA*, No. 21-1159 (D.C. Cir.); *Util. Air Regul. Grp. v. EPA*, No. 12-1342 (D.C. Cir.); *Texas v. United States*, No. 14-5151 (D.C. Cir.); *Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. EPA*, No. 22-1013 (D.C. Cir.); *EME Homer City Generation, L.P. v. EPA*, No. 11-1302 (D.C. Cir.); *New York v. Meta Platforms, Inc.*, No. 21-7078 (D.C. Cir.); *Wisconsin v. EPA*, No. 16-1406 (D.C. Cir.); *Murray Energy Corp. v. EPA*, No. 15-1385 (D.C. Cir.); *Mozilla Corp. v. FCC*, No. 18-1051 (D.C. Cir.).

This litigation conduct is a particularly strong "plus factor" for jurisdiction. After all, the "essential" concern of the Due Process Clause is that "the defendant purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Paxton has frequently availed himself of that privilege here to further his agenda as Attorney General, independently satisfying the plus factor requirement. *Cf. Trump v. Comm. on Ways & Means, U.S. House of Representatives*, 415 F. Supp. 3d 98, 108 n.4, 110 n.6 (D.D.C. 2019) (concluding "litigation activity in the District . . . arguably satisfies subsection (a)(1)" and explaining state Attorney General's appearance in nine cases showed she "may have engaged in a persistent course of conduct in the District" under subsection (a)(4) but finding no plausibly alleged tortious act); *Turner v. Abbott*, 53 F. Supp. 3d 61, 67 (D.D.C. 2014) (similar).[6]

Finally, Paxton regularly avails himself of the District of Columbia for his own campaign efforts. Since his first run for Attorney General, Paxton has raised over $1.5 million from D.C. residents and entities. Dodge Decl., Ex. W. This includes close to $1.2 million from the Republican Attorneys General Association ("RAGA"), a D.C.-based political action committee of which Paxton is a current member and former chair. *Id.*, Ex. X. Paxton has regularly disbursed campaign funds to vendors, hotels, and restaurants within the District during his time in office, including for events like "campaign reception[s]," "Meeting with donor," and "overnight lodging for

---

[6] Paxton's contacts with District of Columbia courts are not protected by the so-called "government contact" doctrine. The District of Columbia Court of Appeals recently held that doctrine does not apply to subsection (a)(4), even when the contacts involve "federal policy advocacy." *Akhmetshin v. Browder*, 275 A.3d 290, 296 (D.C. 2022) ("declin[ing]" to "construe the 'persistent course of conduct' requirement in § (a)(4) of the D.C. long-arm statute to exclude government contacts"). Moreover, Plaintiffs are not aware of any case in which that doctrine has been applied to contact with federal *courts* in the District of Columbia, as compared to federal *agencies*. *Cf. Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983) (explaining doctrine applies to "official contacts with the Congress and the executive branch").

fundraiser," showing that Paxton regularly avails himself of the District to raise funds, *id.*, Ex. Y, yet another basis for finding a persistent course of conduct, *see Lewy*, 723 F. Supp. 2d at 128 (considering solicitation and receipt of donations in D.C. in finding plus factor requirement met).

### B.     Exercising personal jurisdiction over Paxton is consistent with due process.

Plaintiffs' opening brief provided three separate bases for exercising jurisdiction over Paxton in a manner consistent with due process. *See* Mem. 21–22. Paxton's response does not even address the second basis—that Paxton's conduct is purposefully directed at the District because the Demand seeks "reams of documents stored, and in many cases created" in D.C.—and thus concedes the point. *See* Opp'n 15–19, *Brett*, 404 F. Supp. 3d at 59. With respect to the other two bases—that Paxton physically entered the District of Columbia for purposes of his investigation, and that the *Calder* "effects" test is satisfied—Paxton's arguments are either contrary to the facts or inconsistent with the relevant case law.

*First*, courts consistently have held that where a defendant sends a process server into a jurisdiction and the resulting claim flows from that effectuation of service, that jurisdiction may hear the claim consistent with due process. *See, e.g.*, *Schleit*, 693 F. Supp. at 422–23; *Balsly*, 2012 WL 628490, at *5–7 (explaining that "serving process in Virginia, alone, gives rise to personal jurisdiction" in view of "the defendant's physical presence in the forum state" through its agent). This makes sense—even "a single act, so long as it creates [a] 'substantial connection,' is sufficient" to confer personal jurisdiction. *Heller v. Nicholas Applegate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475 (1984)). And "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (citation omitted).

Paxton's only response is to suggest that *Walden* requires an "ongoing business relationship." Opp'n 17. That is incorrect. *Walden* stands for the rule that "the plaintiff cannot be the only link between the defendant and the forum." 571 U.S. at 286. Here, Plaintiffs are *not* the only link; Paxton's counsel described Paxton's activities as directed at the District of Columbia in his Maryland briefing, arguing that Maryland lacked jurisdiction specifically because the "CID was issued to, and served in, the District of Columbia." Branch Decl., Ex. I at 16; *see also id.* at 2 ("The CID was issued to Media Matters in the District of Columbia"); *id.* at 15 (same). Paxton's counsel admitted as much at the Maryland hearing:

```
18          THE COURT:  Are you saying kind of like the fact of
19   the matter is, you directed your investigation to Media Matters
20   in D.C. --
21          MR. LAVORATO:  Absolutely.
```

Branch Decl., Ex. H, Tr. 22:18–21.

*Second*, personal jurisdiction is also proper under the effects test. Mem. 22 (citing *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007), and *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)). Paxton concedes that "[s]ome courts" apply the effects test, Opp'n 17, and does not dispute this case satisfies that test. Paxton also never discusses, let alone distinguishes, *Defense Distributed v. Grewal*, 971 F.3d 485, 493 (5th Cir. 2020), a case from *his home circuit* which held that by sending a cease-and-desist letter to a Texas company in Texas, the New Jersey Attorney General had "projected himself across state lines and asserted a pseudo-national executive authority" more than sufficient to "constitute[] purposeful availment." *Id.* at 493–94. Paxton has done the same here.

The rejoinders Paxton does advance as to *Calder* are erroneous. He first suggests that *Calder* and the effects test "are inapposite" because "subsection (a)(3) of the D.C. long-arm statute 'stops short of the outer limits of due process.'" Opp'n 17 (citation omitted). But that *statutory*

argument is irrelevant to the *constitutional* analysis—all Plaintiffs need to show for constitutional purposes is that they satisfy the effects test, which does not require a tortious act in the District. *See Walden*, 571 U.S. at 286 (explaining *Calder* "illustrates" how defendants may "create[] the necessary contacts with the forum" to satisfy due process). In any case, as Plaintiffs have explained, they also satisfy (a)(3)'s additional requirement of such an act. *See supra* Section I.A.

Paxton's remaining due process arguments are as confusing as they are irrelevant. Opp'n 18–19. Paxton seems to suggest that a plaintiff may not rely on a First Amendment injury to satisfy the harm element of the effects test under *Calder*. But *Calder* says the opposite: It rejects the suggestion that "the potential chill on protected First Amendment activity" is a reason to *restrict* personal jurisdiction (specifically, over libel and defamation cases). 465 U.S. at 790–91 (setting aside this concern in finding jurisdiction); *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 n.12 (1984) (explaining *Calder* rejected notion that a "First Amendment" defense may defeat jurisdiction otherwise proper under the Due Process Clause" (emphasis added)). The location, not the substance, of the harm is what matters. *Menken*, 503 F.3d at 1058. In any event, unlike the defendant in *Calder*, Paxton does not argue that issuing his Demand is First Amendment activity at risk of chill from exercising jurisdiction here. *Calder*, 465 U.S. at 784–85.

Finally, Paxton cites *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), but that out-of-circuit decision does not help him. The same judge who authored *Stroman* later wrote *Defense Distributed* and distinguished *Stroman* in ways that also apply here. *See* 971 F.3d at 491–92. First, both here and in *Defense Distributed* the claims stem from the *direct* action the defendant took against the plaintiff in the forum—here, the Demand served in the District of Columbia, and in *Defense Distributed*, the New Jersey Attorney General's cease-and-desist letter sent into Texas. *Id. Stroman*, by contrast, held Texas lacked jurisdiction to hear a Texas company's *generalized*

14

challenge to "Arizona's regulatory scheme" for timeshare brokers. *Id.* (citing *Stroman*, 513 F.3d at 481). Second, *Stroman* concerned an Arizona public official's assertion of authority over "real estate transactions involving Arizona residents or property," *id.* (citing *Stroman*, 513 F.3d at 485–86), which the plaintiff had *admittedly* engaged in within Arizona, *Stroman*, 513 F.3d at 485–86 (noting Stroman "chose to deal in Arizona timeshares and with Arizona residents"). As the concurrence explained, the official in *Stroman* was "simply attempting to uniformly apply [Arizona's] laws" against a Texas-based company that "chose to market Arizona properties and transact business with Arizona residents." *Defense Distributed*, 971 F.3d at 497 (Higginson, J., concurring) (quoting *Stroman*, 513 F.3d at 486). This case is more akin to *Defense Distributed*, where the New Jersey Attorney General "asserted a pseudo-national executive authority" to "reach conduct" in Texas "that did not involve New Jersey residents or assets at all." *Id.* Indeed, Paxton claims a virtually unbound "discretion" regarding the "breadth and relevance" of materials he may demand without providing *any* reasonable basis for jurisdiction. Branch Decl., Ex. F.[7] *Stroman* is thus plainly distinct, as *Defense Distributed*—a case Paxton simply ignores—explains.[8]

---

[7] Although Paxton does not cite it, *Stroman* relied on *United States v. Ferrera*, 54 F.3d 825 (D.C. Cir. 1995). In *Ferrera*, an attorney licensed only in New Mexico was alleged to have committed an ethical violation while practicing as an Assistant U.S. Attorney in the District of Columbia. *Id.* at 826. After a New Mexico agency filed ethics charges, the United States sought an injunction in D.C. against the charging prosecutor, Ferrera. *Id.* The D.C. Circuit held there was no jurisdiction over Ferrera because her only tie to the District of Columbia was the New Mexico-licensed attorney's "unilateral decision to practice law in the District of Columbia." *Id.* at 829. Paxton, by contrast, has elected to target a D.C.-founded and D.C.-based media organization without showing that it has any preexisting ties to Texas. Padera Decl. ¶¶ 11–14, ECF No. 4-2.

[8] *Music Makers Holdings, LLC v. Sarro*, No. RWT 09cv1836, 2010 WL 2807805 (D. Md. July 15, 2010), is about private-party cease-and-desist letters sent to enforce a trademark. *Id.* at *1–2. Its holding that "cease-and-desist letters alone are not sufficient to invoke specific personal jurisdiction *in an action for trademark infringement*," *id.* at *6 (emphasis added), has no bearing on whether this Court has personal jurisdiction over claims arising from a government official's issuance of retaliatory, and judicially enforceable, investigatory demand on a media organization.

## II.      Venue in the District of Columbia is proper.

Paxton is also wrong that Plaintiffs' theory of venue "depends on the plaintiff's residence rather than the defendant's residence." Opp'n 21. Plaintiffs have asserted that venue is proper in D.C. because "a substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(b)(2). Paxton nowhere disputes that.

Even if Paxton made such an argument, it would be meritless. Paxton has *repeatedly* stressed that the Demand "was issued to, and served in, the District of Columbia." Branch Decl., Ex. I at 16; *see also id.* at 2 ("The CID was issued to Media Matters in the District of Columbia"); *id.* at 15 (same). His declarant likewise admits the Demand was mailed to, and then physically served on Media Matters in the District of Columbia. Fuller Decl. ¶¶ 2–3. These admissions alone plainly show that a "substantial part of the events . . . giving rise to the claim"—service and issuance of the Demand inflicting chill on Plaintiffs—occurred in this district.

Venue is further appropriate in D.C. because many of the events giving rise to Paxton's retaliatory investigation occurred here. It is undisputed that Paxton's investigation was triggered by Hananoki's November 16 article, which was edited and reviewed by Media Matters's D.C.-based editorial team, including Media Matters's D.C.-based editor-in-chief. Dimiero Decl. ¶¶ 8–10, ECF No. 4-4. Similarly, Plaintiffs have alleged that they are *injured* in the District of Columbia due to Paxton's conduct. Where, as here, a case is "brought on First Amendment grounds, [this] impact becomes the most important part" of the venue analysis because "[t]he suppression itself is a more 'substantial' event than the decision to suppress the speech." *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009). Plaintiffs "suffer[] harm . . . where the[ir] speech would have taken place," making such locations more appropriate venues than "the district in which the statute was written and the decision to restrict th[e] plaintiff's speech was made." *Id.*

Paxton argues that venue is only proper in Texas, relying solely on *Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979), an outdated case which interprets a *superseded* venue statute under which venue was only appropriate in the district where a claim "arose." Opp'n 21–22. But "in 1990 Congress revamped the venue statute" and made clear "that venue can be appropriate in more than one district." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); *see also Exelon Generation Co., LLC v. Grumbles*, 380 F. Supp. 3d 1, 13 (D.D.C. 2019) (noting the 1990 amendments recognized venue can be appropriate "in multiple districts," making *Leroy* "academic"). "*Leroy* is of limited, if any, significance now." 14D Wright & Miller, *Fed. Prac. & Proc.* § 3802 (4th ed.). Because a substantial portion of the events giving rise to this suit indisputably occurred in D.C., venue is proper in this Court. *See, e.g.*, Compl. ¶¶ 14–17, 62–67.[9]

## III.   Plaintiffs' claims are ripe for adjudication.

Plaintiffs' claims are ripe because Paxton's retaliatory conduct has already had its predictable and intended effect—chilling Plaintiffs from engaging in their constitutionally protected newsgathering and reporting activities. Plaintiffs are therefore "suffer[ing] a present, objective harm," namely "an objective chill of [their] first amendment rights." *Clark v. Libr. of Cong.*, 750 F.2d 89, 93 (D.C. Cir. 1984) (finding employee's claim for alleged objective chill of First Amendment rights due to retaliatory investigation justiciable); *cf. Chamber of Commerce of the U.S. v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir. 1995) ("A party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are arguably chilled,

---

[9] Paxton's offhand suggestion that this case be transferred to the Northern District of Texas, Opp'n 22, is also meritless. The Northern District of Texas has no jurisdiction over Plaintiffs, as binding federal circuit precedent precludes the exercise of jurisdiction in a case where the targeted conduct consists of a story published online with no meaningful ties to Texas. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–20 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022); *see also* Compl. ¶¶ 102–05, 115.

so long as there is a credible threat of prosecution."). This ongoing chill more than suffices to show a ripe and cognizable injury, particularly since "ripeness requirements are . . . relaxed in First Amendment cases" due to the "special need to protect against any inhibiting chill." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1274 n.6 (D.C. Cir. 2018) (recognizing that "presence of constitutional claims may favor judicial review" under "prudential doctrine[]" of ripeness); *accord* 13B Wright & Miller, *Federal Practice and Procedure* § 3532.3 (3d ed. 2023) ("In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.") (collecting cases).

Paxton's response turns almost exclusively on his choice to not (yet) enforce the Demand in Texas court. But Plaintiffs are harmed *now* by the objectively reasonable chill imposed by Paxton's retaliatory course of conduct. Such a claim is ripe once a plaintiff has "plausibly alleged" the defendant's conduct "require[s] them to self-censor," *Edgar v. Haines*, 2 F. 4th 298, 311 (4th Cir. 2021), *cert. denied* 142 S. Ct. 2737 (2022), such as by pleading a "non-speculative and objectively reasonable chilling effect" of their speech. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021) (quoting *Cooksey*, 721 F.3d at 236, 240–41); *also Hartley v. Wilfert*, 918 F. Supp. 2d 45, 53 (D.D.C. 2013) (alleging an objectively reasonable fear of engaging in future protected speech suffices to plead retaliation claim (citing *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011))). Thus, the "fundamental question is whether plaintiffs have shown that" the retaliation "to which they are currently subject . . . . require[s] them to self-censor." *S.C. State Conf. of NAACP v. Wilson*, No. 2:23-CV-01121-DCN, 2023 WL 5207978, at *5 (D.S.C. Aug. 14, 2023) (quoting *Edgar*, 2 F.4th at 311). That is precisely what Plaintiffs have shown here based on extensive evidence that their First Amendment activities are presently chilled; indeed, the

Maryland district court strongly indicated it would likely "find subject matter jurisdiction" upon this showing. Branch Decl., Ex. H, Tr. 30:13–17, 4:13–17 (further explaining Plaintiffs had "pled enough" to show their claim is "ripe constitutionally").

It is irrelevant that "more discourse could occur" between Paxton and Plaintiffs, "or that [Paxton] ha[s] not yet made [his] final decision on th[e] issue" of enforcement. *Cooksey*, 721 F.3d at 241. A "First Amendment claim may be ripe for review even before the government has taken enforcement action" if the plaintiff alleges an objectively reasonable chill. *Kramer v. Grossman*, No. 13-cv-1745-ELH, 2014 WL 937146, at *8–9 (D. Md. Mar. 10, 2014); *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 221 (4th Cir. 2008) (similar); *cf. Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (expressing "reluctance to require parties to subject themselves to enforcement proceedings . . . where . . . First Amendment rights are implicated and arguably chilled by a 'credible threat of prosecution'" (cleaned up)). Here, where Paxton's invasive Demand has caused Plaintiffs to curtail their speech, including by causing them "not to write about certain topics because" of retaliation, their chill is "objectively reasonable." *Edgar*, 2 F.4th at 310; *see* Dimiero Decl. ¶¶ 16–22; Hananoki Decl. ¶¶ 26, 29–37, ECF No. 4-3; Supp. Hananoki Decl. ¶¶ 3-6. "Such self-censorship is enough." *Edgar*, 2 F. 4th at 310 (citation omitted).

Paxton's reliance on *Twitter, Inc. v. Paxton* is misplaced and misreads that decision. *See* Mem. 43–44. That case arose after Twitter removed former President Trump from the platform in the wake of January 6. *See* 56 F.4th 1170, 1172 (9th Cir. 2022). After Paxton issued a document demand to Twitter under the same Texas law at issue here, Twitter sued Paxton in California, alleging "its content moderation decisions are protected speech." *Id*. at 1172–73. Notably, the Ninth Circuit **rejected** Paxton's argument that Twitter's First Amendment challenge was not ripe "because the CID is not self-enforcing" and had not yet been enforced. *Id*. at 1174. It recognized

that Twitter was "not really making a pre-enforcement challenge" but rather alleging Paxton's retaliatorily conduct "targeted [Twitter] specifically with the CID and related investigation." *Id*. at 1175; *see also id*. ("[T]he subject of [Twitter's] challenge is not only some anticipated future enforcement action by OAG; Twitter claims OAG has already acted against it."). Accordingly, the Court "conclude[d] that the retaliatory framework"—the same framework Plaintiffs invoke here— "is the appropriate one under which to evaluate Twitter's standing." *Id*. at 1175.

Where Twitter ran into trouble—and why the Ninth Circuit ultimately found that its "allegations [were] not enough to establish constitutional standing and ripeness"—was "because Twitter *fail[ed] to allege any chilling effect* on its speech or any other legally cognizable injury." *Id*. (emphasis added). The court noted that Twitter's affiant did "not declare that the OAG's CID has actually chilled employees' speech or Twitter's content moderation decisions." *Id.*; *see also* Mem. 43–44. In contrast, Plaintiffs extensively describe how the Demand is chilling their speech, including by impacting their decisions about what to publish. Dimiero Decl., ¶¶ 16–23 (Plaintiffs have declined leads, withheld articles, and suffered from a slower, more burdensome publication process due to a "culture of fear" from retaliation); Hananoki Decl., ¶¶ 29–31 (explaining his work has been "curtail[ed]" and he is no longer publishing stories on X or Musk); *id*. ¶¶ 32–34 (describing additional story ideas he has not pursued for fear of retaliation).

Paxton attempts to recast *Twitter* as standing for the proposition that a plaintiff "does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID." Opp'n 2. But he ignores that the Ninth Circuit expressly recognized that "a chilling effect on speech *can itself be the harm*" when a plaintiff brings a First Amendment claim in response to such a demand. 56 F.4th at 1178 (emphasis added). The Ninth Circuit further explained that once a plaintiff shows an objectively reasonable chill, "its constitutional injury has already occurred;

there is no way for [a plaintiff] to avoid that alleged injury by challenging the document request later" when the CID is eventually enforced in state court. *Id.* at 1178–79. Paxton's reading is thus at odds with the plain text of the opinion. Indeed, if the Ninth Circuit had meant to adopt the rule that pre-enforcement challenges to civil subpoenas are *per se* unripe, as Paxton urges, it would have had no occasion to discuss (at length) First Amendment retaliation principles and Twitter's insufficiently pled chill. *Id.* at 1174–79. Instead, that court held that, "[i]n the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* at 1174 (quoting *Edgar*, 2 F.4th at 310).[10]

Paxton also fails to inform the Court that *Twitter* expressly rejected much of his remaining authority. The Ninth Circuit found Paxton's reliance on *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)—a case that concerned a pre-enforcement challenge to a CID under Mississippi law, and which Paxton again cites here, Opp'n 20—misplaced because the case errantly "did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID even prior to the CID's enforcement," 56 F.4th at 1178 n.3. That is the very injury Plaintiffs have shown here. Similarly, it explained that *Reisman v. Caplin*, 375 U.S. 440, 442 (1964), did not "apply for two simple reasons: It's not about the First Amendment nor ripeness." 56 F.4th at 1178. *Reisman* involved a civil demand issued by the IRS to a couple's accountant that the couple alleged violated their rights against unreasonable

---

[10] Nor did *Twitter* hold that any chill from a CID is self-inflicted. After concluding Twitter failed to allege chill, 56 F.4th at 1174–75, the court went on to say Twitter had "not allege[d] that it ha[d] suffered *any other legally cognizable harm*," *id.* at 1175–76 (emphasis added). Specifically, Twitter complained the CID "forced it to incur financial costs and divert employee time," but the Court found *these* non-speech injuries were incurred "voluntarily in responding to the CID" since "the enforceability of the CID remain[ed] an open question." *Id.* at 1176.

seizure and self-incrimination. The Court dismissed for "want of equity"—not ripeness—finding the couple could challenge the request "on any appropriate ground" upon enforcement. 375 U.S. at 443, 449. Here, Plaintiffs' claim arises under the First Amendment and they have shown their speech is chilled *now*—not in the future when they may be compelled to turn over documents.[11]

   *Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978), also does not help Paxton. There, a coalition of journalists challenged AT&T's practice of turning over long-distance billing records to law enforcement, arguing it was required to first provide notice. *Id*. at 1036. Plaintiffs sought "extraordinary prospective relief by which they" would "be notified of any subpoena directed at their toll-call records." *Id*. at 1064. *No* document demand or subpoena, however, was actually pending against the plaintiffs. As a result, the Court found their claim sought relief tantamount to "an ongoing judicial audit of future government investigations in order to screen out [b]ad faith subpoenas." *Id*. at 1064. Here, Plaintiffs' claim does not concern the "mere possibility of future abridgment of rights," *id*. at 1070, but the *present* abridgment of such rights from a specific, ongoing investigation and intrusive Demand targeting their work.[12]

   *Laird v. Tatum*, 408 U.S. 1 (1972), is irrelevant for similar reasons. The plaintiffs there challenged the Army's domestic data-gathering system but complained of "no specific action of the Army against them" and offered only "speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause" them harm. *Id*. at 9, 13.

---

[11] Unlike the couple in *Reisman,* Plaintiffs may *not* set aside the Demand on "any appropriate ground." As Paxton emphasized in his December 29 letter, Plaintiffs have only limited bases upon which to challenge his Demand. According to Paxton, he enjoys "broad discretion" to issue a document demand unbound "by the Texas Rules of Civil Procedure"—with no showing of cause or jurisdiction—and a recipient must establish "zero permissible justifications for the investigation" to avoid responding. Branch Decl., Ex. F.

[12] The Court "accept[ed] the notion that otherwise legitimate investigative techniques" such as subpoenas "may be abused" and "can abridge journalists' First Amendment rights." *Id.* at 1067. That, of course, is this case.

Here, in contrast, Plaintiffs are "presently [] subject" to the state-sponsored retaliation they are "challenging," *id.* at 11—there is nothing speculative about that retaliation's ongoing impact on Plaintiffs. *See Clark*, 750 F.2d at 93 & n.3 (explaining the "direct injury and objective chill incurred" by the plaintiff placed the case "outside the limitations imposed by *Laird*").

Paxton's assertion that a pre-enforcement CID can *never* chill speech or supply a ripe injury is also contrary to his own prior statements about the impact of such demands. He previously acknowledged that First Amendment activity is "chill[ed]" by a CID "hanging in the air" and "stifling . . . those seeking information [] to evaluate various viewpoints in [a] public policy debate." Branch Decl., Ex. J at 6. Indeed, Paxton's prior briefing to *three* federal courts—authored by his office on behalf of Texas and other states—argued that First Amendment challenges to pre-enforcement CIDs are cognizable solely on the basis that issuance of such demands can alone unlawfully chill speech—the opposite position he urges here. *See* Branch Decl., Exs. J at 6, K at 2, L at 10. In stark contrast to his current position, Paxton told those courts that such conduct imperiled "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it." Branch Decl., Ex. K at 2; *id.*, Ex. L at 10. Paxton makes no effort to reconcile these past statements with his current position.

Finally, Paxton notes that certain categories of untrue statements do not fall within the First Amendment and claims Plaintiffs cannot show "*on this record*" that their work "was protected First Amendment activity." Opp'n 22–23. But Paxton offers nothing beyond his bare say-so to prove that Hananoki's reporting would fall within that narrow exception. Indeed, Paxton admits he has *no idea* whether X's claims are true, nor reason to believe well-established constitutional protections for speech would not apply. *See id.* at 7, 10, 19. Plaintiffs, in contrast, offer affidavits attesting to the veracity of their reporting, their adherence to journalistic standards, plus undisputed

evidence that their reporting was consistent with *a year's worth of other media coverage* about the rise of extremism on X, including the repeated placement of advertisements next to such content. Compl. ¶¶ 27–39. Paxton's response conspicuously ignores this publicly available evidence.

## IV.    The equities strongly favor issuing the requested preliminary injunction.

Paxton argues that the equities do not weigh in favor of relief by: (1) criticizing Plaintiffs for not pursuing relief under Texas law; and (2) suggesting occasional television appearances from Media Matters's President undercuts Plaintiffs' ample showing of chill. Both points are meritless.

Paxton first claims Plaintiffs' harm is self-inflicted because they did not avail themselves of a procedure under Texas law for setting aside the Demand. But doing so would have run the risk of forfeiting Plaintiffs' jurisdictional defenses in Texas court. *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998) (seeking affirmative action from court waives special appearance). Moreover, Paxton's December 29 letter not only confirms but underscores his position that baseline procedural safeguards are not available to Plaintiffs under Texas law—including the protections of the Texas Rules of Civil Procedure. Branch Decl., Ex. F; *see also* Opp'n 8 n.2 (noting Plaintiffs "do[] not have a right to understand" Paxton's "possible theories"). That is not a meaningful alternative pathway for Plaintiffs to vindicate federal constitutional rights they enjoy here in the District of Columbia.[13]

Second, the occasional television appearances by Media Matters's President noted by Paxton do not refute that the organization's editorial and reporting staff—including Hananoki— are presently self-censoring and making different journalistic decisions than they otherwise would

---

[13] Moreover, the Texas statute under which Paxton is proceeding contemplates challenges in the county where the target of the Demand "reside[s]," which—if the statute is read to apply to nonresidents—should permit challenges outside the state. Tex. Bus. & Com. Code Ann. § 17.61(g).

have, including by deciding not to publish specific articles. Those are paradigmatic examples of chill. *See Edgar*, 2 F.4th at 310. Moreover, many of those appearances were intended specifically to defend Media Matters from the litany of allegations made against it in the wake of Musk's suits and Paxton's retaliatory campaign, such as Paxton's assertion that Media Matters is "a radical left-wing organization[] who would like nothing more than to limit freedom," Compl. ¶ 6. There is a qualitative difference between an organization's leader appearing on television to defend the group from slanderous attacks and the predictable chill suffered by beat reporters like Hananoki who wish to write *new* coverage of emerging events but are reasonably fearful of doing so for fear of further retaliation. *See* Supp. Hananoki Decl. ¶¶ 3–6.[14] More importantly, it is basic First Amendment law that "a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The First Amendment forbids retaliatory "conduct that tends to *chill* such activity, not just conduct that *freezes* it completely." *Id.* Plaintiffs readily show such irreparable harm here, which counsels in favor of immediate relief from this Court.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a preliminary injunction.

---

[14] Paxton claims Hananoki reposted a tweet discussing Paxton's investigation on November 21, allegedly "after the CID was issued to Media Matters." Opp'n 10. While the Demand was "issued" late the same day, Media Matters "first received the Demand on November 22, 2023 via FedEx at its Washington, D.C. office." Mem. 3 n.1 (citing Branch Decl. ¶ 4). Indeed, the tracking slip supplied by Paxton's *own declarant* confirms that Media Matters—never mind Hananoki—first received the Demand on November 22. Fuller Decl., Ex. A ("Nov. 22, 2023 07:48"). Hananoki therefore did not know at the time that Paxton would demand he turn over his private notes and communications. *Accord* Hananoki Decl. ¶¶ 33–39 (discussing impact of Demand).

Dated: February 1, 2024

Respectfully submitted,
*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Christopher D. Dodge[Δ] (DC 90011587)
Jacob D. Shelly[Δ] (DC 90010127)
Elena A. Rodriguez Armenta[Δ] (DC 90018798)
Daniela Lorenzo [Δ+]
Omeed Alerasool[Δ] (DC 90006578)
Samuel T. Ward-Packard[Δ] (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

26

Amer S. Ahmed (DC 500630)
Anne Champion**
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Admitted *pro hac vice*
***Pro hac vice* application forthcoming
[Δ]Admitted *pro hac vice* and application for admission pending
[+]Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch