# Exhibit 2

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

IN THE CIRCUIT COURT OF COLE COUNTY
STATE OF MISSOURI

| | |
|---|---|
| STATE OF MISSOURI, ex rel.<br>ANDREW BAILEY, ATTORNEY<br>GENERAL,<br><br>    Petitioner,<br><br>v.<br><br>MEDIA MATTERS FOR AMERICA,<br><br>    Serve Registered Agent At:<br>    Angelo Carusone<br>    800 Maine Avenue SW<br>    Suite 500<br>    Washington, DC  20024<br><br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)  Case No.<br>)<br>)  Division:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PETITION FOR ORDER TO ENFORCE
## <u>CIVIL INVESTIGATIVE DEMAND</u>

The State of Missouri, by and through Attorney General Andrew Bailey,
petitions the Court pursuant to Missouri Revised Statutes section 407.090, to
enforce its Civil Investigative Demand directed to Media Matters for America
(hereinafter "Media Matters"), and upon information and belief states in
support as follows:[1]

### INTRODUCTION

Media Matters, a self-styled not-for-profit "progressive research and

---

[1] All statutory citations are to RSMo 2016 unless otherwise noted.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

information center," envisions itself monitoring, analyzing, and correcting "conservative misinformation" in the U.S. media. In fact, this description falls far short of reality for this political activist organization. Instead, rather than passively "monitoring," Media Matters has used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America.

Media Matters has pursued an activist agenda in its attempt to destroy X, because they cannot control it. And because they cannot control it, or the free speech platform it provides to Missourians to express their own viewpoints in the public square, the radical "progressives" at Media Matters have resorted to fraud to, as Benjamin Franklin once said, mark X "for the odium of the public, as an enemy to the liberty of the press." Missourians will not be manipulated by "progressive" activists masquerading as news outlets, and they will not be defrauded in the process.

Based on serious allegations of false and deceptive behavior, the Attorney General's Office has issued a Civil Investigative Demand ("CID"), as authorized by Missouri Law, to Media Matters to investigate possible violations of the Missouri Merchandising Practices Act. Because Media Matters has refused such efforts in other states and made clear that it will refuse any such efforts, the Attorney General seeks an order from the Court,

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

pursuant to section 407.090, compelling Media Matters to comply with the CID within 20 days.

## PARTIES

1.    Andrew Bailey is the Attorney General of the State of Missouri and files this petition in his official capacity pursuant to chapter 407 and section 27.060 of the Missouri Revised Statutes, as well as the authority granted to the Attorney General at common law.

2.    Respondent Media Matters is incorporated under the laws of, and has its principal place of business in the District of Columbia, and engages in media activity as well as fundraising throughout the United States, including in Missouri. Specifically, Media Matters engages in internet and email solicitations, phone solicitations, and in-person solicitations for fundraising–listing Missouri in its public financial disclosures as a state in which it "is registered or licensed to solicit contributions or has been notified it is exempt from registration."

## JURISDICTION

3.    This Court has subject matter and personal jurisdiction over this action under the Missouri Constitution Article. V, § 14 and section 506.500.

## VENUE

4.    This Court has authority over this action pursuant to section 407.090, which allows the Attorney General to file in the trial court of general

jurisdiction of a county or judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of such CID.

5.     Media Matters transacts business in this county.

## MISSOURI MERCHANDISING PRACTICES ACT

6.     Section 407.020 of the Missouri Merchandising Practices Act ("MMPA") provides in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice… Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement, or solicitation.

7.     The words in the statute are "unrestricted, all-encompassing and exceedingly broad." *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001).  "[T]he literal words cover every practice imaginable and every unfairness to whatever degree." *Id*.

8.     "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010(5).

9.   "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." § 407.010(4).

10.   "Trade" or "commerce" is defined as the "advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state." § 407.010(7).

11.   Respondent Media Matters has engaged in trade or commerce within the meaning of section 407.010.

12.   Pursuant to section 407.145, the Attorney General has promulgated rules explaining and defining terms in sections 407.010-407.145 of the Merchandising Practices Act. The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60.

13.   Section 407.040 provides in pertinent part:

> When it appears to the attorney general that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful by this chapter or when he believes it to be in the public interest that an investigation should be made to ascertain whether a

5

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

person in fact has engaged in or is engaging in any such method, act, use, practice or solicitation, he may execute in writing and cause to be served upon any person who is believed to have information, documentary material, or physical evidence relevant to the alleged or suspected violation, a civil investigative demand requiring such person to appear and testify, or to produce relevant documentary material or physical evidence or examination, at such reasonable time and place as may be stated in the civil investigative demand, concerning the advertisement, sale or offering for sale of any goods or services or the conduct of any trade or commerce or the conduct of any solicitation that is the subject matter of the investigation. Service of any civil investigative demand, notice, or subpoena may be made by any person authorized by law to serve process or by any duly authorized employee of the attorney general.

14.    Section 407.070 provides in pertinent part:

At any time before the return date specified in a civil investigative demand issued under section 407.040, or within twenty days after the civil investigative demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside the civil investigative demand, stating good cause, may be filed in the circuit court of the county where the parties reside or in the circuit court of Cole County.

**ALLEGATIONS OF FACT**

15.    On March 25, 2024, the Office of the Missouri Attorney General served upon Media Matters, through its Registered Agent, Angelo Carusone, 800 Maine Avenue SW, Suite 500, Washington DC, 20024, Civil Investigative Demand Number ("Investigative Demand") CID No. 24-10. A true and accurate copy of the Investigative Demand is attached hereto as Exhibit 1 and

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

incorporated herein. A true and accurate copy of proof of service is attached hereto as Exhibit 2 and incorporated herein.

16.     Pursuant to section 407.040, Investigative Demand No. CID No. 24-10 identified the statute of the suspected violation and the general subject matter of the investigation.

17.     Specifically, Investigative Demand CID No. 24-10 requests information relevant to whether Media Matters has engaged in or is engaging in any merchandising practices declared to be unlawful by section 407.020 with regard to Media Matters' fraudulent manipulation of data on X.com (formerly known as Twitter).

18.     The return date to produce all requested documentation and information and submit the Certification of Compliance to the Attorney General's Office is no later than 10:00 a.m. April 15, 2024.

19.     Media Matters has expressed its intent not to comply with CIDs like this one.

20.     For example, the State of Texas served on Media Matters a virtually identical civil investigative demand in December of 2023, which Media Matters refused to comply with and instead filed a lawsuit to block compliance and disclosure of information and materials. *See* Exhibit 3 (Texas CID); Exhibit 4 (Media Matters complaint); *see generally Media Matters for*

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*America, et al. v. Paxton*, 1:24-cv-00147-APM (United States District Court for the District of Columbia).

### COUNT I–REQUEST FOR ORDER ENFORCING INVESTIGATIVE DEMAND

21.    Petitioner incorporates all of the allegations contained in Paragraphs 1 through 20 above.

22.    The Attorney General has reason to believe that Media Matters has engaged in methods, acts, uses, or practices that violate chapter 407, and that it is in the public's interest that an investigation should be made.  *See* § 407.040.1.

23.    Investigative Demand CID No. 24-10 meets all of the statutory requirements of section 407.040.2.

24.    The CID does not run afoul of the statutory prohibitions of section 407.040.3, RSMo, or of the Missouri or U.S. Constitutions.

25.    Media Matters has failed or will fail to comply with the Investigative Demand CID No. 24-10, as it has expressed that it will not comply with similar investigative demands.

26.    Accordingly, Petitioner is entitled to an order pursuant to section 407.090 requiring Media Matters to produce responses to Investigative Demand CID No. 24-10.

WHEREFORE, Petitioner State of Missouri ex rel. Attorney General Andrew Bailey, prays this Court for an Order enforcing the Civil Investigative

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Demand, and ordering Media Matters to produce complete responses to Civil Investigative Demand No. 24-10 within twenty (20) days of the entry of its Order.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, MO 50387
Deputy Attorney General – Civil
Jeremiah.Morgan@ago.mo.gov
Steven Reed, MO 40616
Chief Counsel – Consumer Protection
Steven.Reed@ago.mo.gov
Kathryn Monroe, MO 76022
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800; Fax: (573) 751-0774

ATTORNEYS FOR PETITIONER

Exhibit 1

24AC-CC02291

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



ATTORNEY GENERAL OF MISSOURI

JEFFERSON CITY

65102

ANDREW BAILEY
ATTORNEY GENERAL

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

**CID NO. 24-10**

**Date:** March 25, 2024

## INVESTIGATIVE DEMAND

**THE ATTORNEY GENERAL TO:**

**Media Matters for America**
**PO Box 44811**
**Washington, DC 20026**

*Served:* *U.S. Postal Service*
*Certified Mail*

    The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

    The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

    The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

    The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

## DEFINITIONS

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind. "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise. Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto. Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

"**Relating to**", "**related to**", "**relate to**" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

"**You**", including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

## DEMAND FOR INFORMATION

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

    The list of donations should include, but is not limited to:
    - Identity of each individual or organization who donated funds;
    - Address of each individual or organization who donated funds;
    - Total amount spent per donation;
    - Date and time of each donation;
    - Payment method for each donation;
    - Identity of financial institution where funds were sent;
    - Contracts and/or agreements governing or related to each donation;

For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

3

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

## DEMAND FOR DOCUMENTS

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2.  All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3.  All documents or communications showing how solicited donations were used.

4.  All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5.  All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6.  Documents sufficient to identify your employee organizational chart.

7.  Documents sufficient to identify all your operational expenses in the state of Missouri.

8.  All documents discussing Elon Musk's purchase of X (formerly Twitter).

9.  All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

10. All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11. All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12. All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation. This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo. Your prompt response and provision of the requested information is requested.

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

6

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

STATE OF _____  )
                             ) SS.
COUNTY OF _____  )

## BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE

Before me, the undersigned authority, personally appeared
_____, who, being by me duly sworn, deposed as follows:

My name is _____, I am of sound mind, capable of
making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of _____.
Attached hereto are _____ pages of records from _____.
These _____ pages of records are kept by _____
in the regular course of business, and it was the regular course of business
of_____ for an employee or representative
of_____ with knowledge of the act, event, condition,
opinion, or diagnosis recorded to make the record or to transmit information
thereof to be included in such record; and the record was made at or near the
time of the act, event, condition, opinion or diagnosis. The records attached
hereto are the original or exact duplicate of the original.

I further certify that all documents and information required by Civil
Investigative Demand No. 24-10 which is in the possession, custody, control,
or knowledge of, _____ has been submitted to the
Missouri Attorney General as directed herein.

_____
                    Affiant

Sworn to before me this _____ day of_____, 2024.

_____
Notary Public
Commission Expires:

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| | |
|---|---|
| Certified Mail Fee | |
| $ | |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☐ Return Receipt (hardcopy) | $ |
| ☐ Return Receipt (electronic) | $ |
| ☐ Certified Mail Restricted Delivery | $ |
| ☐ Adult Signature Required | $ |
| ☐ Adult Signature Restricted Delivery | $ |
| Postage | |
| $ | |
| To | |

MAR 25 2024
Postmark
Here

Media Matters for America
P.O Box 44811
Washington, DC 20026

7017 0660 0000 8553 8055

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

24AC-CC02291
Exhibit 3



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To: Media Matters for America**  *via FedEx 7741 8756 3037*
**Return Date: December 12, 2023**

**c/o  Angelo Carusone**
**800 Maine Ave SW, Suite 500**
**Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller
Levi Fuller
Assistant Attorney General
(512) 936-1308

**Authorized Agent**
Ryan Hanlan
Investigator
(512) 936-3354

# Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;
   b. the name of each recipient, addressee, or party for whom such document was intended;
   c. the date the document was created;
   d. the date(s) the document was in use;
   e. a detailed description of the content of the document;
   f. the reason it is no longer in your possession, custody or control; and
   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;
   b. all authors of the document;
   c. all addressees of the document;
   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction.** All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship.  It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems.  The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes.  Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises.  This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices.  Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication.  This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

a. Regarding an individual, to identify that individual's:

     i. name;

     ii. current or last known telephone numbers at business and home; and

     iii. current or last known business and home addresses.

b. Regarding a person other than an individual, to identify:

     i. its full name;

     ii. the nature of its organization;

     iii. the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

     iv. its principal line of business or activity.

c. Regarding any other tangible thing, to identify:

     i. what it is, giving a reasonably detailed description thereof;

     ii. when, where, and how it was made, if applicable;

     iii. who made it, if applicable; and

     iv. its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

24AC-CC02291
Exhibit 1
Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,
P.O. Box 44811,
Washington, D.C. 20026;

*and*,

ERIC HANANOKI,
Notice of address to be filed under seal
pursuant to LCvR 5.1(c)(1),

                Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,
P.O. Box 12548,
Austin, TX 78711,

                Defendant.

Civil Action No. 24-cv-147

[CIVIL RIGHTS ACTION]

**COMPLAINT**

**(Rule 57 Speedy Hearing Request)**

## INTRODUCTION

1.     This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.     Plaintiff Media Matters for America ("Media Matters") is a Washington, D.C. based organization dedicated to comprehensively monitoring, analyzing, and correcting

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

misinformation in the U.S. media. It employs over 60 reporters, writers, and researchers, who regularly publish news articles, analysis, research, and studies about a variety of issues of great public interest. Among them are Plaintiff Eric Hananoki, Media Matters's Senior Investigative Reporter, who for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and Islamophobia—in the public square. For years, Media Matters and Mr. Hananoki have regularly published material that is critical of powerful figures, politicians, and elected officials. Their careful reporting and research work has been extensively cited and discussed by other media outlets—and even government agencies—as they have established themselves as important voices contributing to an ongoing and critical national discussion about extremism in our politics and media.

3. Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, reportedly the world's richest man, in late 2022. As Media Matters and countless others in the media have reported, as hateful rhetoric has continued to proliferate on the platform (often alongside Musk's own statements appearing to endorse extremist views and conspiracy theories), many advertisers have chosen to leave X. And much of Media Matters's reporting on the subject has come from Hananoki who, for nearly a year now, has been publishing a series of articles specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content—despite X's repeated promises that it would do just that.

4. This case arises out of an article that Media Matters and Hananoki published in November. That article was published on November 16, 2023, when Musk was in the middle of a veritable media storm resulting from his apparent endorsement on X of a fringe conspiracy theory

that postulates that Jewish people have a "hatred against whites" and support "flooding the[]

country" with "hordes of minorities." That article was titled, "*As Musk endorses antisemitic

conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-

Nazi content*," and, in it, Hananoki reported that at the same time Musk appeared to endorse this

antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi

content. His article published several examples, such as this image of an advertisement for Oracle

appearing next to an image of Adolf Hitler:



5.      Although the subject of the article—specifically X's consistent failure to protect

advertisers from their advertisements appearing alongside hate speech on the platform—had been

addressed in near-constant media coverage for over a year, Musk appeared to take personal offense

at the November 16 article, and shortly after it was published, tweeted to his 165 million followers

that X would be filing a "thermonuclear" lawsuit against Media Matters and anyone else involved

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

with the article. A mere two days later, Musk made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175, 2023 WL 8091661 (N.D. Tex. Nov. 20, 2023). Although Media Matters and Hananoki have no meaningful contacts with Texas, X chose to file this lawsuit in federal district court for the Northern District of Texas, in the face of binding precedent that merely having a website available in a state does not supply jurisdiction.

6.     On the same day that X filed that lawsuit (indeed, within minutes of its filing), Defendant Texas Attorney General Ken Paxton—another prominent public figure about whom Hananoki and Media Matters have reported in the past—announced he was launching an investigation into Media Matters, purportedly under Texas's deceptive trade practices act. *See* Ex. A, *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, Texas Att'y Gen.'s Office (Nov. 20, 2023). The press release announcing the investigation was four sentences long and identified no basis for the State of Texas to "investigate" Media Matters, a D.C.-based organization, for purported violation of Texas law. It does, however, repeatedly describe the investigation's target in troubling and nakedly partisan terms, calling Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square." It also admits that the sole bases for the "investigation" are X's own self-serving and unverified allegations about Media Matters's and Hananoki's reporting.

7.     That the "investigation" was pretext to rifle through Media Matters' internal communications and chill the reporting of Media Matters and Hananoki was proved the following day, when Paxton issued a civil investigative demand ("Demand") to Media Matters. The Demand commanding Media Matters to "produce [] documentary material[s] and permit inspection and

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

copying" of a sweeping array of materials in both Media Matters's and Hananoki's possession, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters's operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Office of the Att'y Gen. (Nov. 21, 2023) at 7. Paxton did not pause for even a moment to consider other public reporting on the same topic, or materials clearly within his office's reach, to determine either whether there was a legitimate substantive or jurisdictional basis for the investigation, before demanding these extraordinarily invasive materials from Media Matters itself. The result has been to immediately and significantly chill Plaintiffs' newsgathering, research, and reporting activities on X or Musk, by asserting an immediate, seemingly unrestrained right to any and all related materials, from now until Paxton determines the investigation is over. Ex. B at 7. And, under Texas procedure, Paxton is entitled to enforce the Demand in Texas state court *at any time*, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law.

8.      Paxton's retaliatory campaign has had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. Hananoki himself had two articles that were already researched and drafted—including one article that had gone through the entire editing process and was effectively ready for publication—at the time Media Matters received the Demand. But neither was published in the wake of the Demand. The chill on Hananoki's reporting is ongoing—he previously published one or two articles per week prior to receiving the Demand, but has published only two articles *altogether* since then, and none about Musk's handling of

political extremism on X. In the two articles Hananoki was able to publish, he has purposefully avoided commenting on X's content moderation policies, even where plainly relevant to the article.

9.    "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10.    In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities occur, where Media Matters is incorporated and has its office, where most of Media Matters's reporters and researchers live and work, and where Plaintiffs will be uniquely injured by being compelled to disclose information—to vindicate their fundamental right to gather news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

## JURISDICTION & VENUE

11.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental

6

jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12. Subject matter jurisdiction further exists under Article III because Plaintiffs have suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech.

13. This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. The District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475, n.18 (1984)).

14. The Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton procured the service of an agent—a

7

process server—and directed that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "physical entry into the State—either by the defendant in person *or through an agent*" is a "relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). Second, Paxton's Demand seeks documents from Media Matters that are overwhelmingly located in the District, where Media Matters is headquartered and where Media Matters will have to undertake any effort to comply with the Demand. By demanding such documents, Paxton has unquestionably "directed" activity at Media Matters in D.C. And Plaintiffs' claims unquestionably "arise" from those contacts because three of their claims challenge the statutory and constitutional propriety of Paxton's Demand. *See infra* Counts II–IV. Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Count I. In intentional-tort cases, "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered—in the forum state." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)), *aff'd*, No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984). Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District causing a substantial and predictable chill to Media Matters and its reporters, including Hananoki. Indeed, Paxton has conceded the Demand was "directed" at Media Matters in the District of Columbia. *See infra* ¶¶ 76–77 & note 28.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Paxton caused his

8

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Demand to be served in the District; Media Matters's compliance or noncompliance therewith will occur in the District; and the substantial chill to Plaintiffs has been suffered, in substantial part, in the District.

## PARTIES

16. Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago. Most of its reporters and employees live in and work from the Washington, D.C. metropolitan area, including in Maryland and Virginia, as well as the District itself. Nearly all of Media Matters's executive leadership lives and works in the District of Columbia. Any periodic in-person meetings, trainings, and other convenings are held at Media Matters's office space in the District of Columbia, where it also stores any physical documents.

17. Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written many articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

in Maryland. Although Hananoki primarily works from his Maryland home, he occasionally visits the Media Matters office in Washington, D.C. as part of his job responsibilities.

18.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Under Texas law, the Attorney General is not required to show any cause or even make a threshold determination that he has jurisdiction to issue a Demand—he may do so if he "believes" the recipient to be in possession of relevant material concerning a possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

### A.     Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.

19.     Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

20.     Media Matters has over 100 employees—including over 60 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where

Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Orgs. Ann. Code § 9.002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

21.    Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

22.    His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Nonetheless, since October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

11

Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee, have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

23.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

24.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked

---

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

[5] *See, e.g.*, Jonathan D. Salant, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] Eric Hananoki, "*A Texas assistant attorney general is a Qanon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020),

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.    Elon Musk purchases X and cuts back its content-moderation infrastructure.**

25.    On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

26.    Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised

---

https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

27.     Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

28.     Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately

---

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[13] *See* Makena Kelly, "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

14

following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

29. Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

30. A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

31. This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over.

---

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*," Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*," N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

15

Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[20]

32.     The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[21]

33.     More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform began appearing increasingly often alongside their advertising, creating a false association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34.     Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1.   **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2.   **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk,*" Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

---

[20] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

3.  **ARS Technica**, "*Twitter running major brands' ads with extremist tweets— until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4.  **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5.  **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6.  **The Washington Post**, "*Extremist influencers are generating millions for Twitter, report says*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7.  **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8.  **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9.  **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.  None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C.  Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.  As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37.     From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Eleven of these articles were researched and written by Hananoki. They include:

1. "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2. "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3. "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4. "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media Matters for America (July 27, 2023), https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5. "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool**," Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6. "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands**," Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7. "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account**," Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

8. "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9. "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**," Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38. Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

19

39.     Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.     Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[22] Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:

---

[22] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



41.     Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.     Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**D. Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

43.     Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

44.     Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id*.



45.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

46.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM ET), https://perma.cc/9E6L-FJGY.

47.    Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



48.    On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The four-sentence press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter— were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead of providing any substantive basis that could justify the "investigation," Paxton's press release disparaged Media Matters as "a radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

49.    Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[23]— on the Charlie Kirk Show, Paxton discussed his investigation into Media Matters, asserting that his office could "take away [Media Matters's] ability to do business in Texas[,]" and "go after"

---

[23] *See* "Charlie Kirk," Media Matters for America, https://www.mediamatters.org/charlie-kirk.

Media Matters for large amounts of money—to which Kirk replied, "I love it."[24]

50.     In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping … [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 28, 2023, 12:36 PM ET), https://perma.cc/JA55-6A8G.



51.     Paxton responded by encouraging other state attorneys general to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the

---

[24] RealAmericasVoice, "*'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.

next couple of weeks, you'll see other attorney generals [sic] look at this." Ex. C. Paxton neither disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he only even became aware of Media Matters's alleged conduct through Musk's litigation, rather than any independent investigation or work by his office.[25]

52. On November 21, 2023, the day after Paxton announced his investigation, the office of the Attorney General of Texas issued the Demand, which references and requests a broad swath of documents related to Hananoki's November 16 article. Ex. B at 7. Plaintiffs first received the Demand on November 22 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton later dispatched a process server, who attempted to serve the Demand on Media Matters at its office in the District of Columbia on November 30, 2023. The Demand was subsequently served on Media Matters's District of Columbia-based outside counsel at their Washington, D.C. office, on December 1, 2023. The Demand has a return date of December 12, 2023. *Id.* at 1.

53. Paxton's Demand, like his press release, provides no explanation for how Media Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any explanation for how Paxton could exercise the State's coercive power over them. *See generally* Ex. A; Ex. B. To date, Paxton has provided no explanation at all for how Plaintiffs may have violated Texas law, or are plausibly subject to Texas's jurisdiction, and has continued to point to Musk's allegations as the sole basis of his investigation.

54. The overbroad Demand requests that Media Matters produce "all documents related to internal and external communications relating to the article titled '*As Musk endorses antisemitic*

---

[25] *See also* Newsmax, "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*" Rumble (Nov. 21, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it.").

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*" by Eric Hananoki." Ex. B at 7. The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. *Id.*

55.    Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

56.    On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Paxton's office responded on December 29. Paxton's letter confirms he intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand

and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. The letter requested an answer by January 4, at which point counsel for Media Matters responded to Paxton's December 29 correspondence to reassert all objections to the Demand, and reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment.

**E.  Attorney General Paxton chilled, and continues to chill, Media Matters's and Hananoki's speech and reporting.**

57.  Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.  Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Draft articles he intended to publish about extremism on X were cut for fear of generating documents that would be subject to Paxton's Demand and further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership after consistently doing so for months.

59.  Hananoki's diminished reporting output is not for lack of story ideas. Since Paxton's investigation began, Hananoki has continued generating potential story ideas regarding extremist content on X but has not pursued them for fear of retaliation. This includes coverage of

27

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X account of Stew Peters, a white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki fears that reporting on these topics will draw further retaliation towards himself, his employer, and his colleagues. These story ideas are well within Hananoki's long-running beat, yet he was nonetheless chilled from reporting on these topics, at least one of which received extensive national coverage in other publications.[26] Even where Hananoki has been able to publish work, he has self-censored on the topic related to X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing former General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones's recent reinstatement on X—a plainly relevant aspect of the story.

60. Hananoki's chill is further compounded by the fear that any materials he generated in preparing such stories will end up in Paxton's hands, which calls for the ongoing production of any and all internal communications even touching upon Musk's purchase of X or X's CEO Linda Yaccarino, who has frequently made claims (undermined by Plaintiffs' reporting) that X provides

---

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

a safe platform for advertisers.[27] This same concern has even hampered Hananoki's ability to communicate internally with his editor—who is based in Washington, D.C.—for fear that their communications about story ideas will be turned over to the attorney general of a state with absolutely no connection to Hananoki's work.

61.     Prior to the Demand, Hananoki regularly posted commentary on X regarding his work, responded to other journalists' posts, and communicated with other journalists. Since Paxton issued the Demand, however, he no longer actively engages in such communications.

62.     As a direct result of Paxton's intrusive Demand, many other Media Matters reporters, writers, and researchers—many of whom live and work in the District of Columbia and surrounding suburbs—have also pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation, fearful of being ensnared in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional legal action. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. The Demand has effectively tied Media Matters's hands in reporting on these issues, even while it has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips, afraid that under Paxton's Demand it could be compelled to turn over any work performed in response.

---

[27] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

63.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

64.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on issues of hate speech on X while the Demand remains pending. Media Matters's external affairs staff have also paused sharing research regarding X and its content moderation policies with longstanding partners, refraining even from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners.

65.     Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

66.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—

further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over sensitive documents and communications, including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

67.     The scope of the Demand extends far beyond any document requests Plaintiffs may receive in X's civil suit—should that matter proceed past the pleading stage and reach discovery. Whereas X's civil suit is focused exclusively on Plaintiffs' *past* coverage of X and Musk—specifically the November 16 and 17 articles written by Hananoki—Paxton's Demand requires ongoing production of materials pertaining to *future* articles that Plaintiffs may wish to prepare, chilling their speech indefinitely. Even if X's suit reaches discovery (and given X's choice of jurisdiction and binding precedent in that jurisdiction holding a lack of jurisdiction in a similar case, it very well may not), Plaintiffs can avail themselves of the full protections of the Federal Rules of Civil Procedure which, among other protections, limit document production to "nonprivileged matter[s]" that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But according to Paxton, the Texas Civil Rules of Civil Procedure do not apply to his Demand—in other words, he may demand documents regardless of relevance, overbreadth, and proportionality.

68.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a

tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

69. Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Orgs. Code Ann § 9.002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). And, as explained, Hananoki's reporting that is the focus of Paxton's investigation occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

70. The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

71. Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state attorneys general, Paxton filed an amicus brief excoriating Massachusetts for using its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici

Curiae, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K (N.D. Tex. Sept. 8, 2016), ECF No. 63-2. Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public . . . debate." *Id.* at 3.

**F.    Plaintiffs sued Paxton to protect their First Amendment rights.**

72.    Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1. Plaintiffs filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles giving rise to Paxton's unlawful investigation. The Demand—which targets Hananoki's work and communications—sought documents created and stored at Hananoki's home in Maryland.

73.    Plaintiffs also moved for a preliminary injunction and temporary restraining order the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF Nos. 2, 20. Plaintiffs' motion—refiled on December 14, 2023 after completing service on Paxton—was fully briefed on January 2, 2024. Paxton's response offered little defense on the merits, but raised ripeness, personal jurisdiction, and venue objections.

74.    The District Court of Maryland (Xinis, J.) held a hearing on the motion on January 8. The court indicated that if it reached the question, it would likely find that Plaintiffs' claims are ripe, explaining at the outset it believed Plaintiffs had "jumped the broom on subject matter jurisdiction" and had "pled enough for this [matter] to be ripe constitutionally."

75.     The court expressed concern, however, about whether Maryland had personal jurisdiction over Paxton. The court's concern was rooted specifically in whether Paxton had awareness of Hananoki's connections to Maryland, coupled with the fact that the Demand had been formally served on Media Matters in Washington, D.C.

76.     The court expressed little doubt, however, that the District of Columbia had specific jurisdiction over Paxton. It repeatedly stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." The court even understood Paxton's "pleadings" to have "referenced that there is personal jurisdiction in D.C."[28]

77.     The court's reading of Paxton's pleadings was well-founded—his opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 16. And counsel for Paxton made the same point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*"

78.     The court did not rule on Plaintiffs' motion, or Paxton's personal jurisdiction argument, but indicated that if the parties "want a resolution that is fast and fair to both sides," they "would move it to D.C." either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. The court advised Paxton's counsel that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Despite the court's offer and

---

[28] Although Paxton's prior briefing argues the District of Columbia is not the "proper venue" for this proceeding and that he is "not subject to personal jurisdiction there," he has also argued that Media Matters "could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 18 n.5, 24.

Plaintiffs' willingness to transfer the matter to this District, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed."

79.    Accordingly, without ruling on the pending motion, the court set a briefing schedule for Paxton's motion to dismiss, through which it would further evaluate the issue of jurisdiction and, upon finding jurisdiction, evaluate the merits of Plaintiffs' motion. It advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that."

80.    While Plaintiffs continue to believe Maryland has specific jurisdiction over Paxton, and that the District of Maryland is an appropriate venue for this case, given the urgency of the relief needed, they agree with Judge Xinis's conclusion that the "fast and fair" way to resolve this dispute is by moving this matter to the District of Columbia, which also has specific jurisdiction over Paxton, where venue is also appropriate, and where both Paxton and Judge Xinis appeared to agree that jurisdiction and venue more clearly lies. Plaintiffs therefore filed a notice of voluntary dismissal of their action in the District of Maryland and have promptly refiled their complaint in this District.

## CLAIMS FOR RELIEF

### COUNT I

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

81.    Plaintiffs incorporate paragraphs one through 80 above as if set forth fully herein.

82.    Attorney General Paxton violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Paxton's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories

and further chills their ability to participate in a robust public discussion around political extremism on the X platform. Absent relief from this Court, that chill will continue so long as Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at 6.

83.    "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

84.    The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable because 'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs satisfy each element.

85.    *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women, N.Y.C Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

86. *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann.

§§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

87. *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a day after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

88. Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

## COUNT II

**Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

89. Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90. Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to

38

turn over sensitive and privileged materials, including those that impinge upon their association with other organizations.

91.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added).

92.     Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights.

93.     The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

94.     Relatedly, the Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

95.     The Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

96.     It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights.

97.     Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

98.     Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *cf. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513, (D.C. Cir. 2002) (holding that website interacting and "entering into contracts with residents of a foreign jurisdiction" subject to personal jurisdiction (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))).

99.     With the Demand's return date now past, Plaintiffs are now faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights to comply with the Demand, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them should they continue to resist the Demand. That is no true choice at all.

100.     This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

## COUNT III

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

101.     Plaintiffs incorporate paragraphs one through 100 above as if set forth fully herein.

102.     The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

103.     For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

104.     Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

105.     Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

## COUNT IV
### Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws

106.     Plaintiffs incorporate paragraphs one through 105 above as if set forth fully herein.

107.     Attorney General Paxton's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected,

confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

108. The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

109. Maryland's shield provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2).

110. To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

111. Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and

representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

112.    Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An order setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask for the following relief:

113.    Declare Paxton's Demand constitutes a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

114.    Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

115.    Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

116.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of Plaintiffs' constitutional rights.

117.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

118.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

119.     Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: January 17, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*⁺
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

45

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
ᵻAdmission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*