# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
　　　　　　　　　　　　　　　　　　　　　　　　)
**MEDIA MATTERS FOR AMERICA, et al.,** )
　　　　　　　　　　　　　　　　　　　　　　　　)
**Plaintiffs,** )
　　　　　　　　　　　　　　　　　　　　　　　　)
**v.** )　　　　　**Civil No. 24-cv-147 (APM)**
　　　　　　　　　　　　　　　　　　　　　　　　)
**WARREN KENNETH PAXTON,** )
*Attorney General of the State of Texas*, )
　　　　　　　　　　　　　　　　　　　　　　　　)
**Defendant.** )
_____)

## <u>MEMORANDUM OPINION</u>

## I.　　INTRODUCTION

On November 16, 2023, Plaintiff Media Matters for America, Inc. ("Media Matters"), a District of Columbia-based media company, published an online article written by one of its long-time journalists, Plaintiff Eric Hananoki, which reported that advertisements for major corporations were appearing next to extremist content on X.com, the social media platform formerly known as Twitter ("November 16 Article"). The story depicted multiple images of the advertisements and posts at issue. The article showed images of Adolph Hitler alongside advertisements from Apple, Oracle, and IBM, and white nationalist tweets next to advertisements from Xfinity and Bravo. X's new owner, Elon Musk, responded that the November 16 Article was a "fraudulent attack on [the] company," and he promised to file "a thermonuclear lawsuit against Media Matters[.]"

Days later, the Attorney General for the State of Texas, Defendant Warren Kenneth Paxton, announced that he was opening an investigation into whether Media Matters' reporting about X had violated Texas' Deceptive Trade Practices Act ("DTPA"). According to a press release,

Defendant "was extremely troubled" by allegations that Media Matters had "fraudulently manipulated data on X.com" in its reporting. Defendant then issued a Civil Investigative Demand ("CID"), which sought from Media Matters a host of records, including its internal and external communications about Musk's purchase of X; the company's CEO, Linda Yaccarino; and the November 16th Article. It also sought records about the company's sources of income and expenditures in Texas. Defendant hired a process server who successfully served the CID on Media Matters in the District of Columbia.

Plaintiffs are before this court seeking an order that preliminarily enjoins Defendant from enforcing the CID. Their primary claim is that Defendant has retaliated against them for exercising their First Amendment rights, which caused substantial chilling effects such as self-censorship and other disruptions of their journalistic endeavors. For his part, Defendant urges the court to reject the requested relief on various grounds: (1) lack of personal jurisdiction, (2) failure to pursue an adequate legal remedy in Texas state court, (3) improper venue, (4) failure to demonstrate a likelihood of success on the merits, and (5) absence of irreparable harm.

As explained below, the court finds that Defendant is subject to personal jurisdiction in this court, and Plaintiffs have satisfied each of the preliminary injunction factors. The court therefore grants Plaintiffs' motion for preliminary relief.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     *Media Matters and Eric Hananoki*

Plaintiff Media Matters is a non-profit research and information center that monitors and reports on misinformation and political extremism in the U.S. media landscape. Compl., ECF No. 1, ¶ 2 [hereinafter Compl.]. Media Matters is incorporated in Washington, D.C. Pls.'

Mot. for TRO & Prelim. Inj., ECF No. 4 [hereinafter Pls.' Mot.], Decl. of Cynthia Padera in Supp. of Pls.' Mot., Ex. 2, ECF No. 4-2, ¶ 7 [hereinafter Padera Decl.].  Its principal place of business and office space are in the District, as are its hard-copy records.  Padera Decl. ¶ 9.  Media Matters has no meaningful ties to the State of Texas.  Padera Decl. ¶¶ 10–14.

Plaintiff Eric Hananoki is a senior investigative reporter who has worked at Media Matters since 2007.  Pls.' Mot., Decl. of Eric Hananoki in Supp. of Pls.' Mot., Ex. 3, ECF No. 4-3, ¶ 2 [hereinafter Hananoki Decl.].  Hananoki resides in Maryland and works remotely from there, although he occasionally visits Media Matters' D.C. office.  *Id.* ¶ 3.  For more than a decade, Hananoki's work "has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia."  *Id.* ¶ 4.  As part of his reporting, Hananoki has covered the social media platform X.  *Id.* ¶ 9.  None of that work has involved speaking with Texas residents or businesses, and he has never traveled to Texas for business purposes.  *Id.* ¶ 21.

2.    *Media Matters Publishes the November 16 Article about X*

In 2022, Elon Musk acquired X.  In the wake of the ownership change, Hananoki observed a "sustained and significant surge" in extremist content on the platform.  *Id.* ¶ 10.  He reported, in nearly a dozen articles, that corporate advertisements on X were appearing alongside extremist content.  *Id.* ¶ 12 (listing articles).  Other media outlets published similar stories.  *Id.* ¶¶ 10, 13; Pls.' Mem. in Supp. of Pls.' Mot., ECF No. 4-1 [hereinafter Pls.' Mem.], at 6 (listing news stories).

One of Hananoki's articles gave rise to the present controversy.  On November 16, 2023, Media Matters published on its website an article written by Hananoki titled, "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" ("November 16 Article").  Hananoki Decl. ¶ 12.[1]  The story included

---

[1] Article available at https://perma.cc/HHX2-AT2N (last visited on April 12, 2024).

multiple images of antisemitic tweets, in some cases depicting Hitler, next to advertisements by the companies identified in the article's title. *Id.* ¶ 15.  The story also noted that the night before Musk had "endorsed the pernicious antisemitic conspiracy that Jewish people are supporting 'hordes of minorities' who are 'flooding' into the country to replace white people." *Id.* ¶ 14.

Musk responded to the article swiftly and aggressively.  On November 18, 2023, he posted on his X account that "X will be filing a thermonuclear lawsuit" against Media Matters and others "who colluded in this fraudulent attack on our company." *Id.* ¶ 16.  Then, on November 20, 2023, X filed suit against Media Matters and Hananoki, citing the November 16 Article and one other. *Id.* ¶ 18.

> 3.   *Defendant Launches an Investigation of Media Matters' Reporting on X*

Defendant Kenneth Paxton is the Attorney General for the State of Texas.  Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act, which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a).  Deceptive trade practices include "disparaging the goods, services, or business of another by false or misleading representation of facts[.]" *Id.* § 17.46(b)(8).  The DTPA authorizes the Consumer Protection Division of the Office of Attorney General to enforce the statute.  *See id.* § 17.61(a).

On November 20, 2023, the same day that X filed suit, Defendant issued a press release announcing that he was opening an investigation of Media Matters "for potential fraudulent activity" in violation of the DTPA.  Pls.' Mot., Ex. 5, Decl. of Aria C. Branch in Supp. of Pls.' Mot. [hereinafter Branch Decl.], Ex. B, ECF No. 4-5, at 13.[2]  The press release explained that Defendant "was extremely troubled by the allegations that Media Matters, a radical anti-free

---

[2] Page number references to the exhibits attached to the Branch Declaration are those generated by CM/ECF.

speech organization, fraudulently manipulated data on X.com (formerly known as Twitter)." *Id.*
The press release quotes Defendant describing Media Matters as a "radical left-wing organization
who would like nothing more than to limit freedom by reducing participation in the public square."
*Id.*

Defendant talked to the press about the investigation. He told Newsmax that his office had
learned about the controversy from Musk's lawsuit and press accounts. Pls.' Mem. at 10 n.6.
Defendant said on CNBC that he had initiated the investigation because of the "information" that
Media Matters had reported about X. Branch Decl., Ex. D, at 25. On a podcast called "The Benny
Show," Defendant "encouraged" Attorneys General of both political parties to look into Media
Matters' reporting, though he observed that Democratic Attorneys General "probably won't but
they should because they should care about free speech as much as we do." *Id.*, Ex. C, at 17.[3]
And, on another podcast a week later, Defendant described Media Matters as a "left-wing
organization" and stated he was "pretty sure that they had put hit pieces out on [him]." Hananoki
Decl. ¶ 25 (citing Tudor Dixon Podcast, Dec. 1, 2023).

    4.    *Defendant Serves a Civil Investigative Demand on Media Matters*

The DTPA grants the Attorney General various tools to investigate violations of the Act.
Among them are issuing a CID "requiring [a] person to produce [] documentary material and
permit [its] inspection and copying." Tex. Bus. & Com. Code § 17.61(a). The statue permits
service of the CID on out-of-state persons either by "delivering a duly executed copy of the demand
to the principal place of business in the state of the person to be served" or, "if the person has no
place of business in th[e] state," by "mailing by registered mail or certified mail a duly executed

---

[3] At least one Attorney General has followed Defendant's lead. On March 25, 2024, Missouri Attorney General
Andrew Bailey announced that he was serving a "virtually identical" CID on Media Matters and filing a petition to
enforce it in Missouri state court. Pls.' Notice of Mo. Att'y Gen. CID & Pet., ECF No. 36.

copy of the demand addressed to the person to be served . . . to his principal office or place of business."  *Id.* § 17.61(d)(2), (3).  The CID's recipient may petition to "modify or set aside the demand, stating good cause," in "the district court in the county where the parties reside, or a district court of Travis County."  *Id.* § 17.61(g).

The day after announcing his investigation, Defendant issued a CID, seeking a broad array of records from Media Matters.  Branch Decl., Ex. A, at 5.  The CID directed the company to produce records relating to the following:

- an employee organizational chart;

- sources of income originating in Texas;

- operational expenditures in Texas;

- internal and external communications regarding Musk's purchase of X;

- internal and external communications regarding the CEO of X, Linda Yaccarino;

- current and past X accounts under ownership or control of Media Matters;

- internal and external communications regarding the November 16 Article;

- the X accounts that Media Matters used to obtain the screenshot images used in the November 16 Article;

- the accounts, profiles, and members followed by Media Matters' X accounts referenced in November 16 Article;

- external communications with employees and representatives of X from November 1, 2023, to November 21, 2023;

- external communications with Apple, IBM, Bravo, and the various other companies identified in the November 16 Article; and,

- direct and indirect sources of funding for all Media Matters operations involving X research or publications.

*Id.* at 11.  The CID set a return date of December 12, 2023.  *Id.* at 5.  It further instructed that Media Matters could produce responsive records directly to the designated Assistant Attorney General, "[i]n lieu of producing the originals for inspection and copying at your principal place of business[.]"  *Id.* And it directed Media Matters to contact the designated Assistant Attorney General "to discuss the logistics of producing the requested documents to the [Consumer Protection] Division."  *Id.*

Media Matters received the CID on November 22, 2023, via FedEx delivery at its office in the District.  Compl. ¶ 52.  Defendant also dispatched a process server who, on November 30, 2023, attempted to serve the CID upon Media Matters at its office.  *Id.*  The agent ultimately delivered the CID to Media Matters' outside counsel, the Elias Law Group, at their D.C. office on December 1, 2023.  Branch Decl. ¶ 4.

Media Matters responded on December 12, 2023, with objections to the CID and put Defendant on notice that it would seek preliminary injunctive relief in federal court in Maryland. Branch Decl., Ex. E, at 33–35.  Media Matters asserted that Defendant lacked jurisdiction to issue and enforce the CID, the CID violated the First Amendment, and the CID's scope was overly burdensome and broad.  *Id.*  Defendant responded on December 29, 2023.  He wrote that he had "broad discretion" in determining the breadth and relevance of materials sought in a pre-litigation investigatory demand.  Branch Decl., Ex. F, at 38–39.  He said that Media Matters would need "to establish that there were zero permissible justifications for the investigation" in order to "resist the Attorney General's investigation," and that Media Matters could seek relief in Texas state court under the DTPA.  *Id.*

### B.    Procedural Background

Plaintiffs initially brought suit for injunctive relief against Defendant, in his official capacity, in the U.S. District Court for the District of Maryland on December 12, 2023. *Media Matters for Am. v. Paxton*, No. 8:23-cv-3363 (PJX) (D. Md.), ECF Nos. 1–2. That court held a hearing on January 8, 2024, which focused primarily on whether it could exercise personal jurisdiction over Defendant. The court's comments suggested that it believed that personal jurisdiction in the District of Columbia might be less controverted, prompting Plaintiffs to voluntarily dismiss that action and refile suit here on January 17, 2024. Pls.' Mem. at 19–20; Compl.

Plaintiffs assert four claims. The first three are under 42 U.S.C. § 1983 for (1) retaliation in violation of the First Amendment (Count I); (2) an overbroad CID in violation of the First and Fourth Amendments (Count II); and (3) unlawful service of the CID in violation of the Due Process Clause (Count III). Compl. at 35–42. Plaintiffs' fourth cause of action is for violations of the D.C. and Maryland reporters' shield laws. *Id.* at 42–44. Plaintiffs also sought both a temporary restraining order and a preliminary injunction. Pls.' Mot. Defendant agreed that he would not seek to enforce the CID until the court ruled on the preliminary injunction motion, thereby mooting Plaintiffs' request for temporary relief. Resp. to Order of the Ct., ECF No. 11; Minute Order, Jan. 23, 2024.

The parties' dispute centers primarily on whether the court can exercise personal jurisdiction over Defendant and whether Plaintiffs' suit is premature. Pls.' Mem. at 21–23; Def.'s Opp'n to Pls.' Mot., ECF No. 26 [hereinafter Def.'s Opp'n], at 11–19; Pls.' Reply in Supp. of Pls.' Mot., ECF No. 28 [hereinafter Pls.' Reply], at 2–15. As to the first issue, Defendant filed a sur-reply brief at the court's direction. Minute Order, Feb. 7, 2024; Def.'s Sur-Reply to Pls.' Reply,

ECF No. 30 [hereinafter Def.'s Sur-Reply].  The court held a hearing on February 15, 2024.  Hr'g Tr., ECF No. 33.  At the court's request, the parties then submitted supplemental briefing on the discrete question of whether Defendant is a "person" for purposes of the D.C. long-arm statute. Def.'s Suppl. Briefing on *Ex Parte Young*, ECF No. 34 [hereinafter Def.'s Suppl. Br.]; Pls.' Suppl. Br. in Supp. of Pls.' Mot., ECF No. 35 [hereinafter Pls.' Suppl. Br.].

## III.   LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest."  *Id.* at 20 (citations omitted).  Courts in this jurisdiction evaluate these factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citation omitted). *Winter*, however, sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors regardless. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

Here, application of the sliding scale makes no difference because the court finds that Plaintiffs have met their burden even under a more stringent application of the traditional four-factor test.  *See infra* Part IV.

## IV.   DISCUSSION

### A.   Personal Jurisdiction

The first factor—success on the merits—includes demonstrating a likelihood of successfully establishing jurisdiction.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015).  The court thus begins with Defendant's personal jurisdictional challenge.  *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510–14 (D.C. Cir. 2018) (holding that the court must determine whether it has personal jurisdiction over the defendant before reaching the merits).

To determine whether the court has personal jurisdiction over a non-resident, it engages in a two-part inquiry: "A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

### 1.   Whether Defendant Is a "Person" under the D.C. Long-Arm Statute

The court starts with a threshold question regarding the applicability of the D.C. long-arm statute.  In his sur-reply brief, Defendant argued for the first time that, because he is sued in his official capacity, he should be treated as the State of Texas for jurisdictional purposes and that, because the D.C. Circuit has held that a State is not a "person" under the District's long-arm statute, the court cannot exercise specific jurisdiction over him.  Def.'s Sur-Reply at 2–3.

That argument was far from well-developed.  Defendant made it in a single sentence with one accompanying citation.  *See id.* (citing *United States v. Ferrara*, 54 F.3d 825, 831–32 (D.C. Cir. 1995)).  Plaintiffs urge the court to treat the argument as forfeited.  Pls.' Suppl. Br. at 9–10.  The court declines to do so.  Given the threshold importance of the issue, and because the parties later fully briefed it at the court's request, the court will address the contention.  *See Smith v. United States*, No. 19-cv-324-BAH, 2022 WL 425059, at *33 (D.D.C. Feb. 11, 2022).

Defendant's argument rests on the D.C. Circuit's decision in *United States v. Ferrara*, 54 F.3d at 825.  In *Ferrara*, the United States brought suit in this court against the Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court in her official capacity, seeking to enjoin her from taking disciplinary action against an Assistant United States Attorney barred in New Mexico.  *Id.* at 827–28.  The D.C. Circuit first held that personal jurisdiction over Ferrara was lacking under the "transacting business" prong of the long-arm statue, D.C. Code § 13-423(a)(1), whose reach is co-extensive with the Due Process Clause, because Ferrara lacked the requisite "minimum contacts" with the forum.  *Id.* at 828–31.

The court also rejected the United States' alternative argument—the one relevant here—that "due process considerations [were] inappropriate in this instance" because (1) a State is not a "person" under the Due Process Clause and (2) because Ferrara was sued in her official capacity, she should be treated as if she were the State of New Mexico for due process purposes, making constitutional considerations "not relevant to the question of jurisdiction[.]"  *Id.* at 831.  The D.C. Circuit avoided "determinin[g] whether a State official sued in his official capacity should be treated as if he were a State for jurisdictional purposes because the United States could not have established jurisdiction over the State of New Mexico in the District of Columbia regardless of whether due process considerations are relevant to the inquiry."  *Id.*  The court so concluded

11

because it determined that a State is not a "person" within the meaning of the D.C. long-arm statute. *Id.* at 831–832. That conclusion hinged on the Supreme Court's articulation of the principle in *Will v. Michigan Department of State Police* that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it[.]" *Id.* at 831. (quoting 491 U.S. 58, 64 (1989)). The court in *Ferrara* also looked to the statutory definition of "person," which did not "clearly indicate" that a "person" included a State. *See id.* at 832 (quoting and citing D.C. Code § 13-421).

Defendant reads *Ferrara* to mean that the court lacks jurisdiction over him. He argues that, because he is sued in his official capacity, he should be treated as if he were the State of Texas, and therefore he is not a "person" under the long-arm statute. Def.'s Suppl. Br. at 3. Plaintiffs, on the other hand, contend that *Ferrara* explicitly declined to answer the question presented here. Pls.' Suppl. Br. at 8. They maintain that the definition of "person" encompasses Defendant under the *Ex Parte Young* legal fiction, which permits suits against a state official when the relief sought is to enjoin a constitutional violation. *See Id.* at 8–9. That fiction permits litigants to avoid the Eleventh Amendment's sovereign immunity bar. *See Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008). Applied here, Plaintiffs contend, the doctrine renders Defendant a "person" for purposes of the long-arm statute as well. *See generally* Pls.' Suppl. Br.

The court agrees with Plaintiffs that *Ferrara* does not squarely address the question presented here, and other courts in this District have recognized the same. *See West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (explaining that "[i]t is an open question in this circuit whether, under the D.C. long-arm statute, a court may exercise personal jurisdiction over an official sued under *Ex Parte Young*" and declining to answer the question); *Trump v. Comm. on Ways & Means, U.S. House of*

*Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019) (noting same open question). The court therefore must answer the question whether Defendant should be considered a "person" for purposes of the D.C. long-arm statute.

The court begins, as it must, with the statutory text. As relevant here, a "person" under the long-arm statute includes "an individual . . . whether or not a citizen or domiciliary of the District of Columbia[.]" D.C. Code § 13-421. That text does not resolve whether a state official sued in their official capacity is an "individual," but historical context provides guidance.

The Supreme Court decided *Ex Parte Young* in 1908. *See* 209 U.S. 123. The Court in *Young* held that, "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." 209 U.S. 123, 159–60 (1908). In other words, when a plaintiff seeks to enjoin an official defendant from acting unconstitutionally, such suit is "brought against the defendant not as a representative of the state but to restrain him individually from, as it is alleged, wrongfully subjecting plaintiff to such unauthorized prosecutions." *Ex Parte La Prade*, 289 U.S. 444, 455 (1933).

When Congress enacted the D.C. long-arm statute in 1970, it would have understood that the term "person" included official-capacity defendants in suits involving injunctive relief. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (stating that courts must "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent"). In *Will*, the Supreme addressed whether States and state officials acting in their official capacity are "persons" under § 1983. 491 U.S. at 60. In holding that they were not, the Court explained, "in common usage, the term "person" ordinarily does not include the sovereign, and statutes employing the word are

ordinarily construed to exclude it." 491 U.S. at 58. The Court, however, recognized an exception for suits brought against "a state official in his or her official capacity, when sued for injunctive relief." 491 U.S. at 71 n.10. Such cases "would be [against] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). That distinction "would not have been foreign to the 19th-century Congress that enacted § 1983," the Court wrote, because it was "commonplace in sovereign immunity doctrine." *Id.* Thus, the Court in *Will* imported the longstanding *Ex Parte Young* fiction into its reading of § 1983. *See id.* If the post-Civil War Congress that enacted § 1983 would have understood the term "person" to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well.

And so too would have the D.C. Circuit 25 years later in *Ferrara*. It relied on the "common usage" of the term "person," as articulated in *Will*, to interpret the D.C. long-arm statute not to reach States. *Ferrara*, 54 F.3d at 831 (citing *Will*, 491 U.S. at 64). It stands to reason that, if confronted with the question today, the D.C. Circuit would read the term "person" to include suits against an official-capacity defendant for injunctive relief, just as the Court did in *Will*.

As Plaintiffs point out, a contrary reading would upend years of settled jurisdictional understanding and significantly constrain plaintiffs' ability to sue federal officials for injunctive relief in this District Court. For instance, the term "person" also appears in the D.C. Code's general jurisdiction provision. D.C. Code § 13-422. If Defendant were correct, non-resident federal officials who maintain their primary place of business in the District would not be "persons" because they would be treated as the United States, which is not specifically enumerated as a "person" in § 13-421. Yet, it has long been understood that the court can exercise jurisdiction over

14

such federal officials under the District's general jurisdiction statute. *See Cameron v. Thornburgh*, 983 F.2d 253, 258 n.4 (D.C. Cir. 1993) (recognizing that the court had personal jurisdiction over the Director of the Bureau of Prisons under § 13-422 because his "office was located in the District"); *cf. Pollack v. Hogan*, 703 F.3d 117, 120–21 (D.C. Cir. 2012) (recognizing that sovereign immunity does not bar suits brought against federal officials for injunctive relief when the official is accused of acting beyond constitutional or statutory authority).

The same is true of a non-resident WMATA official, despite WMATA enjoying the same sovereign immunity as a State. In *Hedgepeth ex rel. Hedgepeth v. WMATA*, the D.C. Circuit rejected the WMATA general manager's assertion that he was not a "person" for purposes of § 1983 when sued only for injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State." 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004) (quoting *Will*, 491 U.S. at 71 n.10). Likewise, this court has exercised jurisdiction over federal officials acting under color of D.C. law under the same rationale. *See Roy v. Fulwood*, No. 09-cv-463-HHK, 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over the Chairman of the U.S. Parole Commission "with respect to his duties under the D.C. Revitalization Act") (citing *Fletcher v. District of Columbia*, 481 F. Supp. 2d 156, 169–71 (D.D.C. 2007).

When construing a statute, the court must read it to "avoid absurd results." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). The court must steer clear of outcomes that are both "contrary to common sense" and "absurd when considered in the particular statutory context." *Id.* Defendant's reading of the term "person" would produce "absurd results." Congress could not have intended to foreclose this District Court from hearing the types of cases described in the preceding paragraph, when for decades prior to 1970 the Supreme Court had recognized that

"official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10.  The court will not read District of Columbia law in a way that would cast doubt on decades of federal court practice and jurisdictional reach.

Defendant maintains that Plaintiffs' suit cannot be construed as anything other than one against the State of Texas because of the "*effect* of the relief sought[.]"  Def.'s Suppl. Br. at 2 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011)).  He notes that the injunctive relief requested seeks to bind not only him but also "his officers, agents, servants, and employees," thus making this a "suit that is functionally against the State."  *Id.*  But the Court in *Ex Parte Young* said otherwise.  It explained that "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."  209 U.S. at 159.  "It is simply an illegal act upon the part of a state official . . . .  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."  *Id.* at 159–60 (citation omitted).  Put differently, when a federal court restrains a state official from pursuing an unconstitutional act, it is not proscribing state action, but the unlawful conduct of a person stripped of his official protections.  Thus, the fact that an injunction here would reach not only Defendant but also his agents and employees does not make this a suit against the State of Texas.

Defendant also resorts to statutory construction, asserting that the *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of the other") and *noscitur a sociis* ("it is known by its associates") canons apply to the definition of "person" to exclude a "statewide official," like the Texas Attorney General.  Def.'s Suppl. Br. at 3–4.  These canons, however, are of no help here.  The former is context-specific and applies only when circumstances support a "sensible inference that the term left out must have been meant to be excluded." *See Chevron*

16

*U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  And the latter "requires some context cues indicating that the statutory text should be limited by its company," and "especially holds that words grouped in a list should be given related meanings."  *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir.), *cert. granted*, 144 S. Ct. 537 (2023) (internal quotation marks and citation omitted).  The definition of "person" does not support a "sensible inference" of exclusion or contain any "context cues" of limitation.  *See* D.C. Code § 13-421.

Finally, Defendant contends that reading "person" to reach him in this case "would at least raise serious federalism problems under the Constitution."  Def.'s Suppl. Br. at 4.  He notes that there are few cases of State Attorneys General being sued in out-of-state federal courts, and only one found the exercise of jurisdiction to be appropriate.  *See id.* at 5 (citing *Def. Distrib. v. Grewal*, 971 F.3d 485 (5th Cir. 2020)).  The court is sensitive to the federalism matters implicated here and does not take lightly the notion of enjoining a State Attorney General.  But *Ex Parte Young* struck the federalism balance in favor of enforcing constitutional rights in federal court against state officials.  As a panel of the Fifth Circuit observed (albeit in dicta):

> If the *Ex Parte Young* exception applies, sovereign immunity is unavailable—the official is an individual, not the State, so a sister-State court's exercising personal jurisdiction does not offend state sovereignty, even if the challenged conduct was enforcement of a state statute. This anomaly comes from the *Ex Parte Young* "fiction," not the sister State's personal-jurisdiction statute.

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 355 n.2 (5th Cir. 2021).[4]  In other words, treating a foreign state official as a "person" under a long-arm statute poses no federalism problem because under *Ex Parte Young*

---

[4] This passage from *Bulkley* was a direct response to dicta in an earlier Fifth Circuit case, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), suggesting that "the Texas [long-arm] statute offers no obvious rationale for including nonresident individuals sued solely in their official capacity under *Ex Parte Young*." *Id.* at 482–83.

a federal court's exercise of jurisdiction over a state official does not infringe upon that state's sovereignty.[5]

### 2. *Grounds for Exercising Personal Jurisdiction*

Having determined that Defendant is a "person" in this suit for purposes of the D.C. long-arm statute, the court now turns to the specific jurisdictional grounds asserted by Plaintiffs.  The D.C. long-arm statute provides, in relevant part, that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's":

> (1) transacting any business in the District of Columbia; . . .
>
> (3) causing tortious injury in the District of Columbia by causing an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code. § 13-423(a).  "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements[.]"  *GTE New Media*, 199 F.3d at 1347.  Section (a)(3), on the other hand, "is a precise and intentionally restricted tort section which stops short of the outer limits of due process."  *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (cleaned up).  Section (a)(4) likewise "stop[s] short of the outer limit of the constitutional space."  *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).

---

[5] Although rare, more than one court has found personal jurisdiction over a State Attorney General who projects himself into an outside forum.  *See Grewal*, 971 F.3d 491–96; *El Paso Water Utils.-Pub. Serv. Bd. v. Kenney*, No. EP-22-cv-460-DB, 2023 WL 4612549, at *5 (W.D. Tex. July 18, 2023); *Twitter, Inc. v. Paxton*, No. 21-cv-01644-MMC, 2021 WL 1893140, at *2–3 (N.D. Cal. May 11, 2021) (finding personal jurisdiction over Defendant in analogous case involving CID served on a California corporation); *but cf. Wercinski*, 513 F.3d at 482–487 (declining to exercise personal jurisdiction over a State Attorney General that did no more than mail a cease-and-desist letter to a Texas real estate agency about its marketing activities in the Attorney General's own state); *Bulkley & Assocs.*, 1 F.4th at 352–55 (same).

Plaintiffs claim to have established personal jurisdiction under subsections (a)(1), (a)(3), and (a)(4).  Pls.' Reply at 2.  The court agrees as to subsections (a)(1) and (a)(3) and thus does not reach subsection (a)(4).

a.  <u>The "transacting business" prong</u>

1.  *Minimum contacts analysis*

Because the "transacting business" prong has been interpreted to reach the fullest extent permitted by the Due Process Clause, the statutory and constitutional analyses "merge[s] into a single inquiry."  *Ferrara*, 54 F.3d at 828.  Due process is satisfied if there are "minimum contacts" between the defendant and the forum such that the defendant "should reasonably anticipate being haled into court there[.]"  *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 287, 297 (1980)).  "Such minimum contacts must show that 'the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with notions of 'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, (1945)).[6]

First, the court finds that Defendant invoked the benefits and protections of the District's laws when he "caused" service of the CID in the District of Columbia "through a professional

---

[6] To satisfy subsection (a)(1), the "claim of relief" also must "aris[e] from" the person's transacting of business in the District.  D.C. Code § 13-423(b).  The D.C. Court of Appeals has interpreted the "arise from" language of § 13-423(b) "flexibly and synonymously with 'relate to' or having a 'substantial connection' with[.]'"  *Shoppers Food Warehouse*

process service." Def.'s Opp'n, Decl. of Ass't Att'y Gen. Levi Fuller, Ex. 1, ECF No. 26-1, ¶ 3 [hereinafter Fuller Decl.].  Courts have found that the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the "minimum contacts" requirement.  *See Schleit v. Warren*, 693 F. Supp. 416, 419–20 (E.D. Va. 1988) (so holding under Virginia law); *Balsly v. W. Michigan Debt Collections, Inc.*, No. 11-cv-642-DJN, 2012 WL 628490, at *5–7 (E.D. Va. Feb. 27, 2012) (same); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) (so holding under Michigan law).  Courts also have held that a person who arranges for personal delivery of process in a State "purposely avail[s] themselves of the privilege of serving process in [the State]."  *Hori*, 520 F. Supp. at 70.  As one court has put it: "it [is] reasonable to conclude that a lawyer who knowingly serves abusive process in a jurisdiction . . . is 'purposely avail[ing] himself of the privilege of conducting activities within the forum State.'" *Schleit*, 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)).  Defendant's hiring of a process server in the District of Columbia to effect service on Media Matters therefore created the requisite jurisdictional contacts with the District. *See Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982) ("Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so.") (citations omitted).

Second, Defendant reasonably should have anticipated being haled into court here because the CID established a future course of dealing with a D.C. resident.  *Cf. Burger King*, 471 U.S. at 478 (eschewing "mechanical tests" to determine whether an agreement with a forum resident

---

*v. Moreno*, 746 A.2d 320, 335 (D.C. 2000).  Defendant does not make any argument about § 13-423(b).  But even if he had, Plaintiffs' suit plainly "relates to" or has a "substantial connection" with Defendant's hiring of a process server to personally serve the CID on Media Matters in the District.

creates the requisite contacts and looking instead at the contract terms and the parties' actual dealings).  Defendant knew that the CID would require negotiations with Media Matters' counsel, who is based in the District.  Branch Decl., Ex. F, at 38–40.  If Media Matters ultimately agreed to produce records, it could have elected to have Defendant's representatives come to the District to inspect and copy those records.  *See* Tex. Bus. & Com. Code § 17.61(e).  If the investigation continued beyond the CID, Defendant might have sought to interview Media Matters leadership or employees, with such interviews possibly occurring in the District.  And perhaps Defendant would have tried to compel sworn testimony.  *Id.* § 17.60(2) (authorizing the Attorney General to "examine under oath any person in connection with this alleged violation").  By targeting a D.C.-based entity for investigation and demanding records from it, Defendant committed himself to a potentially long course of dealing in the District.  In such circumstances, Defendant should have reasonably foreseen that he would be called into court here.[7]

Third, asserting jurisdiction here is reasonable "in the context of our federal system of government."  *World-Wide Volkswagen*, 444 U.S. at 293 (quoting *Int'l Shoe*, 326 U.S. at 317). The Fifth Circuit's decision in *Grewal* provides a close analogy to this case.  There, the Fifth Circuit concluded that Texas state courts had personal jurisdiction over the Attorney General of New Jersey, who had sent a Texas-based business, which published "materials related to the 3D printing of firearms," a letter "threatening action if [it] published its files."  *Grewal*, 971 F.3d at 488–89, 497.  The court found that the letter created sufficient minimum contacts with the State of Texas because the Attorney General not only sought not merely to enforce New Jersey law but "halt [the company's] activity nationwide, including activity that had no connection to New Jersey

---

[7] Defendant's service of the CID is analogous to a subpoena served under Federal Rule of Civil Procedure 45, which permits the subpoena's recipient to quash or modify the subpoena in the federal district court where it resides.  *See* Fed. R. Civ. P. 45(d)(3).  Like a party that issues a Rule 45 subpoena to an out-of-state person, Defendant should have reasonably expected to appear in Media Matter's home forum.

property or residents." *Bulkley & Assocs.*, 1 F.4th at 353–54 (citing *Grewal*, 971 F.3d at 492). The court reasoned that "Grewal's letter had a chilling effect on the exercise of [the plaintiffs'] First Amendment rights . . . .   That chilling effect, in turn, caused [the plaintiffs] to cease publication and reduced Texans' access to materials the plaintiffs seek to publish . . . .   In this sense, Grewal created contacts with Texas and not just the plaintiffs." *Grewal*, 971 F.3d at 495 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

That same rationale applies here.   Defendant promised to "vigorously enforce" the Texas DTPA against Media Matters for "fraudulent acts" with no apparent connection to Texas.   Branch Decl., Ex. B at 13.   His issuance of the CID had the effect of chilling Plaintiffs' expressive activities nationwide, which deprived D.C. residents access to Plaintiffs' reporting.   The national implications of Defendant's actions were compounded by his calling upon other Attorneys General to investigate Media Matters. *See id.*, Ex. C, at 17.   Thus, like the New Jersey Attorney General in *Grewal*, Defendant "projected himself across state lines and asserted a pseudo-national executive authority" that makes exercising jurisdiction over him reasonable and does not offend principles of federalism. *Grewal*, 971 F.3d at 493.

### 2.    *Defendant's contentions*

Defendant offers three main arguments as to why the "transacting business" prong is inapplicable, but none is persuasive.   First, he argues that "transacting business" requires some "'commercial or business-related activity' directed towards D.C. persons."   Def.'s Sur-Reply at 1 (quoting *Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017)).   He concedes that "negotiating or performing contracts" counts, *id.* (quoting *Trump*, 415 F. Supp. 3d 107), but declares without citation that "hiring a process server does not qualify." *id.*

"It is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted).  Defendant's hiring of a process server to hand-deliver the CID did "cause a consequence here": it legally obligated Media Matters to produce records to Defendant absent court intervention.  Tex. Bus. & Com. Code § 17.61(h).  Such effect is not "too remote or too trivial to be regarded as a consequence" of Defendant's contractual activity.  *Cf. Cockrell v. Cumberland Corp.*, 458 A.2d 716, 718 (D.C. 1983) (holding that the plaintiff's "writing of a check on a District of Columbia bank" did not suffice to invoke § 13-423(a)(1)).

In any event, Defendant cites no appellate authority from the D.C. Circuit or the D.C. Court of Appeals for the proposition that only strictly commercial activity qualifies as "transacting business."  And persuasive authority from Maryland that pre-dates enactment of the D.C. long-arm statute rejects Defendant's narrow reading.  *See Mouzavires*, 434 A.2d at 991 (observing that "Congress intended to vest courts of the District with jurisdictional reach identical to that in effect in Maryland[.]").  In 1967, Maryland's highest court held that a non-profit had sufficient contacts with the state when it regularly employed an agent to inspect a racing track to certify it according to the organization's standards.  *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 23 (Md. 1967).  In so holding, the court observed that "acts done within a State which will support in personam jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State."  *Id.* (quoting *Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 821 (Md. 1966)).  The D.C. Circuit has since cited favorably to *Novack*.  *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *id.* at 932–33 (Wright, J., concurring) (citing *Novack* for

the proposition that "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit").  Thus, the sole relevant appellate authorities interpreting the "transacting any business" prong have rejected the rigid commercial–non-commercial distinction Defendant proposes.  *See id.* (Wright, J., concurring) (opining that Interpol's activities in the District of Columbia constituted "transacting any business").

Second, Defendant notes that he lacks "a continuing corporate presence" in the District.  Def.'s Sur-Reply at 1–2 (citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981).  But an ongoing course of conduct is not necessary to satisfy § 13-423(a)(1).  *See Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008).  Even "'a single act may be sufficient to constitute transacting business,' so long as the contact is 'voluntary and deliberate, rather than fortuitous.'"  *Id.* at 1093 (quoting *Mouzavires*, 434 A.2d at 992, 995).  Defendant's single act of hiring a process server to conduct his business in the District was "voluntary and deliberate."  Fuller Decl. ¶ 3.

Finally, citing the D.C. Circuit's decision in *Thompson Hine LLP v. Taieb*, Defendant argues that "simply retaining a process server to serve papers on a D.C. plaintiff is insufficient to establish personal jurisdiction."  Def.'s Sur-Reply at 4–5 (citing 734 F.3d 1187, 1194 (D.C. Cir. 2013)).[8]  In *Thompson Hine*, the D.C. Circuit held that a non-resident who hired a law firm with a D.C. office, and whose lawyers in the District worked on the matter, without more, had not done business in the District.  734 F.3d at 1191–95.  The court so held because of the "quality and nature" of the non-resident client's activities.  That is, he never purposely availed himself of the privilege of conducting activities in the District.  *Id.* at 1193–94.  To buttress this conclusion, the

---

[8] Defendant makes this argument in connection with his discussion of subsection (a)(3), but *Thompson Hine* has nothing to do with that subsection.  It is a "transacting business" case.  *Thompson Hine*, 734 F.3d at 1189.  So, the court addresses the argument here, where it belongs.

court quoted from the D.C. Court of Appeals' opinion in *Environmental Research International, Inc. v. Lockwood*: "The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within the jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws." *Id.* (quoting 355 A.2d 808, 812 (D.C. 1976)).  Defendant bases his argument on his quote.  Def.'s Sur-Reply at 5.

*Thompson Hine* is inapposite, however.  In *Thompson Hine*, the non-resident client signed the retainer agreement outside the District, the engagement related to a matter in Oregon, and nothing in the retainer required the firm to perform work or receive payment in the District. 734 F.3d at 1192.  Further, the Oregon matter was supervised by Atlanta-based lawyers and the record contained no communications between the client and D.C.-based counsel.  *Id.*  Here, by contrast, Defendant contracted with the process server to carry out a specific task in the District of Columbia directed at a District resident and, presumably, directed the server's fee here.  That action was purposefully aimed at the District, and the work contracted for had a direct nexus to this forum, unlike the retainer agreement for legal services in *Thompson Hine*.  Defendant's business here was more than the "mere" retention of professional services.[9]

b.   Causing tortious injury by an act in the District

The court also finds that it can exercise jurisdiction over Defendant under subsection (a)(3) of the long-arm statute, which reaches a non-resident who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]"  D.C. Code § 13-423(a)(3). Application of that provision is, in a sense, straightforward: Defendant's service of process,

---

[9] In passing, Defendant cites *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987), to confusingly argue that claims alleging tortious injury "do not fit [the transacting business] description."  Def.'s Sur-Reply at 2.  But the "transacting business" prong requires no showing of injury in the District of Columbia, whether tortious or otherwise.  And, even if it did, as will be discussed, Media Matters has made such showing.

through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests. And, although subsection (a)(3) falls short of the outer perimeter of the Due Process Clause, in the tort context, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious[] actions' 'expressly aimed' at a jurisdiction," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Calder*, 465 U.S. at 789), and the effects of those actions in the District of Columbia are not "some 'fortuitous' or 'unilateral' choice of the plaintiff's," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). That is precisely the circumstance here, as Defendant's intentional service of the CID is the act that caused chilling effects in the District. *Cf. Ferrara*, 54 F.3d at 829–30 (holding that *Calder* did not apply where the action arose from the attorney's "preexisting relationship" as a member of the New Mexico Bar).

Still, Defendant contends that he committed no act in the District of Columbia. Def.'s Opp'n at 13–15. That is not correct. The process server's in-forum acts are imputed to him as his "agent." D.C. Code § 13-423(a); *see also Walden*, 571 U.S. at 285. For that reason, Defendant's reliance on cases involving limited telephonic or electronic communications with a District resident or the mere mailing of matters into the District is misplaced. Def.'s Opp'n at 14 (citing *Slate v. Kamau*, No. 20-cv-3732 (BAH), 2021 WL 3472438, at * 6 (D.D.C. Aug. 6, 2021) (holding that such mailing is not an "act . . . in the District of Columbia" for purposes of subsection (a)(3)); *Dyson v. Dutok Ragen Homes & Invests.*, No. 21-cv-2280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022) (holding that "one text message, a single email, and two phones calls" initiated from outside the District were not acts "in the District")).

The better analogy, as Plaintiffs submit, is to those cases holding that subsection (a)(3) is satisfied when abusive service of process causes injury within the forum. Pls.' Reply at 6–7. The

Fourth Circuit, for instance, has held that "if an out-of-state defendant causes abusive process to be served upon an in-state plaintiff, and the plaintiff subsequently sues the defendant in plaintiff's state . . . , personal jurisdiction exists over the out-of-state defendant." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982). Numerous district courts have held the same. *See, e.g.*, *Guest v. Provident Funding Assocs.*, No. 12-cv-224, 2013 WL 1003524 (WHR), at *4 (S.D. Ohio March 13, 2013); *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F. Supp. 2d 173, 178 (D. Mass. 2008); *Schleit*, 693 F. Supp. at 420–22; *Balsly*, 2012 WL 628490, at *6; *Hori*, 520 F. Supp. at 70.

Defendant resists the force of these authorities on the grounds that, in those cases, "the service itself was tortious because the claim in question was service of *abusive* process," whereas "the CID functioned as an **official act** of a state law enforcement officer as part of an investigation." Def.'s Sur-Reply at 4 (emphasis in original). The court finds that factual distinction unpersuasive. In both cases, it is the act of service that caused the alleged injury, whether ordinary tortious injury in the abuse-of-process cases or a constitutional one as alleged here. The fact that service here is an official act is not dispositive. It gave rise to Plaintiffs' claims and, under *Ex Parte Young*, Defendant enjoys no immunity for the act.

Next, Defendant cites *Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016), for the proposition that under subsection (a)(3) the injury cannot be part of the tort "because such a theory would obliterate subsection (3)'s careful distinction between 'injury' and 'act.'" Def.'s Opp'n at 14 (quoting 812 F.3d at 1107). That principle has no application here. It arises only in the context of defamation or libel actions in which the alleged tortious act takes place outside the District, and the plaintiff claims that an act took place in the District because of a subsequent publication here. *Forras*, 812 F.3d at 1107. In such circumstances, subsection (a)(3) is inapplicable because the

tortious act and injury are one and the same.  *See id.*  That simply is not the case here, where there is an identifiable act (physically serving the CID on Media Matters) that is separate from the claimed injury (chilling of First Amendment rights).

## B.    No "Justiciable Injury"

Having determined that Plaintiffs are likely to be successful in establishing personal jurisdiction, the court turns to the remaining threshold issues.

Defendant contends that "Media Matters has suffered no judicially cognizable injury." Def.'s Opp'n at 19.  Defendant's argument is based on the Supreme Court's opinion in *Reisman v. Caplin*, 375 U.S. 440 (1964), which, he says, stands for the proposition that "an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it," Def.'s Opp'n at 19 (arguing that "*Reisman* is now widely understood as having 'announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas'") (quoting *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984)).  He thus contends that *Reisman* forecloses Media Matters from "seek[ing] pre-enforcement review of the CID in federal court." Def.'s Opp'n at 20.  In the same section of his brief, Defendant quotes from the Ninth Circuit's decision in *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), a similar case in which Twitter moved in federal court in California to oppose a CID that Defendant had served on it.  The Ninth Circuit wrote there that "Twitter has not suffered an Article III injury because the CID is not self-enforcing."  Def.'s Opp'n at 20 (quoting *Twitter*, 56 F.4th at 1176).  For that same reason, Defendant argues, "Media Matters has suffered [no] cognizable injury."  *Id.*

Defendant's argument conflates two distinct concepts: an adequate remedy at law and Article III standing.  The first is an equitable principle, and the latter a constitutional one.  *Reisman* concerns the adequacy of an alternative remedy and has nothing to do with justiciability.  *Twitter*,

28

by contrast, is about standing and has nothing to do with the adequacy of an alternative remedy. In any event, both arguments are wrong.

### 1. Alternative Adequate Remedy at Law

In *Reisman*, attorneys for two taxpayers sued the Internal Revenue Service ("IRS") Commissioner and an accounting firm that had been working on their client's financial records. *See* 375 U.S. at 440. The IRS had issued summonses to the accounting firm calling for the accountants to provide testimony and to produce reports, correspondence, and other materials relating to the taxpayers. *Id.* at 441–42. Their attorneys moved to enjoin the summonses, arguing that "the enforced production of" the requested papers was "an unlawful appropriation of [their] work product and trial preparation as well as an unreasonable seizure[.]" *Id.* at 442. The Court concluded that the "comprehensive procedure of the [IRS] Code, which provides full opportunity for review," either before an administrative hearing officer or a district court, provided adequate remedies that did not warrant judicial interference where the IRS had done no more than issue the summonses. *Id.* at 450. The Court would later make clear that *Reisman* had nothing to do with justiciability requirements. In *Donaldson v. United States*, the Court said that it had held in *Reisman* "that the petitioner-attorneys possessed an *adequate remedy at law* and that the complaint, therefore, was subject to dismissal." 400 U.S. 517, 539 (1971) (emphasis added).

Thus, properly framed, Defendant's argument is as follows: *Reisman* compels dismissal both because his office has not sought to enforce the subpoena and because the Texas Code provides an adequate remedy, permitting Plaintiffs to file an action to modify or set aside the CID in state court in Travis County, Texas. Def.'s Opp'n at 19–20 (citing Tex. Bus. & Com. Code § 17.61(g)).

*Reisman* is inapplicable for two reasons.  First, the sole alternative remedy identified here is judicial relief in a foreign forum.  According to Defendant, Media Matters, which is a D.C. resident, would have to go to Texas state court to obtain relief.  *See id.*  Defendant has not cited any authority holding that an exclusive remedy in foreign state court is an adequate remedy at law.  In *Reisman*, the remedy that the Court found to be sufficient involved review before an administrative hearing officer and, if the Commissioner moved to enforce the summons, before a district court "for the district *within which the person so summoned resides or is found*[.]"  375 U.S. at 447 n.7 (emphasis added).  The Texas Code contains no equivalent remedies for a non-resident challenging a CID.

Second, "[t]his case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."  *Twitter*, 56 F.4th at 1178.  "The key to the holding in *Reisman*," the Ninth Circuit explained in *Twitter*, "was that there had not yet been an injury: The Court held that the remedy specified by Congress (to challenge the document request) 'suffer[ed] no constitutional invalidity."  *Id.* (quoting *Reisman*, 375 U.S. at 450).  Not so here.  As will be discussed below, Plaintiffs' constitutional injury—the chilling effect on their First Amendment rights—has occurred and is ongoing.  Plaintiffs cannot "avoid that alleged injury by challenging the document request" in Texas state court.  *Id.* at 1179.  *Reisman* thus does not compel denying injunctive relief.

### 2.    *Cognizable Injury*

Defendant says this case is identical to *Twitter*.  Def.'s Opp'n at 20.  As in that case, Defendant argues, Plaintiffs have suffered no injury because the CID is not self-enforcing and, to the extent they claim a First Amendment injury, any such injury is "self-inflicted[.]"  *Id.* at 21

(quoting *Twitter*, 56 F.4th at 1176) (internal quotation marks omitted).  Defendant is wrong on both counts.

Where, as here, a plaintiff brings a claim of First Amendment retaliation, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression."  *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)) (internal quotation marks omitted); *see also Twitter*, 56 F.4th at 1174 (citing *Edgar*, 2 F.4th at 310); *Cooksey*, 721 F.3d at 236 (finding justiciable injury where a state official informed plaintiff that she had "statutory authority" to seek an injunction against him if he did not edit his diet-advice website and plaintiff alleged "speech-chilling uncertainty about the legality of private conversations and correspondence").  The chill must be "objectively reasonable."  *Edgar*, 2 F.4th at 310 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Through sworn affidavits, Plaintiffs have demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission.  Media Matters' Editor-in-Chief, Benjamin Dimiero, declares that the CID has "dramatically changed [his] team's editorial processes[.]"  Pls.' Mot., Decl. of Benjamin Dimiero in Supp. of Pls.' Mot., Ex. 4, ECF No. 4-4, ¶ 16 [hereinafter Dimiero Decl.].  Dimiero describes a "new culture of fear" amongst Media Matters staff about research and reporting.  *Id.*  For example, he avers that the editorial team and leadership now engage in "greater internal scrutiny and risk calculation" when approaching stories that they otherwise would have published after their normal vetting process, such as stories about media coverage of the Defendant's anti-abortion actions in Texas.  *Id.*  Dimiero further states that other stories, such as one concerning content moderation decisions made by X, "may go unreported on

entirely." *Id.* "There is," he says, "a general sense among our team and organization that we must tread very lightly[] and be careful not to cross lines that would jeopardize our work or our employees' safety . . . because of concern that certain reporting could make us a target for further retaliation." *Id.*

According to Dimiero, since Defendant announced the investigation, "Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation." *Id.* ¶ 17. Absent the CID, Media Matters would have coordinated follow up research and reporting on Hananoki's November 16 Article, as well as the one that appeared the next day. *Id.* ¶ 18. Media Matters, for instance, "received several tips from people who have seen advertisements for prominent brands placed alongside extremist content," but has limited the scope of its reporting on the subject "for fear of additional retaliation." *Id.* Furthermore, Media Matters otherwise would have published at least two additional articles on the topics of Hananoki's reporting, but his team withheld them due to concerns of further legal action. *Id.* ¶ 19. Writers have expressed concerns that their investigations could serve as the basis for retaliatory legal action and that their work product might be subject to investigative demands. *Id.* ¶ 22; *see also* Padera Decl. ¶¶ 23–24 (same). Media Matters' leadership and editorial team have since assumed a more significant role in publishing decisions, which "has significantly slowed down [their] editorial and publication process." Dimiero Decl. ¶ 21. Media Matters has been taking these steps out of fear of retaliation, not out of legitimate concerns about fairness or accuracy. *Id.* ¶ 16.

The CID also has adversely impacted Hananoki. According to Hananoki, the CID has forced him to curtail his investigation and coverage of X out of fear of harassment, threats, and retaliation. Hananoki Decl. ¶ 29. His editors explicitly have told him that, because of the

investigation, Media Matters will not publish work that he already has prepared regarding Musk and extremism on X. *Id.* ¶ 30. That includes two pieces concerning X's placement of advertising alongside antisemitic, pro-Nazi accounts. *Id.* ¶ 31. And though he has generated story ideas on related topics, he has "self-censored," *id.* ¶ 34, and "not pursued them due to the fear of further legal retaliation," *id.* ¶ 32. According to Hananoki, the CID also has impeded his relationship with his editor and others at Media Matters, because of concern that their internal communications regarding story ideas could be subject to the CID. *Id.* ¶¶ 33, 35. As a result, Hananoki's reporting has appeared less frequently online. Media Matters used to publish Hananoki's work approximately once or twice a week. Dimiero Decl. ¶ 20. Between the CID's issuance on November 22, 2023, and mid-January 2024, Media Matters had published only two of his articles. *Id.*

Defendant has not challenged these concrete and particularized declarations, and they are what distinguish this case from *Twitter*. Whereas Twitter's complaint and declarations "[did] not quite show chilled speech," Plaintiffs here have offered ample evidence of the chilling effects of the investigation and CID. *Cf.* 56 F.4th at 1175. Moreover, the "self-inflicted" injuries the Ninth Circuit said were insufficient to establish standing were not about self-censorship, but about the "financial costs and diverted employee time" that Twitter expended to produce some records "voluntarily[.]" *Id.* at 1176. And the Ninth Circuit said that Twitter had "not suffered an Article III injury because the CID is not self-enforcing" in order to make the point that in the posture of that case, Twitter's claimed injuries were speculative and "may never occur." *Id.* Here, however, Plaintiffs have offered ample evidence of injury, so the fact that the CID is not self-enforcing is of no moment.

The other cases to which Defendant cites are similarly inapposite.  In *Google v. Hood*, the Mississippi Attorney General issued an administrative subpoena, seeking information on Google's platforms, advertising practices, and efforts to police illegal content.  822 F.3d 212, 218–19 (5th Cir. 2016).  Google filed suit, seeking a preliminary injunction and alleging that the Attorney General's investigation violated Google's immunity under the Communications Decency Act and its Fourth and First Amendment rights.  *Id.* at 219–20.  Addressing the First Amendment claim, the Fifth Circuit observed: "A preliminary injunction is not appropriate [] unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Id.* at 227–28 (internal quotation marks omitted).  The Fifth Circuit did not have before it, as here, self-censorship and other chilling effects experienced by a media organization and journalist.  *See id.* at 228; *see also Twitter*, 56 F.4th at 1178 n.3 (explaining that the *Google v. Hood* "court did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID").

For this same reason, this case does not present the concern expressed by Judge Wilkey in *Reporters Committee for Freedom of Press*, and relied on by Defendant, that "[a]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith as to violate that right."  Def.'s Opp'n at 1 (quoting 593 F.2d 1030, 1070 (D.C. Cir. 1978)).  The "person" here is a press organization and a journalist, and they have presented the "real and imminent prospect" of harm that Judge Wilkey demanded.  *Reps. Comm. for Freedom of Press*, 593 F.2d at 1070.

Finally, *Laird v. Tatum*, 408 U.S. 1 (1972), offers Defendant no help.  *See* Def.'s Opp'n at 21.  There, the plaintiffs claimed that an Army data-gathering system chilled their First Amendment rights.  *Laird*, 408 U.S. at 13.  The Court rejected this claim because it amounted to

34

a "disagree[ment] with the judgments made by the Executive Branch," and they had presented only an amorphous "subjective 'chill'" and not "a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14. Those are not the facts here.

Accordingly, there is no Article III impediment to the court hearing this case, and Plaintiffs are not required to turn to a state court in Texas for relief.

### C.    Venue

Defendant makes a half-hearted argument that venue is not proper in the District. Def.'s Opp'n at 21–22. Venue is proper here because a "substantial part of the events . . . giving rise to the claim," 28 U.S.C. § 1391(b)(2), occurred here: physical service of the CID on Media Matters and the chilling effect that ensued, *see Twitter, Inc. v. Paxton*, No. 21-cv-01644 (MMC), 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (same).

### D.    Likelihood of Success on the Merits

The court now turns to Plaintiffs' likelihood of success on the merits. Although Plaintiffs argue that they have established a likelihood of success on all of their claims, Pls.' Mem. at 23–40, the court only addresses one: First Amendment retaliation. To prevail on that claim, a plaintiff must show that (1) they engaged in conduct protected under the First Amendment; (2) "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). On this record, Plaintiffs have proven each of these elements.

*Protected Conduct.* Plaintiffs' reporting on matters of public concern are core First Amendment activities. *See N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment

has long been settled by our decisions."); *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up).

Defendant nevertheless contends that, because Hananoki's articles were "deliberately designed" to mislead, they are not "constitutionally protected." Def.'s Opp'n at 23. Oddly, he cites to a Lanham Act case and a Federal Trade Commission Act case for that proposition, which have no application here. *Id.* (citing *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250 (D.D.C. 1997); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)).

*Objective Deterrence.* Defendant's investigation of Media Matters is "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again[.]" *Aref*, 833 F.3d at 258. Defendant makes no contrary argument, Def.'s Opp'n at 23, so the court treats as conceded the sufficiency of Plaintiffs' proof as to this element, *see Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Still, the court explains why Plaintiffs prevail regardless. "[T]he threat of invoking legal sanctions" is sufficient to deter protected speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). So, too, is the "threat of administrative and judicial intrusion into newsgathering and editorial process" that arises from official process and its possible enforcement. *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (internal quotation marks omitted). The Texas Code authorizes the Attorney General to seek restraint of future conduct and the imposition of civil penalties of up to $10,000 per violation in a Texas state court if he has "reason to believe"

Plaintiffs violated the DTPA.  Tex. Bus. & Com. Code § 17.47(a), (c).  He also can seek to have Plaintiffs held in contempt in Texas state court for not complying with the CID.  *Id.* § 17.62(c). These potential punitive consequences, as well as possible judicial intervention to enforce the CID, make Plaintiffs' claim of chilled expression objectively reasonable.

There is more.  "The compelled production of a reporter's resource materials can constitute a significant intrusion . . . [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"  *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980).  The CID seeks such records.  It demands "internal and external communications . . . regarding Elon Musk's purchase of X," X's CEO "Linda Yaccarino," and Hananoki's November 16 Article, as well as external communications with "employees and representatives of X" and the various companies that were the subject of the November 16 Article for a three-week period. Branch Decl., Ex. A, at 11.  The compelled disclosure of such "research materials poses a serious threat to the vitality of the newsgathering process."  *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995).  And, of course, Plaintiffs' actual self-censorship in response to the announced investigation and the CID "provides some evidence of the tendency of [Defendant's] conduct to chill First Amendment activity."  *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). The court need not repeat that uncontested evidence here.

*Causation.*  To establish causal link, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  Defendant's initial press release establishes that Defendant opened an investigation of

Media Matters in response to its protected media activities.  Branch Decl., Ex. B, at 13.  Also, Defendant's description of Media Matters as a "radical anti-free speech" and "radical left-wing organization" and his encouraging of other Attorneys General to look into Media Matters' reporting is evidence of retaliatory intent.  *See supra* Section II.A.3.

Defendant has not responded to Plaintiffs' causation evidence.  *See* Def.'s Opp'n at 22–23. Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation.  By remaining silent, he has conceded the requisite causal link.  *See Day*, 191 F. Supp. 2d at 159.

### E.   Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted).  "A preliminary injunction is not appropriate, however, unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (cleaned up).  In *National Employees Treasury Union*, the D.C. Circuit rejected a request for injunctive relief where nothing in the record evinced that the plaintiffs would have "cease[d] speaking or writing before the district court resolve[d] their constitutional challenges."  *Id.* at 1255.  There is no such absence of evidence here.  As discussed above, the investigation and the CID have caused Plaintiffs to self-censor when making research and publication decisions, adversely affected the relationships between editors and reporters, and restricted communications with sources and journalists.  Plaintiffs have amply "demonstrate[d]

some likelihood of a chilling effect on their rights" to justify preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

Defendant asserts that Plaintiffs' claimed harm is not irreparable because it is "self-inflicted," as they have not taken the "opportunity to avail themselves of a regulatory scheme [under the DTPA] to avoid the very harm for which they seek injunctive relief[.]"  Def.'s Opp'n at 24 (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)).  But that argument fails to recognize that Plaintiffs are *already* suffering First Amendment harm in the form of chilled protected activities.  Plaintiffs' "constitutional injury has already occurred; there is no way for it to avoid that alleged injury by challenging the document request" in Texas state court. *Twitter*, 56 F.4th at 1179.  Only injunctive relief will "prevent the [ongoing] deprivation of free speech rights." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003)).

Defendant also contends that it is "factually untrue" that Media Matters has had its expression chilled, citing television appearances by Media Matters' President, in which he has defended the organization's reporting and "doubled down" on the accuracy of the X images contained the November 16 Article.  Def.'s Opp'n at 24; Fuller Decl., Exs. E & F, at 24–39.  But this argument asks too much of Plaintiffs.  They "need not show that the government action led them to stop speaking 'altogether,'" only that it would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Edgar*, 2 F.4th at 310 (quoting *Benham* 635 F.3d at 135).  Therefore, the fact that Media Matters' President has publicly defended its work does not mean that Plaintiffs have not suffered irreparable harm.

### F.      Balance of Equities and the Public Interest

The balance of equities and the public interest favor Plaintiffs.[10]  Defendant has not identified any resulting harms to his interests if the court imposes an injunction.  Def.'s Opp'n at 25.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]"  *Pursuing Am.'s Greatness*, 831 F.3d at 511. Defendant does not argue otherwise.  Def.'s Opp'n at 25.  The court thus finds that the final two *Winter* factors support awarding injunctive relief.

## V.      CONCLUSION

For the foregoing reasons, the court grants Plaintiffs' motion for a preliminary injunction, ECF No. 4.  The Order accompanying this Memorandum Opinion sets forth the terms of the injunction. Fed. R. Civ. P. 65(d).

Additionally, because Defendant has moved to dismiss on the very same grounds that he has opposed injunctive relief, Def.'s Mot. to Dismiss, ECF No. 31, that motion is denied.


Dated:  April 12, 2024                                             Amit P. Mehta
                                                                   United States District Judge

---

[10] The court does not presume here that Defendant's interest and the public interest are one and same, *cf. Pursuing Am.'s Greatness*, 831 F.3d at 511, as federalism considerations may create some daylight between the two factors.