IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, | |
| ERIC HANANOKI, | Civil Action No. 24-cv-147 |
| Plaintiffs, | |
| v. | **(EXPEDITED HEARING REQUESTED)** |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AGAINST BAILEY**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I. In 2023, under Musk's ownership, advertisements frequently appeared on X alongside racist, antisemitic, and violent content. .......................................................... 2

II. Media Matters and Hananoki reported on X's pattern of permitting the placement of advertisements alongside extremist content.................................................................. 5

III. Texas Attorney General Ken Paxton issued a retaliatory civil investigative demand to Media Matters, but this Court enjoined its enforcement................................................. 7

IV. Missouri Attorney General Andrew Bailey issued a copycat demand, moved prematurely to enforce it in Missouri state court, and served abusive discovery. ........ 9

V. Bailey's actions have chilled Plaintiffs' First Amendment–protected activities by subjecting them to a retaliatory investigation in a foreign jurisdiction. ..................... 15

LEGAL STANDARD ........................................................................................................... 17

ARGUMENT ........................................................................................................................ 17

I. This Court has personal jurisdiction over Bailey in his official capacity as Attorney General of Missouri. .................................................................................................. 17

   A. The Court has long-arm jurisdiction over Bailey. ............................................. 17

   B. The Court has constitutional personal jurisdiction over Bailey........................ 23

II. Media Matters and Hananoki are likely to prevail on the merits of their claims........ 25

   A. Plaintiffs are likely to establish that Bailey retaliated against their constitutionally protected activities in violation of the First Amendment. ...... 25

   B. Plaintiffs are likely to establish that Bailey's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws.................. 32

   C. Plaintiffs are likely to establish that the legal process against them in Missouri violates due process due to a lack of contact with that state. ........................... 36

III. Plaintiffs will suffer irreparable harm absent an order restraining Bailey's investigation and efforts to enforce his Demand. ...................................................... 37

IV. The remaining equitable factors strongly favor granting preliminary relief.............. 38

CONCLUSION...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*,
  333 F.3d 168 (D.C. Cir. 2003) ......................................................................33

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ...............................................................................33

*Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*,
  64 F.4th 1354 (2023) ..................................................................................25

*Anderson v. Reilly*,
  691 F. Supp. 2d 89 (D.D.C. 2010) ..............................................................25

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) .............................................25, 27, 28, 31

*Bice v. Bernstein*,
  No. 93-CA-22258, 1994 WL 555379 (Md. Cir. Ct. Apr. 20, 1994).............35

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ...................................................................................36

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) ...................................................................................36

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .......................................................................................33

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ...................................................................................37

*Calder v. Jones*,
  465 U.S. 783 (1984) ...................................................................................24

*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) .....................................................................38

*Constantine v. Rectors & Visitors of George Mason Univ*,
  411 F.3d 474 (4th Cir. 2005) .....................................................................27

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) .....................................................................29

*Crawford-El v. Britton,*
    93 F.3d 813 (D.C. Cir. 1996) ......................................................................25

*Def. Distrib. v. Grewal,*
    971 F.3d 485 (5th Cir. 2020) ................................................................21, 24

*El Dia, Inc. v. Rossello,*
    165 F.3d 106 (1st Cir. 1999) ......................................................................25

*Equitable Tr. Co. v. State Comm'n on Human Relations,*
    411 A.2d 86 (Md. 1980) ..............................................................................35

*Experience Works, Inc. v. Chao,*
    267 F. Supp. 2d 93 (D.D.C. 2003) ..............................................................17

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
    264 U.S. 298 (1924) ....................................................................................33

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    592 U.S. 351 (2021) ....................................................................................36

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002) ......................................................................39

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    564 U.S. 915 (2011) ..............................................................................36, 37

*Grunseth v. Marriott Corp.,*
    868 F. Supp. 333 (D.D.C. 1994) ................................................................35

*Hartley v. Wilfert,*
    918 F. Supp. 2d 45 (D.D.C. 2013) ..............................................................27

*Hartman v. Moore,*
    547 U.S. 250 (2006) ....................................................................................25

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.,*
    386 F.3d 1148 (D.C. Cir. 2004) ..................................................................25

*Heller v. Nicholas Appelgate Cap. Mgmt. LLC,*
    498 F. Supp. 2d 100 (D.D.C. 2007) ............................................................23

*IMAPizza, LLC v. At Pizza Ltd.,*
    334 F. Supp. 3d 95 (D.D.C. 2018) ..............................................................23

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ....................................................................................36

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ....................................................................38

*Klayman v. Obama*,
    142 F. Supp. 3d 172 (D.D.C. 2015) .............................................................39

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) .......................................................................34

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) .........................................................................39

*Lewis v. Mutond*,
    568 F. Supp. 3d 47 (D.D.C. 2021) ..............................................................23

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
    667 F.2d 267 (2d Cir. 1981) ........................................................................34

*Major League Baseball v. Crist*,
    331 F.3d 1177 (11th Cir. 2003) ...................................................................34

*Marcus v. Search Warrants*,
    367 U.S. 717 (1961) ....................................................................................33

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) .....................................................................24

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ....................................................................................38

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. 1981) ...........................................................................19

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ....................................................................................33

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................1, 26

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ................................................................................31

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................17

*Ohio v. EPA*,
    No. 22-1081, 2024 WL 1515001 (D.C. Cir. Apr. 9, 2024).........................18

*Okla. Press Publ'g Co. v. Walling*,
    327 U.S. 186 (1946) ........................................................................................ 32

*Pebble Ltd. P'ship v. EPA*,
    310 F.R.D. 575 (D. Alaska 2015) .............................................................. 32, 34

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ........................................................................ 32

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ........................................................................................ 25

*Playboy Enters. v. Meese*,
    639 F. Supp. 581 (D.D.C. 1986) ..................................................................... 28

*Ports Petroleum Co. of Ohio v. Nixon*,
    37 S.W.3d 237 (Mo. 2001) ............................................................................. 14

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
    573 F. Supp. 3d 1021 (D.S.C. 2021) .............................................................. 39

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................. 17, 38

*Roth v. United States*,
    354 U.S. 476 (1957) .................................................................................. 26, 38

*Schleit v. Warren*,
    693 F. Supp. 416 (E.D. Va. 1988) .................................................................. 20

*Shoen v. Shoen*,
    48 F.3d 412 (9th Cir. 1995) ............................................................................ 28

*Shoppers Food Wearhouse v. Moreno*,
    746 A.2d 320 (D.C. 2000) .............................................................................. 22

*Snoeyenbos v. Curtis*,
    60 F.4th 723 (4th Cir. 2023) ........................................................................... 27

*Stanford v. Texas*,
    379 U.S. 476 (1965) ........................................................................................ 33

*Tech. Patents, LLC v. Deutsche Telekom AG*,
    573 F. Supp. 2d 903 (D. Md. 2008) ............................................................... 29

*Thompson Hine, LLP v. Taieb*,
    734 F.3d 1187 (D.C. Cir. 2013) ..................................................................... 19

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) ................................................................26

*Turner v. U.S. Agency for Global Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020) .........................................29

*United States v. Ferrara*,
  54 F.3d 825 (D.C. Cir. 1995) ....................................................19

*Urquhart-Bradley v. Mobley*,
  964 F.3d 36 (D.C. Cir. 2020) ....................................................22

*Vishay Intertech., Inc. v. Delta Int'l Corp.*,
  696 F.2d 1062 (4th Cir. 1982) ..................................................23

*Walden v. Fiore*,
  571 U.S. 277 (2014) ...........................................................23, 37

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ..................................................29

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................17

*Ex parte Young*,
  209 U.S. 123 (1908) ..................................................................17

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978) ...........................................................32, 34

**Statutes**

28 U.S.C. § 2201 ............................................................................25

28 U.S.C. § 2202 ............................................................................25

D.C. Code § 13-421 ....................................................................8, 17

D.C. Code § 13-422 ........................................................................18

D.C. Code § 13-423(a)(1) ...............................................................18

D.C. Code § 13-423(a)(3) ...............................................................18

D.C. Code § 13-423(b) ...................................................................21

D.C. Code § 16-4702 ......................................................................35

D.C. Code § 16-4703 ......................................................................35

Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(1).............................................................35

Md. Cts. & Jud. Proc. Code Ann. § 9-112(c)(2)............................................................35

Mo. Rev. Stat. § 351.572.................................................................................................16

Mo. Rev. Stat. § 407.020.................................................................................................16

Mo. Rev. Stat. § 407.040..........................................................................................10, 20

Mo. Rev. Stat. § 407.080.................................................................................................28

Mo. Rev. Stat. § 407.090.................................................................................................13

Mo. Rev. Stat. § 407.472.................................................................................................10

## INTRODUCTION

This motion turns on questions the Court has already answered. On March 25, 2024, Missouri Attorney General Andrew Bailey issued a civil investigative demand (the "Missouri Demand" or "Demand") to Plaintiff Media Matters for America. Less than three weeks later, this Court entered a preliminary injunction against a civil investigative demand (the "Texas Demand") issued by Texas Attorney General Ken Paxton. According to Bailey himself, he is coordinating with Paxton in his "war" against Media Matters and his Missouri Demand is "virtually identical" to Paxton's Texas Demand. Bailey's lawless investigation, like Paxton's before it, is a frontal assault on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs come to this Court once again seeking immediate relief to safeguard their constitutionally protected speech and press rights. The Court should take Bailey at his word about the nature of his investigation and grant Plaintiffs an immediate temporary restraining order against Bailey, as well as a preliminary injunction providing the same relief the Court has already granted against Paxton.

The few differences in the circumstances giving rise to the instant motion only make the need for relief against Bailey more apparent. Bailey moved prematurely to enforce his Demand by filing a state-court enforcement petition (the "Petition") *before Media Matters was even aware of the Demand*. Media Matters must respond in that action just days from now, on April 29. Bailey then doubled down on his abusive tactics by serving Media Matters with "Requests for Production" in the Missouri action that would require Plaintiffs to comply with nearly all the Demand's substance before his enforcement action is even resolved. These bad-faith tactics and Bailey's retaliatory Demand and Petition have caused and are causing Plaintiffs irreparable harm. Only the immediate entry of a temporary restraining order, followed by a preliminary injunction, will stave off further injury pending full and final resolution of the merits.

## BACKGROUND[1]

I. **In 2023, under Musk's ownership, advertisements frequently appeared on X alongside racist, antisemitic, and violent content.**

Elon Musk completed his purchase of the social media platform now known as X on October 27, 2022. He purchased the platform, purportedly, because of his belief that "it is important to the future of civilization to have a common digital square."[2] After taking control, Musk laid off approximately 80 percent of the platform's staff and downsized or eliminated critical teams responsible for overseeing platform policy, trust and safety, communications, and ethical AI. Compl. ¶ 26, ECF No. 1. He likewise laid off many of the content moderators responsible for keeping the platform free of harassment. *Id*. Musk's changes raised public alarm and sparked concern amongst lawmakers over the platform's ability to combat misinformation and hate speech.[3]

Under the auspices of promoting "free speech," Musk also suspended products and policies that protected users from misinformation and violent content. Compl. ¶ 27. He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists reporting on his air travel. *Id*. In the wake of Musk's breakneck changes to the social media platform, extremist, racist, antisemitic, and violent content surged on X. *Id*. ¶ 28. Within the first 12 hours of Musk's takeover, there was "a nearly 500% increase in the use of the

---

[1] Although the Court is already familiar with much of the relevant background, including Musk's takeover of Twitter/X and Plaintiffs' subsequent reporting about extremism on that platform, Plaintiffs repeat some of that background here to ensure a fulsome record with respect to the claims against Bailey.

[2] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[3] Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*].

N-word." *Id.* Within the first week, use of the word "Jew" increased fivefold with antisemitic content receiving the most engagement. *Id.* Within just two months, the *New York Times* reported the following about the rise in hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."
- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."
- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."

*Id.* ¶ 29. The platform likewise saw a renewed explosion of baseless conspiracy theories concerning, among other things, COVID-19 vaccines and QAnon. This spike in violent and extremist content on X, as well as Musk's drastic management changes, were widely reported on by a broad array of media outlets at the time. *Id.* ¶ 34 (collecting sources).

These developments quickly led to advertisers leaving the platform. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[4] The result was a precipitous drop in X's revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" and, in September, reported that advertising revenue was "still down 60%."[5] Still

---

[4] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3; Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership,* Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk.

[5] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3.

more advertisers began to flee X when the increasing hateful and violent rhetoric started appearing

alongside their advertising, creating a false association between their brands and vile hate speech.

X's inability to control the placement of extremist content alongside advertisements was

widely reported in the media, beginning soon after Musk's takeover. Examples include:

1. **Reuters**, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022) ("Advertisers are grappling with Twitter's new ownership under Tesla boss Elon Musk, who once tweeted 'I hate advertising.'").

2. **Washington Post**, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022) ("Ads from dozens of major brands were appearing on white nationalist and extremist accounts.").

3. **ARS Technica**, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022) ("[T]he US Department of Health and Human Services realized its promoted tweet about updated COVID vaccines was appearing on Twitter pages of white nationalist accounts.").

4. **The Verge**, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022).

5. **Center for Countering Digital Hate**, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 2023) ("[J]ust ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter.").

6. **Washington Post**, "Extremist influencers are generating millions for Twitter, report says," Taylor Lorenz (Feb. 9, 2023).

7. **Kansas City Star**, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Mar. 15, 2023) ("CNN reported on Thursday that in the past 24 hours it had spotted ads on X, formerly called Twitter, for the University of Missouri and major brands, such as Amazon, Samsung, Cox Communications and others, on the profile page of VDARE, a racist outlet.").

8. **Business Insider**, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023) ("Ads for Disney, ESPN, the NBA, Adobe, and Microsoft appeared . . . next to vitriolic white supremacist content.").

9. **New York Post**, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023) ("Neo-Nazi propaganda continues to find a home on Twitter and is adjacent to ads from major companies.").

Compl. ¶ 34. This coverage occurred independently of Plaintiffs' reporting efforts, reflecting the

widespread interest and discussion around hate speech in America's "digital town square."

II.    **Media Matters and Hananoki reported on X's pattern of permitting the placement of advertisements alongside extremist content.**

Since 2004, Media Matters has reported on misinformation and bias in the media. As part of its mission to educate the public about violent extremism and political rhetoric, Media Matters began researching and reporting on the rise in extremist and fringe content on X after Musk's changes to the platform. Eric Hananoki, a Senior Investigative Reporter at Media Matters whose beat includes political extremism, has for over a decade researched and written about extremist and violent rhetoric on social media platforms, often shining a spotlight on politicians and other public figures in the process. Declaration of Eric Hananoki ("First Hananoki Decl.") ¶¶ 2, 4, 6–9, ECF No. 4-3. His reporting has been widely cited and discussed in America's largest news outlets. *Id.* ¶ 5. And government agencies and public officials have relied on it in their work, including in a Department of Justice indictment, the Mueller Report on Russian interference in the 2016 election, and a bipartisan U.S. Senate Select Committee on Intelligence report. *Id.* ¶ 6. Even Paxton has previously relied on Hananoki's reporting. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats" and conspiracy theories from an Assistant Attorney General in Texas, prompting Paxton's office to fire the employee. *Id.* ¶ 8.

Hananoki has reported on X—and before that, Twitter—for nearly a decade. *Id.* ¶ 9. In 2023, he wrote numerous articles about X concerning the marked increase in extremism on the platform after Musk's takeover. *Id.* ¶¶ 10–12. Hananoki's research and reporting has often focused on what advertisements X's users may encounter on the platform. *Id.* ¶ 12. Since February 10, 2023, Media Matters has published at least fourteen articles about X's placement of advertisements alongside hateful content, most of which were researched and written by Hananoki. Declaration of Benjamin Dimiero ("First Dimiero Decl.") ¶ 12, ECF No. 4-4. They include:

1.    "Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers," (Feb. 10, 2023).

2.   "Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers," (June 8, 2023).

3.   "Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group," (June 22, 2023).

4.   "Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account," (July 27, 2023).

5.   "Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool," (Aug. 8, 2023).

6.   "X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands," (Aug. 11, 2023).

7.   "Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account (Aug. 16, 2023).

8.   "X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11," (Sept. 11, 2023).

9.   "X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates," (Sept. 12, 2023).

10.  "X is placing ads for the NFL on prominent white nationalist accounts," (Sept. 27, 2023).

11.  "X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts," (Oct. 12, 2023).

12.  "Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing," (Nov. 13, 2023).

13.  "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," (Nov. 16, 2023).

14.  "X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags," (Nov. 17, 2023).

Media Matters's reporting is consistent with the findings of other news sources—in the wake of Musk's purchase (and regardless of his intent), the X platform continued to allow the juxtaposition of advertisements alongside extremist content. *Id.* ¶ 13; *see also* First Hananoki Decl. ¶ 13. Hananoki employed ordinary and unremarkable investigative journalistic practices to investigate this issue, using an existing X research account controlled by Media Matters to follow white supremacist accounts and gauge how X's automated advertising algorithm would respond. Compl. ¶¶ 39–40.

Hananoki's November 16, 2023, article reported the results of his investigatory work, providing public examples of X's advertisement placement alongside extreme content and reporting on Musk's apparent endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities." First Hananoki Decl. ¶ 14. In researching, fact checking, and drafting the November 16 article, Hananoki complied with Media Matters's policies and used ordinary journalistic practices. First Dimiero Decl. ¶¶ 7, 11–12. Hananoki typically works from home in Maryland, but sometimes visits Media Matters's District of Columbia office for work-related purposes. First Hananoki Decl. ¶ 3.

In the months since this action was filed, reporting by other outlets has continued to bolster Hananoki's findings. For instance, just a few weeks ago, on April 16, NBC News released a report finding that at least "150 paid 'Premium' subscriber X accounts and thousands of unpaid accounts have posted or amplified pro-Nazi content on X in recent months, often in apparent violation of X's rules[.]" Ex. 1, Second Supplemental Declaration of Eric Hananoki ("Third Hananoki Decl.") ¶ 13.[6] NBC News found adds running on 74 of those 150 accounts, and cited Hananoki's earlier reporting about the same issue. *Id.*

## III. Texas Attorney General Ken Paxton issued a retaliatory civil investigative demand to Media Matters, but this Court enjoined its enforcement.

Despite a year's worth of reporting by Media Matters and other outlets on X's inability to protect advertisers from extremist content, Musk singled out Hananoki's November 16 article reporting on Musk's apparent endorsement of an antisemitic conspiracy theory, for which Musk

---

[6] Quoting David Ingram, *Verified pro-Nazi X accounts flourish under Elon Musk*, NBC News (Apr. 16, 2024), https://www.nbcnews.com/tech/social-media/x-twitter-elon-musk-nazi-extremist-white-nationalist-accounts-rcna145020.

also received widespread condemnation by other news outlets. First Hananoki Decl. ¶¶ 14, 16–18. Two days after the article was published, with direct reference to Hananoki's article, Musk posted on X that he would file "a thermonuclear lawsuit against Media Matters." *Id.* ¶ 16.

Certain conservative media and political figures—nearly all themselves prior subjects of Media Matters's reporting on political extremism—quickly urged retaliation against Media Matters. In particular, on November 19, 2023, President Trump's former advisor Stephen Miller declared, "There are 2 dozen+ conservative state Attorneys General," implying states should investigate Plaintiffs for their journalism. Compl. ¶ 46. Texas Attorney General Ken Paxton answered the call, announcing in a November 20, 2023, press release that he was launching an "investigation" into Media Matters under Texas's deceptive trade practices act, and issuing a sweeping civil investigative demand for Media Matters's internal and journalistic documents one day later, under the auspices of the same "investigation." ECF No. 4-5 at 5–13.

Plaintiffs filed this action on January 17, 2024, naming Paxton as the sole defendant. One day later, Plaintiffs moved for a temporary restraining order and preliminary injunction against Paxton. ECF No. 4. After Paxton confirmed that his office would take no steps to enforce the Texas Demand while the preliminary injunction motion was pending, ECF No. 11, the Court entered a Minute Order on January 23 denying the request for a temporary restraining order as moot. The Court then held a hearing on the preliminary injunction motion on February 15, and thereafter ordered supplemental briefing on whether Paxton, when sued in his official capacity, is a "person" within the meaning of the District of Columbia's personal jurisdiction statute, D.C. Code § 13-421.

On April 12, 2024, this Court granted a preliminary injunction against Paxton preventing him from taking any steps to enforce the Texas Demand or issue further demands. ECF Nos. 37,

38. In doing so, the Court made various factual determinations, including that Paxton's issuance of the Texas Demand "had the effect of chilling Plaintiffs' expressive activities nationwide" and had "deprived D.C. residents [of] access to Plaintiffs' reporting." Mem. Op. at 22, ECF No. 37 (hereinafter "PI Op.").

IV.   **Missouri Attorney General Andrew Bailey issued a copycat demand, moved prematurely to enforce it in Missouri state court, and served abusive discovery.**

Paxton was not the only state attorney general to respond to Stephen Miller's call for retaliation against Media Matters. On November 19, 2023, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' coverage of Musk and extremism on X. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



Bailey subsequently issued a "Notice of Pending Investigation" on December 11, 2023, demanding that Media Matters preserve certain documents. ECF No. 39-3. But Bailey never formally served that Notice, instead electing only to email it to the generic email inbox "action@mediamatters.org." His press release announcing the Notice provided no explanation as to what possible basis he had for investigating or exercising jurisdiction over Media Matters, yet nonetheless lambasted the organization as a group of "progressive tyrants." ECF No. 39-4 at 4.

Although Bailey did not immediately take further retaliatory steps, he continued to attack Media Matters publicly. In one interview, on a YouTube show called "Cancel This!," Bailey claimed that "Media Matters is built on lies . . . It's a radical, progressive, tyrannical advocacy

group masquerading as a news outlet." Third Hananoki Decl. ¶ 5.[7] He then described Media Matters as a weapon of "the enemy." *Id.* In another interview, on Newsmax, Bailey voiced no disagreement when host Rob Schmitt remarked about Media Matters that "these people are evil" and "these people should be deported for this." *Id.*[8] In a third interview, Bailey indicated that he had "coordinated with Texas," and was "in talks with other states as well" as part of the "new front in the war, in the fight for free speech." *Id.*[9]

Then, on March 25, 2024, months after this lawsuit was filed but before the preliminary injunction motion against Paxton was resolved, Bailey copied Paxton's playbook by issuing a civil investigative demand of his own. Missouri law grants Bailey the power to issue such demands in several narrow contexts. *See, e.g.*, Mo. Rev. Stat. § 407.040 (Merchandising Practices Act); *id.* § 407.472 (Charitable Organizations and Solicitations Act). As in Texas, the Missouri Attorney General is not required by statute to show probable cause or establish jurisdiction before issuing a civil investigative demand. Rather, state law authorizes him to do so, among other reasons, whenever he "believes it to be in the public interest that an investigation should be made." *Id.*

Bailey's Demand, like Paxton's, seeks to rifle through Media Matters's most sensitive internal documents—donor records, internal correspondence, and journalistic source material—in retaliation for Media Matters's reporting about X. *See* ECF No. 39-5. Among other things, it seeks names, home addresses, and donation amounts for Missouri-based donors to Media Matters;

---

[7] Quoting Cancel This!, *It's A Color-Coded Christmas Party for This Boston Mayor + Andrew Bailey & Nelson McIlveen LIVE!*, YouTube at 1:41:27–1:43:05 (Dec. 14, 2023), https://www.youtube.com/watch?v=xDFXO1MjIME.

[8] Quoting Rob Schmitt Tonight, Newsmax at 40:54–42:00 (Dec. 12, 2023), https://www.newsmaxtv.com/Shows/Rob-Schmitt-Tonight/vid/52639c50-996a-11ee-a4f2-5b4ee1ed8474.

[9] Quoting Tim Jones & Chris Arps Show, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, NewsTalkSTL at 5:32–58 (Dec. 12, 2023), https://omny.fm/shows/newstalk-stl/mo-a-gandrew-bailey-missouri-doesnt-have-sanctuar.

internal communications about sources and uses of donated funds; internal communications about strategy; and confidential source information related to Mr. Hananoki's reporting. *Id.* at 4–5. The Missouri Demand is, like the Texas Demand, incredibly broad in scope; for instance, it seeks several categories of documents without imposing any temporal limits on the requested production. *See id.*

The Missouri Demand is materially very similar to the Texas Demand, and in many respects is a word-for-word copy. Indeed, Bailey has described the Missouri Demand as "virtually identical" to the Texas Demand. ECF No. 39-6 ¶ 20. For instance, the Texas Demand sought "all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023." ECF No. 1-4 at 7. The Missouri Demand similarly seeks "[a]ll communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024." ECF No. 39-5 at 5.[10]

Substantial evidence indicates that Bailey issued the Missouri Demand—and then immediately moved to enforce in court—to harass and retaliate against Plaintiffs, rather than for any good-faith investigative reason. For example, although more than three months passed

---

[10] This Court has previously noted the close relationship between the two investigations. In its decision enjoining Paxton, the Court noted that Bailey had "followed [Paxton's] lead" by "serving a 'virtually identical' CID on Media Matters and filing a petition to enforce it in Missouri state court." PI Op. at 5 n.3.

between Bailey's Notice of Pending Investigation and his issuance of the Missouri Demand, Bailey apparently expended little investigative effort in that time. Neither the Missouri Demand nor the Petition seeking to enforce it identifies *any* new facts regarding Media Matters that have come to light in the three months since Bailey first announced that he was "looking into" Media Matters's reporting. Both documents simply regurgitate the vague and groundless accusations leveled at Media Matters in the Notice. Similarly, Bailey's press release announcing the escalation in harassment was short on facts and long on baseless invective directed at Media Matters and Hananoki. Among other things, it characterized Media Matters as a "political activist organization," described its reporting on X as "an "attempt to destroy X, because they [sic] cannot control it," and described its reporters as "radical 'progressives'" and ""progressive' activists masquerading as news outlets [sic]."  ECF No. 39-7 at 4. And although Hananoki himself has not previously reported on Bailey, Bailey has, like Paxton, been the subject of critical reporting from Media Matters.[11] Bailey's Demand, much like Paxton's, thus reeks of opportunistic retaliation.

The sequence of events surrounding issuance of the Missouri Demand confirms that it is being used as a tool of harassment (and a failsafe against suspension of the Texas Demand), rather than for any good-faith investigative purpose. The Missouri Demand had a return date of April 15, 2024. ECF No. 39-5 at 3. Media Matters received the Demand by certified mail on April 1, 2024. Ex. 2, Supplemental Declaration of Cynthia Padera ("Second Padera Decl.") ¶ 6. Remarkably, Bailey filed an enforcement petition against Media Matters in Missouri state court on March 25—the same day he issued the Missouri Demand, a full *week* before Media Matters had even received

---

[11] *E.g.*, Payton Armstrong, *On Salem Media, Jenna Ellis and Missouri Attorney General Andrew Bailey push states to ban health care for trans people*, Media Matters for Am. (Aug. 31, 2023). https://www.mediamatters.org/salem-media-group/salem-media-jenna-ellis-and-missouri-attorney-general-andrew-bailey-push-states.

the Demand in D.C., and several weeks before the return date. *See* ECF No. 39-6. That Petition, citing this case, claims an immediate enforcement action is appropriate because Media Matters has previously resisted Paxton's Demand. *Id.* ¶ 20. On Bailey's view, because Media Matters chose to vigorously defend its constitutional rights against Paxton rather than capitulate to his bullying, Bailey is free to disregard the basic dictates of due process—and even Missouri state law, *see* Mo. Rev. Stat. § 407.090—by enforcing a Demand without even serving it. This rush to court further illustrates that Bailey issued the Missouri Demand chiefly to harass and punish Media Matters, rather than for any bona fide investigatory purpose. Indeed, as noted below, Bailey was fully aware of the case pending before this Court, and thus likely engineered the Missouri "investigation" as a backup should Paxton's virtually identical Demand be enjoined.

Bailey served the Petition by dispatching a process server to Media Matters's D.C. office on March 28, 2024. Second Padera Decl. ¶ 8. By that point, Bailey was well aware that such an action would likely subject him to this Court's jurisdiction. Plaintiffs had made Paxton's similar dispatch of a process server to serve his Demand the crux of their jurisdictional arguments to this Court. And Bailey was following this case closely—he relied on Plaintiffs' arguments in this case to rationalize his premature move to enforce his Demand. ECF No. 39-6 ¶ 20.

Although Bailey's Demand purports merely to be investigating Media Matters, the Petition goes much further, affirmatively alleging that Media Matters "has used fraud to solicit donations from Missourians." *Id.* at 2. But the Petition provides zero factual support for that inflammatory suggestion, asserting only that Bailey "has reason to believe" that Media Matters has somehow violated Missouri law. *Id.* ¶ 22. The Petition, echoing Bailey's press releases, describes Media Matters and its employees as "radical 'progressives" who are "attempt[ing] to destroy X, because they cannot control it," and as "activists masquerading as [a] news outlet[]."*Id.* at 2.

The Petition indicates that Bailey intends to rely upon his authority under the Missouri Merchandising Practices Act ("MMPA") as the basis for issuing and enforcing the Demand. *Id.* ¶¶ 13–14, 16, 22–24; *see also* ECF No. 39-7 (accusing Media Matters of acting in direct violation of the Missouri Merchandising Practices Act). Specifically, Bailey's Petition alleges that "Media Matters has engaged in trade or commerce [in Missouri] within the meaning" of the MMPA. ECF No. 39-6 ¶ 11. But Media Matters indisputably engages in no "trade or commerce" in Missouri. *See* Second Padera Decl. ¶¶17–25. The Missouri Supreme Court has made clear that the relevant portion of the MMPA applies only to "the protection of consumers who are the actual buyers in a sale." *Ports Petroleum Co. of Ohio v. Nixon*, 37 S.W.3d 237, 241 (Mo. 2001). Media Matters makes no "sales" and has no "actual buyers" in Missouri or elsewhere. *See* Second Padera Decl. ¶ 23. Bailey's choice to invoke authority under a law that, on its face, has no possible application to Media Matters further demonstrates that his conduct is not for any real investigative purpose, but instead is aimed at harassing and retaliating against Media Matters.

On April 15, 2024, the return date for the Missouri Demand, Media Matters replied to the Demand in a letter objecting to it in full. ECF No. 39-8. In that letter, Media Matters informed Bailey of this Court's granting of a preliminary injunction against Paxton's Texas Demand and requested that Bailey withdraw the Missouri Demand. *Id.* at 2. Bailey refused to withdraw the Demand in an email sent by one of his deputies on April 17, 2024. ECF No. 39-9. That email failed to explain the basis for Bailey's purported jurisdiction over Media Matters, nor did it acknowledge—let alone distinguish—this Court's preliminary injunction against Paxton's "virtually identical" Demand. *Id.* The only thing made clear by the email is that Bailey intends to proceed with his investigation and attempts to enforce the Missouri Demand regardless of this Court's preliminary injunction order against Paxton.

14

Plaintiffs moved for leave to file a supplemental complaint naming Bailey as an additional defendant on April 18, 2024. *See* ECF No. 39. This Court granted leave to file the supplemental complaint on April 24. *See* ECF No. 44.

Less than 24 hours after Plaintiffs sought leave to add him to this action, Bailey escalated matters further, serving Media Matters with Requests for Production that sweep as far as the Demand itself. Ex. 3, State's First Requests for Production to Respondent, *Missouri ex rel. Bailey v. Media Matters for Am.*, No. 24AC-CC02291 (Cir. Ct. Cole Cnty Apr. 19, 2024). Bailey has not bothered trying to justify his entitlement to discovery into the *substance* of the Demand in an action filed to determine whether the Demand is *enforceable*. Bailey's view appears to be that he may short-circuit procedural norms at will: He may issue a Demand without any plausible allegation that Media Matters has violated Missouri law, file to enforce that Demand within a few minutes of dropping it at the post office, then use discovery in the enforcement action as a stalking horse to get everything sought by the Demand.

## V.   Bailey's actions have chilled Plaintiffs' First Amendment–protected activities by subjecting them to a retaliatory investigation in a foreign jurisdiction.

In granting the preliminary injunction against Paxton, the Court credited Plaintiffs' undisputed evidence of substantial chill, finding that "Plaintiffs are *already* suffering First Amendment harm in the form of chilled protected activities." PI Op. at 39 (emphasis in original); *see also id.* at 31 ("Through sworn affidavits, Plaintiffs have demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission."). The Missouri Demand and Petition have served their intended purpose, to magnify and compound that chill. *See* Third Hananoki Decl. ¶¶ 6–14; Second Padera Decl. ¶¶ 10–16; Ex. 4, Supplemental Declaration of Benjamin Dimiero ("Second Dimiero Decl.") ¶¶ 4–9. That effect is no surprise: Bailey himself has admitted that he is coordinating his "war" on Media Matters with Paxton and considers Media

Matters to be a weapon of "the enemy." Third Hananoki Decl. ¶ 5. And Paxton expressly encouraged other Attorneys General to follow his lead, *see* Compl. ¶ 51, which Bailey has now done. In fact, Bailey has gone even further: The Missouri Demand, unlike the Texas Demand, is the subject of a pending enforcement action. It therefore represents a significant escalation. Moving to enforce creates an imminent possibility that Plaintiffs will be coerced into granting Bailey access to Plaintiffs' most sensitive papers.

Bailey's enforcement action is also in a foreign venue with which neither Media Matters nor Hananoki has any ties. Media Matters is not registered as a foreign corporation in Missouri because it does not "transact business" in Missouri. Mo. Rev. Stat. § 351.572; *see* Second Padera Decl. ¶ 19. Nor does it have a registered agent in Missouri. Second Padera Decl. ¶ 21. Further, Media Matters is not engaged in "the sale or advertisement of any merchandise in trade or commerce" in Missouri. Mo. Rev. Stat. § 407.020; *see* Second Padera Decl. ¶ 23. Nor is it targeting any "solicitation of any funds for any charitable purpose" at Missouri. Mo. Rev. Stat §§ 407.020, .453; *see* Second Padera Decl. ¶¶ 24–25. Indeed, it is not even registered as a charity in Missouri because nearly two decades ago the Missouri Attorney General's Office itself concluded Media Matters was exempt from registration. ECF No. 39-11; *see also* Second Padera Decl. ¶ 20. Media Matters has never employed anyone in Missouri and has no physical presence in the state. Second Padera Decl. ¶¶ 18, 22.  And Hananoki's reporting involved no contact with Missouri. Third Hananoki Decl. ¶ 8. Despite these readily ascertainable facts, Bailey's Petition seeking to enforce the Missouri Demand flatly asserts without support that "Media Matters transacts business in this county [*i.e.*, Cole County, Bailey's home jurisdiction]." ECF No. 39-6 ¶ 5.

**LEGAL STANDARD**

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a temporary restraining order or preliminary injunction is sought against the government, the last two requirements merge, "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). The requirements for a preliminary injunction and for a temporary restraining order are the same. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

**ARGUMENT**

**I.    This Court has personal jurisdiction over Bailey in his official capacity as Attorney General of Missouri.**

**A.    The Court has long-arm jurisdiction over Bailey.**

The Court has statutory long-arm jurisdiction over Bailey under the same analysis it has already applied to Paxton. *See* PI Op. at 12–28. To begin, Bailey is a "person" under D.C. Code § 13-421. As the Court has already recognized, the D.C. civil-jurisdiction law's definition of "person" incorporates "the *Ex parte Young* legal fiction, which permits suits against a state official when the relief sought is to enjoin a constitutional violation." PI Op. at 12; *see also Ex parte Young*, 209 U.S. 123, 159–60 (1908). When Congress enacted § 13-421 in 1970, it would have understood "that the term 'person' included official-capacity defendants in suits involving injunctive relief." PI Op. at 13 (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010)). Indeed, following analogous reasoning, the Supreme Court has imported the "longstanding *Ex Parte Young* fiction

into its reading of § 1983." *Id.* at 14 (citing *Will v. Mich Dep't of State Pol.*, 491 U.S. 58, 71 n.10 (1989)). And if "the post-Civil War Congress that enacted § 1983 would have understood the term 'person' to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well." *Id.* When they are sued for injunctive relief under the Constitution, state attorneys general—including Bailey—are therefore "persons" for purposes of § 13-421.[12]

The Court may exercise long-arm jurisdiction over Bailey under both D.C. Code § 13-423(a)(1) and (a)(3). That statute provides, in relevant part, that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's: (1) transacting any business in the District of Columbia; [or] (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]"[13]

---

[12] As the Court recognized, a contrary reading of "person" would "upend years of settled jurisdictional understanding and significantly constrain plaintiffs' ability to sue federal officials for injunctive relief" in D.C. federal court. PI Op. at 14. That's so because the term "person" underpins the D.C. Code's general jurisdiction provision, not just its long-arm statute. *Id.*; *see also* D.C. Code § 13-422. Affected categories of cases would include those against "non-resident federal officials who maintain their primary place of business in the District," against "non-resident WMATA official[s]," and against "federal officials acting under color of D.C. law." PI Op. at 14–15 (collecting cases). Reading the term "person" to foreclose such cases would "produce 'absurd results.'" *Id.* at 15 (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)). The Court properly declined Paxton's invitation to "read District of Columbia law in a way that would cast doubt on decades of federal court practice and jurisdictional reach." *Id.* at 16.

[13] The Court likely has long-arm jurisdiction over Bailey under subsection (a)(4) as well, as Bailey "regularly . . . engages in [a] persistent course of conduct" in the District in his official capacity as Missouri Attorney General. *See, e.g.*, *Ohio v. EPA*, No. 22-1081, 2024 WL 1515001 (D.C. Cir. Apr. 9, 2024). But for present purposes, subsections (a)(1) and (a)(3) suffice to establish the Court's jurisdiction. *See* PI Op. at 19 (declining to reach subsection (a)(4) after finding jurisdiction proper with respect to Paxton under subsections (a)(1) and (a)(3)).

*Subsection (a)(1) – Transacting business in D.C.*   Bailey is subject to this Court's jurisdiction, for starters, because he has transacted business in D.C. and that business gave rise to Plaintiffs' claims. The "transacting business" prong extends to the limits of the Due Process Clause, so the statutory and constitutional analyses "merge into a single inquiry." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). The Due Process Clause is satisfied—and with it, subsection (a)(1)—if the defendant has "minimum contacts" with the forum such that the defendant "should reasonably anticipate being haled into court there." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagon Corp v. Woodson*, 444 U.S. 287, 297 (1980)). "Such minimum contacts must show that 'the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see also* PI Op. at 19. "It is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted).[14]

Bailey has invoked the benefits and protections of the District's laws in at least two discrete ways. *First*, Bailey caused his abusive enforcement petition to be served upon Media Matters in the District by retaining and directing the activities of a professional process server in the District. As this Court held with respect to Paxton, and as many other courts have concluded, "the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the 'minimum contacts' requirement." PI Op. at 20 (citing *Schleit v. Warren*, 693 F. Supp. 416, 419–20 (E.D. Va.

---

[14] As the Court concluded with respect to Paxton, jurisdiction under subsection (a)(1) is not limited to "only strictly commercial activity." PI Op. at 23.

1988); *Balsly v. W. Mich. Debt Collections, Inc.*, No. 11-cv-642, 2012 WL 628490, at *5–7 (E.D. Va. Feb. 27, 2012); and *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981)). As these cases recognize, it is "reasonable to conclude that a lawyer who knowingly serves abusive process in a jurisdiction . . . is 'purposely avail[ing] himself of the privilege of conducting activities within the forum State.'" *Schleit*, 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)). Bailey's "hiring of a process server in the District of Columbia to effect service on Media Matters therefore created the requisite jurisdictional contacts with the District." PI Op. at 20 (citing *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982)).

*Second*, Bailey's Demand, service of the Demand, and premature attempt to enforce the Demand established a "course of dealing with a D.C. resident." PI Op. at 20. Bailey knew that the Demand "would require negotiations with Media Matters' counsel," who are based in the District. *Id.* at 21. So, too, would bringing a premature enforcement action and serving improper and retaliatory discovery. And although Bailey's Demand purports to require Plaintiffs to comply "in person or via mail" in "Jefferson City, Missouri," ECF No. 39-5 at 4, the statute on which Bailey relies limits productions for inspection to "reasonable time[s] and place[s]," Mo. Rev. Stat. § 407.040. Bailey cites no authority for the unintuitive proposition that Jefferson City is a "reasonable place" for inspecting the sensitive records of a Washington, D.C.–headquartered media organization with no relevant ties to Missouri at all, never mind to Jefferson City. Bailey therefore knew or should have known that if Media Matters elected to comply with parts of his Demand, his agents would likely need to travel to the District of Columbia to conduct such inspection. *Cf.* PI Op. at 21 (citing Tex. Bus. & Com. Code § 17.61(e)).

As with the claims against Paxton, "[t]he Fifth Circuit's decision in *Grewal* provides a close analogy to this case." PI Op. at 21. *Grewal* concerned the jurisdictional effects of the New Jersey Attorney General's sending a letter threatening action if a Texas business published certain files related to the 3D printing of firearms. *Def. Distrib. v. Grewal*, 971 F.3d 485, 488–89 (5th Cir. 2020). The Fifth Circuit concluded that the letter created sufficient minimum contacts with the State of Texas because the Attorney General "sought not merely to enforce New Jersey law but 'halt the company's activity nationwide, including activity that had no connection to New Jersey property or residents.'" PI Op. at 21–22 (quoting *Bulkley & Assocs., LLC v. Dep't of Indus. Rels. Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 353–54 (5th Cir. 2021)) (alteration accepted). The court in *Grewal* explained that Texas courts had jurisdiction because the New Jersey Attorney General's actions had created a chilling effect felt in Texas, reducing "Texans' access to materials" the Texas company sought "to publish." *Grewal*, 971 F.3d at 495. Similarly, here, Bailey's issuance of the Demand, filing and service of the enforcement Petition, and issuance of abusive discovery all have chilled Media Matters in D.C., and have thereby "deprived D.C. residents [of] access to Plaintiffs' reporting." PI Op. at 22. "Thus, like the New Jersey Attorney General in *Grewal*, [Bailey] 'projected himself across state lines and asserted a pseudo-national executive authority' that makes exercising jurisdiction over him reasonable and does not offend principles of federalism. *Id.* (quoting *Grewal*, 971 F.3d at 493). He did so, moreover, after Paxton "call[ed] upon other Attorneys General to investigate Media Matters." *Id.* Bailey's and Paxton's abuses of authority go hand in hand and are both subject to this Court's jurisdiction under the "transacting business" prong of the D.C. long-arm statute.

Finally, Plaintiffs' claims for relief plainly "aris[e] from," D.C. Code § 13-423(b), Bailey's transacting of business in the District, *see* PI Op. at 19 n.6 (noting that Paxton did not bother to

21

dispute this point). This requirement is interpreted "flexibly and synonymously with 'relate to' or having a 'substantial connection with.'" *Shoppers Food Wearhouse v. Moreno*, 746 A.2d 320, 335 (D.C. 2000). Plaintiffs' claims against Bailey plainly have a substantial connection with his hiring of a process server and directing of that agent's activities in the District, a necessary step for Bailey to enforce his Demand. And Plaintiffs' claims similarly arise from the Demand itself and the course of dealing within the District it necessitates.

*Subsection (a)(3) – Causing tortious injury by act or omission in D.C.* Separately, Bailey is subject to this Court's jurisdiction because he has caused tortious injury to Plaintiffs by acts taken within the District. As with Paxton, application of this provision is "straightforward," because Bailey's "service of process, through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests." PI Op. at 25–26. In the tort context, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious[] actions' 'expressly aimed' at a jurisdiction," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)), and the effects of those actions in the District of Columbia are not "some 'fortuitous' or 'unilateral' choice of the plaintiff's," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). That is the case here, as the service of the Petition is the action currently causing most of Plaintiffs' chill—it has created an imminent threat that Plaintiffs will be forced to turn over the materials Bailey seeks in the Demand. Although a process server served the petition on Bailey's behalf, the process server's in-forum acts are imputed to Bailey by virtue of the agency relationship. PI Op. at 26 (citing D.C. Code § 13-423(a)). As many courts have recognized, "if an out-of-state defendant causes abusive process to be served upon an in-state plaintiff, and the plaintiff subsequently sues the defendant in plaintiff's state," then

"personal jurisdiction exists over the out-of-state defendant." *Vishay Intertech., Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982); *see also* PI Op. at 27 (collecting cases). So too here.

**B.     The Court has constitutional personal jurisdiction over Bailey.**

For constitutional purposes, specific personal jurisdiction exists where (i) the defendant has "purposefully directed" activity at residents of the forum and (ii) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Rudzewicz*, 471 U.S. at 475).

This Court has at least three related bases to exercise jurisdiction over Bailey consistent with the demands of due process. First, Bailey has repeatedly entered the District of Columbia for purposes of his investigation, both by using a common carrier to physically deliver the Demand to Media Matters's headquarters, and then by procuring the service of an agent—a process server— and directing that agent to enter the District of Columbia to serve the Petition upon Media Matters. It is well-settled that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person *or through an agent*, goods, *mail*, or some other means—is certainly a relevant contact" for purposes of personal jurisdiction. *Fiore*, 571 U.S. at 285 (emphases added) (citation omitted); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). The Court therefore has constitutional personal jurisdiction over Bailey for all the same reasons it has statutory personal jurisdiction under the "transacting business" prong of the D.C. long-arm statute. *See supra* Section I.A.

Second, Bailey's Demand seeks numerous categories of documents that he had reason to believe would be located primarily in the District, where Media Matters is headquartered. By demanding reams of documents stored, and in many cases created, in the District, Bailey has unquestionably "directed" activity at the District. Plaintiffs' claims, in turn, "are based on" Bailey's Demand and steps to enforce it. *Grewal*, 971 F.3d at 492.

Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. In intentional-tort cases, specific jurisdiction exists where the defendant has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007); *see also Calder*, 465 U.S. at 788–89. Here, jurisdiction is proper because Bailey has intentionally served a Demand and enforcement Petition on Media Matters in the District, causing a substantial and predictable chill to Media Matters. *See infra* Section II.A.

Again, the Fifth Circuit's decision in *Grewal* is directly on point. The court held there that the Attorney General of New Jersey had purposefully availed himself of Texas by issuing a cease-and-desist letter to a Texas company in Texas, thereby "project[ing] himself across state lines and assert[ing] a pseudo-national executive authority." 971 F.3d at 493. The plaintiffs in *Grewal* plausibly alleged the "letter had a chilling effect on the exercise of their First Amendment rights," which, "in turn, caused them to cease publication." *Id.* at 495. As the Fifth Circuit explained, "*this alone constitutes purposeful availment*" because "[t]he defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* at 493–94 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)) (emphasis added). That is precisely the case here.

**II.      Media Matters and Hananoki are likely to prevail on the merits of their claims.**

**A.      Plaintiffs are likely to establish that Bailey retaliated against their constitutionally protected activities in violation of the First Amendment.**

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id.* at 256 (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). It is "obvious" that efforts "to punish political speech by members of the press . . . run afoul of the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999). The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable" because "'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To prevail on their retaliation claim, Plaintiffs must show that "(1) [they] engaged in conduct protected under the First Amendment; (2) [Bailey] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs are likely to prove each of these elements and prevail on the merits of their first claim. A declaratory judgment and injunctive relief are appropriate remedies for First Amendment injury. *See* 28 U.S.C. §§ 2201, 2202; *Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*, 64 F.4th 1354, 1366–67 (2023); *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

1.   **Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities.**

Media Matters is a nonprofit media watchdog group that provides journalistic research and investigative reporting on political extremism. Hananoki is a senior investigative reporter for Media Matters who covers political extremism, including extensive coverage of X's ongoing placement of advertisements on racist, antisemitic, and violent accounts on the X platform. Plaintiffs routinely investigate, publish, report, and comment on political extremism in American media, including on platforms like X. In particular, since Musk purchased X in October 2022, the platform has permitted advertisements to appear next to accounts that promote racist, antisemitic, and violent content. *See supra* Background, Section I. This development has been covered extensively, and not only by Plaintiffs. *See supra* Background, Section II. And X and Musk have invited this scrutiny by repeatedly framing X as the "digital town square" for public debate. *See supra* Background, Section I.

Plaintiffs' journalistic pursuits—about topics of public concern and discussion—are at the core of our First Amendment freedoms. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves not only the news media itself, but society at large: "A broadly defined freedom of the press assures the maintenance of our political system and an open society," *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). A free press is foundational to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 269–70 (explaining such "freedom of expression upon public questions is secured by the First Amendment"). Thus, as the Court has already determined with respect to Paxton, PI Op. at 35, Plaintiffs' reporting about X and Musk is unequivocally protected

by the First Amendment. "Speech on matters of public concern is at the heart of the First Amendment's protection." *Id.* at 35–36 (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)).

### 2. Bailey's retaliatory conduct has compounded the chill Plaintiffs suffered because of Paxton's similar conduct.

Bailey, through his investigation and Demand, has taken "action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258. The "cause of action targets conduct that tends to *chill* [First Amendment] activity, not just conduct that *freezes* it completely." *Constantine v. Rectors & Visitors of George Mason Univ,* 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original). Though not dispositive, Plaintiffs' "actual response" to the retaliatory conduct "'provides some evidence of the tendency of that conduct to chill First Amendment activity.'" *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine*, 411 F.3d at 500. Plaintiffs are not required to "prove that the allegedly retaliatory conduct caused [them] to cease First Amendment activity altogether." *Constantine,* 411 F.3d at 500. It is sufficient to show—as Plaintiffs do—that Bailey's retaliatory acts would chill the First Amendment activity of similarly situated individuals and organizations of ordinary firmness.

The Court must "conduct this inquiry on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023). Here, as the result of their reporting about a company organized under Nevada law with its principal place of business in California, a non-profit news organization headquartered in Washington, D.C.— with most of its employees, including Hananoki, working within the Washington, D.C. metropolitan area—has been made subject to an investigation in Missouri seeking highly sensitive material regarding its funding, expenditures, organizational structure, communications with sources, and internal discussion of news stories. The investigation was initiated by the Missouri Attorney General without any showing that Plaintiffs violated that state's law or are even subject

to its jurisdiction. Plaintiffs had *no* reasonable expectation of ever being subject to investigation by the Missouri Attorney General, never mind under the state's Merchandising Practices Act—Media Matters is a non-profit media organization, does not engage in trade or commerce with consumers, and neither it nor Hananoki has any relevant connection to the state of Missouri. Second Padera Decl. ¶¶ 17–25; Third Hananoki Decl. ¶ 8. Despite the plain lack of jurisdictional nexus, Bailey demands Plaintiffs turn over their most sensitive journalistic and organizational documents.

Bailey's explicit retaliation against Plaintiffs for news coverage and reporting would plainly "deter a person of ordinary firmness in plaintiff's position from speaking again," *Aref*, 833 F.3d at 258, particularly when paired with Bailey's constant stream of vitriol and solicitation of other state officials to join his retaliatory "war" on Media Matters. Indeed, the mere "*threat* of invoking legal sanctions and other means of coercion, persuasion, and intimidation" can be sufficient to tend to chill protected speech. *Playboy Enters. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing First Amendment harm from the "threat of administrative and judicial intrusion into the newsgathering and editorial process"). Here, Bailey's threats are backed up by the many enforcement powers he enjoys by virtue of his elected office—including, in particular, powers related to the enforcement of civil investigative demands. *See, e.g.*, Mo. Rev. Stat. § 407.080; *cf.* PI Op. at 36–37.

And Bailey's conduct has already moved well beyond threats; after issuing the Demand, he filed an extremely premature action to enforce it and has now served Media Matters with abusive discovery. Courts have, naturally, found that the actual commencement of a threatened investigation constitutes actionable retaliation. Indeed, the Fourth Circuit found a plaintiff's speech

chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to modify what content he could put on his website—actions that pale in comparison with Bailey's conduct here. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013). "A person of ordinary firmness would surely feel a chilling effect" under such circumstances. *Id.*; *see also White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them"). Similarly, courts have recognized the "chilling effect" of haling a party into a jurisdiction with which it has limited contacts. *See, e.g.*, *Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 917 (D. Md. 2008), *aff'd sub nom. Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012).

Finally, although not dispositive, Plaintiffs' speech has been chilled by Bailey's conduct. *See Hartley*, 918 F. Supp. 2d at 53; *Cooksey*, 721 F.3d at 236 (finding plaintiff had "sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020). Hananoki indicates that "Bailey's Demand, Petition, and his aggressive public statements about Media Matters" all have had "an extremely negative effect" on his journalistic work. Third Hananoki Decl. ¶ 10. Hananoki perceives Bailey's retaliation to be "even more aggressive" than Paxton's, and has continued to curtail his "investigative reporting and to self-censor in researching and drafting new articles" in response. *Id.* ¶¶ 10, 12. For instance, even though other news outlets, such as NBC News, have published follow-on investigations building on Hananoki's 2023 reporting on X, Hananoki himself has been unable to do so. *Id.* ¶¶

13–14. Similarly, Media Matters Editor-in-Chief Ben Dimiero attests that Paxton's actions had "stifled" Media Matters's "editorial process," and that Bailey's "are now contributing to and compounding that negative impact and disruption." Second Dimiero Decl. ¶ 5. Dimiero describes "a persisting sense on [Media Matters's] editorial team and in [its] organization that we must proceed extremely cautiously with our journalism or else face further legal retaliation that threatens our ability to operate." *Id.* ¶ 6. And he indicates that Bailey's investigation has "slowed [Media Matters's] output and hampered [its] ability to promptly publish coverage of emerging stories and topics." *Id.* ¶ 7; *see also id.* ¶¶ 8–9.

### 3. Bailey's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities.

Plaintiffs' commentary and reporting on X, and in particular Hananoki's November 16 article discussing Musk's apparent endorsement of an antisemitic conspiracy theory, caused Bailey's investigation. Bailey, like Paxton, first showed interest in Media Matters when Stephen Miller implied that some of the "2 dozen+ conservative state Attorneys General" should retaliate against Media Matters on Musk's behalf—Bailey's tweet that his "team" was "looking into" Media Matters was a direct response to Miller. *Supra* Background, Sections IV, V. And as with Paxton, Bailey's "initial press release establishes that [he] opened an investigation of Media Matters in response to its protected media activities." PI Op. at 37–38. In his December press release announcing his investigation, Bailey labeled Media Matters "[r]adicals" and "progressive tyrants" and accused them of "attempting to kill Twitter because they cannot control it." ECF No. 39-4 at 4. In interviews in the following days, he called Media Matters "a radical, progressive, tyrannical advocacy group masquerading as a news outlet" and a weapon of "the enemy." Third Hananoki Decl. ¶ 5 (collecting interviews). By Bailey's own account, he is "coordinating with Texas," and "other states as well" to fight what he sees as the "new front in the war." *Id.* Bailey continued to

employ similarly charged language in his press release announcing the Demand and even in his enforcement Petition—a formal court filing. *See* ECF No. 39-7 at 4; ECF No. 39-6 at 3. His Petition, for instance, calls Media Matters a "political activist organization" and calls X "one of the last platforms dedicated to free speech in America." ECF No. 39-6 at 2. This is not the neutral and cautious language of a sincere, impartial investigation. As this Court put it, Bailey "has followed [Paxton's] lead," PI Op. at 5 n.3—including with respect to his motives driving his so-called investigation.

The Demand's substance also confirms that Bailey's retaliatory conduct is motivated by Plaintiffs' coverage of X and Musk. It demands that Plaintiffs turn over "[a]ll communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X"; "[a]ll documents discussing Elon Musk's purchase of X"; "[a]ll documents related to the article, or to the events described in the article, by Eric Hananoki entitled 'As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content'"; and various documents and communications related to Media Matters's and Hananoki's research into X and communications with X advertisers. ECF No. 39-5 at 4–5. These demands reflect Bailey's desire to rifle through Plaintiffs' files concerning their news coverage and reporting.

In short, as with Paxton, there is no serious dispute that but for Plaintiffs' constitutionally protected reporting on X, Bailey would not have launched his retaliatory investigation, issued his Demand, or filed and served his enforcement Petition. On that basis, Plaintiffs will show "a causal link between the exercise of a constitutional right and the adverse action." *Aref*, 833 F.3d at 258; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

Plaintiffs are therefore likely to prevail on their claim for unlawful retaliation.

**B.**  **Plaintiffs are likely to establish that Bailey's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws.**

Plaintiffs' First Amendment retaliation claim, on its own, is sufficient to warrant a temporary restraining order and preliminary injunction. But Plaintiffs also face other imminent harms, captured by their other claims, that separately warrant immediate relief.

1.  ***Constitutional Claims***. Attorney General Bailey has demanded that Plaintiffs turn over a trove of their most sensitive documents and has sued them in Missouri in an attempt to force compliance. Bailey's wide-ranging Demand touches upon nearly every part of Media Matters's operations, including its organizational and employee structure; its use of "solicited donations"; its "operational expenses"; its "communications," both "internal and external," about strategy, operations, articles, research, and matters of public concern; its social media accounts on X; and its communications with employees at X and X's advertisers (including potential sources). ECF No. 39-5 at 4. Plaintiffs are likely to show this intrusive Demand violates both the First and Fourth Amendments.

The Fourth Amendment limits the scope of administrative subpoenas. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment guards Plaintiffs from the compelled disclosure of materials that would chill their constitutional rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010); *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment"). These twin constitutional guarantees often overlap; thus, where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added). "No

less a standard could be faithful to First Amendment freedoms." *Stanford,* 379 U.S. at 485. That is especially true where, as here, no cause has been shown before demanding documents—such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants,* 367 U.S. 717, 729 (1961).

Bailey's Demand seeks to pry into matters protected by the First Amendment and shows no trace of "scrupulous exactitude." *Stanford*, 379 U.S. at 485. Instead, it broadly seeks information about Plaintiffs' donors, sources of funding, and expenditures in a manner designed to chill Plaintiffs' speech and press activities. ECF No. 39-5 at 3–4. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a . . . right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The First Amendment thus "prohibit[s] . . . compelled disclosure" of documents about an organization's associational activities—including the compelled disclosures about members and donors—absent compliance with "exacting scrutiny." *Id.* at 2382–83, 2386 (holding California violated First Amendment by requiring disclosure of "donors' names and the total contributions" to charitable organization); *see also NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (membership lists); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (campaign contributions); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (identities of employees and volunteers). Bailey has failed to demonstrate the "exacting scrutiny" and "scrupulous exactitude" required to obtain these types of materials. "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). This Court has the power to enjoin enforcement of such a constitutionally infirm subpoena. *See*

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 274 (2d Cir. 1981).

The Demand is also infirm because it seeks journalistic materials that are afforded significant constitutional protection. Bailey may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through his search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Bailey has not satisfied any such standard here, yet nonetheless seeks categories of notes and files on draft articles and communications with potential sources—clearly protected materials. *See Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"). The Demand is not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship*, 310 F.R.D. at 582 (quashing subpoena). Fundamentally, Bailey's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187–88 (11th Cir. 2003) (concluding that CID violated Fourth Amendment and "that an investigation predicated solely upon legal activity does not pass muster under *any* standard"). And there is no question that Bailey means to enforce his Demand, because he has already taken steps to do so.

Plaintiffs are therefore likely to prevail on their claim that the Demand and Petition amount to an unlawful fishing expedition in violation of the First and Fourth Amendments.

    ***D.C. & Maryland Shield Laws***. The Missouri Demand seeks information protected by the District of Columbia's shield law. D.C. Code §§ 16-4702, -4703. The D.C. shield law provides absolute protection against compelled disclosure of sources, *id.* § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp*., 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702. The Demand also seeks information protected by Maryland's analogous shield law. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(1), (c)(2). The shield laws are grounds to quash or limit a subpoena. *Grunseth*, 868 F. Supp. at 336–37 (quashing subpoenas under the D.C. shield law); *see also Equitable Tr. Co. v. State Comm'n on Human Relations*, 411 A.2d 86, 99 (Md. 1980) ("It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." (quoting *Fed. Trade Comm'n v. Texaco, Inc.*, 517 F.2d 137, 149–50 (D.C. Cir. 1975)); *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1 (Md. Cir. Ct. Apr. 20, 1994) (quashing subpoena even where qualified disclosure test met).

    Permitting attorneys general like Bailey to skirt another state's shield laws by misusing their statutory authority to issue administrative subpoenas violates basic principles of federalism and would make a mockery of state shield laws. The District of Columbia and Maryland both have a profound interest in protecting their residents from being made to answer outside their home jurisdictions—by states that obviously lack personal jurisdiction over such residents—and made to divulge documents protected by D.C. and Maryland law. Missouri may not "enact [] a policy

for the entire Nation" by issuing CIDs that trample over another state's shield laws and deprive foreign residents of the benefits of such laws. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

Plaintiffs are therefore likely to prevail on their claim under the D.C. and Maryland shield laws.

### C.   Plaintiffs are likely to establish that the legal process against them in Missouri violates due process due to a lack of contact with that state.

The Due Process Clause of the Fourteenth Amendment "recognizes and protects an individual liberty interest" against being subjected to legal process in a jurisdiction with which one lacks meaningful contact. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Simply put, due process guards against forcing parties like Plaintiffs to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers*, 582 U.S. at 263. Such arbitrary imposition of a "State's coercive power" is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Plaintiffs are likely to show that they are not within the personal jurisdiction of Missouri, and thus not lawfully subject to Bailey's retaliatory investigation and attempts to coerce compliance with that investigation in Missouri state court.

Two flavors of personal jurisdiction exist: general and specific. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021) (citing *Goodyear*, 564 U.S. at 919). Plaintiffs are plainly not subject to general jurisdiction in Missouri—neither is domiciled or "fairly regarded as at home" in Missouri. *Goodyear*, 564 U.S. at 924; *see supra* Background, Section V.

Specific jurisdiction is lacking as well. Such jurisdiction requires "an affiliation[n] between the forum and the underlying controversy, principally, [an] activity . . . that takes place in the forum

State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (first alteration in original). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark' for exercising personal jurisdiction." *Rudzewicz*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297). The controversy here arises out of Plaintiffs' reporting and publishing on political extremism on X—work that occurred exclusively in D.C. and Maryland. No element of this work occurred in Missouri, required interaction with Missouri, or was purposefully directed towards—or intended to have an effect—in Missouri. *See* Second Padera Decl. ¶¶ 17–25; Third Hananoki Decl. ¶ 8. Indeed, Media Matters is exempt even from registering in Missouri, as Bailey's own office long ago acknowledged. ECF No. 39-11. Bailey's actions alone are what connects Plaintiffs to Missouri, but Bailey "cannot be the only link between" his chosen forum and Plaintiffs—"[r]ather, it is [Plaintiffs'] conduct that must form the necessary connection with the forum State" for that state to exercise jurisdiction. *Fiore*, 571 U.S. at 285.

Plaintiffs are likely to prevail on their claim that Bailey's investigation and  premature attempt to enforce his Demand in state court violate due process.

## III.    Plaintiffs will suffer irreparable harm absent an order restraining Bailey's investigation and efforts to enforce his Demand.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." PI Op. at 38 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 511). In granting Plaintiffs a preliminary injunction against Paxton, this Court credited Plaintiffs evidence that Paxton's CID had cause them "to self-censor when making research and publication decisions, adversely affected the relationships between editors and reporters, and restricted

communications with sources and journalists." *Id.* Bailey's Demand and Petition, which arrived on Media Matters's doorstep shortly before this Court's order (and likely in anticipation of it, as a failsafe for getting at Plaintiffs' sensitive and privileged materials), has perpetuated and will continue to inflict those injuries absent this Court's intervention. *See* Third Hananoki Decl. ¶¶ 6–14; Second Padera Decl. ¶¶ 10–16; Second Dimiero Decl. ¶¶ 4–9; *see also supra* Background, Section V. And Bailey's service of abusive discovery in Missouri confirms what was already plain to see from his Demand and Petition: Plaintiffs' option to defend their rights in a foreign forum with which they have no meaningful ties does not cure or even significantly mitigate their injury. The Court should not let Paxton and Bailey—who, according to Bailey, are coordinating with one another—circumvent this Court's orders by means of sequencing tricks.

## IV.   The remaining equitable factors strongly favor granting preliminary relief.

The remaining equitable factors favor Plaintiffs. Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest" (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))). "The public's interest in protecting First Amendment rights" is beyond dispute: "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" state action. *Pursuing Am.'s Greatness*, 831 F.3d at 511–12. That interest is heightened where, as here, First Amendment protections serve both Plaintiffs and the general public; "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up). Granting temporary relief will ensure that Plaintiffs may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and

further serves the public interest against government fishing expeditions, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see also Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015) ("Given . . . that plaintiffs are likely to succeed on the merits of their Fourth Amendment claim, the public interest weighs heavily in their favor.").

In contrast, granting preliminary relief will not harm Bailey. Because his investigation lacks any legitimate basis or connection to Missouri, he lacks any legitimate interest in continuing his investigation. Bailey "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a temporary restraining order and a preliminary injunction. A proposed temporary restraining order is filed herewith.

Dated: April 25, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Christopher D. Dodge (DC 90011587)
Elena A. Rodriguez Armenta* (DC 90018798)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
cdodge@elias.law
erodriguezarmenta@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed (DC 500630)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch